UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| ANGELA CLARK, KENNETH CLARK, | ) | |
| BRANDON HULSE, DIANE SAMELSON, | ) | |
| KRISTINA ATWOOD, BRIGETTE WOLFE, | ) | No. 10-301 |
| and JOSEPH WOLFE, individually and on | ) | |
| behalf of all others similarly situated, | ) | CLASS ACTION COMPLAINT |
| | ) | |
| Plaintiffs; | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE PROCTER & GAMBLE COMPANY; | ) | |
| THE PROCTER & GAMBLE PAPER | ) | |
| PRODUCTS COMPANY and THE PROCTER | ) | |
| & GAMBLE DISTRIBUTING LLC, | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiffs Angela Clark, Kenneth Clark, Brandon Hulse, Diane Samelson, Kristina

Atwood, Brigette Wolfe, and Joseph Wolfe, individually and on behalf of all others similarly

situated, allege the following based upon information and belief, and upon the investigation of

counsel:

## I.    INTRODUCTION

1.      This class action is brought by Plaintiffs ("Class Representatives") individually

and on behalf of all purchasers ("Class Members") of Pampers brand diapers or "Easy Ups"

containing Pampers' "Dry Max" technology including, but not limited to, products labeled as Swaddlers or Cruisers diapers, hereinafter ("Pampers").  The Pampers were manufactured, marketed, distributed, promoted, and/or sold by Defendants The Procter & Gamble Company ("P&G"); The Procter & Gamble Paper Products Company ("P&G Paper"); and/or The Procter & Gamble Distributing LLC ("P&G Distributing") (collectively, "P&G Companies" or "Defendants").  On information and belief, P&G Companies first offered the Pampers with Dry Max for sale in the U.S. market on or about March 1, 2010, but, on information and belief, P&G Companies began placing some of the new Dry Max diapers into prior packaging as early as the fall of 2009.[1]

2.      Although P&G Companies represented that the Pampers they made, marketed, distributed, promoted and/or sold were safe for premature babies ("preemies"), newborns, older babies, and toddlers (collectively, "babies"), the Pampers actually had the capacity to and, in many cases, did actually harm the babies by causing severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments, on babies' and children's extremely sensitive and delicate bottoms and other body parts that the Pampers were supposed to cover and to protect.  P&G Companies knew or should have known that the Pampers were not the safe, gentle, and healthful products that P&G Companies represented them to be. Instead, the Pampers not only harmed or potentially harmed the Plaintiffs' preemies, newborns, older babies, and toddlers, but they also were rendered useless to Plaintiffs and Class Members because they failed to perform as P&G Companies promised and represented in its advertisements and packaging representations.

---

[1] Jessica Wohl, "U.S. Safety Agency Looking into P&G's New Pampers," Reuters, May 5, 2010 (*available at* http://www.reuters.com/assets/print?aid=USTRE6444RW20100505 (last accessed May 10, 2010)).

3.      Preemies, newborns, older babies, and toddlers are especially sensitive and vulnerable to skin irritation.  As described in a recent study by Italian scientists, "The absorption of substances in contact with the skin is greater in newborns and infants for three reasons: 1) their skin is thinner; 2) there is a high ratio between skin surface area and body weight; 3) the skin is covered by a sort of down that increases the absorbent surface."[2]  Likewise, the study "Ages of Man and Their Dermatoses," recently published in *Dermatology in Clinical Practice*, establishes the following:

> The skin of neonates and infants differ from adults in the following ways:
> - In neonates and during early infancy, the skin defenses are not fully developed, the skin is vulnerable to physical, chemical, and microbial attack.
> - The surface area to the weight ratio is higher than at other times of life; there is a greater hazard from increased absorption of topically applied medicaments. Serious toxicity can occur from the application of topical steroids, salicylic acid, neomycin, boric acid, aniline dyes, hexachloro-phene, and related antiseptics.
> - The rate of transepidermal water loss through intact and non sweating skin of the newborn is high, indicating immaturity of the skin barrier function. Dehydration rapidly develops.
> - Hypothermia develops rapidly in widespread skin rashes.
> - During early weeks of life, the blood levels of some hormones are similar to that of the mother, e.g., androgens levels are high and these are the cause of neonatal acne.
> - Scratching does not seem to develop until around 6 months of age.[3]

4.      The authors of "Alternative Test Methods for Assessing Mechanical Properties of Disposable Diapers" note of absorbent products, "These products affect the skin's health directly, because they are in close contact with the human skin."[4]  P&G Companies scientist

---

[2] Paolo Pigatto et al., *Contact Dermatitis in Children*, 36 Italian Journal of Pediatrics, 2 (2010).

[3] S.W. Lanigan & Zahra Zaidi, *Ages of Man and Their Dermatoses*, *in* Dermatology in Clinical Practice, 481 (2010).

[4] Necla Yaman et al., *Alternative Test Methods for Assessing Mechanical Properties of Disposable Diapers*, 15 Fibres & Textiles in Eastern Europe, 80 (Apr./June 2007).

Miranda A. Farage noted in a 2005 study that baby diapers "are intended to be worn in contact with the skin for prolonged periods of time."[5]

5.     Keenly aware of this vulnerability and seeking to protect their children from harm, parents and caregivers relied upon P&G Companies' false and misleading product labels and advertisements that the Pampers were safe and appropriate for their intended general and specific use as products to absorb babies' and children's bodily waste and to protect their babies' sensitive skin from unnecessary irritation.  Plaintiffs and Class Members purchased P&G Companies' Pampers believing that they would ensure the safety and well-being of their children.  Plaintiffs would not have purchased the Pampers if P&G Companies had disclosed the true capacity of the Pampers to irritate skin and cause severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments when used as directed. Thus, Plaintiffs and the Class Members were damaged by P&G Companies' omissions and failure to warn that the Pampers were irritating to babies' tender skin, particularly when preemies, newborns, older babies, and toddlers excreted on the Pampers, as they were intended to be used.

6.     As the manufacturers and/or distributors of the Pampers, which were designed for use by preemies, newborns, older babies, and toddlers, P&G Companies knew or should have known that their products contained a chemical irritant.  P&G Companies failed to take critical steps to ensure that their representations, advertisements and/or labels were accurate, and that the Pampers were safe.  Upon information and belief, P&G Companies could have, and should have acted to ensure the safety of their products.

---

[5] Miranda A. Farage, *Are We Reaching the Limits of our Ability to Detect Skin Effects with our Current Testing and Measuring Methods for Consumer Products?*, 52 Contact Dermatitis, 297, 298 (2005).

## II.    JURISDICTION AND VENUE

7.      The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d) because this action is between citizens of different states, a class action has been pled, and the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs.

8.      Venue is proper in this District under 28 U.S.C. §§ 1391(a), (b), and (c); 28 U.S.C. § 1407; and 15 U.S.C. § 22.  P&G Companies do substantial business in the State of Ohio and within this Federal Judicial District, advertise in this District, receive substantial compensation and profits from the sales of the Pampers, and have made material omissions and misrepresentations and breaches of warranties in this District so as to subject them to personal jurisdiction in this District.

## III.   PARTIES

9.      Plaintiffs Angela Clark and Kenneth Clark reside in Bay City, Michigan.  They have identical twin daughters who are two years old.  Plaintiffs received a coupon for Pampers Cruisers with Dry Max and purchased the diapers in mid-April 2010 in Essexville, Michigan. One of the twins (Baby A) started wearing Pampers Cruisers with Dry Max, while the other twin (Baby B) was wearing another brand.  During the week that the twins were wearing different brands, within a few days of wearing the Pampers, Baby A developed swelling and skin irritation accompanied by severe pain during urination.  She was visibly uncomfortable as a result of the symptoms, and expressed that she had discomfort and pain in the affected area.  The Clarks took Baby A to a medical doctor for evaluation and treatment.  The doctor tested Baby A for a urinary tract infection.  Before those tests came back, Baby A developed a fever, at which point the Clarks returned to the doctor with Baby A.  The doctor prescribed Cefdinir antibiotic.  When the family ran out of the diaper brand that Baby B had been wearing, both Baby A and Baby B used

Pampers Cruisers with Dry Max.  Baby B then developed the same symptoms that Baby A had already exhibited, including swelling and skin irritation, painful urination, a fever, pain, and discomfort.  Baby B was then tested for a urinary tract infection.  The tests for urinary tract infections involved a painful catheterization procedure.  The tests for Baby A and Baby B came back negative, and the medical professionals involved could not definitively diagnose the twins' conditions.  However, upon switching both children from Pampers Dry Max to another diaper brand, their conditions are now clearing up.  Had P&G Companies fully disclosed the presence of chemical irritants in the Pampers, Mr. and Mrs. Clark would neither have purchased the Pampers nor allowed their children to be exposed to them.  Now that the Clarks are aware that use of Pampers with Dry Max directly correlated with their daughters' medical conditions, the product is of no value to them.  On information and belief, the Pampers caused these medical conditions.  In addition, the Clarks incurred medical expenses in connection with their use of Pampers Cruisers with Dry Max.  As a result of the foregoing, Plaintiffs Angela Clark and Kenneth Clark have been damaged.

10.     Plaintiff Brandon Hulse resides in Tacoma, Washington, and has a three-year-old son.  On or about April 19, 2010, he purchased Defendant P&G Companies' Pampers Cruisers with Dry Max diapers for his son in Tacoma, Washington.  On or about April 22, Mr. Hulse began to use the diapers.  Within a day or two of Mr. Hulse's first use of the diapers, his son developed a severe rash, including raw skin, oozing, blisters and redness.  The child was visibly uncomfortable as a result of the symptoms, and expressed that he had discomfort and pain in the affected area.  Plaintiff Hulse took his son to an urgent care facility for evaluation and treatment, where he was prescribed Bactroban topical antibiotic to treat or prevent a skin infection.  Over the next several days, as yet unaware that the diapers were causing the problem, Mr. Hulse

continued using them. His son's wounds were not healing during this time. Mr. Hulse saw a news report about possible irritation caused by Dry Max on or about May 5, 2010, and stopped using the diapers at that time. Only after he stopped using Pampers Cruisers with Dry Max did Plaintiff Hulse's son's skin condition begin to clear up. Mr. Hulse emailed the Consumer Product Safety Commission on or about May 7 to report his experience. Had P&G Companies fully disclosed the presence of chemical irritants in the Pampers, Mr. Hulse would neither have purchased them nor allowed his child to be exposed to them. Now that Mr. Hulse is aware that use of Pampers Dry Max directly correlated with his son's condition, the product is of no value to him. On information and belief, the Pampers caused this medical condition. In addition, Mr. Hulse incurred medical expenses in connection with his use of Pampers Cruisers with Dry Max. As a result of the foregoing, Plaintiff Hulse has been damaged.

11. Plaintiff Diane Samelson resides in Stamford, Connecticut, and has two-year-old twins. In or about December 2009, she purchased Defendant P&G Companies' Pampers Cruisers diapers for her children in the New York metropolitan area. The packaging of the Cruisers diapers did not indicate that they were any different from other Pampers Cruisers diapers she had previously purchased for her children. Shortly after her son started using diapers from this new package of Pampers Cruisers, her son developed a severe diaper rash with welts and blistering. Plaintiff Samelson initially assumed that her son had a diaper rash. (Her daughter did not develop any obvious skin reaction to the Pampers diapers.) Her son's rash developed into red welts, and her son was visibly uncomfortable from his skin condition. In an effort to heal the rash, she tried several different brands of diaper rash cream (including Triple Paste, Mustela, and two types of Desitin), but none of the products healed the rash. In early 2010, Plaintiff Samelson consulted with her son's doctor about his skin condition in his diaper area,

and the doctor suggested that she use Lotrimin, an over-the-counter anti-fungal cream, to treat the rash. The Lotrimin did not heal the rash. Shortly thereafter, Plaintiff Samelson stopped using Pampers diapers. She switched her son to another brand of diapers. Upon ceasing use of Pampers diapers, Plaintiff Samelson's son's skin condition immediately cleared up. Plaintiff Samelson currently uses another brand of diapers for her children, and there has been no reoccurrence of skin problems since she stopped using Pampers diapers. Had P&G Companies fully disclosed the presence of chemical irritants in the Pampers, Plaintiff Samelson would neither have purchased them nor allowed her children to be exposed to them. Now that Plaintiff Samelson is aware that use of Pampers diapers directly correlated with her son's visible skin condition, the product is of no value to her. On information and belief, the Pampers caused this medical condition. In addition, Ms. Samelson incurred medical expenses in connection with her use of the Pampers. As a result, Plaintiff Samelson has been damaged.

12. Plaintiff Kristina Atwood resides in Tacoma, Washington, and has a five-month-old son. In early- to mid-April 2010, she purchased Defendant P&G Companies' Pampers Cruisers with Dry Max and Pampers Baby Dry diapers for her son in Tacoma, Washington. Within a day after she started using Pampers diapers with Dry Max, her son developed a rash, which progressed to a blistered and oozing burn-like skin condition. He was visibly uncomfortable as a result of the symptoms, and expressed that he had discomfort and pain in the affected area. Plaintiff Atwood called a medical doctor for evaluation and treatment, who prescribed Nystatin for diaper rash, suspected a yeast infection, and advised her that the rash should clear up in one to two days with use of the prescription. When the condition failed to improve after about ten days, Ms. Atwood took her son to the doctor again. This time, the pediatrician said he believed the child was having a reaction to the diapers and advised her to

switch to a different diaper brand. He also prescribed a prescription paste. Upon stopping use of Pampers Dry Max, Plaintiff Atwood's son's condition began to clear up. On May 7, 2010, Ms. Atwood wrote to a consumer advocacy website (www.consumeraffairs.com) to share her son's condition and her experience with Pampers Dry Max. Ms. Atwood also filed a complaint with the Consumer Product Safety Commission on or about May 7, 2010. Had P&G Companies fully disclosed the presence of chemical irritants in the Pampers, Ms. Atwood would neither have purchased them nor allowed her child to be exposed to them. Now that Ms. Atwood is aware that use of Pampers Dry Max directly correlated with her son's medical condition, the product is of no value to her. On information and belief, the Pampers caused this medical condition. In addition, Ms. Atwood incurred medical expenses in connection with her use of Pampers Cruisers with Dry Max. As a result of the foregoing, Plaintiff Atwood has been damaged.

13. Plaintiffs Brigette Wolfe and Joseph Wolfe reside in Elk Grove, California. They have a fourteen-month-old daughter. In mid-April, 2010, they purchased Pampers Cruisers with Dry Max in Elk Grove, California. Within a few days of starting use of the product, their daughter developed a rash that Desitin was not helping. They took her to a medical doctor on or about April 30, 2010, who diagnosed a yeast infection and prescribed Nystatin. On May 1 and 2, the condition worsened, and the Wolfe's daughter developed blisters that opened and were oozing. The child was visibly uncomfortable as a result of the symptoms, and expressed that she had discomfort and pain in the affected area. The Wolfes had multiple telephone calls with medical professionals in early May, 2010 regarding their daughter's skin condition. During telephone calls on or about May 2 and 3, both a paramedic and an on-call doctor told the Wolfes to stop using the Pampers and start using cloth diapers, because the condition should be treated as a burn. On or about May 3, the Wolfes were told to use cortisone to treat open blisters and

sores. On or about May 5, they returned to the doctor with their daughter, at which time the doctor diagnosed her with contact dermatitis, caused by coming into contact with a skin irritant. Upon switching their daughter from Pampers to cloth diapers and other brands of disposable diapers, her condition began to improve. She is currently healing, and may have scarring. Had P&G Companies fully disclosed the presence of chemical irritants in the Pampers, Mr. and Mrs. Wolfe would neither have purchased them nor allowed their daughter to be exposed to them. Now that the Wolfes are aware that use of Pampers Dry Max directly correlated with their daughter's medical condition, the product is of no value to them. On information and belief, the Pampers caused this medical condition. In addition, the Wolfes incurred medical expenses in connection with their use of Pampers Cruisers with Dry Max. As a result of the foregoing, Plaintiffs Brigette Wolfe and Joseph Wolfe have been damaged.

14. Defendant The Proctor & Gamble Company ("P&G") is an Ohio corporation whose principal place of business, upon information and belief, is One Procter & Gamble Plaza, Cincinnati, Ohio 45202. P&G engages in business throughout the State of Ohio and the United States. Defendant P&G marketed, promoted, and profited from the Pampers. In addition to this direct conduct, as the parent company of Defendants P&G Paper and P&G Distributing, Defendant P&G is liable for the actions of Defendant P&G Paper and Defendant P&G Distributing under basic doctrines of agency and corporate law.

15. Defendant P&G Paper is an Ohio corporation whose principal place of business, upon information and belief, is 6105 Center Hill Avenue, Cincinnati, Ohio 45224. P&G Paper engages in business throughout the State of Ohio and the United States. P&G Paper manufactured the Pampers diapers that were purchased by Plaintiffs and Class Members during the relevant period.

16.     Defendant P&G Distributing is a Delaware corporation whose principal place of business, upon information and belief, is One Procter & Gamble Plaza, Cincinnati, Ohio 45202. P&G Distributing engages in business throughout the State of Ohio and the United States. P&G Distributing is a subsidiary of Defendant P&G. P&G Distributing distributed Pampers to Plaintiffs and Class Members during the relevant period.

### IV.   FACTUAL BACKGROUND

17.     Despite the fact that P&G Companies knew or should have known that the Pampers with Dry Max had the capacity to and, in many cases, did actually harm preemies, newborns, older babies, and toddlers by causing severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments, P&G Companies made numerous representations to Plaintiffs about their products wherein they failed to disclose the chemical irritants contained in their products and/or represented that they were safe for use with children.

18.     P&G Companies marketed the Pampers as safe and gentle, using such descriptive passages on their product labels as "Wraps Baby in All-Around Softness," and "Pampers Swaddlers contain…mild ingredients which are gentle to the skin."[6]

19.     However, P&G Companies' Pampers, which contain chemical irritants, are anything but the safe and gentle products that P&G Companies claim.

20.     P&G Companies use safety as a core tenet of their product advertising. In a brochure titled "The Tradition & Science of Safe Products,"[7] Defendant P&G Companies use the slogan, "Touching lives, improving life." At the website pgproductsafety.com, P&G states, "we

---

[6] *See* Pampers Swaddlers with Dry Max 36-pack, size "N" product label.

[7] P&G Brochure, "The Tradition & Science of Safe Products", (*available at* http://www.pg.com/en_US/downloads/sustainability/pov/HumanSafetyBrochure2009.pdf (last accessed May 9, 2010)).

take product safety very seriously,"[8] and P&G's "Our Values and Polices" brochure contains the statement: "Procter & Gamble ensures the safety of our products, packages and operations for our…consumers...We consider this to be a requirement for conducting responsible business, and an essential element of building and maintaining public trust in our products." [9] On the website pgproductsafety.com, P&G states, "Safety is an intrinsic part of our products' quality and value."[10]

**A.    Children Are Especially Vulnerable To Chemical Irritants.**

21.    Children are especially susceptible to dermal absorption of chemicals because their skin is much more permeable than that of adults.   Chemicals in P&G Companies' products irritate children's skin through direct contact.[11]  P&G Companies intended for parents and caregivers to fasten the Pampers directly onto their children's delicate and sensitive skin for up to 12 hours.[12]

22.    Scientists and policy makers recognize that children are particularly vulnerable to toxins and chemicals and consider this fact when identifying contaminants that acutely impact children's health.   Federal government action extensively illustrates this fundamental approach. For example, in 1997, the EPA established a policy requiring consideration of health risks to infants and children in all risk assessments, risk characterizations, and environmental standards. In another instance, Congress explicitly recognized the increased susceptibility of children to contaminants by mandating in the Food Quality Protection Act that the EPA evaluate pesticides

---

[8] *Available at* http://www.pgproductsafety.com/productsafety/index.shtml (last accessed May 9, 2010).

[9] P&G Brochure, "Our Values and Policies," *available at*
http://www.pg.com/en_US/downloads/company/governance/PG_Values_Policies.pdf (last accessed May 9, 2010).

[10] *Available at* http://www.pgproductsafety.com/productsafety/product_safety.shtml (last accessed May 9, 2010).

[11] Yaman, *Alternative Test Methods*, *supra* note 4.

[12] P&G "Latest Innovations" fact sheet states that Dry Max diapers "lock wetness in for up to 12 hours." *Available at* http://www.pg.com/en_US/downloads/innovation/factsheet-PampersDM.pdf (last accessed May 10, 2010).

on a scale ten times more sensitive than regulatory levels to account for the fragile, developing bodies of children and infants.

23.     "Multiple and complex links between pollutant exposures and health effects may have obscured perceptions of risk," which can manifest gradually over time or immediately, notes Professor Anne Steinemann in "Human exposure, health hazards, and environmental regulations."  "(W)hen they do cause immediate effects, there is the troubling tendency to misdiagnose or misattribute common symptoms caused by exposures,"[13] such as mistaking severe chemical irritation for common diaper rash.  Such mistakes are magnified in relation to babies' health, as infants cannot speak for themselves to identify the cause of irritation or the severity of their pain.

**B.     The P&G Companies' Pampers Brand.**

24.     Defendant P&G identifies Pampers as one of its "Billion Dollar Brands" in its 2009 Annual Report.  "Baby Care and Family Care" products comprise 18% of P&G's net sales and 16% of net earnings.  Pampers is identified as "the Company's largest brand," with annual net sales of approximately $8 billion.  P&G claims to have approximately 35% of the global market share in baby care products such as diapers, training pants and baby wipes.[14]

25.     On Defendant P&G Companies' website, Pampers is identified as "the world's top-selling brand of baby diapers."[15]

26.     The pampers.com website encompasses the Pampers Parenting Institute and Pampers Parenting Network, a forum where an "expert advisory board" offers advice articles on

---

[13] Anne Steinemann, *Human Exposure, Health Hazards, and Environmental Regulations*, 24 Environmental Impact Assessment Review, 695, 700 (2004).

[14] *Available at* http://www.annualreport.pg.com/annualreport2009/_downloads/PG_2009_AnnualReport.pdf (last accessed May 9, 2010).

[15] *Available at* http://www.pg.com/en_US/brands/household_care/pampers.shtml (last accessed May 9, 2010).

common parenting topics, and parents can submit questions to be answered by the board. These interactions are intended to build the consumer's trust in the brand as purveyor of expert health advice.

## C. "Dry Max" Technology.

27. P&G Companies claims that its Pampers "Dry Max" technology is "the biggest innovation to Pampers in 25 years."[16] In a video posted on the Pampers website—"Mom's [sic] Vote Cruisers with Dry Max!"—Kerri Hailey, Associate Director of Global Baby Care Research and Development, introduced as a "Mom of Two," describes Pampers with Dry Max as "one of the most thoroughly tested products in our brand's history," including "high-tech modeling," "simulations," analysis of diapers used by babies, and discussion with "moms and babies around the world." Hailey says the product is "something we think moms truly enjoy."[17]

28. P&G Companies claims that "Pampers is the only brand with this technology on the market,"[18] and asserts in advertising that its diapers are two times drier and twenty percent thinner than Huggies Little Movers diapers.[19]

29. On the Pampers website under "Pampers Swaddlers & Cruisers with Dry Max FAQs," Dry Max technology is described as "the result of more than a decade of research and testing involving more than 20,000 babies."[20] According to the FAQs, "Dry Max is referring to the new absorbent part of Swaddlers and Cruisers diaper." P&G Companies claim that their Pampers with Dry Max "use the same type of ingredients and materials as our other diapers and

---

[16] *See* Pampers Swaddlers & Cruisers with Dry Max FAQs, *available at* http://www.pampers.com/en_US/dry-max-faqs (last accessed May 10, 2010).

[17] "Mom's [sic] Vote Cruisers with Dry Max!", *available at* http://www.pampers.com/en_US/Vote-Cruisers-DryMax (last accessed May 9, 2010).

[18] P&G "Latest Innovations" fact sheet, *supra* note 12.

[19] *See* http://www.pampers.com/en_US/proddetail/baby-products/new-pampers-cruisers/id/900827 (last accessed May 9, 2010).

[20] *See* Dry Max FAQs, *supra* note 16.

in fact, many other disposable diapers on the market. The key difference is simply in how we designed and produced the diaper itself."[21]

30.     Pampers with Dry Max ingredients include "Absorbent Gelling Material" (AGM), which is consistent with Sodium Polyacrylate or Polyacrylic Acid.  AGM is described on the pampers.com website:

> AGM is the absorbent gelling material widely used in diaper padding to absorb wetness. It is perfectly normal to see some gel on the skin from time to time, especially if the diaper is heavily saturated. It can easily be removed by wiping your baby's skin.  This material has a long history of safe use in a variety of products and has been in diapers for more than a decade. Absorbent gelling material is closely related to ingredients widely used in cosmetics, in food processing and as binders in medicine capsules.[22]

31.     In the video featuring Kerri Hailey, Hailey explains, "When we set out to create Dry Max, we were looking at how do we make a really really absorbent product that also looks and feels like underwear…How do we make it thin but yet perform extremely well."  Hailey states that P&G Companies "were able to make Dry Max work by replacing more inefficient pulp with a much more efficient superabsorber that we have throughout our products. We're now able through a new manufacturing process to place it exactly where we need it throughout the product."[23]

32.     Hailey describes the "superabsorber" as "the storage core," and "the engine of the diaper."[24]  This is the crotch area of the diaper that is in contact with the most sensitive parts of a baby's body.  Hailey states that P&G Companies have "removed all of the old fluff paper pulp from the core in order to make it highly efficient.  By getting rid of the less-efficient pulp—it

---

[21] *Id*.

[22] *See* http://www.pampers.com/en_US/proddetail/baby-products/new-pampers-cruisers/id/900827/utm_source=eds&utm_medium=crm&utm_campaign=May10Newsletter (last accessed May 10, 2010).

[23] *See* "Mom's [sic] Vote Cruisers with Dry Max!" *supra* note 17.

[24] *Id*.

only holds about four times its weight—and replacing it all with super-sorber, which holds over twenty-five times its weight…we've been able to make a very thin, very high performing product."[25]

33.    On information and belief, due to the removal of cushioning paper fiber from the diaper products in whole or in part, the "superabsorber," "storage core," or "super-sorber," comprised of crystallized chemicals such as Sodium Polyacrylate or Polyacrylic Acid, is in nearly direct contact with babies' and children's extremely sensitive and delicate bottoms and other body parts that the Pampers are supposed to cover and to protect, causing severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments.

**D.    Defendants' Representations About Pampers.**

34.    P&G Companies manufactured, advertised and sold their Pampers Cruisers and Swaddlers with Dry Max.  P&G Companies represented to Plaintiffs and the public that this product was safe for children.

35.    P&G Companies have used direct marketing tactics such as including free product samples in bags of the older versions of Swaddlers New Baby, and Cruisers which were not marketed as containing the Dry Max material; distributing coupons; and providing free samples through hospitals.  Defendants also began advertising the new Pampers products during the February, 2010 Vancouver Winter Olympics, outfitting babies of Team USA athletes with Pampers with Dry Max.  According to a P&G press release, parents could request a free sample three-pack of new Cruisers diapers on pampers.com starting February 12, 2010; the promotion included a chance to win a year's supply of Pampers Cruisers Diapers with Dry Max.  The

---

[25] *Id.*

products became available for general consumption in March, 2010.[26]  The following are several

examples of samples offered to parents who sign up for an online membership with Pampers:



[27]



[28]

36.    P&G Companies states the following on its website about their Pampers diapers

with Dry Max technology: "blanket-like softness," "all-around comfort," "keeps babies dry and

---

[26] *See* "Babies of U.S. Olympic Athletes Among First to Get New High Performance Diaper - Pampers(R) Cruisers With Dry Max," *available at* http://www.pginvestor.com/phoenix.zhtml?c=104574&p=irol-newsArticle&ID=1376140 (last accessed May 10, 2010).

[27] *See* http://www.pampers.com/en_US/home/ (last accessed May 10, 2010).

[28] *See* https://www.pgeverydaysolutions.com/pgeds/pampers/brandsampler-login.jsp (last accessed May 10, 2010).

happy," 'helps lock in wetness," "super absorbing technology," "breathable and soft like cotton," "our first high performance diaper," "for your active and healthy baby," "The #1 Choice of Hospitals for Newborns," and "Moms vote Cruisers!"  The following are several examples of web graphic representations:

37.





---

29 *See* http://media.us.pampers.com/en_US/emails/Walgreens_Email_04_08_2010/web/Walgreens_Email_Online.html (last accessed May 10, 2010).

30 *See* http://www.pampers.com/en_US/home/ (last accessed May 10, 2010).



31 *See* http://www.pampers.com/en_US/proddetail/baby-products/new-baby-diapers-swaddlers/id/900826/sectionid/0 (last accessed May 10, 2010).



38.     P&G Companies advertises their Pampers diapers with Dry Max with the slogan, "Familiar comfort. Premium protection. Exclusively from Pampers."[33]  Defendants also claim, "4 out of 5 moms who've tried Pampers Cruisers with Dry Max would recommend them to other moms."[34]

39.     Pampers Swaddlers New Baby and Cruisers diapers are printed with images of Sesame Street® characters such as Elmo, Big Bird, Cookie Monster, and Ernie.  These popular characters are used in Pampers advertising to make Pampers appear kid-friendly and appealing to parents.

---

[32] *See* http://www.bestbuy2store.com/pampers-swaddlers-dry-max-diapers/ (last accessed May 10, 2010).

[33] *See* http://www.pampers.com/en_US/proddetail/id/900826, accessed May 10, 2010.

[34] *See* "Mom's [sic] Vote Cruisers with Dry Max!" *supra* note 17.

40.     P&G Companies distribute advertisements such as the "In the Winners Circle" brochure, indicating that Pampers with Dry Max are "Parent Tested, Parent Approved."[35]

41.     In the "Pampers Swaddlers & Cruisers with Dry Max FAQs" on the Pampers website, P&G Companies explicitly represent that Pampers with Dry Max are safe: "Q: Is Dry Max safe for my baby?  Yes."  On the same page, P&G Companies indicate that Pampers with Dry Max do not "sacrifice performance," despite the change in technology from the older version of Swaddlers and Cruisers.[36]

42.     P&G states the following on its packaging of Pampers Swaddlers New Baby with Dry Max: "Wraps Baby in All-Around Softness," "Quilted, Blanket-Like Softness," and "Pampers Swaddlers contain these mild ingredients which are gentle to the skin: Petrolatum, Stearyl Alcohol, Aloe Barbadensis Leaf Extract."[37]

43.     P&G represented to Plaintiffs and Class Members that Pampers diapers with Dry Max were a safe, gentle, and healthful choice for their children.  Indeed, P&G Companies' credo, described in its "Our Values and Policies" brochure is that "Procter & Gamble ensures the safety of our products, packages and operations for our…consumers...We consider this to be a requirement for conducting responsible business, and an essential element of building and maintaining public trust in our products."[38]

44.     P&G Companies make the following claim on the Pampers website:

> Nothing is more important to the people at Pampers than ensuring the safety of our diapers for babies. We evaluate the safety of all ingredients used in our products. We thoroughly evaluate for systemic toxicity, skin irritation or skin sensitization (skin allergy). Safety evaluation is based on the principles of the

---

[35] *Available at* http://www.pampers.com/en_US/content/pdf/Dry-Max_Awards_Results.pdf (last accessed May 10, 2010).

[36] *See* Dry Max FAQs, *supra* note 16.

[37] *See* Pampers Swaddlers with Dry Max 36-pack, size "N" product label.

[38] P&G Brochure, "Our Values and Policies," *supra* note 9.

National Academy of Science (US) and World Health Organization's assessment process to evaluate the safety of the ingredients. We also conduct clinical studies to confirm good skin compatibility. In addition, we constantly monitor consumer health comments to ensure product safety in real consumer use conditions. Our products always meet and often exceed all regulatory and legal safety requirements around the world.[39]

45.     However, the above representations are false and misleading.

**E.     Pampers Diapers are Harmful to Preemies, Newborns, Older Babies, and Toddlers.**

46.     Despite the above representations and assurances, many parents' babies experienced severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments when using Pampers with Dry Max.

47.     On information and belief, Defendants' Pampers do not contain a warning label indicating the Pampers actually had the capacity to and, in many cases, did actually harm the preemies, newborns, older babies, and toddlers by causing severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments.

48.     Defendants knew, or should have known, that their Pampers presented a serious risk to the health and safety of children, and therefore were defective.

49.     Neither P&G Companies' websites nor its product labels contain any information about chemical irritants with the capacity to harm preemies, newborns, older babies, and toddlers by causing severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments.

50.     Despite the presence of chemical irritants, with the claims and representations made in their labels and advertisements, P&G Companies continued to appeal to parents' and caregivers' desire to be gentle and loving to their children by using healthful children's products.

---

[39] *See* Dry Max FAQs, *supra* note 16.

51.     P&G Companies' Pampers with Dry Max emit a strong chemical smell.  Despite this sensory warning, parents trusted that Defendants' Pampers were safe for their children.

52.     Defendants admit on their product packaging that the chemicals used in their Pampers can leach out of the diaper with normal use, coming in direct contact with babies' skin.  The packaging of Swaddlers New Baby and Cruisers Pampers states, "If you notice gel-like material on your baby's skin, don't be alarmed.  This comes from the diaper padding and can be easily removed by wiping your baby's skin with a soft, dry cloth."[40]

53.     In 2005, the journal *Contact Dermatitis* published an article by Miranda A. Farage Principal Scientist in Feminine Care and Family Care Clinical Sciences at P&G, titled "Are we reaching the limits of our ability to detect skin effects with our current testing and measuring methods for consumer products?"  Farage's study noted that the company had recently observed during tests of its paper products, including baby diapers:

> (W)e have seen that current test methods may not be robust enough to evaluate perceived skin effects that may be important for consumer comfort during product use.  This observation is consistent with feedback from consumers…These observations lead to the conclusion that our traditional skin testing approaches are not always good predictors of consumer-perceived skin comfort."[41]

The study suggests that P&G Companies knew or should have known of the limitations of current pre-market product testing.  Knowing this, P&G should have reformulated their market testing practices to ensure that they released safe products for children into the consumer market.

54.     If Plaintiffs and Class Members had known the true nature of P&G Companies' Pampers, they would not have purchased Pampers or allowed their children to be exposed to them.

---

[40] *See* Pampers Swaddlers with Dry Max 36-pack, size "N" product label; Pampers Cruisers with Dry Max 31-pack, size 3 product label.

[41] Farage, *Reaching the Limits of our Ability to Detect Skin Effects*, *supra* note 5.

**F.     Defendants' Response to Parents' Complaints.**

55.     As reported in Advertising Age magazine, P&G Companies has admitted that

they knew of major problems related to the Pampers by at least "late" 2009:

> The reality is that P&G, while trying to play it cool publicly, has been focused
> fairly intently on the burgeoning blowup since late last year [2009].  "We've been
> having daily 7 a.m. conference calls among all the functions every morning,
> including weekends, about this, since we got the first inkling," Jodi Allen, VP-
> North American baby care told Ad Age.

Jack Neff, "How Pampers Battled Diaper Debacle," *Advertising Age* (May 10, 2010).

56.     Despite numerous parents' claims that Pampers with Dry Max have caused their

children to have severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores,

scarring and/or other ailments, P&G Companies continue to claim that their Dry Max products

are "Safe for Babies," and address consumers' concerns as "an online dust-up" initiated by "a

small group of online Facebook activists [who] appear to be spreading sensational accusations

and making unsubstantiated claims."[42]  A group of Facebook users asking P&G Companies to do

away with harmful Dry Max numbered over 6,700 at the time of filing.

57.     P&G Companies have called consumers' concerns "rumors" and "completely

false."  In a May 6, 2010 press release, Defendant P&G stated, "Some (parents) have specifically

sought to promote the myth that our product causes 'chemical burns.'  We have comprehensively

and thoroughly investigated these and other claims and have found no evidence whatsoever that

the reported conditions were in any way caused by materials in our product." [43]

---

[42] *See* http://www.pampers.com/en_US/Expert-Discussion-Dry-Max-Safety (last accessed May 10, 2010).  *But see*
"Parents Gather on Facebook to ask Pampers for Diaper Change," *available at*
http://blogs.consumerreports.org/safety/2010/05/pampers-crusiers-swaddlers-rashes.html (last accessed May 10,
2010).
[43] "Pampers Calls Rumors Completely False," *available at*
http://www.pginvestor.com/phoenix.zhtml?c=104574&p=irol-newsArticle&ID=1423829 (last accessed May 9,
2010).

58.     These statements are in direct opposition to P&G Companies' published materials about the companies' values and ethics.  On its website, Defendant P&G describes the "five core strengths required to win in the consumer products industry," including "Consumer Understanding: Uncovers the unarticulated needs of consumers."  In connection with these "core strengths," P&G notes, "We are designed to lead in each of these areas."[44]  In "The Tradition & Science of Safe Products" brochure, P&G states that one of the "P&G product safety assurance key elements" is "Post market surveillance and rapid response."[45]  Despite thousands of publicly available online comments expressing parents' concern, P&G Companies have not rapidly responded to address the needs of consumers.

59.     P&G Companies continue to dismiss parent concerns about severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments affecting their preemies, newborns, older babies, and toddlers as the result of diaper rash: "Unfortunately, diaper rash is very common, and sometimes severe, regardless of the diaper used.  At any given moment, more than 250,000 babies will experience a serious rash."[46]

60.     A video released by Defendant P&G features Dr. Suzanne Loiselle, a New York pediatrician and Clinical Instructor of Pediatrics at The Mount Sinai Medical Center, indicating that severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments can be nothing more than diaper rash.  Dr. Loiselle states, "Having looked at all the safety data and the research done, I have no safety concerns whatsoever with the Pampers with Dry Max technology."  She explains that diaper rash is "incredibly common," and suggests "coat(ing) the area with a lot of zinc" when a parent notices redness on their baby's

---

[44] *See* http://www.pg.com/en_US/company/core_strengths.shtml (last accessed May 10, 2010).
[45] P&G Brochure, "The Tradition & Science of Safe Products", *supra* note 7.
[46] "Pampers Calls Rumors Completely False," *supra* note 43.

- 25 -

bottom.  She suggests calling a pediatrician and arranging for a doctor's office visit if the baby experiences "some little breaks in the skin that can allow the normal yeast and bacteria to get into the skin and cause some pimples or even little blisters."[47]

61.     On information and belief, in response to public uproar regarding Dry Max Pampers, P&G Companies employ what can reasonably be called scare tactics.  Another video released by Defendants features Dr. Kimberly Thompson, who is *not* a medical doctor, though she impliedly plays one and makes no reference to the fact that her true degrees are an Sc.D. and a M.S.  *See* http://www.hsph.harvard.edu/faculty/kimberly-thompson/ (last accessed May 11, 2010).  Furthermore, Thompson works on P&G external advisory boards.   In response to the question, "Do you think this is an unnecessary health scare?"  Thompson replied:

> I think it has…the characteristics of a scare because what we're seeing is the use of emotionally charged terms like chemical burn and, you know, pictures that make parents fearful as opposed to, actually, people who are trying to provide them with good information and help them really understand what they need to do to make their babies have a better experience.[48]

62.     P&G Companies make concerted and repeated efforts to shift blame to parents, implying that they (the very people whose children are suffering from painful rashes and sores) fail to change their children's diapers with sufficient frequency.  When asked, "Is this product really causing rashes on babies?"  Thompson replies:

> The evidence that we've seen so far suggests that Pampers with Dry Max is not causing any difference in the experience parents are having with diaper rash, period. They're not seeing different types, they're not seeing different severity, and they're not seeing more or less; it's basically the same…When you look at the overall safety profile and the consumer data that the Pampers with Dry Max team has collected, it's very clear that the relationship is not there.[49]

---

[47] *Available on* Pampers public Facebook page, at http://www.facebook.com/video/video.php?v=399435808192 (last accessed May 10, 2010).

[48] *Available at* http://www.pg.com/en_US/news_views/blog_posts/2010/may/perspective_pampers.shtml (last accessed May 10, 2010).

[49] *Id.*

63.     While the above statements show P&G Companies taking the position that parents whose children are experiencing severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments are experiencing diaper rash, the Pampers Village Skin Care Guide, subtitled "Helping You Maintain Your Baby's Healthy Skin," states only that symptoms of diaper rash include "red or pink bumps" and "red, swollen bumps."  The pamphlet states that "diaper rash is caused by pH changes that occur when stools and urine combine,"[50] and does not mention that severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments could result from chemical irritation.  A suggested remedy is to "change diapers frequently," despite representing in other materials that Pampers can be worn for 12 hours.[51]  Defendants also suggest "try(ing) an extra-absorbent disposable diaper"[52] as a remedy for diaper rash, when in fact, use of Pampers "extra-absorbant" Dry Max diapers is causing consumers' children to experience severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments.

64.     In an online comment in response to a news article about consumer concerns, P&G General Manager Jodi Allen writes, "Please know, our first and only priority is the health and well being of babies.  We would never release any product that gave us even the slightest cause for concern."[53]

65.     P&G Companies indirectly address consumer complaints about Pampers with Dry Max by including a segment on diaper rash in the video featuring Kerri Hailey.  Hailey states,

---

[50] P&G Brochure, "Skin Care Guide: Helping You Maintain Your Baby's Healthy Skin," *available at* http://www.pampers.com/en_US/tools/pdfs/Skin_Care_Guide.pdf (last accessed May 10, 2010).

[51] *See* P&G "Latest Innovations" fact sheet, *supra* note 12.

[52] P&G Brochure, "Skin Care Guide," *supra* note 50.

[53] Jessica Wohl, "New Pampers trigger safety concerns," msnbc.com, May 5, 2010, *available at* http://www.msnbc.msn.com/id/36972785/ (last accessed May 10, 2010).

"There are many factors that cause diaper rash, therefore its impossible to make a claim for our product that it eliminates it all. What we do know is that excess moisture against baby's skin can contribute to rash. Hence, an absorbent diaper that helps keep it away will help prevent diaper rash."[54] This video segment indicates that Pampers with Dry Max, touted as being "super-absorbent," will in fact help prevent diaper rash. Instead, babies and children are experiencing severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments when using Pampers.

**G.    Federal Investigations.**

66.    The U.S. Consumer Product Safety Commission ("CPSC") is charged with protecting the public from unreasonable risks of serious injury or death from thousands of types of consumer products under the agency's jurisdiction, and has jurisdiction over more than 15,000 kinds of consumer products used in and around the home, in sports, recreation and schools. The CPSC urges consumers who are harmed by consumer products to report to the CPSC safety problems encountered with products online, through email, phone, fax or letter. In comments to reporters on May 5, 2010, Scott Wolfson, the CPSC's agency director of public affairs, indicated that the CPSC had begun an investigation into consumer complaints about Pampers with Dry Max. The investigation includes discussions with Defendant P&G about the products. Wolfson stated that parents with comments about Pampers with Dry Max are asked to contact the CPSC via its online incident report.[55]

---

[54] "Mom's [sic] Vote Cruisers with Dry Max!" *supra* note 17.

[55] Wohl, "U.S. Safety Agency Looking into P&G's New Pampers," *supra* note 1.

67.     Health Canada issued a press release on May 5, 2010 announcing an investigation into rashes reported by consumers in connection with the use of Pampers diapers with Dry Max.[56]

68.     A second Health Canada press release issued on May 7, 2010 notes, "Health Canada takes all consumer incident reports very seriously, and is following up on reports involving Pampers Dry Max diapers," and encourages Canadians to report any health and safety incidents to the Department's website. The investigation is currently ongoing.[57]

## V.    CLASS ACTION ALLEGATIONS

69.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs seek certification of a national Consumer Class defined as follows:

> All purchasers ("Class Members") of Pampers brand diapers or "Easy Ups" containing Pampers' "Dry Max" technology including, but not limited to, products labeled as Swaddlers or Cruisers diapers ("Pampers"). Excluded from the proposed Class are (i) P&G Companies, any entity in which P&G has a controlling interest, and P&G Companies' officers, directors, legal representatives, predecessors, successors, and assigns; (ii) the judicial officers to whom this case is assigned; and (iii) any member of the immediate families of excluded persons.

70.     The proposed Class consists of many millions of persons throughout the United States, making individual joinder of all proposed Class Members impractical.

71.     All proposed Class Members share a united interest in the fair, just, and consistent determination of the questions of law and fact necessary to the adjudication of P&G Companies' liability, which predominate over questions affecting only individual members. These key common liability questions include:

---

[56] *Available at* http://www.hc-sc.gc.ca/ahc-asc/media/advisories-avis/_2010/2010_68-eng.php (last accessed May 9, 2010).

[57] *Available at* http://www.hc-sc.gc.ca/ahc-asc/media/advisories-avis/_2010/2010_71-eng.php (last accessed May 9, 2010).

A.      whether and when P&G Companies knew or should have known that the Pampers had the capacity to cause severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments on Plaintiffs' preemies, newborns, older babies, and toddlers' sensitive skin when used as directed;

B.      whether and when P&G Companies knew or should have known that the Pampers had dangerous defects;

C.      whether P&G Companies withheld from disclosure the true nature of their products in the sale and promotion of the Pampers;

D.      whether P&G Companies' conduct violated state consumer protection statutes and state fraud and deceptive practice acts;

E.      whether P&G Companies breached implied warranties covering the Pampers;

F.      whether P&G Companies was unjustly enriched at the expense of Plaintiffs and the proposed Class Members;

G.      whether P&G Companies negligently designed, manufactured, distributed, marketed, tested and/or sold the Pampers;

H.      whether P&G Companies conducted adequate studies and quality tests of the Pampers to determine whether and to what extent the Pampers were unsafe and/or had the capacity to and, in many cases, did actually harm the babies by causing severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments, on the babies' and children's extremely sensitive and delicate bottoms and other body parts that the Pampers are supposed to cover and to protect; and

I.      whether a national class or statewide classes, and/or other subclasses, are superior, within the requirements of Rule 23(b)(3), on any of the claims.

72.     The proposed Class is also united on fundamental questions regarding its members' entitlement to damages and equitable relief, including:

A.     whether proposed Class Members are entitled to damages and/or equitable relief based on their payments, in whatever form, for the Pampers and related costs incurred as a result of purchase;

B.     if proposed Class Members are so entitled, what is the appropriate scope, extent and measure of damages and equitable relief that should be awarded;

C.     whether the degree of reprehensibility of P&G Companies' conduct warrants the imposition of punitive damages under controlling authority; and

D.     whether proposed Class Members are entitled to attorneys' fees, prejudgment interest and costs of suit.

73.     Plaintiffs' claims and defenses are typical of the claims and defenses of the proposed Class because P&G Companies uniformly misrepresented the safety of the Pampers, and uniformly and actively suppressed, concealed, and failed to disclose the material risks of exposure associated with the products on the product label and in advertisements.  P&G Companies' uniform conduct deprived Plaintiffs and all members of the proposed Class of their ability to make an informed decision about whether to use and/or pay for P&G Companies' Pampers.

74.     Plaintiffs and their counsel will fairly and adequately assert and protect the interests of all members of the proposed Class.  Plaintiffs have retained counsel who are competent and experienced in complex class action litigation, including consumer litigation.  Plaintiffs have no interest adverse to those of any absent Class Members, with respect to the key common issues of P&G Companies' product design, labeling, and marketing.

75.     All members of the proposed Class share a common interest in the determination of all factual and legal issues pertinent to P&G Companies' liability through the disgorgement and restitution of Pampers revenue unjustly obtained by P&G Companies.

76.     Class certification is proper under Fed. R. Civ. P. 23(b)(1)(A), because the prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual members of the Class and establish incompatible standards of conduct for P&G Companies.

77.     Class certification is proper under Fed. R. Civ. P. 23(b)(1)(B) because the prosecution of separate actions by individual Class Members would create a risk of adjudications with respect to individual Class Members which would, as a practical matter, be dispositive of the interest of the other members not parties to these adjudications and/or substantially impair their ability to protect these interests.

78.     Class certification is proper under Fed. R. Civ. P. 23(b)(3) because common issues of law and fact predominate over any questions affecting only individual members of the Class, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

79.     Class adjudication is superior to individual litigation, which would foreclose the ability of most Class Members to litigate their claims, impose an undue burden on the courts, and result in inconsistent determination of common issues.  The Court may employ issue certification under Rule 23(c)(4)(B) to address any variation of law, fact, or interest from the standpoint of fairness, efficiency, and economy, in order to avoid denial of class treatment which would require reversion to repetitive and piecemeal individual litigation.

80.     The need for Class-wide notice presents no barrier to certification because notice can be effectively disseminated to the proposed Class by techniques commonly used in consumer class actions.  Notice may be provided to proposed Class Members under the requirements of Fed. R. Civ. P. 23(c)(2) by such combination of print publication, broadcast publication, internet publication, and/or first class mail that this Court determines best comports with modern Fed. R. Civ. P. 23(c)(2) class notice form, content, and dissemination techniques, as used in other consumer cases and as recommended by the *Manual for Complex Litigation*, 4th and the Federal Judicial Center.

## VI.   COUNT I

### Breach of Implied Warranty of Merchantability

81.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

82.     The Uniform Commercial Code § 2-314 provides that, unless excluded or modified, a warranty that goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind.  P&G Companies marketed, promoted, manufactured and/or sold the Pampers and placed them into the stream of commerce.  P&G Companies knew or had reason to know of the ordinary use for which the Pampers were purchased, and impliedly warranted that the Pampers were of merchantable quality and fit for such use as diapers.  Contrary to these representations, the Pampers were defective as they contained potentially toxic and hazardous chemicals and skin irritants and were unsafe for use as diapers.

83.     At all times, the following states listed below, including the District of Columbia, have codified and adopted the provisions of the Uniform Commercial Code governing the

implied warranty of merchantability:  Ala. Code § 7-2-314; Alaska Stat. § 45.02.314; Ariz. Rev. Stat. Ann. § 47-2314; Ark. Code Ann. § 4-2-314; Cal. Com. Code § 2314; Colo. Rev. St § 4-2-314; Conn. Gen. Stat. Ann. § 42a-2-314; 6 Del. C. § 2-314; D.C. Code § 28:2-314; Fla. Stat. Ann. § 672.314; Ga. Code Ann. § 11-2-314; Haw. Rev. Stat. § 490:2-314; Idaho Code § 28-2-314; 810 Ill. Comp. Stat. Ann. 5/2-314; Ind. Code Ann. § 26-1-2-314; Iowa Code Ann. § 554.2314; Kan. Stat. Ann. § 84-2-314; Ky. Rev. Stat. Ann. § 355.2-314; La. Civ. Code Ann. art. § 2520; 11 Me. Rev. Stat. Ann. § 2-314; Md. Code Ann. § 2-314; Mass. Gen. Laws Ch. 106 § 2-314; Mich. Comp. Laws Ann. § 440.2314; Minn. Stat. Ann. § 336.2-314; Miss. Code Ann. § 75-2-314; Mo. Rev. Stat. § 400.2-314; Mont. Code Ann. § 30-2-314; Nev. Rev. Stat. U.C.C § 104.2314; N.H. Rev. Ann. § 382-A:2-314; N.J. Stat. Ann. § 12A:2-314; N.M. Stat. Ann. § 55-2-314; N.Y. U.C.C. Law § 2-314; N.C. Gen. Stat. Ann. § 25-2-314; N.D. Stat § 41-02-314; Ohio Rev. Code Ann. § 1302.27; Okla. Stat. tit. 12A § 2-314; Or. Rev. Stat. § 72.3140; 13 Pa. Stat. Ann. § 2314; R.I. Gen. Laws § 6A-2-314; S.C. Code Ann. § 36-2-314; S.D. Stat. § 57A-2-314; Tenn. Code Ann. § 47-2-314; Tex. Bus. & Com. Code Ann. § 2-314; Utah Code Ann. § 70A-2-314; Va. Code § 8.2-314; Vt. Stat. Ann. 9A § 2-314; W. Va. Code § 46-2-314; Wash. Rev. Code § 62A 2-314; Wis. Stat. Ann. § 402.314; and Wyo. Stat. § 34.1-2-314.

84.    As designers, manufacturers, producers, marketers and/or sellers of the Pampers, P&G Companies are "merchants" within the meaning of the various states' commercial codes governing the implied warranty of merchantability.

85.    P&G Companies designed, manufactured, distributed, marketed and/or sold the Pampers and represented to Plaintiffs and the Class that they manufactured and sold high quality and safe diapers and "Easy Ups" that complied with all applicable state and federal laws and regulations.  Further, by selling the Pampers to Plaintiffs and the Class, P&G Companies have

derived a substantial amount of revenue from sale of these products to consumers, and continue to do so.

86.     The Pampers are "goods," as defined in the various states' commercial codes governing the implied warranty of merchantability.

87.     As merchants of the Pampers, P&G Companies knew that purchasers relied upon them to design, manufacture and/or sell Pampers that would serve as diapers for their preemies, newborns, older babies, and toddlers were reasonably safe, and would not endanger their babies' health.

88.     P&G Companies designed, manufactured and/or sold Pampers to parents of babies, and they knew that such products would be used by preemies, newborns, older babies, and toddlers.

89.     P&G Companies specifically represented in their marketing and advertising that the Pampers were of high quality, safe, and complied with state and federal laws and regulations. Moreover, P&G Companies specifically marketed and sold the Pampers as appropriate diapers and "Easy Ups" for preemies, newborns, older babies, and toddlers, with marketing materials claiming that the products produce "all-around comfort," "keep babies dry and happy," and contain "mild ingredients which are gentle to the skin."

90.     At the time that P&G Companies designed, manufactured, sold and/or distributed the Pampers, P&G Companies knew the purpose for which the products were intended and impliedly warranted that the products were of merchantable quality; were free of unreasonably harsh or hazardous chemicals; were free of manufacturing defects; were free of design defects; and were safe and fit for their ordinary purpose—as diapers.

91.     P&G Companies breached their implied warranties in connection with the sale of the Pampers to Plaintiffs and Class Members.  The Pampers were not safe and fit for their ordinary purposes which involved contact with babies' bottoms and delicate skin.  They were not free of defects, as evidenced by the severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments, on the babies' and children's extremely sensitive and delicate bottoms and other body parts that the Pampers are supposed to cover and to protect.

92.     As a direct and proximate result of P&G Companies' breach of implied warranties, Plaintiffs and other Class Members are entitled to damages available under applicable law, including, but not limited to, the purchase price of the Pampers.

## VII.   COUNT II

### Breach of the Implied Warranties of Merchantability and Fitness for a Particular Purpose

93.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

94.     P&G Companies sold and promoted the Pampers and placed them into the stream of commerce.  P&G Companies knew or had reason to know of the particular purpose for which the Pampers were purchased and impliedly warranted to consumers that the Pampers were of merchantable quality and fit for such use because they communicated that the Pampers contained P&G Companies' proprietary Dry Max absorbent material and were hence, drier, and thinner than other diapers offered by Pampers or other diaper manufacturers.

95.     Plaintiffs and the Class Members reasonably relied upon the expertise, skill, judgment, and knowledge of P&G Companies and upon their implied warranty that the Pampers

were of merchantable quality and fit for their particular purpose and intended use as ultra-absorbent Pampers with Dry Max.

96.     P&G Companies knew, should have known, or had reason to know that Plaintiffs and the Class Members were influenced to purchase the Pampers because of P&G Companies' expertise, skill, judgment, and knowledge in creating diapers with this new technology, and furnishing the Pampers Dry Max for that use to consumers.

97.     P&G Companies' Pampers were not of merchantable quality and were not fit for their intended particular use, because they had the capacity to cause severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments, on the babies' and children's extremely sensitive and delicate bottoms and other body parts that the Pampers are supposed to cover and to protect.

98.     P&G Companies breached the implied warranty of fitness for a particular purpose in violation of the following state statutes:  Ala. Code § 7-2-314, *et seq.*, Alaska St. § 45.02.314, *et seq.*, Ariz. Rev. Stat. Ann § 47-2314, *et seq.*, Ark. Code Ann. § 4-2-314, *et seq.*, Cal. Comm. Code § 2314, *et seq.*, Co. Rev. St. § 4-2-314, *et seq.*, Conn. Gen. Stat. Ann, § 42a-2-314, *et seq.*, 6 Del. C. § 2-314, *et seq.*, D.C. Code § 28:2-314, *et seq.*, Fla. Stat. Ann. § 672.314, *et seq.*, Ga. Code. Ann. § 11-2-314, *et seq.*, Haw. Rev. Stat. § 490:2-314, *et seq.*, Id. Code § 28-2-314, *et seq.*, Ill. Comp. Stat. Ann. Ch. 810, 5/2-314, *et seq.*, Ind. Code Ann. § 26-1-2-314, *et seq.*, Iowa Code Ann. § 554.2314, *et seq.*, Kansas Stat. Ann. § 84-2-314, *et seq.*, Ken. Rev. Stat. Ann. § 355.2-314, *et seq.*, La. Civ. Code Ann. Art. 2520, *et seq.*, 11 Maine Rev. Stat. Ann. § 2-314, *et seq.*, Md. Code Ann., Com. Law § 2-314, *et seq.*, Mass. Gen. Laws Ann. Ch. 106 § 2-314, *et seq.*, Mich. Comp. Laws Ann. § 440.2.314, *et seq.*, Minn. Stat. Ann. § 336.2-314, *et seq.*, Miss. Code Ann. § 75-2-314, *et seq.*, Missouri Rev. Stat. § 400.2-314, *et seq.*, Mont. Code Ann. § 30-

2-314, *et seq.*, Nev. Rev. Stat. U.C.C. § 104.2314, *et seq.*, N.H. Rev. Stat. Ann. § 382-A:2-314, *et seq.*, N.J. Stat. Ann. § 12A:2-314, *et seq.* ; N.M. Stat. Ann. § 55-2-314, *et seq.*, N.Y. U.C.C. Law 2-314, *et seq.*, N.C. Gen. Stat. Ann. § 25-2-314, *et seq.*, N.D. Stat. § 41-02-314, *et seq.*, Ohio Rev. Code Ann. § 1302.27, *et seq.*, 12A Okla. Stat. § 2-314, *et seq.*, Or. Rev. Stat. § 72.3140, *et seq.*, 13 Pa. Stat. Ann. § 2314, *et seq.*, R.I. Gen. Laws § 6A-2-314, *et seq.*, S.C. § 36-2-314, *et seq.*, S.D. Stat. 57A-2-314, *et seq.*, Tenn. Code Ann. § 47-2-314, *et seq.*, Tex. Bus. & Com. Code Ann. § 2.314, *et seq.*, Ut. Code Ann. § 70A-2-314, *et seq.*, Va. Code Ann. § 8.2-314, *et seq.*, Vt. Stat. Ann. § 9A-2-314, *et seq.*, Wa. Rev. Code § 62A.2-314, *et seq.*, W.Va. Code § 46-2-314, *et seq.*, Wis. Stat. Ann. § 402.314, *et seq.*, Wyo. Stat. § 34.1-2-314, *et seq.*

99.     As a proximate cause of P&G Companies' breach of warranty of fitness for a particular purpose, Plaintiffs and the Class suffered ascertainable losses, injuries, and damages as specified herein in an amount to be determined at trial.

## VIII.   COUNT III

### Violation of the Various Unfair and Deceptive Trade Practices Acts

100.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

101.     P&G Companies had a statutory duty to refrain from unfair or deceptive acts or practices in the design, development, promotion, sale and/or manufacture of the Pampers.

102.     Had P&G Companies not engaged in the deceptive conduct described above, Plaintiffs and the Class Members would not have purchased and/or paid for the Pampers.

103.     P&G Companies' deceptive, unconscionable or untruthful representations and material omissions to consumers and the public regarding the true nature of the Pampers purchased and used by Plaintiffs and the Class Members, constituted unfair and deceptive acts

and practices in violation of the following state consumer protection statutes: Ala. Code § 8-19-1, *et seq.*; Alaska Stat. § 45.50.471, *et seq.*; Ariz. Rev. Stat. § 44-1522, *et seq.*; Ark. Code § 4-88-101, *et seq.*; Cal. Civ. Code § 1770, *et seq.*, and Cal Bus. & Prof. Code § 17200, *et seq.*; Colo. Rev. Stat. § 6-1-105, *et seq.*; Conn. Gen. Stat. § 2-110a, *et seq.*; 6 Del. Code §§ 2511, *et seq.*, and 2531, *et seq.*; D.C. Code § 28-3901, *et seq.*; Fla. Stat. § 501.201, *et seq.*; Ga. Stat. §§ 10-1-372, *et seq.*, 10-1-392 and 10-1-420; Haw. Rev. Stat. § 480-1, *et seq.*; Idaho Code § 48-601, *et seq.*; 815 ILCS § 505/1, *et seq.*; Ind. Code Ann. § 24-5-0.5-1, *et seq.*; Iowa Code § 714.16, *et seq.*; Kan. Stat. § 50-623, *et seq.*; Ky. Rev. Stat. § 367.170, *et seq.*; La. Rev. Stat. § 51:1401, *et seq.*; 5 Me. Rev. Stat. § 205A, *et seq.*; Md. Com. Law Code § 13-101, *et seq.*; Mass. Gen. L. Ch. 93 A, *et seq.*; Mich. Comp. Laws Ann. § 445.90 1, *et seq.*; Minn. Stat. §§ 325D.43, *et seq.*; 325 F.67, *et seq.*; and 325 F.68, *et seq.*; Miss. Code Ann. § 75-24-1, *et seq.*; Vernon's Ann. Missouri Stat. § 407.010, *et seq.*; Mont. Code Ann. § 30-14-101, *et seq.*; Neb. Rev. Stat. § 59-1601, *et seq.*; Nev. Rev. Stat. Ann. § 59S.0903, *et seq.*; N.H. Rev. Stat. § 358-A:1, *et seq.*; N.J. Rev. Stat. § 56:8-1, *et seq.* ; N.M. Stat. § 57-12-1, *et seq.*; N.Y. Gen. Bus. Law §§ 349, et. seq,. and 350-e, *et seq.*; N.C. Gen. Stat. § 75-1.1, *et seq.*: N.D. Cent. Code §§ 51-12-01, *et seq.*, and 51-15-01, *et seq.*; Ohio Rev. Stat. § 1345.01, *et seq.*; Okla. Stat. § 15 751, *et seq.*; Or. Rev. Stat. § 6464.605, *et seq.*; 73 Pa. Stat. § 201-1, *et seq.*; R.I. Gen. Laws. § 6-13.1-1, *et seq.*; S.C. Code Laws § 39-5-10, *et seq.*; S.D. Codified Laws § 37-24-1, *et seq.*; Tenn. Code § 47-18-101, *et seq.*; Tex. Bus. & Com. Code § 17.41, *et seq.*; Utah Code § 13-11-1, *et seq.*; 9 Vt. § 2451, *et seq.*; Va. Code § 59.1-196, *et seq.*; Wash. Rev. Code § 19.86.0 10, *et seq.*; West Virginia Code § 46A-6-101, *et seq.*; Wis. Stat. § 100.20, *et seq.*; and, Wyo. Stat. § 40-12-101, *et seq.*

104. Plaintiffs and members of the class relied upon P&G Companies' misrepresentations and/or omissions in buying P&G Companies' Pampers.

105.    Plaintiffs will provide any required notice to appropriate entities regarding P&G Companies' unfair and deceptive trade practices.

106.    As a direct and proximate result of P&G Companies' wrongful conduct, Plaintiffs and the Class Members have been damaged by paying for the Pampers.

107.    As a direct and proximate result of P&G Companies' wrongful conduct, Plaintiffs and the Class Members are entitled to the damages available under applicable law.

## IX.   COUNT IV

### Unjust Enrichment

108.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

109.    At all times relevant hereto, P&G Companies designed, sold, distributed, marketed, and/or manufactured Pampers that had the capacity to and, in many cases, did harm preemies, newborns, older babies, and toddlers by causing severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments, on the babies' and children's extremely sensitive and delicate bottoms and other body parts that the Pampers are supposed to cover and to protect, but made false and misleading representations that the Pampers produce "all-around comfort," "keep babies dry and happy," and contain "mild ingredients which are gentle to the skin."

110.    Plaintiffs and Class Members conferred upon P&G Companies, without knowledge of the inherent dangers of P&G Companies' Pampers, payment for such products, benefits that were non-gratuitous.  P&G Companies accepted or retained the non-gratuitous benefits conferred by Plaintiffs and Class Members even though Plaintiffs and Class Members were not receiving products of the high quality, nature, fitness or value that had been represented

by P&G Companies and reasonable consumers would have expected. Retaining the non-gratuitous benefits conferred upon P&G Companies by Plaintiffs and Class Members under these circumstances is unjust and inequitable.

111.    Accordingly, Plaintiffs and Class Members are entitled to, and hereby seek, disgorgement and restitution of P&G Companies' wrongful profits, revenue, and benefits in a manner established by the Court and available under applicable law.

112.    Plaintiffs and the proposed Class Members are entitled to the imposition of a constructive trust upon P&G Companies such that their enrichment, benefit and ill-gotten gains may be allocated and distributed equitably by the Court to and/or for the benefit of Plaintiffs and the proposed Class Members.

## X.    COUNT V

### Negligence – Design, Manufacturing Defect and Failure to Warn

113.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

114.    P&G Companies designed, manufactured, sold, and/or distributed Pampers to parents of preemies, newborns, older babies, and toddlers.

115.    The Pampers had the capacity, and in many cases, did actually harm the preemies, newborns, older babies, and toddlers by causing severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments, on babies' and children's extremely sensitive and delicate bottoms and other body parts that the Pampers are supposed to cover and to protect when they left the hands of P&G Companies.

116.    P&G Companies had a duty to exercise reasonable care in the design, manufacture, sale and/or distribution of the Pampers, including a duty to ensure that the Pampers

did not have the capacity to harm children by causing severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments, on babies' and children's extremely sensitive and delicate bottoms and other body parts that the Pampers are supposed to cover and to protect.

117.    P&G Companies failed to exercise reasonable care in the design, manufacture, sale, and/or distribution, of the Pampers.

118.    Specifically, P&G Companies was negligent in its design, manufacture, testing, inspection, sale and/or distribution of the Pampers in that they:

A.    Failed to use reasonable care in designing and/or manufacturing the Pampers so as to avoid the harm of causing severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments, on babies' and children's extremely sensitive and delicate bottoms and other body parts that the Pampers are supposed to cover and to protect;

B.    Failed to conduct adequate quality testing of the Pampers to determine the safety of the Pampers prior to sale;

C.    Failed to accompany the Pampers with proper warnings regarding the possible adverse effects associated with severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments, on babies' and children's extremely sensitive and delicate bottoms and other body parts that the Pampers are supposed to cover and to protect.

119.    Despite the fact that P&G Companies knew or should have known that the Pampers could cause adverse health effects to children, P&G Companies continued to market and sell the Pampers to consumers, including Plaintiffs and members of the Class, despite the fact that the Pampers had the capacity, and in many cases, did actually harm the children by causing severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores,

scarring and/or other ailments, on babies' and children's extremely sensitive and delicate bottoms and other body parts that the Pampers are supposed to cover and to protect.

120. P&G Companies knew or should have known that Plaintiffs and members of the Class would foreseeably be put at risk and suffer adverse health effects as a result of P&G Companies' failure to warn of severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments, on babies' and children's extremely sensitive and delicate bottoms and other body parts that the Pampers are supposed to cover and to protect.

121. P&G Companies' negligence proximately caused Plaintiffs and the Class to be injured, including but not limited to severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments, on babies' and children's extremely sensitive and delicate bottoms and other body parts that the Pampers are supposed to cover and to protect.

122. Plaintiffs do not allege negligence claims based on an injury to the Pampers and themselves; Plaintiffs' negligence claims relate to injuries that they and Class members sustained as a result of the Pampers.

## XI.   COUNT VI

### Unlawful, Unfair or Fraudulent Business Acts and Practices in Violation of Cal. Bus. & Prof. Code § 17200, *et seq.* (On Behalf of California Resident Plaintiffs Against the Manufacturer Defendants)

123. Plaintiffs Brigette Wolfe and Joseph Wolfe repeat and reallege each and every allegation contained above as if fully set forth herein.

124. California Business and Professions Code § 17200 prohibits any "unfair, deceptive, untrue or misleading advertising." For the reasons set forth above, Defendants engaged in unfair, deceptive, untrue and misleading advertising in violation of California

Business and Professions Code § 17200, in that Defendants' representations and advertising were likely to deceive the public as to the safety of Pampers.

125.     California Business and Professions Code § 17200 also prohibits any "unlawful business act or practice."  The Defendants have engaged in "unlawful" business acts and practices by selling, marketing and distributing Pampers as safe when in fact the Pampers had the capacity to cause severe rashes, chemical burns, infections and/or other ailments on babies' and children's extremely sensitive and delicate bottoms and other body parts that the Pampers are supposed to cover and to protect.

126.     The Defendants' wrongful conduct occurred in California, because Defendants deliberately sold their products in California, and Plaintiffs Brigette Wolfe and Joseph Wolfe bought those products in California as a result of Defendants' efforts to sell their products in California to California residents.

127.     Plaintiffs Brigette Wolfe and Joseph Wolfe and members of the California Sub-Class have reasonably acted and relied on the misrepresentations made by Defendants regarding Defendants' assurances that Pampers were safe and merchantable, and have suffered injury as a direct result of the unlawful business practices of the Defendants.

128.     California Business and Professions Code § 17200 also prohibits any "unfair business act or practice."  Through the above-described conduct, the Manufacturer Defendants engaged in "unfair" business acts or practices and Defendants' conduct outweighs any business justification, motive or reason.

129.     California Business and Professions Code § 17200 also prohibits any "fraudulent business act or practice."  By engaging in the above-described conduct, the Defendants engaged in "fraudulent" business acts or practices in that the business acts and practices described above

- 44 -

had a tendency and likelihood to deceive persons to whom such conduct was and is targeted by selling, marketing and distributing Pampers as safe when in fact the Pampers had the capacity to cause severe rashes, chemical burns, infections and/or other ailments on babies' and children's extremely sensitive and delicate bottoms and other body parts that the Pampers are supposed to cover and to protect.

130.    Plaintiffs Brigette Wolfe and Joseph Wolfe and members of the California Sub-Class relied on Defendants' representations that the Pampers were safe for use.

131.    Plaintiffs Brigette Wolfe and Joseph Wolfe and members of the California Sub-Class were reasonably deceived by Defendants' representations that the products were safe when in fact the Pampers had the capacity to cause severe rashes, chemical burns, infections and/or other ailments on babies' and children's extremely sensitive and delicate bottoms and other body parts that the Pampers are supposed to cover and to protect.  Plaintiffs and members of the California Sub-Class would not have purchased the Pampers had they known of the risk of severe rashes, chemical burns, infections and/or other ailments.

132.    As a direct and proximate result of Defendants' misrepresentations about the safety of the Pampers, Plaintiffs Brigette Wolfe and Joseph Wolfe and members of the California Sub-Class have suffered damages.  Specifically, as a result of the defects and recalls, Plaintiffs Brigette Wolfe and Joseph Wolfe and members of the California Sub-Class, among other things, have purchased products that are defective and not fit for their ordinary use as diapers, and have suffered an increase risk of serious health problems.

133.    The Defendants have thus engaged in unlawful, unfair and fraudulent business acts and practices and false advertising, entitling Plaintiffs Brigette Wolfe and Joseph Wolfe to judgment and equitable relief against Defendants, as set forth in the Prayer for Relief.

134.     Additionally, pursuant to California Business & Professions Code § 17203,

Plaintiffs Brigette Wolfe and Joseph Wolfe seek an order requiring Defendants to immediately

cease such acts of unlawful, unfair and fraudulent business practices.

## XII.   COUNT VII

### Strict Liability- Design Defect/Manufacturing Defect and Failure to Warn (Against All P&G Companies)

135.     Plaintiffs repeat and reallege each and every allegation contained above as if fully

set forth herein.

136.     P&G Companies designed, manufactured, sold and/or distributed Pampers to

parents of preemies, newborns, older babies, and toddlers.

137.     The Pampers that P&G Companies designed, manufactured, sold and/or

distributed were defective in design and/or manufacturing.  Further, the Pampers were defective

when they left the control of the P&G Companies such that: (1) the foreseeable risks of exceeded

the benefits associated with the design or manufacturing with same, or (2) they were

unreasonably dangerous, more dangerous than an ordinary consumer would expect, and more

dangerous than other diapering products, including but not limited to their previous line of

Pampers.

138.     P&G Companies knew or should have known that the Pampers contained a non-

obvious danger to preemies', newborns', older babies', and toddlers' tender skin.  Moreover, the

presence of irritating chemicals was a known danger.

139.     P&G Companies knew that Plaintiffs and the Class would use the products

without first inspecting them for an unreasonably irritating chemicals that may react with babies'

excrement in the diaper.  However, P&G Companies failed to inform Plaintiffs and members of

the Class as to the adverse health and safety effects that the Pampers could have on young children.

140.    The Pampers were expected to and did reach Plaintiffs and other members of the Class without substantial change in condition.

141.    The Pampers P&G Companies designed, manufactured, sold and/or distributed were defective due to inadequate warning and inadequate inspection and testing, and inadequate reporting regarding the results of quality-control testing and safety inspections, or lack thereof.

142.    Had Plaintiffs and members of the Class been warned about the capacity of the Pampers to cause preemies, newborns, older babies, and toddlers to suffer from severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments, they would not have purchased, acquired, or otherwise obtained the Pampers, nor would they have used the Pampers.

143.    As a direct and proximate result of the defective condition of the Pampers as designed, manufactured, sold and/or distributed by P&G Companies, Plaintiffs and other members of the Class have been injured, including the capacity to experience severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments.

144.    Plaintiffs do not allege negligence claims based on an injury to the Pampers themselves; Plaintiffs' negligence claims relate to injuries that they and Class members and their children sustained as a result of the Pampers.

### XIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, for themselves and all others similarly situated, respectfully request that this Court enter a judgment against P&G Companies and in favor of Plaintiffs, and grant the following relief:

A.      Determine that this action may be maintained as a class action with respect to a national class or with subclasses corresponding to the several states' laws, pursuant to the appropriate subsections of Rule 23 of the Federal Rules of Civil Procedure; that the Court certify a class action with respect to particular issues if appropriate, and that the Court designate and appoint Plaintiffs and their counsel, Keller Rohrback L.L.P. and Keller Rohrback P.L.C., to serve as Class Representatives and Class Counsel, respectively;

B.      Require that P&G Companies ensure that the Pampers lack the capacity to cause severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments, on babies' and children's extremely sensitive and delicate bottoms and other body parts that the Pampers are supposed to cover and to protect;

C.      Require P&G Companies to submit product testing results on a regular basis to ensure that their products lack the capacity to cause severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments, on babies' and children's extremely sensitive and delicate bottoms and other body parts that the Pampers are supposed to cover and to protect;

D.       Award costs of rash-related medical expenses for Plaintiffs and members of the Class;

E.      Award the cost of appropriate treatment for those who experience the severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments related to the Pampers;

F.      Declare the conduct of P&G Companies as alleged herein to be unlawful;

G.      Grant Class Members awards of actual, compensatory, punitive and/or exemplary damages in such amount to be determined at trial and as provided by applicable law;

H.     Grant Class Members their costs of suit, including reasonable attorneys' fees, and
expenses as provided by law; and

I.     Grant Class Members such other, further, and different relief as the nature of the
case may require or as may be determined to be just, equitable, and proper by this Court.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on all issues so triable.

DATED this 11th day of May, 2010.

KELLER ROHRBACK P.L.C.

By *Gary D. Greenwald by*
*Gretchen Cappio per telephone*
*authorization*
Gary D. Greenwald   0024480
ggreenwald@kellerrohrback.com
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Tel: (602) 248-0088 / Fax: (602) 248-2822

*Trial Attorney for Plaintiffs*

KELLER ROHRBACK L.L.P.

Lynn Lincoln Sarko
lsarko@kellerrohrback.com
Gretchen Freeman Cappio
gcappio@kellerrohrback.com
Gretchen S. Obrist
gobrist@kellerrohrback.com
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel: (206) 623-1900 / Fax: (206) 623-3384

DONALD S. VARIAN, ESQ.

Mr. Donald S. Varian, Jr.  0013027
195 South Main Street, Suite 400
Akron, OH 44308

Tel: (330) 434-4100 / Fax: (330) 434-4110
varianlaw@aol.com

*Attorneys for Plaintiffs*