UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

|  |  |  |
|---|---|---|
| IN RE DRY MAX PAMPERS LITIGATION | ) ) ) ) ) ) ) ) | No. 1:10-CV-00301-TSB<br><br>CONSOLIDATED CLASS ACTION COMPLAINT |

Plaintiffs Angela Clark, Kenneth Clark, Kelly Adams, Kristina Atwood, Chasitie Ayers-Porter, Crissy Beach, Amber Beck, Ryan Berman, Stacie Berman, Meredith Bottar, Melanie Braun, Gina Brown, Whitney Caldwell, Amanda Converse, Shannon D'Andrea, Angelina Davenport, Robert Davenport, Darcel Darscheid, Brandon Ehrhart, Jessica Ehrhart, Gayle Hironimus, Brandon Hulse, Victoria Katona, Mariah MaLoon, Morgan Maue, Robin York, Jeni McAllister, Maria McMahon, Natalie Papailiou, Cassie Raether, Stephanie Rios, Jodi Robins, Jennifer Robinson, Leah Robison, Alexandra Rosenbaum, Lisa Saacks, Diane Samelson, Adona Schank, Asia Southard, Suzy Sullivan, Nicole A. Tepper, John Walker, Karina Walker, Emily Weaver, Ryan Weaver, Brigette Wolfe, Joseph Wolfe, and Amy Young, individually and on behalf of all others similarly situated, allege the following based upon information and belief, and upon the investigation of counsel:

## I.    INTRODUCTION

1.      This class action is brought by Plaintiffs ("Class Representatives") individually and on behalf of all persons in the United States who purchased or acquired (including by gift) ("Class Members") Pampers brand diapers or "Easy Ups" containing "Dry Max" technology ("Dry Max Pampers"), and who discarded or ceased using the Dry Max Pampers because of concerns about health effects including, but not limited to: severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments linked to the Dry Max Pampers.  As set forth in more detail *infra*, Plaintiffs seek to represent a nationwide class as well as a number of classes defined by State.  Plaintiffs bring a variety of common law and statutory claims for unfair and deceptive trade practices, consumer protection, breach of warranty, unjust enrichment, and product liability, all of which involve the same core issues of fact and law.

2.      The Dry Max Pampers were manufactured, marketed, distributed, promoted, and/or sold by Defendants Procter & Gamble Company ("P&G"); Procter & Gamble Paper Products Company ("P&G Paper"); and/or Procter & Gamble Distributing LLC ("P&G Distributing") (collectively, "P&G Companies" or "Defendants").  On information and belief, P&G Companies first offered the Dry Max Pampers for sale in the U.S. market on or about March 1, 2010, but P&G Companies began placing some of the new Dry Max Pampers into prior packaging as early as the fall of 2008.[1]

3.      Although P&G Companies represented that the Dry Max Pampers they made, marketed, distributed, promoted and/or sold were safe for premature babies ("preemies"),

---

[1] *See* Jeremiah McNichols, Pampers, On The Record: An Interview with Jodi Allen, ZRecommends.com, June 3, 2010, http://www.zrecommends.com/detail/pampers-on-the-record-an-interview-with-jodi-allen/ (last visited Aug. 19, 2010).

newborns, older babies, and toddlers (collectively "babies"), the Dry Max Pampers actually had the capacity to and, in many cases, did actually harm the babies by causing severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments, on babies' extremely sensitive and delicate bottoms and other body parts that the Dry Max Pampers were supposed to cover and to protect. P&G Companies knew or should have known that the Dry Max Pampers were not the safe, gentle, and healthful products that P&G Companies represented them to be. Instead, the Dry Max Pampers not only harmed or potentially harmed the Plaintiffs' and Class Members' preemies, newborns, older babies, and toddlers, but they also were rendered useless to Plaintiffs and Class Members because they failed to perform as P&G Companies promised and represented in its advertisements and packaging.

4.     Preemies, newborns, older babies, and toddlers are especially sensitive and vulnerable to skin irritation and infection. "[T]he skin of infants 8-24 months of age shows functional signs of immaturity. This may lead to increased permeability and a reduced capacity for defense against chemical and microbial aggression."[2] Moreover, as described in a recent study by Italian scientists, "The absorption of substances in contact with the skin is greater in newborns and infants for three reasons: 1) their skin is thinner; 2) there is a high ratio between skin surface area and body weight; 3) the skin is covered by a sort of down that increases the absorbent surface."[3] Likewise, the chapter entitled "Ages of Man and Their Dermatoses" in *Dermatology in Clinical Practice* establishes that the skin of neonates and infants differs from

---

[2] Francesca Giusti, et al., *Skin Barrier, Hydration and pH of the Skin of Infants Under 2 Years of Age*, 18 PEDIATRIC DERMATOLOGY 93 (2001).

[3] Paolo Pigatto et al., *Contact Dermatitis in Children*, 36 ITALIAN J. OF PEDIATRICS 2 (2010), *available at* http://www.ijponline.net/content/36/1/2 (last visited Aug. 19, 2010).

adults because "in neonates and during early infancy, the skin defenses are not fully developed, the skin is vulnerable to physical, chemical, and microbial attack."[4]

5. The authors of "Alternative Test Methods for Assessing Mechanical Properties of Disposable Diapers" note of absorbent products, "These products affect the skin's health directly, because they are in close contact with the human skin."[5] P&G Companies scientist Miranda A. Farage noted in a 2005 study that baby diapers "are intended to be worn in contact with the skin for prolonged periods of time."[6]

6. Seeking to protect their babies from harm, parents and caregivers reasonably relied upon P&G Companies' false and misleading product labels and advertisements that the Dry Max Pampers were safe and appropriate for their intended use as products to absorb babies' bodily waste and to protect their babies' sensitive skin from unnecessary irritation. Plaintiffs and Class Members purchased P&G Companies' Dry Max Pampers believing that they would ensure the safety and well-being of their babies. Plaintiffs and Class Members would not have purchased the Dry Max Pampers if P&G Companies had disclosed the true capacity of the Dry Max Pampers to irritate skin and cause severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments when used as directed. Thus, Plaintiffs and the Class Members were damaged by P&G Companies' omissions and failure to warn that the Dry Max Pampers were irritating to babies' tender skin.

7. As the manufacturers and/or distributors of the Dry Max Pampers, which were designed for use by preemies, newborns, older babies, and toddlers, P&G Companies knew or

---

[4] Zahra Zaidi & Sean W. Lanigan, DERMATOLOGY IN CLINICAL PRACTICE, 481 (2010).

[5] Necla Yaman et al., *Alternative Test Methods for Assessing Mechanical Properties of Disposable Diapers*, 15 FIBRES & TEXTILES E. EUR. 80 (2007).

[6] Miranda A. Farage, *Are We Reaching the Limits of our Ability to Detect Skin Effects with our Current Testing and Measuring Methods for Consumer Products?*, 52 CONTACT DERMATITIS 297, 298 (2005).

should have known that their products contained physical and/or chemical irritants. P&G Companies failed to take critical steps to ensure that their representations, advertisements and/or labels were accurate, and that the Dry Max Pampers were safe. Upon information and belief, P&G Companies could have—and should have—acted to ensure the safety of their products. Instead, Dry Max Pampers reached Plaintiffs and Class Members in the stream of commerce despite defects in design and/or manufacture. P&G Companies have continued to refuse to warn parents of known defects and the risk associated with using Dry Max Pampers.

## II.  JURISDICTION AND VENUE

8.  The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d) because this action is between citizens of different states, a class action has been pled, and the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs.

9.  Venue is proper in this District under 28 U.S.C. §§ 1391(a), (b), and (c); 28 U.S.C. § 1407; and 15 U.S.C. § 22. P&G Companies do substantial business in the State of Ohio and within this Federal Judicial District, advertise in this District, receive substantial compensation and profits from the sales of the Dry Max Pampers, and have made material omissions and misrepresentations and breaches of warranties in this District so as to subject them to personal jurisdiction in this District.

## III.  PARTIES

10.  Plaintiffs Angela Clark and Kenneth Clark reside in Bay City, Michigan. They have identical twin daughters who are two years old. The Clarks received a coupon for Pampers Cruisers with Dry Max and purchased the diapers in mid-April 2010 in Essexville, Michigan. One of the twins (Baby A) was a little bigger and started wearing Pampers Cruisers with Dry Max, while the other twin (Baby B) was wearing another brand in a smaller size. During the

week that the twins were wearing different brands, within a few days of wearing the Dry Max

Pampers, Baby A developed swelling and skin irritation accompanied by severe pain during

urination.  She was visibly uncomfortable as a result of the symptoms, and expressed that she

had discomfort and pain in the affected area.  The Clarks took Baby A to a medical doctor for

evaluation and treatment.  The doctor tested Baby A for a urinary tract infection.  Before those

tests came back, Baby A developed a fever, at which point the Clarks returned to the doctor with

Baby A.  The doctor prescribed Cefdinir antibiotic.  When the family ran out of the diaper brand

that Baby B had been wearing, both Baby A and Baby B used Pampers Cruisers with Dry Max.

Baby B then developed the same symptoms that Baby A had already exhibited, including

swelling and skin irritation, painful urination, a fever, pain, and discomfort.  Baby B was then

tested for a urinary tract infection.  The tests for urinary tract infections involved a painful

catheterization procedure.  The tests for Baby A and Baby B came back negative, and the

medical professionals involved could not definitively diagnose the twins' conditions.  However,

upon switching both children from Dry Max Pampers to another diaper brand, their conditions

started clearing up.  At the time they purchased and used the Dry Max Pampers, Mr. and Mrs.

Clark were unaware that there was a danger that their children would develop such a severe rash.

Had P&G Companies fully disclosed the presence of physical and/or chemical irritants in the

Dry Max Pampers, Mr. and Mrs. Clark would neither have purchased the Dry Max Pampers nor

allowed their children to be exposed to them.  Now that the Clarks are aware that use of Dry Max

Pampers directly correlated with their daughters' medical conditions, the product is of no value

to them.  On information and belief, the Dry Max Pampers caused these medical conditions.  In

addition, the Clarks incurred medical expenses in connection with their use of Dry Max Pampers.

As a result of the foregoing, Plaintiffs Angela Clark and Kenneth Clark have been damaged.

11.     Plaintiff Kelly Adams resides in Colorado Springs, Colorado with her four-month-old son.  Sometime in early May, 2010, Ms. Adams purchased a package of Pampers Swaddlers with Dry Max for her son.  On or about May 5, 2010, within one day of first using the Dry Max Pampers, Ms. Adams observed that her son was developing a hot, irritated-looking rash, including a welt on his buttocks.  The rash covered his entire buttocks and part of his genital area and extended down to his inner thighs.  Ms. Adams tried everything she could to treat the rash at home, including increasing the frequency of his diaper changes, at one point changing her son several times an hour.  She also tried over-the-counter remedies including Desitin, Burt's Bees Diaper Ointment, A&D Ointment, California Baby Diaper Area Spray, Vaseline, frequent baths with California Baby Wash, and cornstarch.  When home treatment failed to alleviate or even improve the rash, Ms. Adams took the baby to her pediatrician on or about May 10, 2010 to have the rash examined and treated.  On this visit, her doctor opined that the rash could be caused by a milk formula allergy, and advised Ms. Adams to try a different formula, which was lactose free.  The doctor also advised her to continue using home treatment methods to attempt to clear up the rash.  When the rash continued to worsen, even with the change in formula, Ms. Adams returned to the doctor on May 14, 2010.  On this visit, her doctor advised her to try another formula change, switching to a formula that had very mild and hypoallergenic ingredients.  The doctor also prescribed silver sulfadiazine, an antifungal/antibacterial burn cream to treat the rash.  When she returned home with the prescription, her husband, a combat medic soldier, noted that the cream prescribed for their baby was the same thing he used for burn victims in Iraq.  However, after yet another change in formula to soy-based Similac (a total of three formula changes) and regular use of the cream, the rash was not improving and her baby was still suffering.  As the rash progressed, the original

welts turned into blisters, which opened and bled, and her son continued to develop more welts and blisters, including ones on the tip of his penis and on the insides of his thighs.  By May 16, 2010, Ms. Adams was washing her baby's diaper area with lukewarm water and mild soap between diaper changes, checking his diaper every five minutes, and changing him multiple times an hour.  Applying cornstarch to the diaper area and letting her baby air-dry without a diaper for a short time between changes was the only thing that seemed to help reduce the rash.  On May 17, 2010, she returned to the doctor again.  This time, because the specialty and hypoallergenic formulas were not making a difference, the doctor said that the rash could be an issue related to her baby's gastrointestinal tract and referred Ms. Adams's son to a gastroenterologist.  On or about May 23, 2010, Ms. Adams first became aware of other parents' experiences with the Dry Max Pampers when she saw it on a friend's Facebook posting.  Ms. Adams immediately discontinued use of the Dry Max Pampers and switched to a store-brand diaper.  Within 30 hours, she noticed marked improvement of the rash; for the first time in weeks there was no oozing or bleeding of her baby's skin when she changed his diaper and the redness was starting to wane.  By May 26, 2010, the rash was gone, although there was still light scabbing of the area where the worst sores had been.  On May 27, 2010, Ms. Adams took her son back to see his pediatrician for his 6 week check up.  At that appointment, the doctor decided that Ms. Adams' son no longer needed to see a gastroenterologist, since all the problematic symptoms had cleared up and her son was no longer experiencing discomfort.  She also advised that the Adamses switch back to the original formula they were using, Similac Advance, since it was obviously not a milk allergy issue.  The Adamses resumed their use of Similac Advance the same day, and have not had any diaper area rashes or gastrointestinal issues since then.  Ms. Adams filed a complaint with the Consumer Products Safety Commission ("CPSC") on May 23,

2010.  At the time she purchased and used the Dry Max Pampers, Ms. Adams was unaware that there was a danger that her son would develop such a severe rash.  Had P&G Companies fully disclosed the presence of physical and/or chemical irritants in the Dry Max Pampers, Ms. Adams would neither have purchased them nor allowed her child to be exposed to them.  Now that Ms. Adams is aware that the use of Dry Max Pampers directly correlated with her son's severe skin condition, the product is of no value to her.  On information and belief, the Dry Max Pampers caused this medical condition.  In addition, Ms. Adams incurred medical expenses in connection with her use of Dry Max Pampers.  As a result, Plaintiff Kelly Adams has been damaged.

12.     Plaintiff Kristina Atwood resides in Tacoma, Washington, and has an eight-month-old son.  In early- to mid-April 2010, she purchased Defendant P&G Companies' Pampers Cruisers with Dry Max and Pampers Baby Dry diapers for her son in Tacoma, Washington.  Within a day after she started using Dry Max Pampers, her son developed a rash, which progressed to a blistered and oozing burn-like skin condition.  He was visibly uncomfortable as a result of the symptoms, and expressed that he had discomfort and pain in the affected area.  Plaintiff Atwood called a medical doctor for evaluation and treatment, who prescribed Nystatin for diaper rash, suspected a yeast infection, and advised her that the rash should clear up in one to two days with use of the prescription.  When the condition failed to improve after about ten days, Ms. Atwood took her son to the doctor again.  This time, the pediatrician said he believed the child was having a reaction to the diapers and advised her to switch to a different diaper brand.  He also prescribed a prescription paste.  Upon stopping use of Dry Max Pampers, Plaintiff Atwood's son's condition began to clear up.  On May 7, 2010, Ms. Atwood wrote to a consumer advocacy website (www.consumeraffairs.com) to share her son's condition and her experience with Dry Max Pampers.  Ms. Atwood also filed a complaint with

- 9 -

the CPSC on or about May 7, 2010.  At the time she purchased and used the Dry Max Pampers, Ms. Atwood was unaware that there was a danger that her child would develop such a severe rash.  Had P&G Companies fully disclosed the presence of physical and/or chemical irritants in the Dry Max Pampers, Ms. Atwood would neither have purchased them nor allowed her child to be exposed to them.  Now that Ms. Atwood is aware that use of Dry Max Pampers directly correlated with her son's medical condition, the product is of no value to her.  On information and belief, the Dry Max Pampers caused this medical condition.  In addition, Ms. Atwood incurred medical expenses in connection with her use of Dry Max Pampers.  As a result of the foregoing, Plaintiff Kristina Atwood has been damaged.

13.     Plaintiff Chasitie Ayers-Porter resides in Madison, Alabama, and has sixteen-month-old twin sons.  Around the end of March, 2010, Ms. Ayers-Porter purchased Defendant P&G Companies' Pampers Cruisers with Dry Max in the Madison, Alabama area.  Within two days of beginning use of the Dry Max Pampers, Ms. Ayers-Porter's sons developed severe rashes with broken, bleeding and oozing blisters in their diaper regions.  The rashes were localized in the groin and buttocks area, rather than manifesting as a rash all over their bottoms, and were nearly identical in appearance and severity.  The children were visibly uncomfortable as a result of the symptoms, and expressed discomfort in the affected areas, including expressions of fear and pain during diaper changes.  Ms. Ayers-Porter attempted to treat her sons' conditions at home with Desitin and Aveeno.  The home treatments failed to result in any improvement.  Ms. Ayers-Porter did not change anything in the twins' diets, wipes or hygienic products.  On or about the first week of April, 2010, she took the twins to their pediatrician.  The doctor prescribed Nystatin and an antibiotic for the twins' severe rashes, described the problem as one of contact irritation, and advised Ms. Ayers-Porter to cease use of the Dry Max Pampers.  After

this appointment, Ms. Ayers-Porter followed her doctor's advice and switched to another brand of diapers.  It was not until this switch was made that her boys' conditions began to improve. Within two days of the switch, the rashes had healed, with the exception of some scarring that is still visible in the areas where the severe, blistering rashes had been on both of her sons.  On or about the first week of May, 2010, Ms. Ayers-Porter filed a complaint with the CPSC about the Dry Max Pampers.  At the time she purchased and used the Dry Max Pampers, Ms. Ayers-Porter was unaware that there was a danger that her child would develop such a severe rash.  Had P&G Companies fully disclosed the presence of physical and/or chemical irritants in the Dry Max Pampers, Ms. Ayers-Porter would neither have purchased them nor allowed her children to be exposed to them.  Now that Ms. Ayers-Porter is aware that the use of Dry Max Pampers directly correlated with her boys' medical conditions, she has completely stopped using and purchasing them.  On information and belief, the Dry Max Pampers caused this medical condition.  In addition, Ms. Ayers-Porter incurred medical expenses in connection with her use of Dry Max Pampers.  As a result, Plaintiff Chasitie Ayers-Porter has been damaged.

14. Plaintiff Crissy Beach resides in Sheridan, Oregon and has a ten-month-old son. On or about May 1, 2010, she purchased Defendant P&G Companies' Pampers Cruisers with Dry Max Pampers for her son in McMinnville, Oregon.  Ms. Beach was a loyal Pampers mom, who had used Pampers with her older children.  Within three or four days of Ms. Beach's first use of the Dry Max Pampers, her son suddenly developed a red, blistering, oozing, bleeding rash over his buttocks.  The rash became severe very quickly, and her son was visibly uncomfortable as a result of the symptoms, screaming and trying to crawl away from his mother during diaper changes.  The same day the rash first appeared, Ms. Beach called her son's pediatrician, who instructed her to apply Neosporin to the area and carefully wipe and clean the area in order to

prevent infection and help it heal.  Though Ms. Beach followed the doctor's instructions, the rash

was so severe and was causing her child so much pain that she took him to the doctor the

following day.  Upon the doctor's physical evaluation of the child, the doctor stated that the

condition was not a normal diaper rash, that it looked like a "chemical burn" and advised her to

stop using the new diapers on her son.  He also advised her to let the baby go diaperless as much

as she could, to apply wet washcloths to the area to cool it off, and to apply a burn cream if

desired.  The same evening, she stopped using the Dry Max Pampers.  Within 24 hours, she

noticed that the condition was beginning to improve.  The day after the doctor visit, the baby's

grandmother brought Ms. Beach some burn cream to apply to the sores and she added that to her

home treatment.  As the sores opened and oozed, diaper changes continued to cause her son

severe pain as his skin would stick to the diaper and peel as the diaper was removed.  Within two

weeks, the condition had completely healed, except for some mild scarring of the affected area.

Ms. Beach filed a complaint with the CPSC in May 2010.  At the time she purchased and used

the Dry Max Pampers, Ms. Beach was unaware that there was a danger that her child would

develop such a severe rash.  Had P&G Companies fully disclosed the presence of physical and/or

chemical irritants in the Dry Max Pampers, Ms. Beach would neither have purchased them nor

allowed her child to be exposed to them.  Now that Ms. Beach is aware that the use of Dry Max

Pampers directly correlated with her son's medical condition, the product is of no value to her.

On information and belief, the Dry Max Pampers caused this medical condition.  In addition, Ms.

Beach incurred medical expenses in connection with her use of Dry Max Pampers.  As a result,

Plaintiff Crissy Beach has been damaged.

15.     Plaintiff Amber Beck resides in Vancouver, Washington and has a seven-month-

old daughter.  Ms. Beck's daughter was born prematurely, and spent several weeks in the

Neonatal Intensive Care Unit (NICU) before being discharged.  During the baby's ten-week hospital stay, she was diapered with Pampers Swaddlers brand diapers.  While at the hospital, the baby developed a severe rash which was treated by medical staff with Desitin.  At the time the baby was discharged at ten weeks old, Ms. Beck was given a package of Pampers Swaddlers with Dry Max in size 1, a size too large for the baby at that time.  Several weeks later, when the baby was three and a half months old, Ms. Beck first used the Dry Max Pampers given to her by the hospital staff.  After using just one of the Dry Max Pampers, Ms. Beck's daughter developed a severe rash, with pimple-like blisters and redness on the infant's buttocks, inner thighs and genital region.  Over the two days that Ms. Beck used the Dry Max Pampers, the baby was visibly uncomfortable as a result of the symptoms, and expressed that she had discomfort in the affected area.  During diaper changes, the infant screamed in pain, flinched and attempted to turn over to avoid her mother's touch on her skin.  Ms. Beck attempted to treat the baby's skin with Desitin, the over-the-counter medication that had been used by the NICU nurses during the baby's hospital stay.  She used a clear version of the medication, so that she could see the skin to monitor it for any changes.  However, the baby's severe skin irritation did not improve.  After two days of using the Dry Max Pampers, Ms. Beck heard from her mother that a television news station had reported about parents' complaints that the Dry Max Pampers were causing severe skin reactions on their children.  Ms. Beck immediately switched to a different brand of diaper, and her daughter's symptoms began to improve.  After four or five days, the redness and blisters had cleared up, and the baby was no longer in discomfort.  At the time she used the Dry Max Pampers, Ms. Beck was unaware that there was a danger that her daughter would develop such a severe rash.  Had P&G Companies fully disclosed the presence of physical and/or chemical irritants in the Dry Max Pampers, Ms. Beck would not have allowed her child to be exposed to

them.  Now that Ms. Beck is aware that the use of Dry Max Pampers directly correlated with her daughter's severe medical condition, the product is of no value to her.  On information and belief, the Dry Max Pampers caused this medical condition.  As a result, Plaintiff Amber Beck has been damaged.

16.     Plaintiffs Ryan and Stacie Berman reside in Commerce Township, Michigan. They have two daughters who are nearly three years old and 20 months old, respectively.  The Bermans have been using Pampers brand diapers since their first child was born.  In April 2010, the Bermans purchased a package of Pampers Cruisers with Dry Max in Commerce Township for use on their children.  They noticed that the package stated "Dry Max" on the label; prior boxes they had purchased did not say "Dry Max."  The Bermans looked up the new diapers on Defendants' website, www.Pampers.com.  The same day that their children began wearing the Dry Max Pampers, they noticed that both girls had developed red, irritated looking rashes on their buttocks.  The Bermans attempted to treat the rashes at home with Desitin ointment, but the rashes persisted and worsened.  The children were visibly uncomfortable as a result of the symptoms, and expressed that they had pain and discomfort in the affected areas.  The girls would fidget and put their hands down the back of their diapers.  They would also avoid wearing the diapers when they could, and the older girl would kick, scream and fight her parents during diaper changes.  Approximately 10 days after the onset of the rash, the Bermans' older daughter exhibited large red and white welts on her buttocks.  These welts were so irritating that she scratched herself until she bled.  Alarmed about the rashes and welts, Ms. Berman telephoned her mother for advice.  Her mother told her that she had just seen a television report about the Dry Max Pampers.  The Bermans concluded that the Dry Max Pampers may have been the cause of their daughters' affliction and Ms. Berman bought a new brand of diapers the following morning.

After their daughters began wearing the new diapers, the problem immediately began to subside and has since disappeared.  At the time they used the Dry Max Pampers, Mr. and Ms. Berman were unaware that there was a danger that their daughters would develop such a severe rash. Had P&G Companies fully disclosed the presence of physical and/or chemical irritants in the Dry Max Pampers, the Bermans would neither have purchased them nor allowed their children to be exposed to them.  Now that the Bermans are aware that the use of Dry Max Pampers directly correlated with their daughters' severe medical conditions, the product is of no value to them. On information and belief, the Dry Max Pampers caused this medical condition.  As a result, Plaintiffs Ryan and Stacie Berman have been damaged.

17.     Plaintiff Meredith Bottar resides in Elgin, South Carolina and has a 22-month-old son.  On or about the beginning of March 2010, she purchased Defendant P&G Companies' Pampers Cruisers with Dry Max for her son in Columbia, South Carolina.  The night after the initial use of the Dry Max Pampers, on March 12, 2010, her son developed a bright red, inflamed rash that extended from his diaper area to the belly button, with two quarter-sized oozing sores on his buttocks.  Her son was visibly uncomfortable as a result of the symptoms.  He cried during diaper changes, refused to sit down in the bathtub during bathtime, and expressed fear and pain when soiling his diaper.  Ms. Bottar was also contacted by her daycare provider when they experienced problems changing her son's diapers.  Ms. Bottar initially attempted to treat her son's condition at home with Desitin, and while the diaper cream stopped the weeping and draining of the blisters, the rash still spread.  On March 18, 2010, Ms. Bottar brought her son to his pediatrician, who prescribed an anti-yeast cream, Vusion.  She applied this ointment as directed, but did not see any improvement in her son's condition.  Ms. Bottar contacted the doctor twice over the phone after this initial appointment and was advised to apply Monistat,

Lotrimin, and Cortisone to treat the rash.  Despite these treatments, the rash failed to improve and continued to spread down the backs of her son's legs and up to his belly button, where she noticed that his skin was breaking out and scabbing over.  Ms. Bottar returned to her son's pediatrician on April 7, 2010.  This time, the doctor determined that the rash could be contact dermatitis, and asked questions about the diaper products Ms. Bottar used, although he was still unsure what the cause of the condition was.  On April 9, 2010, Ms. Bottar saw an article on Yahoo.com describing parents' complaints of rashes caused by the Dry Max Pampers.  Ms. Bottar ceased use of Defendant's product immediately and within 72 hours, she noticed that the rash had receded and started to heal.  The rash has now completely healed except for increased susceptibility to skin irritation in the affected area.  At the time she purchased and used the Dry Max Pampers, Ms. Bottar was unaware that there was a danger that her child would develop such a severe rash.  Had P&G Companies fully disclosed the presence of physical and/or chemical irritants in the Dry Max Pampers, Ms. Bottar would neither have purchased them nor allowed her child to be exposed to them.  Now that Ms. Bottar is aware that the use of Dry Max Pampers directly correlated with her son's medical condition, the product is of no use to her.  On information and belief, the Dry Max Pampers caused this medical condition.  In addition, Ms. Bottar incurred medical expenses in connection with her use of Dry Max Pampers.  As a result, Plaintiff Meredith Bottar has been damaged.

18.     Plaintiff Melanie Braun resides in Morgantown, West Virginia and has a nine-month-old son.  When Ms. Braun's son was about five months old, he developed a severe rash while using Pampers Swaddlers with Dry Max .  Ms. Braun was a regular user of Pampers brand diapers, but first purchased the Dry Max Pampers diapers at the beginning of March 2010.  When she began using the Dry Max Pampers a day or two after her purchase, the baby

immediately developed a red, blistering rash on his buttocks, upper legs and genital area.  As it

worsened, the blisters began bleeding when the baby was wiped during diaper changes.  During

this time, while Ms. Braun used the Dry Max Pampers brand diapers, the baby was visibly

uncomfortable as a result of his symptoms, and expressed that he had discomfort and pain in the

affected area.  He was cranky and unable to sleep, and would scream in pain when his mother

wiped his skin during diaper changes.  Ms. Braun attempted to treat the rash with topical

treatments such as Desitin and Vaseline, with no improvement.  On or around March 3, 2010,

Ms. Braun took the child to his doctor, who prescribed Nystatin with steroid cream, again with

no improvement after use.  The child's severe rash continued for several days, until he spent an

extended stay at his grandmother's home beginning on or around March 13, 2010.  The baby's

grandmother used a different brand of diaper during his visit.  Upon the switch to a non-Pampers

brand diaper, the baby's blistering rash immediately improved.  The blistering rash has now

healed, though left some scarring on the affected area.  Ms. Braun has now switched to a

different brand of diaper.  At the time she used the Dry Max Pampers, Ms. Braun was unaware

that there was a danger that her son would develop such a severe, blistering rash.  Had P&G

Companies fully disclosed the presence of physical and/or chemical irritants in the Dry Max

Pampers, Ms. Braun would neither have purchased them nor allowed her child to be exposed to

them.  Now that Ms. Braun is aware that the use of Dry Max Pampers directly correlated with

her son's severe medical condition, the product is of no value to her.  On information and belief,

the Dry Max Pampers caused this medical condition.  In addition, Ms. Braun incurred medical

expenses in connection with her use of Dry Max Pampers.  As a result, Plaintiff Melanie Braun

has been damaged.

19.     Plaintiff Gina Brown resides in Des Moines, Iowa, and has a one-year-old daughter.  On or about March 7, 2010, she purchased Defendant P&G Companies' Pampers Cruisers with Dry Max in the Des Moines, Iowa metropolitan area.  Within a day or two of Ms. Brown's first use of the Dry Max Pampers, her daughter developed a pin-prick-like rash.  After consulting with a doctor by phone, Plaintiff Brown was concerned that the rash was caused either by a new diaper or a new food.  She therefore eliminated the new Dry Max Pampers and a new food she had been giving her daughter for approximately 6 weeks.  The condition cleared up.  On or about April 27, 2010, Ms. Brown received a phone-call from her in-house daycare provider asking permission to use the Dry Max Pampers purchased by Plaintiff in early March 2010 because the other brand she had been using ran out, to which Ms. Brown agreed.  At approximately 1:00 p.m. that day, the daycare provider put Plaintiff Brown's child in a Dry Max Pampers diaper and put her down for a nap.  At approximately 2:30 p.m., the child woke up screaming.  She had three large bleeding welts and open sores, one of which was oozing and hot to the touch, consistent with a burn.  The daycare provider immediately discontinued use of the Dry Max Pampers.  Ms. Brown then called a medical doctor, who recommended purchasing zinc oxide cream to treat the open sores and wounds.  The child was visibly uncomfortable as a result of the symptoms, and expressed that she had discomfort in the affected area.  She cried and grabbed at her diaper, and tried to roll away from her parents or fight against them during diaper changes.  Plaintiff Brown's daughter's skin condition took nearly six days to completely heal, with the bleeding lasting for two more days and the oozing lasting for four days.  Ms. Brown's daughter has developed visible scars around her diaper region since the complete healing of her sores.  Plaintiff Brown complained to the CPSC on or about May 3, 2010.  At the time she purchased and used the Dry Max Pampers, Ms. Brown was unaware that there was a danger that

her child would develop such a severe rash.  Had P&G Companies fully disclosed the presence

of physical and/or chemical irritants in the Dry Max Pampers, Ms. Brown would neither have

purchased them nor allowed her child to be exposed to them.  Now that Ms. Brown is aware that

the use of Dry Max Pampers directly correlated with her daughter's medical condition, the

product is of no value to her.  On information and belief, the Dry Max Pampers caused this

medical condition.  In addition, Ms. Brown incurred medical expenses in connection with her use

of Dry Max Pampers.  As a result, Plaintiff Gina Brown has been damaged.

   20.  Plaintiff Whitney Caldwell resides in Crocker, Missouri and has a six-month-old

son.  On or about the first week of July, 2010, Ms. Caldwell purchased P&G Companies'

Pampers Swaddlers with Dry Max in the St. Roberts, Missouri area.  On or about July 10, 2010,

Ms. Caldwell noticed a rash localized in the area where the diaper's elastic bands wrapped

around the child's legs.  The rash was initially bright red and hot-looking and, over the next two

days, quickly became more severe, with blisters and open, oozing sores.  The child was visibly

uncomfortable as a result of the symptoms, and expressed that he had discomfort and pain in the

affected areas.  He screamed during diaper changes, trying to crawl away from his mother, and

woke up over five times during the night, crying from pain.  Ms. Caldwell stopped using the Dry

Max Pampers the same day.  Ms. Caldwell initially attempted to treat her son's condition at

home with a Zinc Oxide Paste and Neosporin, but this failed to result in any improvement.  On

July 12, 2010, Ms. Caldwell brought her son to the family doctor who evaluated the child's

symptoms, swabbed the affected areas and determined that the rash was not the result of a fungal

infection.  The doctor told Ms. Caldwell that the condition was a reaction to the diapers, and

advised her to continue using zinc oxide on the area, letting the skin dry before application.  Both

her son's maternal grandmother (a charge nurse in the Emergency Room) and his paternal

grandmother (the head nurse in infection control) visited him at this time and told Ms. Caldwell that they thought the reaction looked like a chemical burn.  Ms. Caldwell continued home treatment as directed, using zinc oxide and butt paste to cover the raw areas of her son's skin. Within 24 hours after she stopped using the Dry Max Pampers, she noticed improvement in her son's symptoms, and within two weeks the rash had completely healed, although there appears to be mild scarring of the affected area.  At the time she purchased and used the Dry Max Pampers, Ms. Caldwell was unaware that there was a danger that her child would develop such a severe rash.  Had P&G Companies fully disclosed the presence of physical and/or chemical irritants in the Dry Max Pampers, Ms. Caldwell would neither have purchased them nor allowed her child to be exposed to them.  Now that Ms. Caldwell is aware that the use of Dry Max Pampers directly correlated with her son's medical condition, the product is of no use to her.  On information and belief, the Dry Max Pampers caused this medical condition.  In addition, Ms. Caldwell incurred medical expenses in connection with her use of Dry Max Pampers.  As a result, Plaintiff Whitney Caldwell has been damaged.

21.     Plaintiff Amanda Converse resides in Lincoln, Nebraska and has a two-year-old son.  On or about March 21, 2010, she purchased Defendant P&G Companies' Pampers Cruisers with Dry Max in Lincoln for use on her son.  Ms. Converse was a loyal Pampers mom, who had used Pampers diapers on her son since his birth without any problems.  Within 24 hours of her initial use of the Dry Max Pampers, she noticed that her son was developing a red, sunburn-like rash over his genitals and buttocks.  The rash quickly worsened over the next 24 hours, becoming brighter red and ulcerated, with bleeding blisters on his buttocks.  Ms. Converse attempted to treat the condition at home with Burt's Bees Baby Bee Diaper Ointment, but without any results. The child was visibly uncomfortable as a result of the symptoms, and expressed discomfort in

the affected areas.  He screamed in pain whenever he urinated or defecated, and jumped back up, crying, when he tried to sit down.  He struggled and fought against his parents so much during diaper changes that it sometimes took two people to change him.  After the blisters developed, she observed that diaper wipes were stinging her son's wounds, so Ms. Converse stopped using them and instead had to rinse her son off in the sink or bathtub at each diaper change.  When the blisters started bleeding and oozing, Ms. Converse called her son's pediatrician for advice and was prescribed Magic Diaper Cream (a prescription diaper cream blend) and Cholestrymen 20% ointment.  She was instructed to use the Magic Diaper Cream four times per day and Cholestrymen at each diaper change.  Ms. Converse used these creams as directed for a week, and the rash gradually became less red and the oozing blisters began to heal.  However, as soon as she stopped using the two prescription creams and returned to her normal diaper regimen, the red, blistering rash immediately recurred.  Ms. Converse called the doctor again and was advised to repeat the Magic Diaper Cream/Cholestrymen regimen.  She again used the creams for a week and the rash gradually cleared as it had before, but immediately came back when she stopped the second course of treatment.  When Ms. Converse called her doctor for the third time, on or about April 14, 2010, the doctor suggested using a different brand of diaper.  That evening, Ms. Converse started using a different brand of disposable diapers and resumed using the Magic Diaper Cream and Cholestrymen.  Within 24 hours after she stopped using the Dry Max Pampers, she noticed that her son's skin was no longer red, that he had stopped expressing fear when going to the bathroom and had become noticeably less irritable.  Within 48 hours, the rash had completely disappeared except for the blisters, which had scabbed over and were healing.  She continued using the non-Dry Max Pampers on her son, and had no further problems with rashes.  In or about the first week of May 2010, Ms. Converse saw an item in her local

newspaper about parents reporting severe rashes after trying the new Dry Max Pampers.  Noting that the recurring rash had correlated with her use of Dry Max Pampers on her son, she used a leftover Dry Max Pampers diaper on her son at his next diaper change to see if his skin would react to it.  She let him wear the diaper for one to two hours, and when she next checked his diaper, his skin had already turned bright red over the genitals and buttocks.  Ms. Converse immediately removed the diaper, and over the next 24 hours, the redness disappeared.  On or about May 14, 2010, Ms. Converse filed a complaint with the CPSC about her experience with the Dry Max Pampers.  At the time she purchased and used the Dry Max Pampers, Ms. Converse was unaware that there was a danger that her child would develop such a severe rash.  Had P&G Companies fully disclosed the presence of physical and/or chemical irritants in the Dry Max Pampers, Ms. Converse would neither have purchased them nor allowed her child to be exposed to them.  Now that Ms. Converse is aware that the use of Dry Max Pampers directly correlated with her son's medical condition, the product is of no value to her.  On information and belief, the Dry Max Pampers caused this medical condition.  In addition, Ms. Converse incurred medical expenses in connection with her use of Dry Max Pampers.  As a result, Plaintiff Amanda Converse has been damaged.

22.     Plaintiff Shannon D'Andrea resides in Sag Harbor, New York and has a 1-year-old son.  She purchased a box of 100 Pampers Cruisers with Dry Max from BJ's Wholesale Club in February 2010.  Her son began wearing the Dry Max Pampers soon thereafter, and within 48 to 72 hours of her first use of the Dry Max Pampers, Ms. D'Andrea noticed that her son was developing a severe, bright red rash on his bottom.  Ms. D'Andrea attempted to treat her son's condition at home with Desitin and Triple Paste for approximately two weeks, but the rash continued to worsen, growing larger and redder.  When home treatment failed to result in any

improvement in her son's symptoms, Ms. D'Andrea took her ton to his pediatrician on March 8,

2010.  Upon examination, the doctor told Ms. D'Andrea that the severe rash was not caused by a

bacterial infection because it manifested in a straight line – like the burn from the edge of a hot

iron.  The doctor also did not think the rash could have been due to bacterial or fungal growth,

and advised Ms. D'Andrea to switch to a hypoallergenic brand of diaper.  Ms. D'Andrea bought

a package of organic diapers on her way home from that doctor's appointment and immediately

stopped using the Dry Max Pampers.  Within 24 hours of her last use of the Dry Max Pampers,

Ms. D'Andrea observed that the bright red rash was almost completely gone.  Ms. D'Andrea has

since switched to a non-organic brand of disposable diapers, but her son has not had any

recurrence of the rash.  At the time she purchased and used the Dry Max Pampers, Ms. D'Andrea

was unaware that there was a danger that her child would develop such a severe rash.  Had P&G

Companies fully disclosed the presence of chemical irritants in the Dry Max Pampers, Ms.

D'Andrea would neither have purchased them nor allowed her child to be exposed to them.  Now

that Ms. D'Andrea is aware that use of Dry Max Pampers directly correlated with her son's

medical condition, the product is of no value to her.  On information and belief, the Dry Max

Pampers caused this medical condition.  In addition, Ms. D'Andrea incurred medical expenses in

connection with her use of Dry Max Pampers.  As a result, Plaintiff Shannon D'Andrea has been

damaged.

23.     Plaintiffs Robert and Angelina Davenport reside in Greenville, Texas, and have a

one-year-old son.  In or around late February or early March, 2010, they purchased several

packages of Defendant P&G Companies' Pampers Cruisers for their son in Greenville, Texas.

They were loyal Pampers customers, having used Pampers diapers with both of their children

since birth without any problems.  When they purchased the Pampers Cruisers in late February or

early March, Ms. Davenport noticed that the diapers appeared different than the Cruisers diapers they were used to; they seemed "cheaper", with a plastic-like outer layer rather than the cloth-like texture of the usual diapers, and had a very strong chemical smell. As it is their custom to "stock up" on diapers occasionally, they did not use any of the packages from this purchase until early April, 2010. Within a week after starting to use diapers from one of the packages they purchased in late February or early March, the Davenports noticed that their son was developing a red, irritated-looking rash in his diaper area. Ms. Davenport attempted to treat it at home like a normal diaper rash with oatmeal baths and A&D Ointment and by letting her son go diaperless for periods of time between diaper changes. However, over the next week, the redness had spread and the skin had started developing red bumps, and after another week had passed, it had worsened into a raw-looking, burnlike, welted rash that was deep red and hot to the touch. As the rash worsened, Ms. Davenport started using Nystatin cream on the rash. She also discontinued the use of diaper wipes, instead gently washing the area with a washcloth and warm water, and increased the frequency of diaper changes, eventually changing diapers every 15 to 20 minutes during the day. She also continued to allow their son to go without a diaper whenever possible. Their son was visibly uncomfortable as a result of his symptoms, and expressed that he had pain and discomfort in the affected area, including waking frequently during the night. He would scream in pain when sitting down and when he soiled his diaper, and struggled against his parents when they tried to pick him up, hold or carry him. He would also struggle to get away from his parents when they tried to change his diaper. After calling a pharmacist and a nurse for advice, Ms. Davenport continued to attempt to treat the condition with Nystatin and added Dermoplast, a combination antiseptic and numbing cream, in order to help their son sleep through the night. On or about May 6, 2010, Ms. Davenport's parents saw a news item on

television reporting that babies were experiencing severe rashes after using the Dry Max Pampers. When the Davenports heard about this, they immediately stopped using the Pampers Cruisers, switching to a different brand of disposable diapers. Within 24 hours after they stopped using the Pampers Cruisers, they noticed an improvement in their son's symptoms. Ms. Davenport continued to treat the symptoms at home during diaper changes by applying a rash salve. Within 48 hours, their son's rash had completely cleared. At the time they purchased and used the Pampers Cruisers, which on information and belief contained Dry Max, Mr. and Ms. Davenport were unaware that there was a danger that their child would develop such a severe rash. Had P&G Companies fully disclosed the presence of physical and/or chemical irritants in the Dry Max Pampers, Mr. and Ms. Davenport would neither have purchased them nor allowed their child to be exposed to them. Now that the Davenports are aware that the use of Dry Max Pampers directly correlated with their son's medical condition, the product is of no value to them. On information and belief, the Dry Max Pampers caused this medical condition. In addition, Mr. and Ms. Davenport incurred medical expenses in connection with their use of Dry Max Pampers. As a result, Plaintiffs Robert and Angelina Davenport have been damaged.

24.     Plaintiff Darcel Darscheid resides in Richland, Michigan and has a four month-old son. When Ms. Darscheid's son was about two and a half weeks old, he developed a severe rash while using Pampers Swaddlers brand diapers. The rash, which spread over the baby's buttocks and testicles, included red skin and blisters which bled during diaper changes. As it worsened, the blistering rash looked like the chemical burns Ms. Darscheid had witnessed during a training exercise in Germany, while she served in the United States Army. The child's severe rash continued for approximately two weeks. During this time, while Ms. Darscheid used the Pampers Swaddlers, the baby was visibly uncomfortable as a result of the symptoms, and

expressed that he had discomfort in the affected area.  He was cranky and unable to sleep, and would scream in pain when his mother wiped his skin during diaper changes. Topical treatments such as Desitin and Boudreaux's Butt Paste cooled the area temporarily, but the baby's pain soon returned.  Over three doctor visits, the child's doctor was unable to identify what was causing the rash.  The doctor recommended Balmex, an over-the-counter cream, as well as Nystatin, a prescription cream, to treat the baby's inflamed skin.  Because the infant was breastfeeding, the doctor suggested that Ms. Darscheid eliminate possible allergens from her own diet, including milk and chocolate.  Two weeks after the severe rash appeared, during her third visit to the baby's doctor, the doctor suggested that Ms. Darscheid change the brand of diaper used on the baby.  Ms. Darscheid had many different types of diapers in her home, including Pampers Swaddlers, having received several diaper packs as baby shower gifts.  The Pampers Swaddlers had been purchased in Michigan as a gift for Ms. Darscheid from her grandmother.  On the doctor's recommendation, Ms. Darscheid initially switched the baby to using only Pampers Swaddlers, thinking that the generic brands of diapers were causing the child's rash.  A few days later, Ms. Darscheid saw a television news report about parents' complaints of severe rashes caused by Dry Max Pampers.  She recognized the Pampers Swaddlers box shown on the news report as the same type of diaper she was now using exclusively on her son.  Ms. Darscheid immediately switched to a generic brand of diaper, and the baby's rash began to improve over the next two days.  The rash was completely healed four or five days after Ms. Darscheid ceased to use the Pampers Swaddlers diapers.  At the time she used the Pampers Swaddlers, which on information and belief contained Dry Max, Ms. Darscheid was unaware that there was a danger that her son would develop such a severe rash.  Had P&G Companies fully disclosed the presence of physical and/or chemical irritants in the Dry Max Pampers, Ms. Darscheid would not

have allowed her child to be exposed to them.  Now that Ms. Darscheid is aware that the use of

Dry Max Pampers directly correlated with her son's severe medical condition, the product is of

no value to her.  On information and belief, the Dry Max Pampers caused this medical condition.

In addition, Ms. Darscheid incurred medical expenses in connection with her use of Dry Max

Pampers.  As a result, Plaintiff Darcel Darscheid has been damaged.

       25.     Plaintiffs Jessica and Brandon Ehrhart reside in Amarillo, Texas and have a one-

year-old son.  On or about May 3, 2010, Ms. Ehrhart purchased Pampers Cruisers with Dry Max

brand diapers for her son.  Less than two hours after she used the first Dry Max Pampers, she

noticed a rash was developing on her son's diaper area.  By the time she changed her son into the

second Dry Max Pampers diaper, the rash had developed into a series of bright red bumps, some

of which were bleeding.  The rash started on her son's buttocks and genitals, and spread down

his thighs and up his lower body to his belly button, over the area covered by the diapers.  Later

that week, Ms. Ehrhart telephoned the baby's doctor to inquire about the baby's skin condition.

The doctor speculated that the baby's skin could be reacting to the diaper, and advised Ms.

Ehrhart to change diaper brands and apply an over-the-counter ointment to help the rash heal.

On or about May 7, 2010, Ms. Ehrhart switched to a different brand of diaper.  Immediately

upon ceasing use of the Dry Max Pampers, the Ehrhart baby's skin condition began to improve.

While the skin has healed significantly, some signs of the rash remain, and the Ehrharts are

concerned that the baby will be left with scars.  At the time the baby's severe rash appeared, Mr.

Ehrhart inspected the Dry Max Pampers diapers, and noticed that they felt rough to the touch.

After touching the diapers for several minutes, Mr. Ehrhart's own skin began to feel

uncomfortable.  At the time they purchased and used the Dry Max Pampers, the Ehrharts were

unaware that there was a danger that their son would develop such a severe rash.  Had P&G

Companies fully disclosed the presence of physical and/or chemical irritants in the Dry Max Pampers, the Ehrharts would neither have purchased them nor allowed their child to be exposed to them.  Now that the Ehrharts are aware that the use of Dry Max Pampers directly correlated with their son's severe medical condition, the product is of no value to them.  On information and belief, the Dry Max Pampers caused this medical condition.  In addition, the Ehrharts incurred medical expenses in connection with their use of Dry Max Pampers.  As a result, Plaintiffs Jessica and Brandon Ehrhart have been damaged.

26.     Plaintiff Gayle Hironimus resides in Beaver Falls, Pennsylvania and has a two-year-old son.  On or around April 10, 2010, Ms. Hironimus purchased a box of her regular diapers, Pampers Cruisers, as well as a box of the Pampers Cruisers with Dry Max from a store in Pennsylvania.  She first used the Dry Max Pampers on her son during the last days of April, 2010.  At the time she used the first Dry Max Pampers, Ms. Hironimus noted that the two versions of the Cruisers diapers differed in appearance.  During this time, Ms. Hironimus was using "pull-up" training pants and overnight diapers on her son in the evenings and at night, as she worked on potty training with the baby.  Within a few days of using the Dry Max Pampers, the baby began to develop a rash, appearing as small red bumps or dots on his belly, thighs and genitals.  The baby began to show signs of discomfort, tugging and pulling on his diaper.  Ms. Hironimus continued using the Dry Max Pampers until on or about May 3, 2010, when she contacted a P&G Companies representative through the Pampers help line.  Ms. Hironimus was advised that the product had not been changed except to make it thinner, and that she should purchase a new box of Dry Max Pampers and discontinue use of the old diapers.  Ms. Hironimus purchased a new box of Pampers Cruisers with Dry Max on or about May 7, 2010 and began using these on her son.  Over that weekend, her son's rash worsened.  The baby's skin was raw

and appeared bright red and raised, like the rash one receives after coming in contact with poison ivy.  The rash spread down the baby's thighs, and across his hips.  The baby was visibly uncomfortable as a result of the symptoms.  He continued to pull the diaper away from his skin, succeeding in pulling off his diaper, and began to fight his mother when she tried to put a new diaper on him.  He also suffered a loss of appetite and vomiting.  Ms. Hironimus attempted to treat the baby's skin with Desitin with only slight improvement.  On or about May 10, 2010, Ms. Hironimus took the baby to see his doctor.  The doctor related parents' complaints about the Dry Max Pampers that she had heard on the news, and advised that Ms. Hironimus switch diaper brands completely.  That night, the baby wore "pull-up" training pants and an overnight diaper. In the morning, Ms. Hironimus diapered him using a Pampers Baby Dry diaper.  By the next day, the baby's rash was greatly improved.  Over the next week, the baby's skin cleared completely.  At the time she purchased and used the Dry Max Pampers, Ms. Hironimus was unaware that there was a danger that her son would develop such a severe rash.  Had P&G Companies fully disclosed the presence of physical and/or chemical irritants in the Dry Max Pampers, Ms. Hironimus would neither have purchased them nor allowed her child to be exposed to them.  Now that Ms. Hironimus is aware that the use of Dry Max Pampers directly correlated with her son's severe skin condition, the product is of no value to her.  On information and belief, the Dry Max Pampers caused this medical condition.  In addition, Ms. Hironimus incurred medical expenses in connection with her use of Dry Max Pampers.  As a result, Plaintiff Gayle Hironimus has been damaged.

27.     Plaintiff Brandon Hulse resides in Tacoma, Washington, and has a three-year-old son.  On or about April 19, 2010, he purchased Defendant P&G Companies' Pampers Cruisers with Dry Max Pampers for his son in Tacoma, Washington.  On or about April 22, Mr. Hulse

began to use the diapers.  Within a day or two of Mr. Hulse's first use of the Dry Max Pampers, his son developed a severe rash, including raw skin, oozing, blisters and redness.  The child was visibly uncomfortable as a result of the symptoms, and expressed that he had discomfort and pain in the affected area.  Plaintiff Hulse took his son to an urgent care facility for evaluation and treatment, where he was prescribed Bactroban topical antibiotic to treat or prevent a skin infection.  Over the next several days, as yet unaware that the Dry Max Pampers were causing the problem, Mr. Hulse continued using them.  His son's wounds were not healing during this time.  Mr. Hulse saw a news report about possible irritation caused by Dry Max Pampers on or about May 5, 2010, and stopped using the diapers at that time.  Only after he stopped using Dry Max Pampers did Plaintiff Hulse's son's skin condition begin to clear up.  Mr. Hulse emailed the CPSC on or about May 7 to report his experience.   At the time he purchased and used the Dry Max Pampers, Mr. Hulse was unaware that there was a danger that his child would develop such a severe rash.  Had P&G Companies fully disclosed the presence of physical and/or chemical irritants in the Dry Max Pampers, Mr. Hulse would neither have purchased them nor allowed his child to be exposed to them.  Now that Mr. Hulse is aware that use of Dry Max Pampers directly correlated with his son's condition, the product is of no value to him.  On information and belief, the Dry Max Pampers caused this medical condition.  In addition, Mr. Hulse incurred medical expenses in connection with his use of Dry Max Pampers.  As a result of the foregoing, Plaintiff Brandon Hulse has been damaged.

28. Plaintiff Victoria Katona resides in Cincinnati, Ohio and has a two-year-old son.  Sometime during mid-March 2010, Dr. Katona, D.O. first purchased a box of Pampers Cruisers with Dry Max at a local store, having previously used the original Pampers Cruisers.  Dr. Katona was a regular user of Pampers brand diapers, having used them for her three-year-old daughter

from her birth through toilet training.  Sometime during the third week of March, 2010, Dr. Katona first used a Dry Max Pampers diaper on her son.  Within a few days of using the Dry Max Pampers, the baby began to develop a severe rash on his buttocks, scrotum, penis and down his thighs.  The baby's skin appeared very red, like a burn, with ulcerations.  Over the next five weeks, the rash worsened, and the ulcerations began bleeding and extruding pus.  The baby was visibly uncomfortable as a result of the symptoms.  He cried and screamed during diaper changes and wiping, and began to fight his mother when she tried to put a new diaper on him.  Dr. Katona is a board-certified Family Practitioner with her own family medical practice.  She prescribed hydrocortisone cream for her son, and also used several over-the-counter medications to combat the rash, including Desitin, A&D Ointment, Maalox, and Boudreaux's Butt Paste.  However, none of these treatments were able to reduce the child's discomfort and clear his skin.  On or about May 3, 2010, Dr. Katona took the baby to see his pediatrician, who prescribed a stronger hydrocortisone cream, Nystatin, and another prescription cream.  That evening, while her husband was filling the prescriptions at their pharmacy, Dr. Katona had the sudden realization that it could be the diaper causing the baby's rash.  She called her husband, who was leaving the store, and asked him to walk back in and purchase a different brand of diapers.  That night, the baby was dressed in one of the non-Pampers brand diapers.  Over the next two days, the baby's rash greatly improved.  A week after she changed to the non-Pampers brand diapers, the child's skin was improved, except for some scarring and/or discoloration where the most severe ulcerations occurred.  While the child's skin has primarily cleared, he still recalls the pain he experienced while he suffered from the rash.  He cries and screams during diaper changes, and runs away from his parents.  It often takes two people to change him, as he fights to avoid diaper changes.  The baby sometimes becomes so upset he vomits during changes.  Upon realizing that

the Dry Max Pampers had been the cause of her son's nearly six-week severe rash, Dr. Katona

contacted Kimberly Thompson, a P&G Companies advisory board member, to inquire about the

issue, and she told Dr. Katona that she was either not using the diapers correctly or was failing to

change the diapers often enough. Dr. Katona was incensed that P&G Companies would lay the

blame for her son's condition on her, when she knows both as his mother and as a medical

professional that she properly cared for his son, and that the change to and away from the Dry

Max Pampers directly correlated with the beginning and end of her son's rash. In her medical

practice, Dr. Katona regularly recommended that parents use Pampers products on their children.

Dr. Katona's older child never used a different brand of diaper, from the time she was born until

she had toilet trained. On or about May 21, 2010, Dr. Katona submitted a complaint to the CPSC

about her experience with the Dry Max Pampers. At the time she purchased and used the Dry

Max Pampers, Dr. Katona was unaware that there was a danger that her son would develop such

a severe rash. Had P&G Companies fully disclosed the presence of physical and/or chemical

irritants in the Dry Max Pampers, Dr. Katona would neither have purchased them nor allowed

her child to be exposed to them. Now that Dr. Katona is aware that the use of Dry Max Pampers

directly correlated with her son's severe skin condition, the product is of no value to her. On

information and belief, the Dry Max Pampers caused this medical condition. In addition, Dr.

Katona incurred medical expenses in connection with her use of Dry Max Pampers. As a result,

Plaintiff Victoria Katona has been damaged.

29.     Plaintiff Mariah MaLoon resides in South Setauket, New York and has a four-

month-old daughter who was born prematurely on April 2, 2010. Ms. MaLoon had first been

provided Pampers Swaddlers diapers by the hospital where her daughter was born. To the best

of her knowledge, the hospital-provided Swaddlers did not contain Dry Max, and Ms. MaLoon's

daughter did not experience a skin reaction while using them.  Ms. MaLoon used the diapers

provided by the hospital for about two weeks before trying another brand.  Dissatisfied with the

other brand, Ms. MaLoon purchased Defendant P&G Companies' Pampers Swaddlers with Dry

Max on or about April 28, 2010, in South Setauket, New York.  On or about May 2, 2010, her

daughter developed a severe rash and broken blisters in her diaper region.  The rash was

localized in the crotch and crack area, rather than manifesting as a rash all over the baby's

bottom.  This location increased the child's risk of bacterial contamination in her open wounds.

The child was visibly uncomfortable as a result of the symptoms, and expressed that she had

discomfort in the affected area; she screamed during diaper changes and whenever she wet her

diaper.  Ms. MaLoon continued to use the Dry Max Pampers, but contacted her pediatrician, who

examined her daughter on May 5, 2010.  The doctor prescribed Mupirocin Ointment for the

child's severe rash and advised Ms. MaLoon, who was exclusively breastfeeding, to eliminate

certain foods from her diet to see if the rash had been caused by a food allergy.  Previously, Ms.

MaLoon had used over-the-counter Desitin and Triple Paste on her daughter as preventative

ointments.  On or about May 6, 2010, Ms. MaLoon switched to another brand of diapers.  At this

point, the rash was able to start healing with the help of medical treatment.  When the

elimination diet and Mupirocin Ointment did not improve her daughter's condition, Ms. MaLoon

saw the doctor again on May 7, 2010.  The doctor prescribed Silver Sulfadiazine for treatment, a

medication which is normally used for second and third degree burns and can cause unpleasant

side effects.  On May 13, 2010, Ms. MaLoon saw her doctor for a third time.  Ms. MaLoon asked

her doctor if her daughter's skin condition was a rash or a burn.  The doctor replied that the

affected area was consistent with a burn.  He prescribed a compound of zinc oxide ointment,

Maalox, hydrocortisone cream, and Nystatin Cream, and advised Ms. MaLoon to use cloth

diapers exclusively. Ms. MaLoon's baby continued to suffer throughout the healing process, until the rash and sores finally resolved on or about June 2, 2010. Plaintiff MaLoon attempted to complain to the CPSC on or about May 12 and May 13, but could not get through to the agency. At the time she purchased and used the Dry Max Pampers, Ms. MaLoon was unaware that there was a danger that her child would develop such a severe rash. Had P&G Companies fully disclosed the presence of physical and/or chemical irritants in the Dry Max Pampers, Ms. MaLoon would neither have purchased them nor allowed her child to be exposed to them. Now that Ms. MaLoon is aware that the use of Dry Max Pampers directly correlated with her daughter's medical condition, the product is of no value to her. On information and belief, the Dry Max Pampers caused this medical condition. In addition, Ms. MaLoon incurred medical expenses in connection with her use of Dry Max Pampers. As a result, Plaintiff Mariah MaLoon has been damaged.

30. Plaintiffs Morgan Maue and Robin York reside in Beaverton, Oregon and have a five-month-old daughter. On March 9, 2010, their daughter was born and, while in the hospital, was placed in the Neonatal Intensive Care Unit ("NICU") due to jaundice. While in the hospital, the nurses diapered their daughter in Pampers Swaddlers with Dry Max. Only the nurses diapered Ms. York and Mr. Maue's daughter while she was in the hospital. The NICU nurses noted a "bad" diaper rash while the baby was at the hospital. While at the hospital, the staff applied diaper rash cream and advised the parents to continue doing so at home. Ms. York and Mr. Maue took their daughter home on March 13 and continued to apply diaper rash treatments to their daughter. They continued using the Dry Max Pampers that had been used in the hospital, and purchased more Dry Max Pampers on or about March 14. They discontinued use of the diapers on or about March 17 because they felt that cloth would allow their daughter's wounds to

- 34 -

heal better.  Their daughter continued to experience the severe rash, including raw skin, oozing, blisters and redness.  The baby was in pain as a result of the symptoms, couldn't be held with any pressure on her buttocks, and her parents had to stop using baby wipes when changing diapers and instead rinse her off and let her skin air dry.  By the time their daughter was seen by her doctor on March 23 for a two-week checkup, the doctor noted the severity of the rash and stated that "this is the worst diaper rash I have ever seen."  On or about March 25, Ms. York and Mr. Maue also saw a lactation consultant, who examined the baby and advised the parents to apply an over-the-counter antifungal cream in case the burn-like rash could be the result of yeast growth.  The lactation consultant also consulted with a second doctor who diagnosed a scalding burn.  For approximately six more weeks, their daughter bore a small open wound in the area that experienced the severe blistering rash, and her parents had to take care when changing her to blot her gently with a soft flannel cloth to avoid inflicting pain.  On or about April 30, Ms. York read an online report of parents experiencing similar problems with Dry Max Pampers and emailed the CPSC to report her experience.  At the time they purchased and used the Dry Max Pampers, Ms. York and Mr. Maue were unaware that there was a danger that their child would develop such a severe rash.  Had P&G Companies fully disclosed the presence of physical and/or chemical irritants in the Dry Max Pampers, Ms. York and Mr. Maue would neither have purchased them nor allowed their child to be exposed to them.  Now that Ms. York and Mr. Maue are aware that use of Dry Max Pampers directly correlated with their daughter's condition, the product is of no value to them.  On information and belief, the Dry Max Pampers caused this medical condition.  In addition, Ms. York and Mr. Maue incurred medical expenses in connection with their use of Dry Max Pampers.  As a result of the foregoing, Plaintiffs Robin York and Morgan Maue have been damaged.

31.    Plaintiff Jeni McAllister resides in Wendell, North Carolina, and has a five-month-old daughter.  On or around February 4, 2010, she received Defendant P&G Companies' Pampers Swaddlers with Dry Max for her daughter from Rex Hospital in Raleigh, North Carolina, where her daughter was born.  The hospital also used the Dry Max Pampers on her newborn.  She was a loyal Pampers customer, having used Pampers diapers with her other, now 4-year-old daughter through infancy and toddlerhood without any problems.  While they were still in the hospital, Ms. McAllister noticed that her daughter was developing a red rash in her diaper area.  She asked a nurse about it, and the nurse told her that it was probably diaper rash and advised her to use diaper cream on it when she took the baby home.  When the McAllisters returned home with their new baby the day after she was born, the rash worsened and became raw, red, blistering, and bleeding.  The child was visibly uncomfortable as a result of the symptoms, screaming especially before and during diaper changes.  Over the next few days, she attempted to treat the rash at home with Boudreaux's Butt Paste and Desitin, but with no improvement.  On or about February 8, 2010, Ms. McAllister took her daughter to her pediatrician's office, who prescribed Mupirocin prescription cream.  Ms. McAllister applied the cream as directed three times a day, and in between applications used Neosporin on the open, bleeding blisters.  She also bathed her daughter twice a day, and in an attempt to determine if one of the products she was using in the diaper area could be causing the reaction, changed brands of baby wipes and baby wash (to a fragrance- and color-free formulation for sensitive skin) but to no avail.  On February 18, 2010, she returned to her pediatrician because the rash had not cleared, although the blisters had scabbed over and stopped bleeding by this time.  Approximately two weeks after the second doctor's visit, Ms. McAllister switched to using Pampers non-Dry-Max Swaddlers Size 1, because her daughter had outgrown the newborn-size

diapers.  After she stopped using the Dry Max Pampers, she almost immediately noticed an improvement in her daughter's symptoms.  Within a few days, her daughter's rash had completely cleared, except for some minor scarring that remains where the bleeding blisters were located.  On or about April 1, 2010, she noticed an item on television during a newscast that the Dry Max Pampers were being investigated for potential problems.  When she looked for more information online, she found other consumers' posts and pictures that strongly resembled her own daughter's symptoms when using the Dry Max Pampers.  On or about May 24th, 2010, after hearing about their investigation, Ms. McAllister filed a complaint with the CPSC.  At the time she purchased and used the Dry Max Pampers, Ms. McAllister was unaware that there was a danger that her child would develop such a severe rash.  Had P&G Companies fully disclosed the presence of physical and/or chemical irritants in the Dry Max Pampers, Ms. McAllister would neither have purchased them nor allowed her child to be exposed to them.  Now that Ms. McAllister is aware that the use of Dry Max Pampers directly correlated with her daughter's medical condition, the product is of no value to her.  On information and belief, the Dry Max Pampers caused this medical condition.  In addition, Ms. McAllister incurred medical expenses in connection with her use of Dry Max Pampers.  As a result, Plaintiff Jeni McAllister has been damaged.

32.     Plaintiff Maria McMahon resides in Paola, Kansas and has a nine-month-old son. In April 2010, she first purchased a box of Pampers Swaddlers with Dry Max from a store in Paola, Kansas, and used the new diaper for the first time with her son in mid-April.  Within a day or two of using the new Dry Max Pampers, Ms. McMahon's son developed a severe rash on his buttocks and genitals.  The baby's skin turned red, as if it had been burnt, and developed small blisters.  The baby was visibly uncomfortable as a result of the symptoms, fussing and crying

during diaper changes.  Ms. McMahon attempted to treat the baby's skin with over-the-counter medications, including A&D Ointment, Desitin and Boudreaux's Butt Paste.  She also let his skin air dry.  However, the baby's severe skin irritation did not improve.  Ms. McMahon continued using the Dry Max Pampers for approximately three weeks, until her diaper supply ran out.  At that time, she happened to switch to a different brand of diaper.  The baby's skin irritation immediately began to improve, with reduced redness, reduced blistering, and alleviation of his discomfort.  At the time she purchased and used the Dry Max Pampers, Ms. McMahon was unaware that there was a danger that her son would develop such a severe rash.  Had P&G Companies fully disclosed the presence of physical and/or chemical irritants in the Dry Max Pampers, Ms. McMahon would neither have purchased them nor allowed her child to be exposed to them.  Now that Ms. McMahon is aware that the use of Dry Max Pampers directly correlated with her son's severe skin condition, the product is of no value to her.  On information and belief, the Dry Max Pampers caused this medical condition.  In addition, Ms. McMahon incurred medical expenses in connection with her use of Dry Max Pampers.  As a result, Plaintiff Maria McMahon has been damaged.

33.     Plaintiff Natalie Papailiou resides in Oceanport, New Jersey and has a two-year-old son.  On or about May 20, 2010, Ms. Papailiou purchased Defendant P&G Companies' Pampers Cruisers with Dry Max for her son in Oceanport, New Jersey.  Within 24 hours of her initial use of the Dry Max Pampers, Ms. Papailiou noticed that her son had developed a bright red rash on his genital area.  The rash quickly spread over his genitals and anus, buttocks, and down his thighs, becoming brighter red in color and developing raised, liquid-filled blisters that oozed.  The child was visibly uncomfortable as a result of the symptoms, and expressed that he had discomfort and pain in the affected areas.  During diaper changes, he screamed and shrank

away from Ms. Papailiou, saying "Mommy, hurts!  Mommy, no!" and tried to pull off his diaper

after she changed him.  Normally a sound sleeper and napper, he had much trouble falling and

staying asleep because of constant pain and itching in the area covered by the diaper.  Ms.

Papailiou attempted to treat her son's condition at home, at first with Desitin and Boudreaux's

Butt Paste during diaper changes, but saw no improvement.  She contacted her pediatrician twice

over the phone, and was advised to try Triple Paste and to apply cornstarch to the area in an

attempt to keep the wounds protected and dry.  The doctor also advised her to allow her son to go

without a diaper periodically, so Ms. Papailiou tried this as well.  She also stopped using wipes

during diaper changes as they would sting the broken skin, and used warm water and a soft

washcloth instead to clean her son after he soiled his diaper.  On May 27, 2010, Ms. Papailiou

discussed the problem with her sister, who suggested that she try a different brand of diaper.  Ms.

Papailiou stopped using the Dry Max Pampers that day.  Within 24 hours, she noticed that the

rash had stopped spreading down her son's legs, and that he was able to sleep through the night

and nap without waking and scratching.  The blisters also stopped oozing.  On or about June 1,

2010, Ms. Papailiou filed a complaint with the CPSC to report her experience with the Dry Max

Pampers.  On June 3, 2010, Ms. Papailiou brought her son to his pediatrician, who examined the

affected areas and said the condition looked like a "chemical burn," not a diaper rash.  Since the

rash had already begun to heal, the doctor advised Ms. Papailiou to start using a cortisone cream

on the area but to otherwise continue her current diapering routine.  The rash continued to

improve and was fully healed in about three weeks.  At the time she purchased and used the Dry

Max Pampers, Ms. Papailiou was unaware that there was a danger that her child would develop

such a severe rash.  Had P&G Companies fully disclosed the presence of physical and/or

chemical irritants in the Dry Max Pampers, Ms. Papailiou would neither have purchased them

nor allowed her child to be exposed to them.  Now that Ms. Papailiou is aware that the use of

Dry Max Pampers directly correlated with her son's medical condition, the product is of no use

to her.  On information and belief, the Dry Max Pampers caused this medical condition.  In

addition, Ms. Papailiou incurred medical expenses in connection with her use of Dry Max

Pampers.  As a result, Plaintiff Natalie Papailiou has been damaged.

34.     Plaintiff Cassie Raether resides in Muskego, Wisconsin and has a 22-month-old

son.  In early March 2010, Plaintiff Raether received in the mail a sample of Pampers with Dry

Max, including a coupon for future Dry Max Pampers purchases.  That month, she purchased, in

Wisconsin, Pampers Cruisers with Dry Max for her son.  She began using the Dry Max Pampers

at the end of March or in early April.  Soon after she began using the Dry Max Pampers, her

child developed a severe rash.  At first the rash was on the top side of his buttocks and then

spread all over his buttocks including the crack area.  Within a few days she could also see marks

and then blistering on his buttocks and crack area.  The rash and blisters were very irritating to

her son.  Her son would scratch at the blisters and cause them become open sores.  As a result of

the open blisters and sores, his diapers would get bloody, especially at the top of the buttocks.

Her son also developed a severe rash on his front side, around his genitals and penis.  The rash

migrated down his legs, stomach, and arms.  She consulted with her doctor, who initially

diagnosed eczema and suggested she use Benadryl and Aquaphor.  When the rashes, blisters and

severe irritation continued, her doctor diagnosed a "contact issue," so Ms. Raether changed

laundry detergent, tried different lotions, and changed soaps to help soothe her son's rash and

blisters.  Nothing helped, and her son's extreme discomfort continued.  In early May, she saw

something on television about possible reactions to Dry Max Pampers and immediately phoned

her husband and requested he purchase different diapers for her child.  Within 24 hours of

switching diapers her son's rash began to heal.  In early May 2010, she filed a complaint with the CPSC by phone about her experience with the Dry Max Pampers.  At the time she purchased and used the Dry Max Pampers, Ms. Raether was unaware that there was a danger that her child would develop such a severe rash.  Had P&G Companies fully disclosed the presence of physical and/or chemical irritants in the Dry Max Pampers, Ms. Raether would neither have purchased them nor allowed her child to be exposed to them.  Now that Ms. Raether is aware that use of Dry Max Pampers directly correlated with her son's condition, the product is of no value to her. On information and belief, the Dry Max Pampers caused this medical condition.  As a result of the foregoing, Plaintiff Cassie Raether has been damaged.

35.     Plaintiff Stephanie Rios resides in Algonquin, Illinois and has a one-year-old daughter.  On or about the beginning of April 2010, she purchased Defendants P&G Companies' Pampers Cruisers with Dry Max Pampers for her daughter in the Chicago, Illinois metropolitan area.  Within twenty-four hours of Ms. Rios's first use of the Dry Max Pampers, her daughter developed a rash which resembled a severe sunburn, including rawness and peeling of the skin. The child was visibly uncomfortable as a result of the symptoms, and expressed that she had discomfort and pain in the affected area.  Normally a happy, energetic baby, her daughter became more irritable and cried frequently, and also experienced periods of lethargy.  Ms. Rios had trouble picking her daughter up or carrying her, because she had to apply pressure to her daughter's bottom to do so, and this would cause the baby increased pain.  During diaper changes, the baby would scream and struggle against her mother, attempting to guard her diaper area with her hands.  Plaintiff Rios took her daughter to a dermatologist for an unrelated appointment and inquired about the child's rash.  The doctor was unsure of the child's ailment and concluded that it was a severe diaper rash.  As a result of the doctor's opinion, Ms. Rios

continued to treat her daughter's condition as a diaper rash by applying diaper rash cream and keeping the child's diaper area clean, dry and constantly changed.  On or about May 9, 2010, Ms. Rios's mother-in-law viewed a newscast regarding the complaints arising from use of Dry Max Pampers and informed Ms. Rios.  That same day, Ms. Rios switched to another brand of diapers. Within 24 to 48 hours, she noticed that the redness was receding and the open sores had started to heal.   The baby continued to experience some redness, peeling of the skin, and bleeding for another three weeks before the rash completely healed.  Plaintiff Rios filed a complaint with the CPSC on or about May 10 or 11, 2010.  At the time she purchased and used the Dry Max Pampers, Ms. Rios was unaware that there was a danger that her child would develop such a severe rash.  Had P&G Companies fully disclosed the presence of physical and/or chemical irritants in the Dry Max Pampers, Ms. Rios would neither have purchased them nor allowed her child to be exposed to them.  Now that Ms. Rios is aware that the use of Dry Max Pampers directly correlated with her daughter's medical condition, the product is of no value to her.  On information and belief, the Dry Max Pampers caused this medical condition.  In addition, Ms. Rios incurred medical expenses in connection with her use of Dry Max Pampers.  As a result, Plaintiff Stephanie Rios has been damaged.

36.    Plaintiff Jodi Robins resides in Miami, Florida with her two-year-old daughter. Sometime in late February or early March, 2010, Ms. Robins purchased a promotional 20-count package of Defendants P&G Companies' Pampers Cruisers with Dry Max for her daughter.  At the same time, she purchased a large box of Pampers Cruisers, her regular diaper.  Both packages were purchased in Florida.  The packaging of the large box did not state that the diapers used the Dry Max technology, but Ms. Robins noticed that some diapers in the box resembled the Dry Max Pampers, and others appeared to be the original version of the diaper.  Ms. Robins observed

that the Dry Max Pampers were thinner than her regular diapers, and lacked the old version's

inner liner.  Ms. Robins was a loyal Pampers user, having used Pampers products with her

daughter since she was born.  Soon after purchasing the two packages of diapers, Ms. Robins

observed that her daughter was developing a rash in her diaper area.  Over the next two weeks,

the rash became more severe, with very red skin that was hot to the touch like a severe sunburn.

The baby's skin became raw and cracked, with open sores.  The rash covered the baby's genital

area and buttocks.  The rash would become more severe during the day, while the baby was

active, subsiding slightly at night.  The baby was visibly uncomfortable as a result of the

symptoms, crying during diaper changes, wiping and bathing, and scratching at her skin under

her diaper.  During this time, Ms. Robins attempted to treat the rash with several over-the-

counter products, including Bacitracin, Cortaid, Desitin and A&D Ointment.  She also used two

prescription creams that she had at her home.  On or about April 11, 2010, Ms. Robins called her

daughter's pediatrician, who recommended Cortaid cream.  On April 15 and 19, 2010, Ms.

Robins brought her daughter in to the doctor's office for additional visits.  During both visits, the

doctor was unable to identify the cause of the rash.  On the second visit, the doctor referred Ms.

Robins to a pediatric dermatologist.  Ms. Robins brought the baby to the pediatric

dermatologist's office on or about April 29, 2010.  The pediatric dermatologist examined the

baby, and observed that the baby's genital area had cracked, raw and oozing skin, with small red

bumps that she related to the growth of yeast on the affected area.  She also observed that the

baby had scratched an area on her lower buttocks until the skin was broken and bleeding.  She

surmised that the rash could be caused by an allergic reaction or contact dermatitis caused by the

diaper, and recommended that Ms. Robins change brands.  Ms. Robins discontinued use of all

Pampers-brand diapers, and began giving her daughter Aveeno bath treatments to relieve her

discomfort.  On May 6, 2010, Ms. Robins returned to the pediatric dermatologist's office, as her daughter's rash had only slightly healed, and her skin was still very reactive to the Florida heat. At this visit, the doctor prescribed prednisone, a higher strength cortisone cream, and zinc oxide. Ms. Robins began using an organic diaper.  Over the next week, the baby's skin condition slowly began to improve.  By May 14 or 15, 2010, the baby's skin was healed except for some small discolorations in the most affected areas.  At the time she purchased and used the Dry Max Pampers and the Pampers Cruisers diapers, which on information and belief contained Dry Max, Ms. Robins was unaware that there was a danger that her daughter would develop such a severe rash.  Had P&G Companies fully disclosed the presence of physical and/or chemical irritants in the Dry Max Pampers, Ms. Robins would neither have purchased them nor allowed her child to be exposed to them.  Now that Ms. Robins is aware that the use of Dry Max Pampers directly correlated with her daughter's severe skin condition, the product is of no value to her.  On information and belief, the Dry Max Pampers caused this medical condition.  In addition, Ms. Robins incurred medical expenses in connection with her use of Dry Max Pampers.  As a result, Plaintiff Jodi Robins has been damaged.

37.     Plaintiff Jennifer Robinson resides in Kalispell, Montana and has a ten-month-old son.  In or about the last week of April, 2010, she purchased Defendant P&G Companies' Pampers Cruisers with Dry Max in Kalispell for use on her son.  On or about May 1, 2010, within 72 hours of her initial use of the Dry Max Pampers, she noticed that her son was developing a red rash over his genitals and buttocks.  The rash quickly worsened over the next three days, spreading over the buttocks and becoming brighter red and ulcerated, with bleeding blisters.  The child was visibly uncomfortable as a result of the symptoms, and expressed discomfort in the affected areas.  He screamed in pain after urination or defecation and during

diaper changes, not able to calm down until the diaper was off and he had been rinsed clean.  He was unable to sleep well at night, because he would wake in pain as soon as he wet or dirtied his diaper.  Ms. Robinson attempted to treat the condition at home with zinc oxide, A&D Ointment, and Vaseline.  Because diaper wipes would sting her son's wounds after the blisters developed, Ms. Robinson stopped using them and instead had to rinse her son off in the sink and pat him dry at each diaper change, using a wet, soft washcloth for difficult-to-clean areas.  Because her son was suffering from constipation during this time, she was not introducing new foods to his diet and had him on a simple diet of formula, water, and certain fruits and vegetables which she knew he tolerated well.  Ms. Robinson added an anti-yeast ointment (miconazole nitrate) to her diaper change routine after about a week and a half of home treatment, in case the condition was related to yeast growth.  When the home treatments failed to result in any improvement in her son's symptoms, Ms. Robinson called his pediatrician on or about May 10, 2010.  She described her son's experience to a nurse, and was advised to continue her home treatment.  On or about May 14, 2010, Ms. Robinson ran out of the Dry Max Pampers and bought a different brand of disposable diaper that was on sale at a local store.  The same day, after buying the non-Dry-Max diapers, Ms. Robinson saw an item on the news that parents were reporting severe rashes after trying the new Dry Max Pampers.  Within 48 hours of ceasing use of the Dry Max Pampers, she noticed a significant improvement in her son's symptoms; the ulcerated areas had stopped bleeding, and he was able to sleep through the night again.  After two more days, his rash had healed, except for some residual redness that took another week to two weeks to clear.   On or about May 16, 2010, Ms. Robinson filed a complaint with the CPSC about her experience with the Dry Max Pampers.  At the time she purchased and used the Dry Max Pampers, Ms. Robinson was unaware that there was a danger that her child would develop such a severe rash.  Had P&G

Companies fully disclosed the presence of physical and/or chemical irritants in the Dry Max Pampers, Ms. Robinson would neither have purchased them nor allowed her child to be exposed to them. Now that Ms. Robinson is aware that the use of Dry Max Pampers directly correlated with her son's medical condition, the product is of no value to her. On information and belief, the Dry Max Pampers caused this medical condition. In addition, Ms. Robinson incurred medical expenses in connection with her use of Dry Max Pampers. As a result, Plaintiff Jennifer Robinson has been damaged.

38. Plaintiff Leah Robison resides in Apex, North Carolina with her one-year-old son. Sometime in early May, 2010, Mrs. Robison purchased a package of Pampers Cruisers with Dry Max for her son in North Carolina and began using them a few days later, on or about May 12 or 13. On the morning of May 15, 2010, Mrs. Robison observed that her son was developing a serious rash such that his skin was bleeding. After she had removed the diaper to wipe him, the top layer of skin melted away as she wiped his stool away. Her son was in extreme discomfort and would scream if she tried to use diaper cream. He would squat on his knees to play with his toys because he was in agony when he tried to sit. To help alleviate his pain and discomfort, she stopped using wipes and used water and a cloth. Although her son had had diaper rash once before, these symptoms were very different. With the previous rash, diaper cream had cleared up the rash within one or two changes, but this incident was much more serious, caused her son much more discomfort, and was not improving. The red patches of rash developed white blisters. The rash and blisters covered his entire buttocks and the area underneath his testicles. Alarmed by her son's condition, Mrs. Robison contacted her doctor by phone on or about May 18, 2010. She described her son's rash to the nurse, who suggested she use Vaseline to protect him from the diaper. On or about May 17, 2010, Mrs. Robison first became aware of other

parents' experiences with the Dry Max Pampers when she discussed her son's problems with other parents in her son's play group.  Mrs. Robison immediately switched to diapers without Dry Max.  Within 12 hours after ceasing use of the Dry Max Pampers, she noticed marked improvement of the rash.  Ms. Robison filed a complaint with the CPSC on or about May 17, 2010.  At the time she purchased and used the Dry Max Pampers, Mrs. Robison was unaware that there was a danger that her son would develop such a severe rash.  Had P&G Companies fully disclosed the presence of physical and/or chemical irritants in the Dry Max Pampers, Mrs. Robison would neither have purchased them nor allowed her child to be exposed to them.  Now that Mrs. Robison is aware that the use of Dry Max Pampers directly correlated with her son's severe skin condition, the product is of no value to her.  On information and belief, the Dry Max Pampers caused this medical condition.  As a result, Plaintiff Leah Robison has been damaged.

39.     Plaintiff Alexandra Rosenbaum resides in Maple Grove, Minnesota and has a twenty-month-old son.  In fall 2009, she purchased Defendant P&G Companies' Pampers Cruisers with Dry Max for her son in Minnesota, and she began using these diapers with her son soon thereafter.  Within 24 hours of her first use of the Dry Max Pampers, she noticed that her son had developed a red, inflamed rash with raised red and pink bumps over the genitals, buttocks, and around his waist where the diaper had been in contact with the body.  As Ms. Rosenbaum still had some non-Dry Max Cruisers to use up from her old supply, she used the Dry Max Pampers and the non-Dry Max diapers interchangably for a time.  Once she switched exclusively to the Dry Max Pampers, the rash worsened and developed open, oozing and bleeding sores.  Prior to this painful reaction, her son had worn Pampers Cruisers without Dry Max as well as other disposable diaper brands and very rarely experienced diaper rash.  As a result of this painful reaction, her son had trouble sitting down and was in so much pain in the

diaper area it made it difficult for Ms. Rosenbaum to hold him and carry him, as she necessarily had to apply pressure to his bottom to do so.  Her son would cry and shriek when she changed his diapers and try to writhe away from her, particularly when she had to wipe sensitive areas clean after bowel movements.  He also experienced pain during baths when the affected area would come in contact with the bath water, and would try to squat instead of sit.  Ms. Rosenbaum was very upset by her son's condition and tried to treat it at home with Desitin, but this resulted in no improvement to her son's condition, at least in part because it was difficult to apply the ointment to his open, oozing sores.  She also tried baking soda baths and stopped using soap during bath time for fear of irritating the sensitive area, as well as washing his laundry separately from the rest of the family's laundry.  One of the only times she noticed any improvement at all in the condition while she was still using the Dry Max Pampers was when she would let him go diaperless for a short time to air out his diaper area and encourage the sores to dry.  Ms. Rosenbaum asked other mothers in her group of friends for advice on how to treat the condition, and on or about April 30, 2010, one of the friends sent her a link to a news article about other parents reporting similar problems with the Dry Max Pampers.  She immediately discontinued use of the Dry Max Pampers and switched to another disposable diaper brand. Within 24 hours, she noticed that the open sores had started healing and the skin was dramatically less red.  Within a week, the rash was completely gone except for some sores that were still healing, and her son's diaper region was no longer irritated and painful.  Her son still bears scars from this extended, painful ordeal in the affected area, and it was a few months before Ms. Rosenbaum herself stopped feeling apprehensive about changing her son's diaper. After noticing the cessation of her son's painful reaction occurred only after she switched from the Dry Max Pampers to another disposable diaper brand, Ms. Rosenbaum complained to P&G

Companies on May 6, 2010.  Upon receiving only an automatic reply, she again complained on

May 8, 2010, and on May 12, 2010.  She also complained via e-mail to the CPSC about her

experience with the Dry Max Pampers.  At the time she purchased and used the Dry Max

Pampers, Ms. Rosenbaum was unaware that there was a danger that her son would develop such

a severe rash.  Had P&G Companies fully disclosed the presence of physical or chemical irritants

in the Dry Max Pampers, Ms. Rosenbaum would neither have purchased them nor allowed her

child to be exposed to them.  Now that Ms. Rosenbaum is aware that the use of Dry Max

Pampers directly correlated with her son's severe skin reaction, the product is of no value to her.

On information and belief, the Dry Max Pampers caused this medical condition.  As a result,

Plaintiff Alexandra Rosenbaum has been damaged.

40.     Plaintiff Lisa Saacks resides in Brooklyn, New York and has a nine-month-old

daughter.  In April, 2010, she purchased Defendant P&G Companies' Pampers Cruisers with Dry

Max in the New York City metropolitan area for use on her youngest child.  She was a loyal

Pampers mom, having used Pampers on both her nine-month old and her older child since birth

without any problems.  When she took the Dry Max Pampers home, she noticed that they had a

strong chemical smell that she had not previously noticed in Pampers diapers.  On or about April

25, 2010, within 24 hours of her initial use of the Dry Max Pampers, her daughter broke out in a

red, pimply-looking rash over her buttocks.  The rash quickly worsened over the next 24 to 48

hours until it resembled a very raw and severe sunburn, including "half-moon" marks on her

daughter's buttocks.  The child was visibly uncomfortable as a result of the symptoms, and

expressed discomfort in the affected areas, screaming during diaper changes and displaying

increased irritability overall.  Ms. Saacks attempted to treat her child's symptoms at home by

applying Triple Paste and increasing the frequency of her diaper changes, but the home

treatments failed to result in any improvement.  On or about April 28, 2010, she took her

daughter to her pediatrician.  The doctor evaluated the child's symptoms and told Ms. Saacks

that he didn't think it was a diaper rash.  Because she had recently started her daughter on two

new foods (rice and lentils), he advised Ms. Saacks to eliminate the new foods to rule out the

possibility that the rash was due to a food allergy.  Ms. Saacks followed this advice and

continued to attempt to treat the rash at home.  When she still failed to see improvement in her

child's condition, Ms. Saacks took her daughter to a pediatric dermatologist on or about May 4,

2010.  The doctor prescribed a prescription antibiotic cream and opined that the symptoms were

related to a yeast infection.  Ms. Saacks used the prescription cream on her daughter but still

failed to see any improvement in the rash.  On or about May 10, 2010, Ms. Saacks heard from

her nanny about a news item that reported that parents were complaining of severe rashes linked

to Dry Max Pampers.  She immediately stopped using Dry Max Pampers and switched to a

different brand of disposable diapers.  Within 24 hours of ceasing use of the Dry Max Pampers,

she noticed a significant improvement in her daughter's symptoms, and within 72 hours the

symptoms were completely gone, except for some slight redness in the "half-moon" areas where

the most severe rawness had been.  At the time she purchased and used the Dry Max Pampers,

Ms. Saacks was unaware that there was a danger that her child would develop such a severe rash.

Had P&G Companies fully disclosed the presence of chemical irritants in the Dry Max Pampers,

Ms. Saacks would neither have purchased them nor allowed her child to be exposed to them.

Now that Ms. Saacks is aware that the use of Dry Max Pampers directly correlated with her

daughter's medical condition, the product is of no value to her.  On information and belief, the

Dry Max Pampers caused this medical condition.  In addition, Ms. Saacks incurred medical

expenses in connection with her use of Dry Max Pampers.  As a result, Plaintiff Lisa Saacks has

been damaged.

41.     Plaintiff Diane Samelson resides in Stamford, Connecticut, and has two-year-old

twins.  In or about December 2009, she purchased Defendant P&G Companies' Pampers

Cruisers diapers for her children in the New York metropolitan area.  The packaging of the

Cruisers diapers did not indicate that they were any different from other Pampers Cruisers

diapers she had previously purchased for her children.  Shortly after her son started using diapers

from this new package of Pampers Cruisers, her son developed a severe diaper rash with welts

and blistering.  Plaintiff Samelson initially assumed that her son had a diaper rash.  Her son's

rash developed into red welts, and her son was visibly uncomfortable from his skin condition.  In

an effort to heal the rash, she tried several different brands of diaper rash cream (including Triple

Paste, Mustela, and two types of Desitin), but none of the products healed the rash.  In early

2010, Plaintiff Samelson consulted with her son's doctor about his skin condition in his diaper

area, and the doctor suggested that she use Lotrimin, an over-the-counter anti-fungal cream, to

treat the rash.  The Lotrimin did not heal the rash.  Shortly thereafter, Plaintiff Samelson stopped

using Pampers brand diapers.  She switched her son to another brand of diapers.  Upon ceasing

use of Pampers Cruisers, Plaintiff Samelson's son's skin condition immediately cleared up.

Plaintiff Samelson currently uses another brand of diapers for her children, and there has been no

reoccurrence of skin problems since she stopped using the Pampers Cruisers.  At the time she

purchased and used the Pampers Cruisers, which on information and belief contained Dry Max,

Ms. Samelson was unaware that there was a danger that her son would develop such a severe

rash.  Had P&G Companies fully disclosed the presence of chemical irritants in the Dry Max

Pampers, Ms. Samelson would neither have purchased them nor allowed her children to be

exposed to them.  Now that Ms. Samelson is aware that use of Dry Max Pampers directly

correlated with her son's visible skin condition, the product is of no value to her.  On information

and belief, the Dry Max Pampers caused this medical condition.  In addition, Ms. Samelson

incurred medical expenses in connection with her use of the Dry Max Pampers.  As a result,

Plaintiff Diane Samelson has been damaged.

42.     Plaintiff Adona Schank resides in Louisville, Kentucky with her two-year-old

daughter.  Ms. Schank is currently a nursing student at Brown Mackie College in Louisville.

Sometime in late March, 2010, Ms. Schank purchased a package of Pampers Cruisers with Dry

Max for her daughter.  Ms. Schank observed that the Dry Max Pampers were thinner than her

regular diapers, and lacked the previous version's mesh liner.  Ms. Schank was a loyal Pampers

user, having used Pampers products with her daughter since she was born, with the exception

that, once her daughter needed a size 4 diaper, she bought Huggies for overnight use only as the

Pampers could not contain overnight voids.  However, Ms. Schank was, and had been, happy

using Pampers since her daughter was born and wanted to continue using Pampers for all of her

daughter's daytime diaper changes.  Shortly after purchasing and first using the Dry Max

Pampers, Ms. Schank observed that her daughter was developing a red, inflamed-looking,

irritating rash on her buttocks and genital area.  Ms. Schank took the baby to her pediatrician on

April 8 to have the rash examined and treated.  Her doctor initially diagnosed her daughter with a

yeast infection caused by the earlier use of antibiotics, and prescribed Nystatin.  Over the next

ten days, Ms. Schank used the Nystatin and over-the-counter treatments, with no improvement.

The baby's skin was so inflamed that Ms. Schank discontinued using her regular hypoallergenic

baby wipes, which contain no dyes, chlorine or alcohol, instead wiping the baby with a soft cloth

and water during diaper changes.  By April 18, when she returned to the doctor, her daughter's

rash had become more severe.  It was now red, swollen and extended over the baby's buttocks and outer labia.  The doctor advised Ms. Schank to continue using the Nystatin, and advised that she let her daughter go without any diapers for a few hours at a time, and not to use any at night. He also prescribed an antibiotic for an unrelated case of Strep Throat.  Ms. Schank followed his advice, keeping her daughter diaper-free as much as possible, and using "chucks," an absorbent diaper-like pad, at night.  She discontinued wiping the baby altogether, and would instead bathe the baby in baking soda and oatmeal baths to try to clean, calm and soothe the diaper area. During the time the rash developed and then worsened, the baby showed visible signs of pain and discomfort as a result of the symptoms.  Her daughter would scream in pain during diaper changes, saying "Ouch, Mommy!" and trying to fight her mother off when being placed in the Dry Max Pampers diapers.  However, when changed into the Huggies diapers for overnight use, the baby would not struggle against the change or complain that the diaper hurt her.  Over time, the screaming and fighting behaviors would begin the moment the child saw her mother holding a Dry Max Pampers diaper.  Her daughter even began to bring Ms. Schank the Huggies diaper at changing time instead of the Dry Max Pampers.  While the baby was undiapered, she would use a potty chair to urinate, or sometimes urinate on the floor, while pulling her labia away from her urethra, to avoid more pain.  Ultimately, the baby completed toilet training as a result of her fear of the diapers; she now only uses a Huggies diaper at night.  Ms. Schank continued to follow her doctor's advice and use the prescribed medications, but the rash failed to improve.  On April 25, she took her daughter to an urgent care facility as the rash had become so severe that she was developing red pustules on the affected area.  The doctor told her to continue using the Nystatin, this time in a powder formula called Nystop.  She took her daughter to her regular doctor the following day, April 26, and the doctor observed that the rash had severely worsened.  The

pustules were extremely red, the entire buttock, perineum and labia area was raw, and Ms.

Schank was unable to put her daughter in diapers at all, except when required so the baby could

go out in public, such as to the doctor's office.  The doctor prescribed Diflucan and advised Ms.

Schank to continue using the Nystatin cream at the same time.  He also prescribed Magic Barrier

Cream, a prescription compound containing analgesic, antibacterial and antifungal ingredients,

often called "Mary's Magic."  On May 2, a Sunday, when her daughter's rash had still failed to

respond to any of these treatments, she visited the doctor again.  By this time, the pustules had

developed into hard, open boils on the baby's labia and inner buttocks, near her rectum.  The

doctor performed a diagnostic test to culture and identify the contents of one of the boils, and

prescribed Bactrim to treat the condition.  The lab's results were returned on May 7, and

confirmed a positive result for MRSA.  On May 7, 2010, Ms. Schank first became aware of other

parents' experiences with the Dry Max Pampers when her mother-in-law saw a news report on

television.  She investigated the story herself on the Internet and immediately noticed that her

daughter's rash shared similar characteristics with what other parents were reporting on Internet

message boards.  Ms. Schank immediately discontinued use of the Dry Max Pampers.

Beginning the next morning, she began applying Silvadene ointment, a prescription burn

ointment that she had at her house unrelated to the baby's condition, to her daughter's boils.

Almost immediately, she noticed marked improvement of the rash, with the skin looking

wrinkled and less red, like a healing surface burn.  By May 10, the rash was gone, except for

some discoloration of the skin in the area where the rash had been.  On May 11, she returned to

her daughter's doctor again and told him about the complaints she had read about the Dry Max

Pampers and what happened after she switched diaper brands and began using the Silvadene.

Upon reexamining her daughter's medical history, her doctor determined that the open sores had,

in fact, been burns that had likely caused the secondary MRSA infection.  He agreed that

Silvadene was a proper treatment for such burns, and that his prior diagnosis of yeast infection

was incorrect.  Ms. Schank filed a complaint with the CPSC after hearing of the widespread

problems with the Dry Max Pampers.  She wants to prevent other parents from enduring a

situation similar to her and her daughter's five week ordeal with the Dry Max Pampers.  She is

also very concerned that there may be some future negative effect on her daughter's health as a

result of the burns she received from the Dry Max Pampers.  At the time she purchased and used

the Dry Max Pampers, Ms. Schank was unaware that there was a danger that her daughter would

develop such a severe rash.  Had P&G Companies fully disclosed the presence of physical and/or

chemical irritants in the Dry Max Pampers, Ms. Schank would neither have purchased them nor

allowed her child to be exposed to them.  Now that Ms. Schank is aware that the use of Dry Max

Pampers directly correlated with her daughter's severe skin condition, the product is of no value

to her.  On information and belief, the Dry Max Pampers caused this medical condition.  In

addition, Ms. Schank incurred medical expenses in connection with her use of Dry Max

Pampers.  As a result, Plaintiff Adona Schank has been damaged.

43.     Plaintiff Asia Southard resides in Standish, Maine with her one-year-old son and

two older children.  On or about April 1, 2010, Ms. Southard purchased a box of Pampers

Cruisers with Dry Max, having previously used Pampers Cruisers on her son.  She began

diapering her son with the new diapers that day.  Within two or three days of using the Dry Max

Pampers, her son developed a severe rash on his buttocks, penis, and scrotum.  The baby's skin

appeared bright red and chapped, resembling a burn, and had small blister-like bumps.  Ms.

Southard was unable to touch, wipe or bathe the baby without causing him pain.  She attempted

to improve the rash using Boudreaux's Butt Paste, Desitin, cornstarch, and allowing the child to

go without a diaper or other covering.  Ms. Southard took him to his doctor, who prescribed

Nystatin and Amoxicillin, an antibiotic.  Over the next few days, the rash became more inflamed

and the blisters began to bleed.  Ms. Southard later consulted with the child's home health nurse,

who upon viewing the affected area, commented that the rash "looked like chemical burns."

During this time, the baby was visibly uncomfortable as a result of the symptoms, crying during

diaper changes, wiping and bathing.  He lost his appetite, losing a whole pound in weight.  The

weight loss resulted in the Dry Max Pampers no longer fitting the baby, so Ms. Southard

switched back to his older, smaller diapers, which were a non-Pampers brand.  Immediately the

baby's rash began to clear, with healing of the blisters and reduced redness.  By four or five days

after the switch in diaper brands, the baby's rash was completely gone, except for one small

healing blister on his penis.  Upon realizing that the Dry Max Pampers had been the cause of her

son's nearly two-week severe rash, Ms. Southard contacted a P&G Companies representative

first by telephone and then through their Facebook "fan" page.  Ms. Southard was made to feel

that the rash was her fault and that she had not properly cared for her son.  At the time she

purchased and used the Dry Max Pampers, Ms. Southard was unaware that there was a danger

that her son would develop such a severe rash.  Had P&G Companies fully disclosed the

presence of physical and/or chemical irritants in the Dry Max Pampers, Ms. Southard would

neither have purchased them nor allowed her child to be exposed to them.  Now that Ms.

Southard is aware that the use of Dry Max Pampers directly correlated with her son's severe skin

condition, the product is of no value to her.  On information and belief, the Dry Max Pampers

caused this medical condition.  In addition, Ms. Southard incurred medical expenses in

connection with her use of Dry Max Pampers.  As a result, Plaintiff Asia Southard has been

damaged.

44.     Plaintiff Suzy Sullivan resides in Coon Rapids, Minnesota, and has a one-year-old daughter.  In or around the first week of March, 2010, she purchased Defendant P&G Companies' Pampers Cruisers with Dry Max for her daughter in Blaine, Minnesota.  Within 72 hours of her first use of the Dry Max Pampers, Ms. Sullivan's daughter had developed a bright red rash over her genital area, causing the area to become severely swollen.  Over the next few days, the rash worsened, spread over her buttocks, thighs and stomach where the diaper was in contact with her skin, and developed pimply spots and blisters.  The child was visibly uncomfortable as a result of the symptoms, and expressed she had discomfort and pain in the affected area.  She would start screaming if she saw her parents about to use diapers or wipes on her, and both her mother and father would have to hold her down during diaper changes, as she would kick and struggle against her parents during changing time.  Ms. Sullivan also noticed that her daughter would walk as if she was "saddle-sore," especially in the mornings.  Ms. Sullivan attempted to treat the rash at home with Triple Paste and baby powder, but without any improvement.  The only thing that appeared to give her daughter even temporary relief was oatmeal baths, which Ms. Sullivan gave her daughter two times per day.  When the rash failed to improve, she took her daughter to a pediatrician at an urgent care center on or about April 5, 2010.  The doctor said that he could not diagnose the rash, as it did not look like a normal diaper rash, but recommended using Bacitracin ointment during diaper changes in addition to the Triple Paste cream, and to continue the oatmeal baths.  On or about April 8, 2010, Ms. Sullivan ran out of diapers.  Because the store was out of Dry Max Pampers in her daughter's size, she bought a different brand of disposable diapers.  Within 24 hours after she stopped use of the Dry Max Pampers, she noticed a dramatic improvement in her daughter's condition, and within 72 hours, the rash had healed.  At the time she purchased and used the Dry Max Pampers, Ms. Sullivan

was unaware that there was a danger that her child would develop such a severe rash. Had P&G Companies fully disclosed the presence of physical and/or chemical irritants in the Dry Max Pampers, Ms. Sullivan would neither have purchased them nor allowed her child to be exposed to them. Now that Ms. Sullivan is aware that the use of Dry Max Pampers directly correlated with her daughter's medical condition, the product is of no value to her. On information and belief, the Dry Max Pampers caused this medical condition. In addition, Ms. Sullivan incurred medical expenses in connection with her use of Dry Max Pampers. As a result, Plaintiff Suzy Sullivan has been damaged.

45.     Plaintiff Nicole A. Tepper resides in Wynnewood, Pennsylvania and has a 21-month-old son. On or about May 21, 2010, she purchased Defendant P&G Companies' Pampers Cruisers with Dry Max for her son in Pennsylvania, and she began using these diapers with her son on or about May 23. Within a few days after she started using Dry Max Pampers, on or about May 27, her son's entire diaper area, including his genitals and buttocks, became extremely sensitive to the touch but there were no visible skin eruptions. Prior to this painful reaction, her son had worn Pampers Cruisers without Dry Max as well as other disposable diaper brands and very rarely experienced diaper rash. As a result of this painful reaction, he did not want to be touched, cried and pointed to his diaper region, had difficulty sleeping, and cried out in pain whenever the affected area was touched. Ms. Tepper was very upset by her son's condition and tried to help him by applying extra thick layers of Aquaphor and Desitin. When these over-the-counter ointments were unable to reduce her son's pain and discomfort, Ms. Tepper took her son to the pediatrician on Tuesday, June 1, and but for the holiday weekend, she would have taken him sooner. The pediatrician was unable to determine the cause of the reaction, but believed it was a diaper rash and recommended Ms. Tepper to cover the entire

diaper area with a thick layer of Desitin and cool baths.  The day after seeing her pediatrician on

June 2, Ms. Tepper first became aware of the litigation concerning other parents' experiences

with the Dry Max Pampers.  Ms. Tepper immediately discontinued use of the Dry Max Pampers

and switched to another disposable diaper brand.  Within 12 hours, her son's diaper region was

no longer painful.  After noticing the cessation of her son's painful reaction occurred only after

she switched from the Dry Max Pampers to another disposable diaper brand, Ms. Tepper filed a

complaint with the CPSC on June 3 and the following week, called Pampers' consumer

telephone line to complain.  At the time she purchased and used the Dry Max Pampers, Ms.

Tepper was unaware that there was a danger that her son would develop such a severe reaction.

Had P&G Companies fully disclosed the presence of physical and/or chemical irritants in the

Dry Max Pampers, Ms. Tepper would neither have purchased them nor allowed her child to be

exposed to them.  Now that Ms. Tepper is aware that the use of Dry Max Pampers directly

correlated with her son's severe skin reaction, the product is of no value to her.  On information

and belief, the Dry Max Pampers caused this medical condition.  In addition, Ms. Tepper

incurred medical expenses in connection with her use of Dry Max Pampers.  As a result, Plaintiff

Nicole A. Tepper has been damaged.

46.    Plaintiffs John and Karina Walker reside in Midlothian, Illinois and have a one-

year-old daughter.  In or about late December 2009 or early January 2010, they purchased

Defendant P&G Companies' Pampers Swaddlers in Orland, Illinois for use on their daughter.

They bought several large packages at this time.  On or about April 28, 2010, Mrs. Walker

opened a new package of Swaddlers diapers and restocked her diaper holder.  She noticed that

the diapers in this package had a very strong chemical smell.  Mrs. Walker used the first diaper

from this package on the evening of April 28.  The next morning, she and her mother noticed that

her daughter was developing a red rash over the area covered by the diaper.  Mrs. Walker's

mother was the baby's caretaker during the weekday, and she reported to Mrs. Walker that

evening that the rash had quickly worsened throughout the day, despite applying Desitin to the

area.  The rash was noticeably more severe at each change even though the changes were only

about two hours apart.  The child was visibly uncomfortable as a result of the symptoms, and

expressed discomfort and pain in the affected areas.  She screamed after urination or defecation

and during diaper changes, fighting against her parents or grandmother until it became necessary

for two people to change her so she could be held still.  She was also unable to sleep well at

night, because she would wake up in pain about every two hours.  Her parents and grandmother

continued to attempt to treat the rash with Desitin, Boudreaux's Butt Paste, and Aveeno Soothing

Relief Diaper Rash Cream, and they stopped the use of diaper wipes, instead rinsing the baby

with water or giving her a bath.  By the following evening, Mrs. Walker's mother told her that

the baby had cried from pain the entire day and needed to be taken to the doctor.  When Mr.

Walker came home from work, Mrs. Walker told him what her mother had witnessed during the

day and asked him to help with the next diaper change.  When changing the diaper together, Mr.

and Mrs. Walker noticed that their daughter had developed liquid-filled blisters over her labia.

Mrs. Walker called her daughter's pediatrician, and was advised to apply A&D Ointment to the

area and give the baby Children's Motrin to relieve her pain.  When later that evening, they

noticed that the number of blisters in the area had increased, Mrs. Walker attempted to call the

doctor's office again, but it was closed.  Mrs. Walker then called a friend who is a doctor, and

she advised Mrs. Walker to let the baby sleep without a diaper overnight.  The Walkers followed

this advice, and noticed that the baby woke up less often during the night.  In the morning, they

also noticed that the redness of the rash had decreased, although the blisters were still present

and starting to ooze.  On May 1, 2010, Mrs. Walker took her daughter in to her pediatrician's office.  The doctor at first thought the problem was normal diaper rash, until she examined the labia and saw the oozing blisters.  The doctor diagnosed the baby with a staph infection and prescribed Mupirocin and Critic-Aid skin paste, and advised Mrs. Walker to continue letting the area "air out" and to use cloth diapers.  The Walkers discontinued use of the Dry Max Pampers that day in compliance with the doctor's advice.  Within 24 hours of ceasing use of the Dry Max Pampers, the Walkers noticed that the redness had decreased still further, and that the baby appeared to be in much less pain.  The condition continued to noticeably improve every day and within a week, the blisters had healed.  The Walkers then started using a different brand of disposable diaper and did not experience any recurrence of symptoms until, on or about July 16, 2010, Mrs. Walker's mother accidentally used one of the Pampers Swaddlers diapers on the baby.  Within an hour, the baby started screaming and when her diaper was changed, her grandmother saw that the entire area was red and blisters were starting to form.  She did not use another Pampers Swaddlers diaper, and the rash healed as it had previously.  At the time they purchased and used the Pampers Swaddlers, which on information and belief contained Dry Max, Mr. and Mrs. Walker were unaware that there was a danger that their child would develop such a severe rash.  Had P&G Companies fully disclosed the presence of physical and/or chemical irritants in the Dry Max Pampers, Mr. and Mrs. Walker would neither have purchased them nor allowed their child to be exposed to them.  Now that the Walkers are aware that the use of Dry Max Pampers directly correlated with their daughter's medical condition, the product is of no value to them.  On information and belief, the Dry Max Pampers caused this medical condition.  In addition, the Walkers incurred medical expenses in connection with their use of Dry Max Pampers.  As a result, Plaintiffs John and Karina Walker have been damaged.

47.     Plaintiffs Emily and Ryan Weaver reside in Springfield, Missouri, and have a 2-year-old son.  On or about April 24, 2010, they purchased Defendant P&G Companies' Pampers Cruisers with Dry Max Pampers for their son in Springfield.  That day, Ms. Weaver used one of the Dry Max Pampers on her son before she put him down for a nap.  Within three hours of Ms. Weaver's first use of the Dry Max Pampers, after her son woke up from his nap, she noticed that blisters had started to form on her son's thighs and that a pimple-like rash was breaking out around his diaper area.  Mr. Weaver, a clinical pharmacist, examined the rash and thought it looked like a skin reaction to some sort of chemical.  The child was visibly uncomfortable as a result of the symptoms, and expressed that he had discomfort and pain in the affected area.  Ms. Weaver also noticed tiny crystals had adhered to her son's genitals and buttocks.  Mr. and Ms. Weaver had never experienced diaper rash issues with their son or their two older children, so they did not have any diaper rash remedy at home to try.  That night, she used one of the diapers they had purchased previously but the following morning they tried another Dry Max Pampers diaper.  When the blistering and pimple-like rash grew worse, Ms. Weaver immediately stopped using the diapers and switched to a different brand of diapers; they also applied a triple antibiotic burn ointment to the affected area.  Only after they stopped using the Dry Max Pampers did Mr. and Ms. Weaver's son's skin condition begin to clear up.  The skin peeled away where there had been blisters, and they are concerned about possible scarring.  Ms. Weaver talked to a friend who experienced a similar issue with Dry Max Pampers on or about May 4, 2010, and emailed the CPSC on or about May 7 to report her experience.  At the time they purchased and used the Dry Max Pampers, Mr. and Ms. Weaver were unaware that there was a danger that their child would develop such a severe rash.  Had P&G Companies fully disclosed the presence of physical and/or chemical irritants in the Dry Max Pampers, Mr. and Ms. Weaver would neither have purchased

them nor allowed their child to be exposed to them.  Now that Mr. and Ms. Weaver are aware

that use of Dry Max Pampers directly correlated with their son's condition, the product is of no

value to them.  On information and belief, the Dry Max Pampers caused this medical condition.

As a result of the foregoing, Plaintiffs Emily and Ryan Weaver have been damaged.

48.     Plaintiffs Brigette Wolfe and Joseph Wolfe reside in Elk Grove, California.  They

have a one-year-old daughter.  In mid-April, 2010, they purchased Pampers Cruisers with Dry

Max in Elk Grove, California.  Within a few days of starting use of the product, their daughter

developed a rash that Desitin was not helping.  They took her to a medical doctor on or about

April 30, 2010, who diagnosed a yeast infection and prescribed Nystatin.  On May 1 and 2, the

condition worsened, and the Wolfes' daughter developed blisters that opened and were oozing.

The child was visibly uncomfortable as a result of the symptoms, and expressed that she had

discomfort and pain in the affected area.  She woke up crying at night whenever she soiled her

diaper, and during diaper changes.  She also noticeably flinched when coming into contact with

her bath water.  The Wolfes had to discontinue use of baby wipes and switch to gently cleaning

their daughter off with a damp cloth during diaper changes.  The Wolfes had multiple telephone

calls with medical professionals in early May, 2010 regarding their daughter's skin condition.

During telephone calls on or about May 2 and 3, both a paramedic and an on-call doctor told the

Wolfes to stop using the Dry Max Pampers and start using cloth diapers, because the condition

should be treated as a burn.  The switch to cloth diapers also helped reduce pressure on the areas

that had been touched by the "elastic" areas of the diaper, and helped cover the irritated skin and

sores on those areas.  On or about May 3, the Wolfes were told to use cortisone to treat open

blisters and sores.  On or about May 5, they returned to the doctor with their daughter, at which

time the doctor diagnosed her with contact dermatitis, caused by coming into contact with a skin

irritant.  Upon switching their daughter from Dry Max Pampers to cloth diapers and other brands of disposable diapers, her condition began to improve.  The worst of the rash was healed within a week, although it took approximately four weeks before the open sores had healed, and the baby still shows signs of scarring in the area.  At the time they purchased and used the Dry Max Pampers, Mr. and Mrs. Wolfe were unaware that there was a danger that their child would develop such a severe rash.  Had P&G Companies fully disclosed the presence of physical and/or chemical irritants in the Dry Max Pampers, Mr. and Mrs. Wolfe would neither have purchased them nor allowed their daughter to be exposed to them.  Now that the Wolfes are aware that use of Dry Max Pampers directly correlated with their daughter's medical condition, the product is of no value to them.  On information and belief, the Dry Max Pampers caused this medical condition.  In addition, the Wolfes incurred medical expenses in connection with their use of Dry Max Pampers.  As a result of the foregoing, Plaintiffs Brigette and Joseph Wolfe have been damaged.

49.     Plaintiff Amy Young resides in Huntington, Texas and has an eight-month-old son.  On November 30, 2009, her son was born in the hospital, where the staff used Pampers Swaddlers diapers during diaper changes.  Soon after the baby was born, while still in the hospital, he developed a red rash in his diaper area.  However, because the delivery had been very difficult, the doctor told Ms. Young that the rash was likely connected to the trauma he had experienced during birth, and advised her that it should clear up within two or three days.  When she went home, she continued to use Pampers Swaddlers diapers that she had received as gifts (she had specifically requested them for a diaper shower), eventually buying more Pampers Swaddlers with Dry Max in the Huntington, Texas area on or about January 15, 2010.  After Ms. Young took her son home, the rash, which appeared over the entire area covered by the diaper,

became more aggressively "blood red," and developed blisters on the genitals and buttocks which bled, oozed and turned white.  The child was visibly uncomfortable as a result of these symptoms and expressed that he had pain and discomfort in the affected area.  He screamed and cried whenever he urinated or had a bowel movement as a result of the pain, and it sometimes took two people to change his diapers, as he would struggle and fight against his parents at changing time.  In an effort to heal the rash, Ms. Young tried Desitin, Boudreaux's Butt Paste, and Aveeno Soothing Relief Diaper Rash Cream, used a sensitive skin formula bath soap that the hospital had given her, and stopped using baby wipes during diaper changes, instead rinsing the area with warm water and patting dry.  When she failed to see any improvement in her son's condition, she took him to a doctor on or about December 4, 2009.  Upon examining the baby, the doctor told Ms. Young that it was most likely a yeast infection, and prescribed antibiotics to guard against infection.  On or about December 11, 2009, Ms. Young took him to her older child's pediatrician.  The doctor gave her a prescription for Oxystat 1% cream, which Ms. Young applied as directed during diaper changes.  Although at times the cream appeared to temporarily reduce the number of oozing blisters on her son's body, it did not otherwise result in any improvement to the rash.  In a subsequent visit, when her doctor considered that her son might also be suffering from eczema, Ms. Young received a prescription for a second cream to coat the entire diaper area except for the genital area, on which she continued to use the Oxystat cream.  Because her son was in so much pain, and was experiencing occasional fevers, Ms. Young was also advised by her doctor at certain times to give him Children's Motrin to control his symptoms.  During the five months her son experienced this rash, Ms. Young took him to the doctor approximately every two weeks, and had to pay $100 per tube of Oxystat about once per week.  In or about the last week of April, 2010, her doctor advised her to try changing the brand

of diapers she was using, as none of the treatments they had tried so far were helping her son heal.  On or about May 1, 2010, Ms. Young purchased a different brand of diapers and stopped using the Dry Max Pampers.  Within 48 hours, she noticed that the redness that had covered the entire diaper area had receded considerably, and within two or three more days, the blisters covering her son's genital area and buttocks were healing.  At the time she purchased and used the Pampers Swaddlers, which all on information and belief contained Dry Max, Ms. Young was unaware that there was a danger that her child would develop such a severe rash.  Had P&G Companies fully disclosed the presence of chemical irritants in the Dry Max Pampers, Ms. Young would neither have purchased them nor allowed her child to be exposed to them.  Now that Ms. Young is aware that the use of Dry Max Pampers directly correlated with her son's medical condition, the product is of no value to her.  On information and belief, the Dry Max Pampers caused this medical condition.  In addition, Ms. Young incurred medical expenses in connection with her use of Dry Max Pampers.  As a result, Plaintiff Amy Young has been damaged.

50.    Defendant The Proctor & Gamble Company ("P&G") is an Ohio corporation whose principal place of business, upon information and belief, is One Procter & Gamble Plaza, Cincinnati, Ohio 45202.  P&G engages in business throughout the State of Ohio and the United States.  Defendant P&G marketed, promoted, and profited from the Dry Max Pampers.  In addition to this direct conduct, as the parent company of Defendants P&G Paper and P&G Distributing, Defendant P&G is liable for the actions of Defendant P&G Paper and Defendant P&G Distributing under basic doctrines of agency and corporate law.

51.    Defendant P&G Paper is an Ohio corporation whose principal place of business, upon information and belief, is 6105 Center Hill Avenue, Cincinnati, Ohio 45224.  P&G Paper

engages in business throughout the State of Ohio and the United States. P&G Paper manufactured the Dry Max Pampers that were purchased by Plaintiffs and Class Members during the relevant period.

52. Defendant P&G Distributing is a Delaware corporation whose principal place of business, upon information and belief, is One Procter & Gamble Plaza, Cincinnati, Ohio 45202. P&G Distributing engages in business throughout the State of Ohio and the United States. P&G Distributing is a subsidiary of Defendant P&G. P&G Distributing distributed Dry Max Pampers to Plaintiffs and Class Members during the relevant period.

## IV. FACTUAL BACKGROUND

53. Despite the fact that P&G Companies knew or should have known that the Dry Max Pampers had the capacity to and, in many cases, did actually harm preemies, newborns, older babies, and toddlers by causing severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments, P&G Companies made numerous representations to Plaintiffs about their products wherein they failed to disclose the physical and/or chemical irritants contained in their products and/or represented that they were safe for use with babies.

54. P&G Companies marketed the Dry Max Pampers as safe and gentle, using such misleading passages on their product labels as "Wraps Baby in All-Around Softness," and "Pampers Swaddlers contain . . . mild ingredients which are gentle to the skin."[7]

55. P&G Companies marketed the Dry Max Pampers as appealing because of their combined thinness and alleged high performance. P&G Associate Director of Global Baby Care Research and Development Kerri Hailey states, "When we set out to create Dry Max, we were

---

[7] *See* Pampers Swaddlers with Dry Max 36-pack, size "N" product label.

looking at how do we make a really really absorbent product that also looks and feels like underwear . . . How do we make it thin but yet perform extremely well."[8]

56.     P&G Companies use safety as a core tenet of their product advertising, and as a major selling point of their products.  In a brochure titled "The Tradition & Science of Safe Products," Defendant P&G Companies use the slogan, "Touching lives, improving life."[9]  At the website pgproductsafety.com, P&G Companies states, "we take product safety very seriously,"[10] and Defendants' "Our Values and Polices" brochure contains the statement:  "Procter & Gamble ensures the safety of our products, packages and operations for our . . . consumers . . . We consider this to be a requirement for conducting responsible business, and an essential element of building and maintaining public trust in our products." [11]  On the website pgproductsafety.com, P&G Companies states, "Safety is an intrinsic part of our products' quality and value."[12]

57.     What P&G Companies neglects to mention is that "[t]he new diapers do cost less for raw materials, packaging and shipping, but P&G isn't lowering the price."[13]  Thus, while P&G Companies' profits per Dry Max diaper are increasing, the quality of the diapers available to consumers is decreasing and physically harming babies.

---

[8] Video interview with Kerri Hailey, *available at* http://www.youtube.com/watch?v=87I4i-hW4bE (last visited Aug. 21, 2010).

[9] P&G Brochure, The Tradition & Science of Safe Products, *available at* http://www.pg.com/en_US/downloads/sustainability/pov/HumanSafetyBrochure2009.pdf (last visited Aug. 19, 2010).

[10] P&G website article, A Foundation of Integrity, http://www.pgproductsafety.com/productsafety/index.shtml (last visited Aug. 21, 2010).

[11] P&G Brochure, Our Values and Policies, 15, *available at* http://www.pg.com/en_US/downloads/company/governance/PG_Values_Policies.pdf (last visited Aug. 19, 2010).

[12] P&G, Our Approach to Product Safety, http://www.pgproductsafety.com/productsafety/product_safety.shtml (last visited Aug. 19, 2010).

[13] Jack Neff, *P&G Dry Max Drubbing offers Lesson for Others*, ADVERTISING AGE, Jan. 18, 2010, *available at* http://adage.com/article?article_id=141552 (last visited Aug. 23, 2010).

58.     P&G Companies' Dry Max Pampers, which contain physical and/or chemical irritants, are anything but the safe, gentle, and effective products that P&G Companies claim.

**A.     Children Are Especially Vulnerable To Physical and/or Chemical Irritants.**

59.     Children are especially susceptible to dermal absorption of chemicals.[14]

60.     Children's skin is much more permeable than that of adults, and children and infants have greater skin surface area relative to their body weight as compared to adults.  For example, "[t]he skin surface area relative to body weight is greater in children than in adults, such that the potential dose received following dermal exposure is likely to be about three times greater in infants than in adults."[15]  For infants, the ratio is even greater: "An infant's ratio of body surface area to weight is up to 5 times that of an adult.  These important differences place infants at increased risk for skin damage, percutaneous infection, and percutaneous toxicity from topically applied agents."[16]  "The skin of an infant differs from an adult in several ways. The thickness of infant skin is 40% to 60% that of adult skin."[17]

61.     Scientists and some policy makers recognize that children are particularly vulnerable to toxins and chemicals, and they consider this fact when identifying contaminants

---

[14] *See supra* notes 2-4 and accompanying text.

[15] Int'l Programme on Chemical Safety, World Health Organization, PRINCIPLES FOR EVALUATING HEALTH RISKS IN CHILDREN ASSOCIATED WITH EXPOSURE TO CHEMICALS, 31-32 (2006), *available at* http://whqlibdoc.who.int/publications/2006/924157237X_eng.pdf (last visited Aug. 21, 2010) (citing Harvey J. Clewell, et al., *Review And Evaluation of the Potential Impact of Age- and Gender-Specific Pharmacokinetic Differences on Tissue Dosimetry*, 32 CRITICAL REV. OF TOXICOLOGY 329, 342 (2002)).

[16] Elaine C. Siegfried, *Neonatal Skin and Skin Care*, 16 DERMATOLOGIC CLINICS 437 (1998).  *See also* Dennis P. West, et al., *Pharmacology and Toxicology of Infant Skin*, 76 J. INVESTIGATIVE DERMATOLOGY 147 (1981), *available at* http://www.nature.com/jid/journal/v76/n3/pdf/5615734a.pdf (last visited Aug. 21, 2010) ("Adults have relatively small surface area while infants have relatively large surface areas.  This serves to maximize the dose of a topical drug in the newborn.  The infant surface area is greater than would be expected from weight alone. Proportions of newborn to adult with respect to weight, surface area and length are respectively 1:21, 1:9 and 1:3.3 [4].").

[17] Siegfried, *Neonatal Skin and Skin Care*, *supra* note 16 at 437; *see also* West, *Pharmacology and Toxicology of Infant Skin*, *supra* note 16 at 148 ("Infant epidermis is less thick than adult epidermis and it is assumed that the stratum corneum is proportionally also thinner…The main barrier to penetration is the stratum corneum.") (citation omitted).

that acutely impact children's health.  Federal government action extensively illustrates this fundamental approach.  For example, in 1997, the EPA established a policy requiring consideration of health risks to infants and children in all risk assessments, risk characterizations, and environmental standards.  In another instance, Congress explicitly recognized the increased susceptibility of children to contaminants by mandating in the Food Quality Protection Act that the EPA evaluate pesticides on a scale ten times more sensitive than regulatory levels to account for the fragile, developing bodies of children and infants.

62.     Despite babies' known chemical sensitivity, chemicals in P&G Companies' products such as Dry Max Pampers may irritate babies' skin through direct contact.[18]  P&G Companies intended for parents and caregivers to fasten the Dry Max Pampers directly onto their babies' delicate and sensitive skin for up to 12 hours.[19]

**B.      The Pampers Brand.**

63.     Defendant P&G Companies identifies Pampers as one of its "Billion Dollar Brands" in its 2009 Annual Report.[20]  "Baby Care and Family Care" products comprise 18% of P&G Companies' net sales and 16% of net earnings.[21]  Pampers is identified as "the Company's largest brand," with annual net sales of approximately $8 billion.[22]  P&G Companies claims to

---

[18] *See* Yaman, *Alternative Test Methods*, *supra* note 5.

[19] P&G's "Latest Innovations" fact sheet states that Dry Max diapers "lock wetness in for up to 12 hours." P&G Fact Sheet, Latest Innovations, *available at* http://www.pg.com/en_US/downloads/innovation/factsheet-PampersDM.pdf (last accessed Aug. 21, 2010).

[20] *See* P&G 2009 Annual Report, 26, *available at* http://www.annualreport.pg.com/annualreport2009/_downloads/PG_2009_AnnualReport.pdf (last visited Aug. 19, 2010).

[21] *Id*. at 32.

[22] *Id*.

have approximately 35% of the global market share in baby care products such as diapers, training pants and baby wipes.[23]

64.     On Defendant P&G's website, Pampers is identified as "the world's top-selling brand of baby diapers."[24]  According to Nielsen group, Procter & Gamble spent $53 million advertising Pampers in 2009, not including online advertising.[25]

65.     The Pampers Parenting Network, launched in 1996 as the Pampers Parenting Institute, provides the majority of the content on the pampers.com website, and is described by P&G Companies as "a group of leading parenting experts and medical professionals hand-picked to provide moms with the best information, support and resources for the health and well-being of their babies and families."[26]  The Pampers Parenting Network includes an "expert advisory board" forum offering advice articles on common parenting topics and Question and Answer topics from questions parents submit to be answered by the board.[27]

66.     For example, the Pampers Parenting Network article "The Skinny on Skin," written by Dr. Loraine Stern, offers "Practical Parenting Advice" on caring for babies' skin and suggests that at least some at P&G Companies have knowledge of how harmful physical and/or chemical irritants can be to babies.[28]  Stern writes, "Because there is less of a layer of hard, dead

---

[23] *Id.*

[24] P&G Pampers Brand website page, http://www.pg.com/en_US/brands/household_care/pampers.shtml (last visited Aug. 19, 2010).

[25] Elaine Wong, *Pampers' Mother of All iPad Apps*, BRANDWEEK, Apr. 25, 2010, http://www.brandweek.com/bw/content_display/news-and-features/digital/e3ieae2fa145a05b6f7a3920de45ad08daf (last visited Aug. 21, 2010).

[26] P&G Press Release, Pampers Launches New "Pampers Village" at Pampers.com, Nov. 13, 2008, *available at* http://www.pginvestor.com/phoenix.zhtml?c=104574&p=irol-newsArticle&ID=1226064&highlight= (last visited Aug. 21, 2010).

[27] *Id.*

[28] Pampers website article, The Skinny on Skin, http://www.pampers.com/en_US/parenting-articles/the-skinny-on-skin/4564 (last visited Aug. 19, 2010).

skin cells, infant skin is more sensitive to sunburn and can absorb chemicals more readily.

Since, in a baby, skin makes up a greater amount of surface area relative to the size of the body

than it does in adults, chemicals and drugs applied to the skin have a greater risk of causing

problems when absorbed."[29]  For this reason, Stern recommends using gentle, non-alkaline

cleansers on babies and small children.[30]

67.     The Pampers Parenting Institute (also called Pampers Parenting Network) has

worked directly with the CPSC on publications and initiatives.  *See, e.g.*, "A Grandparents'

Guide For Family Nurturing & Safety"[31] and a September 19, 2000 press release from the CPSC

announcing, "CPSC, Babies 'R' Us and Pampers Parenting Institute Launch Safety Campaign to

Help Reduce Injuries Further."[32]

68.     The pampers.com website also includes the "Pampers Village," "an online village

where moms can bond and chat with other moms about the topics that affect them and their

families most," developed in 2008.[33]  Resources such as the Pampers Parenting Network and

Pampers Village are intended to build consumer trust in the Pampers brand as a purveyor of

expert health advice.

69.     In addition, Plaintiffs and Class Members are participants in the "Pampers

Village" "Gifts to Grow" loyalty program, where they can collect codes from Pampers purchases

and redeem "points" to apply toward "rewards," such as toys, photo processing, and more

Pampers products.  This is one of many ways the P&G Companies maintain a direct relationship

---

[29] *Id.*

[30] *Id.*

[31] CPSC, A GRANDPARENT'S GUIDE FOR FAMILY NURTURING AND SAFETY, *available at* http://www.cpsc.gov/cpscpub/pubs/grand/704.html (last visited Aug. 21, 2010).

[32] CPSC Press Release, Report Shows Decrease in Nursery Product-Related Injuries, Sept. 19, 2000, *available at* http://www.cpsc.gov/cpscpub/prerel/prhtml00/00182.html (last visited Aug. 21, 2010).

[33] P&G "Pampers Village" Press Release, *supra* note 26.

with their consumers and parents who buy their products, including Plaintiffs and Class

Members.

**C.     Without Notifying Consumers, P&G Companies Begin to Sell Dry Max Pampers, and Later Apologize.**

70.     P&G Companies began distributing Dry Max Pampers to consumers as early as

the fall of 2008, as the Companies converted their manufacturing plants over to new technology

capable of making the new Dry Max Pampers.  P&G Companies have acknowledged that

Defendants did not notify consumers of the change in the composition of the Dry Max Pampers

for over a year.  Jodi Allen, Procter & Gamble's Vice President of North American Baby Care,

states:

> By the fall of 2008, we began shipping Pampers Dry Max diapers [in packaging
> that did not promote a new absorbent core]. We did not ship both types of diapers
> within single packages—every package had either one or the other [i.e. the old or
> the new]. We converted one manufacturing line at a time until we had converted
> them all. By November 2009, we had fully converted our production. We have
> two U.S. plants, and a small percentage of Pampers are made in Mexico—those
> sourcing the West Coast.[34]

Allen also states in an interview that the coloring of the absorbent core was not changed until the

later official introduction of Dry Max Pampers to the market (now marked by a purple dye that

Allen insists is "very safe"), so parents had no information about the product change.[35]

71.     P&G Companies' failure to disclose these substantial material changes in its

product deceived consumers and violated consumers' trust in the brand.  This deception also

caused babies undue pain and suffering, as parents whose babies began experiencing severe

rashes during this transition period had no way of knowing that the undisclosed new (and

---

[34] McNichols, Pampers: On The Record, *supra* note 1.

[35] *Id.*

defective) Dry Max Pampers were the cause of the severe rashes, and did not know to stop using the Dry Max Pampers because they were not labeled as containing Dry Max.

72.     P&G Companies concealed from parents the fact that their babies were unconsenting guinea pigs for a new product.  Spokesman Bryan McCleary's apology, "Looking back on this, we feel sorry for the confusion that we may have caused during the early shipping of the product," is too little, too late.[36]

**D.     Modern Disposable Diaper Composition.**

73.     Most disposable diapers on the market today absorb waste through a combination of cellulose pulp or "fluff" and superabsorbent polymers ("SAPs") such as polyacrylic acid (sodium polyacrylate).  SAPs are designed to trap and store liquids, even under pressure.  When used in consumer products, these SAPs begin as granulated crystals and can expand to gel form and absorb up to 300 times their own weight in liquid.[37]  SAPs are also referred to as absorbent gelling material ("AGM"), which is described on the pampers.com website:

> AGM is the absorbent gelling material widely used in diaper padding to absorb wetness.  It is perfectly normal to see some gel on the skin from time to time, especially if the diaper is heavily saturated.  It can easily be removed by wiping your baby's skin.  This material has a long history of safe use in a variety of products and has been in diapers for more than a decade.  Absorbent gelling material is closely related to ingredients widely used in cosmetics, in food processing and as binders in medicine capsules.[38]

---

[36] James Eli Schiffer, *Whistleblower: Diaper Debut Prompts Rash of Complaints*, (MINNEAPOLIS-ST. PAUL) STAR TRIBUNE, April 30, 2010, http://www.startribune.com/investigators/92469819.html?elr=KArksUUUoDEy3LGDiO7aiU (last visited Aug. 21, 2010).

[37] EVONIK Industries, Experiments With FAVOR Superabsorbents: A Brochure for the Scientists of Tomorrow, 4, *available at* http://www.superabsorber.com/sites/dc/Downloadcenter/Evonik/Product/Superabsorber/en/Sch%C3%BClerbrosch %C3%BCre%20Englisch_v3_3.pdf (last visited Aug. 21, 2010).

[38] Pampers Cruisers with Dry Max Product Information, http://www.pampers.com/en_US/proddetail/baby-products/pampers-cruisers/id/900827/sectionid/0 (click on "Helpful Hints" tab) (last visited Aug. 21, 2010).

Most disposable diapers on the market are comprised of layers, including a nonwoven topsheet treated with surfactants, another nonwoven "acquisition and distribution layer" of pulp-based tissue used to move liquids into the absorbent core, an absorbent layer of SAPs mixed with cellulose pulp, and a backing layer made of polyethylene plastic or a cloth-like film.  These layers are combined through a hot-melt adhesive process.[39]

74.     Though SAPs have been used "for more than 20 years" in disposable diapers, P&G Companies claim that their Pampers Dry Max technology is "the biggest innovation to Pampers in 25 years."[40]  According to the "Pampers Swaddlers & Cruisers with Dry Max FAQs," on the Pampers website, "Dry Max is referring to the new absorbent part of Swaddlers and Cruisers diapers."[41]  Dry Max contains SAPs like other disposable diapers, but on information and belief, the new composition is in fact different.

**E.     Dry Max: A Complex and Highly Engineered New Diaper.**

75.     P&G Companies claim that their Dry Max Pampers "use the same type of ingredients and materials as Pampers' other trusted products and, in fact, many other disposable diapers on the market.  The key difference is simply in how we applied those materials and produced the diaper itself."[42]  Jodi Allen asserts that "Dry Max is a great new invention, but the materials are the same materials we were already using."[43]  In the P&G Companies' video

---

[39] *See* Diaper Industry Source, What Are The Components of a Typical Disposable Diaper, http://www.disposablediaper.net/faq.asp?1  (last visited Aug. 21, 2010); *see also* Simon Aumônier et al., UK Environment Agency, AN UPDATED LIFECYCLE ASSESSMENT STUDY FOR DISPOSABLE AND REUSABLE NAPPIES, (2008), *available at* http://publications.environment-agency.gov.uk/pdf/SCHO0808BOIR-e-e.pdf (last visited Aug. 21, 2010).

[40] Pampers Swaddlers & Cruisers with Dry Max FAQs, http://www.pampers.com/en_US/dry-max-faqs (last visited Aug. 20, 2010).

[41] *Id.*

[42] *Id*.

[43] *See* McNichols, Pampers: On The Record, *supra* note 1.

featuring Kerri Hailey, Hailey explains that P&G Companies "were able to make Dry Max work by replacing more inefficient pulp with a much more efficient superabsorber that we have throughout our products.  We're now able through a new manufacturing process to place it exactly where we need it throughout the product."[44]

76.    Despite these statements from P&G Companies about Dry Max Pampers' ingredients staying the same as previous versions of Pampers diapers, P&G Companies patented and advertised Dry Max Pampers as revolutionary and new.  In the website FAQs, Dry Max technology is described as "the result of more than a decade of research and testing involving more than 20,000 babies."[45]  P&G Companies also claim that "Pampers is the only brand with this technology on the market,"[46] and assert in advertising that the diapers are two times drier and twenty percent thinner than Huggies Little Movers diapers.[47]

### 1.    Dry Max Pampers Are a Unique Diaper Innovation.

77.    P&G Companies have arduously pursued thinner diapers, and, as stated above, thinness is one of the touted qualities of Dry Max Pampers.[48]

78.    P&G Companies hold at least seven patents and 13 patent applications related to the Dry Max Pampers technologies.[49]  The product labels for Dry Max Pampers reference at least

---

[44] Video interview with Kerri Hailey, *supra* note 8.

[45] Dry Max FAQs, *supra* note 40.

[46] P&G "Latest Innovations" fact sheet, *supra* note 19.

[47] *See* Pampers Cruisers with Dry Max Product Information, *supra* note 38.

[48] *See, e.g.*, U. S. Patent No. 5,562,646 col. 1 ln. 22 (filed Oct. 8, 1996) (stating that"[a] highly desired characteristic for such products is thinness.").

[49] *See, e.g.*, '646 Patent; U.S. Patent No. 5,599,335 (filed Feb. 4, 1997); U.S. Patent No. 5,669,894 (filed Sept. 23, 1997); U.S. Patent No. 6,790,798 B1 (filed Sept. 14, 2004); Patent Application, International Publication No. WO2006/014854 A1 (published Feb. 9, 2006); U.S. Patent Application No. US 2006/0048880 A1 (published Mar. 9, 2006); U.S. Patent Application No. 2007/0156108 A1 (published July 5, 2007); U.S. Patent Application No. 2007/0167928 A1 (published July 19, 2007); U.S. Patent Application No. US 2007/0179464 A1 (published Aug. 2, 2007); U.S. Patent Application No. US 2008/0125735 A1 (published May 29, 2008); U.S. Patent Application No. US 2008/0215166 A1 (published Sept. 4, 2008); U.S. Patent Application No. US 2008/0312617 A1

another 19 patents.  Further, P&G Companies hold or have applied for numerous additional

patents that are, on information and belief, related to Dry Max technology.  As is typical, the

patents set forth  many composition options in an effort to maximize their scope, making it very

difficult for Plaintiffs to identify the exact technologies and ingredients ultimately adopted or

used in the manufacture of Dry Max Pampers.  In addition, because patents are proprietary legal

documents and not permits, P&G Companies may be using technologies that are not yet patented

(or that are set forth only in patent applications) in the production or design of the Dry Max

Pampers on the market today.

79. Because Plaintiffs lack access to the exact chemical and physical makeup of the

diapers—information that is in the possession of P&G Companies—Plaintiffs must rely on the

patents and the patents' lists of chemicals that may be in the diapers to analyze the physical

and/or chemical irritants causing the severe rashes, blisters, welts, bleeding, oozing, chemical

burns, infections, sores, scarring and/or other ailments experienced by Plaintiffs' babies.

Nevertheless, the existence of these symptoms, together with the facts described above regarding

Plaintiffs' experiences with the Dry Max Pampers, Dry Max formula or manufacturing process

as the cause for these health effects.

80. According to P&G Companies' relevant patents, three chief differences between

Dry Max and previous versions of Pampers are:  (1) increased quantity and porosity of SAPs; (2)

reduced amount of pulp serving as a buffer between the babies' sensitive skin and the diaper; and

---

(published Dec. 18, 2008); U.S. Patent Application No. US 2008/0312618 A1 (published Dec. 18, 2008); U.S. Patent Application No. US 2008/0312619 A1 (published Dec. 18, 2008); U.S. Patent Application No. US 2008/0312620 A1 (published Dec. 18, 2008); U.S. Patent Application No. US 2008/0312621 A1 (published Dec. 18, 2008); U.S. Patent Application No. US 2008/0312622 A1 (published Dec. 18, 2008); U.S. Patent Application No. US 2008/0312623 A1 (published Dec. 18, 2008); U.S. Patent Application No. US 2008/0312625 A1 (published Dec. 18, 2008); U.S. Patent Application No. US 2008/0312628 A1 (published Dec. 18, 2008); U.S. Patent Application No. US 2010/0051166 A1 (published Mar. 4, 2010); U.S. Patent No. 7,744,576 B2 (filed June 29, 2010); U.S. Patent No. 7,744,713 B2 (filed June 29, 2010); U.S. Patent No. 7,750,203 B2 (filed July 6, 2010).

(3) the use of hot-melt adhesives to act like glue and hold the SAPs in place.  Each of these features is discussed below.  These changes, which all contribute to the thinness of the Dry Max Pampers, also increase the likelihood that irritants within SAPs, hot-melt adhesives, and/or other parts of the Dry Max Pampers could leach out, perhaps when coming into contact with urine, and irritate babies' sensitive skin.

<p style="text-align:center;"><b>a.      SAPs have increased in quantity and porosity.</b></p>

81.     SAPs comprised of polyacrylic acid can be thought of as the crystals that absorb moisture in diapers.  While wood pulp fluff can absorb three to five times its weight in liquid, SAPs can absorb far more—up to 300 times their weight in liquid.[50]

82.     In previous versions of Pampers, SAPs in relevant regions contributed less than 50 percent of material by weight.  However, in the Dry Max Pampers, SAPs in relevant regions may constitute up to 95 percent of material by weight.[51]  Since acrylic acid is never completely polymerized in SAPs, on information and belief, increased amounts of SAPs in Dry Max Pampers proportionally elevates the amount of acrylic acid within the SAPs.  Acrylic acid is highly caustic and a skin irritant, as discussed more fully *infra*.

83.     Not only did P&G Companies increase the amount of SAPs in the Dry Max Pampers, but the structure of the SAPs was also chemically modified to promote the ability of liquids to flow more freely in the new diapers.[52]  This modification means that any substances,

---

[50] *See* EVONIK Industries Brochure, *supra* note 37, at 4.

[51] *See, e.g.*, `646 Patent col. 10 l. 32-39 ("Most preferred polymer materials for use in making the hydrogel-forming absorbent polymers are slightly networked crosslinked polymers of partially neutralized polyacrylic acids and starch derivatives thereof.  Most preferably, the hydrogel-forming absorbent polymers comprise from about 50 to about 95%, preferably about 75%, neutralized, slightly network crosslinked, polyacrylic acid (i.e., poly (sodium acrylate/acrylic acid)).";  `335 Patent col. 62 l. 26-28 ("[H]ydrogel-forming polymer being present in said region in a concentration of from about 70 to 100% by weight….").

[52] *See, e.g.*, `335 Patent col. 62 l. 22-23, 30-32 ("An absorbent core for acquiring, distributing and storing bodily fluids…having…a Saline Flow Conductivity (SFC) value of from about 50 to about 500 x 10-7 cm3/sec") and col.

including any acrylic acid and/or other harmful chemicals, can travel more freely to babies' skin in the Dry Max Pampers than in previous versions.  As a result, any water-soluble irritants, such as unpolymerized acrylic acid, have a less impeded channel to migrate from the SAP core to babies' sensitive skin, when Dry Max Pampers are wet during normal use.  P&G Companies acknowledges that a significant level of water-soluble materials—up to 10-15 percent of the total amount of the polymer[53]—is present and may be leached out of the absorbent core by bodily fluids.[54]

### b.    Less pulp means more exposure.

84.    Simply put, wood pulp fluff is the cotton-like padding abundantly present in previous versions of diapers.  In previous versions of Pampers, the pulp and SAPs were mixed together throughout the diaper.

85.    The reduction or removal of the wood pulp fluff in Dry Max Pampers increases the risk of irritants reaching babies' sensitive skin.  Furthermore, it is common sense that a thinner diaper means there is a shorter route for irritants to traverse from absorbent SAPs to babies' sensitive skin, thus increasing the likelihood of irritation.

---

62 l.64 – col. 63 l.8 ("The absorbent core…wherein said hydrogel-forming polymer is selected from the group consisting of hydrolyzed starch-acrylonitrile graft copolymers; partially neutralized hydrolyzed starch-acrylonitrile graft copolymers; starch-acrylic acid graft copolymers; partially neutralized starch-acrylic acid graft copolymers; saponified vinyl acetate-acrylic ester copolymers; hydrolyzed acrylonitrile copolymers; hydrolyzed acrylamide copolymers; slightly network crosslinked products of any of the foregoing copolymers; partially neutralized polyacrylic acid; slightly network crosslinked products of partially neutralized polyacrylic acid; and mixtures thereof.").

[53] See '335 Patent col. 62 l. 21, 30, 38 ("An absorbent core …having …about 10% or less extractable polymer….");'646 Patent col. 67 l. 66-67 ("[H]ydrogel-forming polymer has about 15% or less extractable polymer.").

[54] See, e.g., '646 Patent col. 3 l. 55-61 ("Many of these hydrogel-forming absorbent polymers contain significant levels of extractable polymer material.  This extractable polymer material can be leached out from the resultant hydrogel by body fluids (e.g., urine) during the time period such body fluids remain in contact with the hydrogel-forming absorbent polymer.").

86.     In an attempt to compensate for the loss of liquid distribution capability provided by wood pulp fluff, the P&G Companies introduced in Dry Max Pampers synthetic fibers or chemically modified natural fibers.  Although the exact chemical nature of the synthetic fibers and the chemical reagents used in Dry Max Pampers remains to be discovered, the patents list a plethora of chemicals which have the capacity to irritate babies' skin.[55]

c.     **Hot-melt adhesives hold SAPs in place.**

87.     As stated above, in previous versions of Pampers, SAPs were interspersed with fibers such as wood pulp fluff and loosely distributed within the diaper.

88.     However, in Dry Max Pampers, P&G Companies strategically glued the SAPs into a layer of chemically modified "non-woven" fiber.[56]  Although the exact chemical nature of the adhesives used in Dry Max Pampers remains to be discovered, P&G Companies' patents list numerous possible chemicals that could work as adhesives, many of which could have the capacity to babies' irritate skin.[57]  In addition, the hot-melt adhesives are processed at high

---

[55] *See, e.g.*, '335 Patent col. 21 l. 28-42 ("Fibers useful in the present invention include those that are naturally occurring fibers (modified or unmodified), as well as synthetically made fibers.  Examples of suitable unmodified/modified naturally occurring fibers include cotton, Esparto grass, bagasse, kemp, flax, silk, wool, wood pulp, chemically modified wood pulp, jute, rayon, ethyl cellulose, and cellulose acetate.  Suitable synthetic fibers can be made from polyvinyl chloride, polyvinyl fluoride, polytetrafluoroethylene, polyvinylidene chloride, polyacrylics such as ORLON®, polyvinyl acetate, polyethylvinyl acetate, non-soluble or soluble polyvinyl alcohol, polyolefins such as polyethylene (e.g., PULPEX®) and polypropylene, polyamides such as nylon, polyesters such as DACRON® or KODEL®, polyurethanes, polystyrenes, and the like.") and col. 22 l. 37-46 ("Suitable hydrophilic fibers for use in the present invention include cellulosic fibers, modified cellulosic fibers, rayon, polyester fibers such as polyethylene terephthalate (e.g., DACRON®), hydrophilic nylon (HYDROFIL®), and the like.  Suitable hydrophilic fibers can also be obtained by hydrophilizing hydrophobic fibers, such as surfactant-treated or silica-treated thermoplastic fibers derived from, for example, polyolefins such as polyethylene or polypropylene, polyacrylics, polyamides, polystyrenes, polyurethanes and the like.").

[56] *See, e.g.*, U.S. Patent No. 6,970,798 B1 fig. 9b (filed Sept. 14, 2004); U.S. Patent No. 7,744,713 B2, fig. 3A (filed June 29, 2010).

[57] *See, e.g.*, '646 Patent col. 27 l. 31-55 ("The thermoplastic materials, and in particular the thermoplastic fibers, can be made from a variety of thermoplastic polymers, including polyolefins such as polyethylene (e.g., PULPEX®) and polypropylene, polyesters, copolyesters, polyvinyl acetate, polyethylvinyl acetate, polyvinyl chloride, polyvinylidene chloride, polyacrylics, polyamides, copolyamides, polystyrenes, polyurethanes and copolymers of any of the foregoing such as vinyl chloride/vinyl acetate, and the like. One preferred thermoplastic binder fiber is PLEXAFIL® polyethylene microfibers (made by DuPont) that are also available as an about 20% blend with 80%

temperatures and sprayed onto SAPs during diaper manufacturing,[58] increasing the risk of SAP

degradation.  Furthermore, by using the hot-melt adhesives to hold the SAPs in place, the process

creates a very porous bed of SAPs which includes open spaces where liquid can flow,[59] thus

contributing to the free movement of irritants and liquids to babies' skin.

### 2. Acrylic Acid and the Polymerization Process.

89.     Acrylic acid is the primary raw ingredient for superabsorbent polymers (SAPs).

The acid, a monomer, is polymerized to produce a polyacrylic acid salt (sodium polyacrylate).

Over three million metric tons of acrylic acid is produced annually, about half of which is used in

the production of diapers and other personal care products.[60]

90.     Acrylic acid is a chemical compound which can be absorbed through human skin

and is corrosive on contact.  Acute industrial exposure to acrylic acid has been known to cause

"skin burns ranging in intensity from moderate to severe," and dermal absorption of the

substance "has been reported to cause systemic illness."[61]  The U.S. Department of Health and

---

cellulosic fibers sold under the tradename KITTYHAWK® (made by Weyerhaeuser Co.) Depending upon the desired characteristics for the resulting thermally bonded absorbent member, suitable thermoplastic materials include hydrophobic fibers that have been made hydrophilic, such as surfactant-treated or silica-treated thermoplastic fibers derived from, for example, polyolefins such as polyethylene or polypropylene, polyacrylics, polyamides, polystyrenes, polyurethanes and the like. The surface of the hydrophobic thermoplastic fiber can be rendered hydrophilic by treatment with a surfactant, such as a nonionic or anionic surfactant, e.g., by spraying the fiber with a surfactant, by dipping the fiber into a surfactant or by including the surfactant as part of the polymer melt in producing the thermoplastic fiber.")

[58] *See, e.g.*, U.S. Patent Application No. US 2008/0312617, at [0088] (published Dec. 18, 2008) ("[T]he thermoplastic adhesive material 68 and 76 may comprise, in its entirety, a single thermoplastic polymer or a blend of thermoplastic polymers, having a softening point… in the in the range between 50° C and 300° C.").

[59] *See, e.g.*, U.S. Patent No. 7,744,576 B2 (filed June 29, 2010); '713 Patent; U.S. Patent No. 7,750,203 B2 (filed July 6, 2010).

[60] *See* Special to E&E of Greenwire, *Enzyme Producers Set Sights on Taking Oil Out of Chemical Production*, N.Y. TIMES, Nov. 16, 2009, *available at* http://www.nytimes.com/gwire/2009/11/16/16greenwire-enzyme-producers-set-sights-on-taking-oil-out-57702.html (last visited Aug. 21, 2010).

[61] U.S. Dep't of Health & Human Services, U.S. Dep't of Labor, OCCUPATIONAL SAFETY AND HEALTH GUIDELINE FOR ACRYLIC ACID, 3 (1992), *available at* http://www.cdc.gov/niosh/docs/81-123/pdfs/0013.pdf (last visited Aug. 21, 2010).

Human Services reports that acrylic acid may also cause skin sensitization (which can lead to accelerated allergic contact dermatitis), based on effects seen in animals.[62]

91.     Moreover, one Material Safety Data Sheet ("MSDS") for sodium polyacrylate states the following with respect to hazards: "May cause skin irritation.  May be harmful if absorbed through the skin."[63]  Another advises the following first aid measures if skin comes in contact with sodium polyacrylate:  "Immediately flush skin with plenty of water for at least 15 minutes while removing contaminated clothing and shoes.  Get medical aid if irritation develops or persists."[64]

92.     Polymerization occurs when acrylic acid is combined with any of a number of other chemicals.  If polymerization is not complete, traces of nonpolymerized substances (*i.e.*, monomers) can remain in the material, thus exposing babies to pure acrylic acid when the polyacrylic acid is applied to the diaper.

93.     A current global shortage of raw acrylic acid, demonstrated by a price jump of 71% in the past twelve months,[65] could make quality acrylic acid harder to purchase as a raw material or could incentivize P&G Companies to buy lower quality polyacrylic acid, which may not be fully polymerized.

94.     As stated above, P&G Companies' Dry Max technology deploys increased amounts of SAPs as compared to the amount used in non-Dry Max diapers.  P&G Companies

---

[62] *Id.*

[63] Material Safety Data Sheet for Poly(acrylic acid), 25 wt% solution in water, http://fscimage.fishersci.com/msds/96928.htm (last visited Aug. 21, 2010).

[64] Material Safety Data Sheet for Polyacrylic Acid -Na Salt, http://www.ampolymer.com/MSDS/PAA.pdf (last visited Aug. 21, 2010).

[65] *See* Jack Kaskey, *Akzo, PPG Profit Squeezed by Paint Materials Shortage*, BLOOMBERG BUSINESSWEEK, June 30, 2010, http://www.businessweek.com/news/2010-06-30/akzo-ppg-profit-squeezed-by-paint-materials-shortage.html (last visited Aug. 21, 2010).

knew or should have known that an increase in the amount of SAPs used in the Dry Max Pampers results in a corresponding increase in the potential amount of corrosive monomer present in the Dry Max Pampers. P&G Companies knew or should have known that the newly engineered SAP polymers afford the corrosive monomers a less obstructed route of escape into aqueous urine, compared to the conventionally engineered SAPs.

95. Further, when urine mixes with acid, the environment becomes even more acidic, causing conditions that could further inflame babies' tender skin.

96. P&G Companies knew or should have known that the decreased amount of pulp in Dry Max Pampers weakens the protective, buffering effect of the pulp layer, and increases the likelihood that acrylic acid monomer can come into contact with babies' most sensitive skin.

**3. Other Potential Irritants.**

97. The facts about Dry Max technology illuminated by P&G Companies' absorbent materials patents support research published by consumer research group Z Recommends. The research posits that there are at least five possible explanations, individually or in combination, for why the introduction of Dry Max technology to Pampers diapers has caused preemies, newborns, older babies, and toddlers to suffer severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments. These factors include but are not limited to: (a) the presence of the chemical acrylic acid, which can corrode skin; (b) the presence of irritating chemical fragrances; (c) excessive dryness caused by the chemical formulation of the superabsorber core; (d) the lack of a mesh or other protective liner; or (e) the

presence of irritating chemical adhesives[66]—the first and last of which are discussed at length *supra*. The additional potential causes of the severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments experienced by Plaintiffs' babies posited by Z Recommends may exacerbate the effect of increased concentrations in SAPs, adhesives, or related chemicals as well as provide independent sources of these health effects. Moreover, any of these combined with babies' liquid excretion, may also increase irritation. Further irritants include dyes, as discussed below.

### a. Chemical Fragrances.

98. P&G Companies have stated on the Pampers website that masking perfumes are used in the manufacture of Dry Max Pampers: "The absorbent core also includes a touch of fragrance inside, to help mask the smell of urine and BM . . . Masking perfume/scent . . . [is a]dded inside the diaper to provide a distinctive pleasant odor to the diaper and its ingredients."[67] Consumers have reported a strong chemical smell emanating from the Dry Max Pampers. As masking perfumes are intended to cover such smells, P&G Companies could have used greater amounts of chemical fragrances to cover a stronger chemical smell than what was used in previous non-Dry Max versions of their Swaddlers and Cruisers diapers. These fragrances have the potential to lead to rashes and skin irritation, and this potential may be exacerbated when fragrances are combined with other chemical elements in the diapers.

---

[66] *See* Jennifer McNichols & Jeremiah McNichols, Five possible sources of irritation in Pampers Dry Max Diapers, ZRecommends.com, May 19, 2010, http://www.zrecommends.com/detail/five-possible-sources-of-irritation-in-pampers-dry-max-diapers/ (last visited Aug. 21, 2010).

[67] Pampers website article, What are the Materials in Pampers with Dry Max?, http://www.pampers.com/en_US/Pampers-DryMax-Ingredients (last visited Aug. 23, 2010).

### b.    Excessive Dryness.

99.    Defendants have promoted Dry Max Pampers as an ultra-dry diaper that is twice as dry as competitors' products.  Pampers' superabsorber technology may be overdrying babies' skin.  The thinness of Dry Max Pampers—a result of the removal of cushioning paper fiber from the diaper products in whole or in part—means that the chemically-composed superabsorbent core is in nearly direct contact with babies' extremely sensitive and delicate bottoms and other body parts, which may cause overdrying to the point of rawness, bleeding, and cracking.

100.    Moreover, caustic chemicals may have a more dramatic effect on babies' skin that has been damaged or opened by other chemicals in the diapers.

### c.    Lack of Protective Liner.

101.    New Dry Max Pampers are not manufactured with a mesh liner as was previously included in non-Dry Max versions of Cruisers and Swaddlers diapers.[68]  Due to the removal of the mesh layer and cushioning cellulosic fiber from the diaper products in whole or in part, the superabsorbent core, comprised of crystallized chemicals such as polyacrylic acid, which may or may not be fully polymerized, is in nearly direct contact with babies' extremely sensitive and delicate bottoms and other body parts that the Dry Max Pampers are supposed to cover and to protect.  This direct proximity could cause severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments.

### d.    Dyes.

102.    Dry Max Pampers are manufactured using a purple dye, the contents of which remains to be discovered.  Nevertheless it is a potential irritant.  In one study, researchers

---

[68] *See* McNichols, Pampers: On The Record, *supra* note 1.

"suspect[ed] that . . . patients demonstrated allergic contact dermatitis [ACD]" in response to various dyes in diapers.[69]

## F.      The Federal Hazardous Substance Act and Chemicals in Dry Max Pampers.

103.    The Dry Max Pampers, and/or any component part thereof, are "children's products" and "consumer products" within the meaning of the Consumer Product Safety Act, 15 U.S.C. § 2052(a)(2) and (5).

104.    Pursuant to 15 U.S.C. § 1261(f)(1)(A) of the Federal Hazardous Substance Act ("FHSA") and regulation 16 C.F.R. 1500.3(b)(4)(i)(A), Dry Max Pampers contain a "hazardous substance," which is defined as a "substance or mixture of substances" which is "toxic, corrosive, an irritant, [or] a strong sensitizer."

105.    As described above, on information and belief, Dry Max Pampers or any component part thereof cause severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments, on babies who use Dry Max Pampers.

106.    Since Dry Max Pampers contain one or more "hazardous substances" which have caused substantial personal injury in babies, Dry Max Pampers are required, under the FHSA, to have a warning label pursuant to 16 C.F.R. 1500.3(b)(14) and 16 C.F.R. 1500.121.

107.    Accordingly, the violations of the warning requirements of the FHSA are willful and deliberate violations of the consumer product statutes in many states, which are enumerated *infra*, as well as evidence of negligence and/or a basis for strict product liability.

---

[69] Lauren Alberta, et al., *Diaper Dye Dermatitis*, 116 PEDIATRICS 450 (2005), *available at* http://www.pediatrics.org/cgi/content/full/116/3/e450 (last visited Aug. 21, 2010).

**G.      Defendants Made False and Misleading Representations About the Health and Safety of Dry Max Pampers.**

   **1.      Defendants Represented that Pampers are Safe for Use by Babies.**

108.     P&G Companies manufactured, advertised and sold their Dry Max Pampers. P&G Companies represented to Plaintiffs and the public that this product was safe for babies. "Dry Max is a technology that is one hundred percent suitable for use by babies and is as safe as anything Pampers has ever brought to the market before," claims Pampers Product Safety representative Mauricio Odio.[70]

109.     P&G Companies have used direct marketing tactics such as including free product samples in bags of the older versions of Swaddlers New Baby and Cruisers which were not marketed as containing the Dry Max material; distributing coupons; and providing free samples through hospitals.  Defendants also began advertising the new Dry Max Pampers during the February 2010 Vancouver Winter Olympics, outfitting babies of Team USA athletes with Dry Max Pampers.  According to a P&G Companies press release, parents could request a free sample three-pack of new Cruisers with Dry Max Pampers on pampers.com starting February 12, 2010; the promotion included a chance to win a year's supply of Pampers Cruisers with Dry Max.  The products became available for general consumption in the U.S. in March, 2010.[71]  The following are several examples of samples offered to parents who sign up for an online membership with Pampers:

---

[70] Malachi Constant, *On Your Side: Pampers Diaper Brings 'Rash' of Complaints*, WJLA-TV News Television Broadcast, May 17, 2010, *available at* http://www.wjla.com/news/stories/0510/736874.html (last visited Aug. 21, 2010).

[71] *See* P&G Press Release, Babies of U.S. Olympic Athletes Among First to Get New High Performance Diaper - Pampers Cruisers With Dry Max, Jan. 18, 2010, *available at* http://www.prweb.com/releases/2010/01/prweb3459294.htm (last visited Aug. 21, 2010).





110.     P&G Companies states the following on its website about their Dry Max Pampers:  "blanket-like softness," "all-around comfort," "keeps babies dry and happy," "helps lock in wetness," "super absorbing technology," "breathable and soft like cotton," "our first high performance diaper," "for your active and healthy baby," "The #1 Choice of Hospitals for

---

[72] http://www.pampers.com/en_US/home/ (last visited May 10, 2010).

[73] https://www.pgeverydaysolutions.com/pgeds/pampers/brandsampler-login.jsp (last visited Aug. 21, 2010).

Newborns," and "Moms vote Cruisers!"  The following are several examples of web graphic

representations:


[74]


[75]





---

[76] *See* Pampers Swaddlers with Dry Max Product Information, http://www.pampers.com/en_US/proddetail/baby-products/new-baby-diapers-swaddlers/id/900826/sectionid/0 (click on "Product Tour" tab) (last visited Aug. 23, 2010).

111.    P&G Companies advertise their Dry Max Pampers diapers with the slogan, "Familiar comfort.  Premium protection.  Exclusively from Pampers."[78]  Defendants also claim, "4 out of 5 moms who've tried Pampers Cruisers with Dry Max would recommend them to other moms."[79]

112.    Pampers Swaddlers New Baby and Cruisers diapers are printed with images of Sesame Street® characters such as Elmo, Big Bird, Cookie Monster, and Ernie.  These popular characters are used in Pampers advertising to make Dry Max Pampers appear kid-friendly and appealing to parents.

113.    P&G Companies emphasize the safety of their Dry Max Pampers on the pampers.com website, stating that Dry Max Pampers are "Parent Tested, Parent Approved" and "Trusted by Leading Pediatricians."[80]

114.    In the "Pampers Swaddlers & Cruisers with Dry Max FAQs" on the Pampers website, P&G Companies explicitly represent that Dry Max Pampers are safe:  "Q: Is Dry Max safe for my baby?  Yes."

115.    P&G Companies states the following on its packaging of Pampers Swaddlers with Dry Max:  "Wraps Baby in All-Around Softness," "Quilted, Blanket-Like Softness," and "Pampers Swaddlers contain these mild ingredients which are gentle to the skin:  Petrolatum, Stearyl Alcohol, Aloe Barbadensis Leaf Extract."[81]  Irritants are conspicuously absent from this "ingredient" list.

---

[77] http://www.bestbuy2store.com/pampers-swaddlers-dry-max-diapers/ (last visited Aug. 21, 2010).

[78] Pampers Swaddlers with Dry Max Product Information, *supra* note 76.

[79] Video interview with Kerri Hailey, *supra* note 8 (description of video on You Tube page).

[80] Pampers website article, Baby Diaper Awards Presented to Pampers with Dry Max, http://www.pampers.com/en_US/dry-max/baby-diaper-award (last visited Aug. 23, 2010).

[81] *See* Pampers Swaddlers with Dry Max 36-pack, size "N" product label.

116. P&G Companies represented to Plaintiffs and Class Members that Dry Max Pampers were a safe, gentle, and healthful choice for their babies. Indeed, P&G Companies' credo, described in their "Our Values and Policies" brochure is that "Procter & Gamble ensures the safety of our products, packages and operations for our . . . consumers . . . We consider this to be a requirement for conducting responsible business, and an essential element of building and maintaining public trust in our products."[82]

117. P&G Companies make the following claim on the Pampers website:

Nothing is more important to the people at Pampers than ensuring the safety of our diapers for babies. We evaluate the safety of all ingredients used in our products. We thoroughly evaluate for systemic toxicity, skin irritation or skin sensitization (skin allergy). Safety evaluation is based on the principles of the National Academy of Science (US) and World Health Organization's assessment process to evaluate the safety of the ingredients. We also conduct clinical studies to confirm good skin compatibility. In addition, we constantly monitor consumer health comments to ensure product safety in real consumer use conditions. Our products always meet and often exceed all regulatory and legal safety requirements around the world.[83]

118. However, the above representations are false and misleading.

**2.     Dry Max Pampers are Harmful to Preemies, Newborns, Older Babies, and Toddlers.**

119. Despite the above representations and assurances, Plaintiffs' babies experienced severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments when using Dry Max Pampers.

120. Defendants' Dry Max Pampers do not contain a warning label indicating the Dry Max Pampers actually had the capacity to and, in many cases, did actually harm the preemies,

---

[82] P&G Brochure, Our Values and Policies, *supra* note 11, at 15.
[83] Dry Max FAQs, *supra* note 40.

newborns, older babies, and toddlers by causing severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments.

121.    Defendants knew or should have known that their Dry Max Pampers presented a serious risk to the health and safety of babies, and therefore were defective.

122.    Neither P&G Companies' websites nor their product labels contain any information about physical and/or chemical irritants with the capacity to harm babies by causing severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments.

123.    Despite the presence of physical and/or chemical irritants, with the claims and representations made in their labels and advertisements, P&G Companies continued to appeal to parents' and caregivers' desire to be gentle and loving to their babies by using healthful products.

124.    Defendants acknowledge on their product packaging that the chemicals used in their Dry Max Pampers can leach out of the diaper with normal use, coming in direct contact with babies' skin.  The packaging of Pampers Swaddlers with Dry Max and Pampers Cruisers with Dry Max states, "If you notice gel-like material on your baby's skin, don't be alarmed.  This comes from the diaper padding and can be easily removed by wiping your baby's skin with a soft, dry cloth."[84]

125.    Moreover, scientists employed by P&G Companies, in a study funded by P&G Companies, noted that babies can be directly exposed to the diaper chemicals:

---

[84] See Pampers Swaddlers with Dry Max 36-pack, size "N" product label; Pampers Cruisers with Dry Max 31-pack, size 3 product label.

Chemicals may be deposited or transferred onto the skin directly, or via solubilization in sweat, urine, or sebum.[85]

Exposure to diaper materials not in direct contact with skin may be possible via the phenomenon of reflux, where an aqueous vehicle like urine may carry these materials toward the direct skin contact areas of the diaper.[86]

Migration of any ingredients from the lower layers of the diaper, albeit remote, is still possible . . . .[87]

Exposure to diaper absorbent core raw materials may occur via the reflux phenomenon, and, depending on the material and molecular weight (MW), may also be absorbed through the skin.[88]

Because polymerization processes are not 100% efficient, low residual amounts of free acrylic acid monomer are expected to be present in SAP [superabsorbent polymer].[89]

Hazard Profile of Acrylic Acid:…Irritation – oral and dermal…Corrosion – dermal, eyes, and respiratory tract…[.][90]

126.    In 2005, the journal *Contact Dermatitis* published an article by Miranda A. Farage, Principal Scientist in Feminine Care and Family Care Clinical Sciences at P&G Companies, titled "Are we reaching the limits of our ability to detect skin effects with our current testing and measuring methods for consumer products?"  Farage's study noted that the company had recently observed during tests of its paper products, including baby diapers:

(W)e have seen that current test methods may not be robust enough to evaluate perceived skin effects that may be important for consumer comfort during product use.  This observation is consistent with feedback from consumers . . . These

---

[85] Prashant Rai, et al., *Safety Evaluation of Disposable Baby Diapers Using Principles of Quantitative Risk Assessment*, 72 J. TOXICOLOGY & ENVTL. HEALTH 1262, 1264 (2009).

[86] *Id*. at 1270-71.

[87] *Id*.

[88] *Id*. at 1268.

[89] *Id.*

[90] *Id*. at 1269, table 5.

observations lead to the conclusion that our traditional skin testing approaches are not always good predictors of consumer-perceived skin comfort."[91]

The study suggests that P&G Companies knew or should have known of the limitations of current pre-market product testing.  Knowing this, P&G Companies should have reformulated their market testing practices to ensure that they released safe products for babies into the consumer market.

127.    If Plaintiffs and Class Members had known the true nature of P&G Companies' Dry Max Pampers, they would not have purchased Dry Max Pampers or allowed their babies to be exposed to them.

**H.     Defendants Made False and Misleading Representations About the Functionality of Dry Max Pampers.**

128.    Not only were the Dry Max Pampers harmful to babies, the purported benefits of the Dry Max technology were overstated and did not justify the risk.

129.    Although P&G Companies represents that Dry Max Pampers are "high performance diapers" that are "thin" yet "perform extremely well,"[92] on information and belief, thinness may actually be accelerating delivery of harmful chemicals to babies' skin.

**I.     Defendants' Response to Parents' Complaints.**

130.    As reported in Advertising Age magazine, P&G Companies have acknowledged that they knew of major problems related to the Dry Max Pampers by at least "late" 2009:

The reality is that P&G, while trying to play it cool publicly, has been focused fairly intently on the burgeoning blowup since late last year [2009].  "We've been having daily 7 a.m. conference calls among all the functions every morning,

---

[91] Farage, *Reaching the Limits of our Ability to Detect Skin Effects*, *supra* note 6, at 297.
[92] Video interview with Kerri Hailey, *supra* note 8.

including weekends, about this, since we got the first inkling," Jodi Allen, VP-North American baby care told Ad Age.[93]

131.    Despite numerous parents' claims that Dry Max Pampers have caused their babies severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments, P&G Companies continue to claim that their Dry Max Pampers are "Safe for Babies," and address consumers' concerns as "an online dust-up" initiated by "a small group of online Facebook activists [who] appear to be spreading sensational accusations and making unsubstantiated claims."[94]   A group of Facebook users asking P&G Companies to do away with harmful Dry Max numbered over 11,385 at the time of filing.  The group was started on or about December 2009 when a Pampers Dry Max consumer reported her negative experience with the diapers to P&G Companies and she was dissatisfied with their response.

132.    Rather than recalling Dry Max Pampers, P&G Companies have insisted that there is nothing wrong with Dry Max technology.  P&G Companies have called consumers' concerns "rumors" and "completely false."  In a May 6, 2010 press release, Defendant P&G Companies stated, "Some (parents) have specifically sought to promote the myth that our product causes 'chemical burns.'  We have comprehensively and thoroughly investigated these and other claims

---

[93] Jack Neff, *How Pampers Battled Diaper Debacle*, ADVERTISING AGE, May 10, 2010, available at http://adage.com/article?article_id=143777 (last visited Aug. 23, 2010).

[94] *See* Kimberly Thompson, Press Release, Expert on Children's Risks Tells Parents Not to Worry About the Facebook Pampers Diaper Rash 'Scare', http://www.prnewswire.com/news-releases/expert-on-childrens-risks-tells-parents-not-to-worry-about-the-facebook-pampers-diaper-rash-scare-93004304.html (last visited Aug. 23, 2010).  *But see* Safety Blog, Parents Gather on Facebook to ask Pampers for Diaper Change, ConsumerReports.org, May 7, 2010, http://blogs.consumerreports.org/safety/2010/05/pampers-crusiers-swaddlers-rashes.html (last visited Aug. 21, 2010).

and have found no evidence whatsoever that the reported conditions were in any way caused by materials in our product." [95]

133.    These statements are in direct opposition to P&G Companies' published materials about the companies' values and ethics.  On its website, P&G Companies describes the "five core strengths required to win in the consumer products industry," including "Consumer Understanding."  In connection with these "core strengths," P&G Companies notes, "We are designed to lead in each of these areas."[96]  In "The Tradition & Science of Safe Products" brochure, P&G Companies states that one of the "P&G product safety assurance key elements" is "Post market surveillance and rapid response."[97]  Despite thousands of publicly available online comments expressing parents' concern, P&G Companies have not rapidly responded to address the needs of consumers.  Nor have P&G Companies warned consumers of the potential for users of Dry Max Pampers to experience severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments.

134.    Instead, P&G Companies continue to dismiss parent concerns about severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments affecting their babies as the result of the Dry Max Pampers:  "Unfortunately, diaper rash is very common, and sometimes severe, regardless of the diaper used.  At any given moment, more than

---

[95] P&G Press Release, Pampers Calls Rumors Completely False, May 6, 2010, *available at* http://www.pginvestor.com/phoenix.zhtml?c=104574&p=irol-newsArticle&ID=1423829 (last visited Aug. 21, 2010).

[96] P&G website article, Core Strengths: Innovation, New Products, Best Practices, http://www.pg.com/en_US/company/core_strengths.shtml (last visited Aug. 21, 2010).

[97] P&G Brochure, The Tradition & Science of Safe Products, *supra* note 9, at 2.

250,000 babies will experience a serious rash."[98]  Meanwhile, Dry Max Pampers sit on store shelves and are in use every day by parents and caregivers nationwide.

135.    Defendants refer to Dry Max health problems as a coincidence of timing.  "The things that are being described, things like blisters, breaks in the skin, deep red rashes, this is part of what is experienced by babies all throughout the year," said spokesman Bryan McCleary.  "As hundreds of thousands of moms and babies are switching to the new Dry Max, it's clear that they're coincidentally developing diaper rashes and severe diaper rashes at the same time." McCleary also stated, "We're insulted that someone would imply that our products are dangerous."[99]

136.    A video released by P&G Companies features Suzanne Loiselle, a New York pediatrician in a testimonial.  Loiselle states, "Having looked at all the safety data and the research done, I have no safety concerns whatsoever with the Pampers with Dry Max technology."[100]  However, despite public outcry about the safety of the Dry Max Pampers, P&G Companies have refused to make this data public.  Loiselle suggests "coat(ing) the area with a lot of zinc" when a parent notices redness on a baby's bottom.[101]  She suggests calling a pediatrician and arranging for a doctor's office visit if the baby experiences "some little breaks in the skin that can allow the normal yeast and bacteria to get into the skin and cause some pimples or even little blisters."[102]  These "breaks in the skin" necessitating a trip to the physician are the very symptoms that many parents report in their babies after using the Dry Max Pampers.

---

[98] P&G Press Release, Pampers Calls Rumors Completely False, *supra* note 95.

[99] Schiffer, *Whistleblower: Diaper Debut Prompts Rash of Complaints*, *supra* note 36.

[100] Video Interview with Dr. Suzanne Loiselle, *available at* Pampers Facebook page, http://www.facebook.com/video/video.php?v=399435808192 (last visited Aug. 21, 2010).

[101] *Id.*

[102] *Id.*

137.    In response to public uproar about Dry Max Pampers, P&G Companies have

repeatedly resorted to blaming parents and others who report problems.  Another video released

by Defendants features Dr. Kimberly Thompson, who is *not* a medical doctor, though she

impliedly plays one and makes no reference to the fact that her true degrees are an Sc.D. and an

M.S.[103]  Furthermore, Thompson works on P&G Companies external advisory boards.  In

response to the question, "Do you think this is an unnecessary health scare?" Thompson replied:

> I think it has . . . the characteristics of a scare because what we're seeing is the use
> of emotionally charged terms like chemical burn and, you know, pictures that
> make parents fearful as opposed to, actually, people who are trying to provide
> them with good information and help them really understand what they need to do
> to make their babies have a better experience.[104]

138.    P&G Companies make concerted and repeated efforts to shift blame to parents,

implying that they (the very people whose babies are suffering from painful rashes and sores) fail

to change their babies' diapers with sufficient frequency, although the Dry Max Pampers are

supposedly able to be used for 12-hour intervals.  When asked, "Is this product really causing

rashes on babies?" Thompson replies:

> The evidence that we've seen so far suggests that Pampers with Dry Max is not
> causing any difference in the experience parents are having with diaper rash,
> period.  They're not seeing different types, they're not seeing different severity,
> and they're not seeing more or less; it's basically the same . . . When you look at
> the overall safety profile and the consumer data that the Pampers with Dry Max
> team has collected, it's very clear that the relationship is not there.[105]

Dr. David Schonfeld, one of three pediatricians who give statements on P&G's Pampers website,

insults parents' intelligence rather than admitting that Dry Max Pampers could cause severe

---

[103] *See* Curriculum Vitae of Kimberly Thompson, http://www.kidsrisk.org/images/kmtCV.pdf (last visited Aug. 21,
2010).

[104] Video interview with Dr. Kimberly Thompson, *available at*
http://www.pg.com/en_US/news_views/blog_posts/2010/may/perspective_pampers.shtml (click on video player to
view) (last visited Aug. 21, 2010).

[105] *Id*.

rashes. He states, "it's called a diaper rash because it appears in the area that diapers are worn, not because the diapers cause the rash."[106]

139.    While the above statements show P&G Companies taking the position that babies who are suffering from severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments are experiencing diaper rash, the Pampers Village Skin Care Guide, subtitled "Helping You Maintain Your Baby's Healthy Skin," states only that symptoms of diaper rash include "red or pink bumps" and "red, swollen bumps." The pamphlet states that "diaper rash is caused by pH changes that occur when stools and urine combine,"[107] and does not mention that severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments could result from chemical irritation. A suggested remedy is to "change diapers frequently," despite representing in other materials that Pampers can be worn for 12 hours.[108] Defendants also suggest "try(ing) an extra-absorbent disposable diaper"[109] as a remedy for diaper rash, when on information and belief, use of P&G Companies' "extra-absorbent" Dry Max Pampers is causing consumers' babies to experience severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments.

140.    In an online comment in response to a news article about consumer concerns, P&G Companies General Manager Jodi Allen writes, "Please know, our first and only priority is

---

[106] Pampers website article, Doctors [sic] Opinions, http://www.pampers.com/en_US/dry-max/diaper-rash-experts (last visited Aug. 23, 2010).

[107] Pampers Village Brochure, Skin Care Guide: Helping You Maintain Your Baby's Healthy Skin, 7, *available at* http://www.pampers.com/en_US/tools/pdfs/Skin_Care_Guide.pdf (last visited Aug. 21, 2010).

[108] P&G Fact Sheet, Latest Innovations, *supra* note 19.

[109] Pampers Village Brochure, Skin Care Guide, *supra* note 106, at 7.

the health and well being of babies.  We would never release any product that gave us even the slightest cause for concern."[110]

141.    As described above, P&G Companies' initial reaction to families' widespread concerns with the Dry Max Pampers was to blame parents and caregivers for not changing their babies' diapers sufficiently (in other words, they told parents to buy more Dry Max Pampers), to point the finger at parents and caregivers for mischaracterizing simple diaper rashes, and to accuse parents of blowing the situation out of proportion through social networking, which they attempted to influence through educating Mommy Bloggers about Dry Max Pampers.

142.    Following these strategies, and in the face of this litigation (which began months earlier), on or about July 27, 2010, P&G Companies began offering a "Satisfaction Guarantee" for their Dry Max Pampers.  On information and belief, P&G Companies does not offer and/or promote similar refunds on other P&G products.  According to the Dry Max Pampers refund webpage:

> We're so confident that you'll love our Pampers Swaddlers and Cruisers with Dry Max that we back them with a total satisfaction guarantee! If you are not totally satisfied with Pampers Dry Max we will refund your money.
>
> Simply send us your original receipt, the UPC from your Pampers Swaddlers or Cruisers Dry Max package, and your full name and mailing address printed on a 3x5 card to the address below. This offer is limited to one redemption per household on one pack; U.S. residents; and no organizations. Any additional submissions will not be processed, returned, or responded to. Refund is the full purchase price of your one Dry Max diaper pack, plus $1 for postage. Please allow six to eight weeks for your refund to arrive.
>
> Offer expires 10/31/2010.
> Pampers Dry Max Guarantee Offer

---

[110] Jessica Wohl, *New Pampers Trigger Safety Concerns*, MSNBC.com, May 5, 2010,
  http://www.msnbc.msn.com/id/36972785/ (last visited Aug. 21, 2010).

PO Box 900082
El Paso, TX 88590-0082[111]

**J.     Consumers' Response to Defendants.**

143.     With annual sales of around $8 billion, Pampers is a blockbuster brand for Procter & Gamble, a Fortune 500 company, and Dry Max Pampers, with a lower cost for raw materials, packaging and shipping than previous versions[112] is intended to boost those profits even more. Spokesman McCleary says of Dry Max Pampers, "America has voted with their purchases…we saw a big increase in sales, a big increase in consumer acceptance."[113]  However, this statement does not reflect the current state of P&G Companies' market share, now that consumers have experienced the problems with Dry Max Pampers.

144.     In June, 2010, the Wall Street Journal reported that Pampers sales were "holding steady" and that P&G Companies had increased spending on Internet advertising and was issuing more coupons for Dry Max Pampers.  The Journal reported of P&G's stance on Dry Max Pampers marketing, "P&G had always planned to pour marketing money into the diapers, which were introduced about three months ago. But it also reflects recently devised plans to advertise 'early and often,' because of the negative attention the new diapers have drawn."[114]

145.     Yet, in July, 2010, Reuters reported that Consumer Edge Research group found that Procter & Gamble had lost "about 3 percentage points of diaper market share in the United States to rival diaper maker Kimberly-Clark" in the span of about four weeks, and that P&G

---

[111] Pampers website page, All About Dry Max: Our Satisfaction Guarantee, http://www.pampers.com/en_US/dry-max/diapers-satisfaction-guarantee (last visited Aug. 20, 2010).

[112] Neff, *Dry Max Drubbing*, *supra* note 13.

[113] AFP, *P&G Fights Allegations Pampers Cause 'Chemical Burns'*, GOOGLE NEWS, May 14, 2010, http://www.google.com/hostednews/afp/article/ALeqM5gCv4dv7Vm17gXwSzI1Vwpnh5V_5A (last visited Aug. 21, 2010).

[114] Ellen Byron, *P&G Goes on Offensive for Pampers*, WALL ST. J., June 14, 2010, *available at* http://online.wsj.com/article/SB10001424052748703685404575306863979636250.html?KEYWORDS=PG+Goes+on+Offensive+for+Pampers (last visited Aug. 21, 2010).

Companies shares have fallen about 5.3 percent overall since April.[115]  Retailers have also seen a drop off in their Pampers sales, and have discounted Dry Max Pampers in order to clear their shelves.

146.    Procter & Gamble offers sizeable coupons to buyers of Dry Max Pampers, which insist that Dry Max Pampers are "Trusted by leading pediatricians, preferred by moms" and "Recommended by…moms."  Such coupons also state, "Thank you for your loyalty"—an indication that many previously loyal consumers may no longer be purchasing Pampers products.





## K.    Federal Investigations.

147.    The U.S. CPSC ("CPSC") is charged with protecting the public from unreasonable risks of serious injury or death from thousands of types of consumer products under the agency's jurisdiction, and has jurisdiction over more than 15,000 kinds of consumer

---

[115] Emily Stephenson, *Analysis: P&G's Pampers Leak Market Share*, REUTERS, July 2, 2010, http://www.reuters.com/article/idUSTRE6613S820100702 (last visited Aug. 21, 2010).

products used in and around the home, in sports, recreation and schools.  The CPSC urges

consumers who are harmed by consumer products to report to the CPSC safety problems

encountered with products online, through email, phone, fax or letter.  In comments to reporters

on May 5, 2010, Scott Wolfson, the CPSC's agency director of public affairs, indicated that the

CPSC had begun an investigation into consumer complaints about Dry Max Pampers.  The

investigation includes discussions with Defendant P&G Companies about the products.  Wolfson

stated that parents with comments about Dry Max Pampers are asked to contact the CPSC via its

online incident report.[116]

148.    While Plaintiffs acknowledge that the CPSC is charged with holding P&G

Companies accountable for the products they make and distribute, Plaintiffs note that the agency

has co-sponsored initiatives with P&G Companies in the past, as described *supra*, and that the

agency has just a few hundred employees to conduct investigations on a myriad of consumer

products.

149.    Health Canada issued a press release on May 5, 2010 announcing an investigation

into rashes reported by consumers in connection with the use of Dry Max Pampers.[117]

150.    A second Health Canada press release issued on May 7, 2010 notes, "Health

Canada takes all consumer incident reports very seriously, and is following up on reports

---

[116] *See* Wohl, *New Pampers Trigger Safety Concerns*, *supra* note 110.

[117] *See* Health Canada Press Release, Information on Investigation Into Pampers Dry Max Diapers, May 5, 2010, *available at* http://www.hc-sc.gc.ca/ahc-asc/media/advisories-avis/_2010/2010_68-eng.php (last visited Aug. 21, 2010).

involving Pampers Dry Max Pampers," and encourages Canadians to report any health and

safety incidents to the Department's website. The investigation is currently ongoing.[118]

## V.    CLASS ACTION ALLEGATIONS

151.    Plaintiffs bring this action on behalf of themselves and all other persons similarly

situated, under Federal Rule of Civil Procedure 23. The Classes that Plaintiffs seek to represent

are defined as follows:

A.    **Nationwide Class**: All persons in the United States who purchased or
acquired (including by gift) Pampers brand diapers or "Easy Ups" containing
"Dry Max" technology ("Dry Max Pampers"), and who discarded or ceased using
the Dry Max Pampers because of concerns about health effects including, but not
limited to: severe rashes, blisters, welts, bleeding, oozing, chemical burns,
infections, sores, scarring and/or other ailments linked to the Dry Max Pampers.

B.    **Alabama Class**: All persons in Alabama who purchased or acquired
(including by gift) Pampers brand diapers or "Easy Ups" containing "Dry Max"
technology ("Dry Max Pampers"), and who discarded or ceased using the Dry
Max Pampers because of concerns about health effects including, but not limited
to: severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections,
sores, scarring and/or other ailments linked to the Dry Max Pampers.

C.    **California Class**: All persons in California who purchased or acquired
(including by gift) Pampers brand diapers or "Easy Ups" containing "Dry Max"
technology ("Dry Max Pampers"), and who discarded or ceased using the Dry
Max Pampers because of concerns about health effects including, but not limited
to: severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections,
sores, scarring and/or other ailments linked to the Dry Max Pampers.

D.    **Colorado Class**: All persons in Colorado who purchased or acquired
(including by gift) Pampers brand diapers or "Easy Ups" containing "Dry Max"
technology ("Dry Max Pampers"), and who discarded or ceased using the Dry
Max Pampers because of concerns about health effects including, but not limited
to: severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections,
sores, scarring and/or other ailments linked to the Dry Max Pampers.

---

[118] Health Canada Press Release, Further Information on Investigation Into Pampers Dry Max Diapers, May 7,
2010, *available at* http://www.hc-sc.gc.ca/ahc-asc/media/advisories-avis/_2010/2010_71-eng.php (last visited
Aug. 21, 2010).

E.      **Connecticut Class**:  All persons in Connecticut who purchased or acquired (including by gift) Pampers brand diapers or "Easy Ups" containing "Dry Max" technology ("Dry Max Pampers"), and who discarded or ceased using the Dry Max Pampers because of concerns about health effects including, but not limited to: severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments linked to the Dry Max Pampers.

F.      **Florida Class**:  All persons in Florida who purchased or acquired (including by gift) Pampers brand diapers or "Easy Ups" containing "Dry Max" technology ("Dry Max Pampers"), and who discarded or ceased using the Dry Max Pampers because of concerns about health effects including, but not limited to: severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments linked to the Dry Max Pampers.

G.      **Illinois Class**:  All persons in Illinois who purchased or acquired (including by gift) Pampers brand diapers or "Easy Ups" containing "Dry Max" technology ("Dry Max Pampers"), and who discarded or ceased using the Dry Max Pampers because of concerns about health effects including, but not limited to: severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments linked to the Dry Max Pampers.

H.      **Iowa Class**:  All persons in Iowa who purchased or acquired (including by gift) Pampers brand diapers or "Easy Ups" containing "Dry Max" technology ("Dry Max Pampers"), and who discarded or ceased using the Dry Max Pampers because of concerns about health effects including, but not limited to: severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments linked to the Dry Max Pampers.

I.      **Kansas Class**:  All persons in Kansas who purchased or acquired (including by gift) Pampers brand diapers or "Easy Ups" containing "Dry Max" technology ("Dry Max Pampers"), and who discarded or ceased using the Dry Max Pampers because of concerns about health effects including, but not limited to: severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments linked to the Dry Max Pampers.

J.      **Kentucky Class**:  All persons in Kentucky who purchased or acquired (including by gift) Pampers brand diapers or "Easy Ups" containing "Dry Max" technology ("Dry Max Pampers"), and who discarded or ceased using the Dry Max Pampers because of concerns about health effects including, but not limited to: severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments linked to the Dry Max Pampers.

K.      **Maine Class**:  All persons in Maine who purchased or acquired (including by gift) Pampers brand diapers or "Easy Ups" containing "Dry Max" technology ("Dry Max Pampers"), and who discarded or ceased using the Dry Max Pampers because of concerns about health effects including, but not limited to: severe

rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments linked to the Dry Max Pampers.

L.     **Michigan Class**:  All persons in Michigan who purchased or acquired (including by gift) Pampers brand diapers or "Easy Ups" containing "Dry Max" technology ("Dry Max Pampers"), and who discarded or ceased using the Dry Max Pampers because of concerns about health effects including, but not limited to: severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments linked to the Dry Max Pampers.

M.     **Minnesota Class**:  All persons in Minnesota who purchased or acquired (including by gift) Pampers brand diapers or "Easy Ups" containing "Dry Max" technology ("Dry Max Pampers"), and who discarded or ceased using the Dry Max Pampers because of concerns about health effects including, but not limited to: severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments linked to the Dry Max Pampers.

N.     **Missouri Class**:  All persons in Missouri who purchased or acquired (including by gift) Pampers brand diapers or "Easy Ups" containing "Dry Max" technology ("Dry Max Pampers"), and who discarded or ceased using the Dry Max Pampers because of concerns about health effects including, but not limited to: severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments linked to the Dry Max Pampers.

O.     **Montana Class**:  All persons in Montana who purchased or acquired (including by gift) Pampers brand diapers or "Easy Ups" containing "Dry Max" technology ("Dry Max Pampers"), and who discarded or ceased using the Dry Max Pampers because of concerns about health effects including, but not limited to: severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments linked to the Dry Max Pampers.

P.     **Nebraska Class**:  All persons in Nebraska who purchased or acquired (including by gift) Pampers brand diapers or "Easy Ups" containing "Dry Max" technology ("Dry Max Pampers"), and who discarded or ceased using the Dry Max Pampers because of concerns about health effects including, but not limited to: severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments linked to the Dry Max Pampers.

Q.     **New Jersey Class**:  All persons in New Jersey who purchased or acquired (including by gift) Pampers brand diapers or "Easy Ups" containing "Dry Max" technology ("Dry Max Pampers"), and who discarded or ceased using the Dry Max Pampers because of concerns about health effects including, but not limited to: severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments linked to the Dry Max Pampers.

R.      **New York Class**:  All persons in New York who purchased or acquired (including by gift) Pampers brand diapers or "Easy Ups" containing "Dry Max" technology ("Dry Max Pampers"), and who discarded or ceased using the Dry Max Pampers because of concerns about health effects including, but not limited to: severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments linked to the Dry Max Pampers.

S.      **North Carolina Class**:  All persons in North Carolina who purchased or acquired (including by gift) Pampers brand diapers or "Easy Ups" containing "Dry Max" technology ("Dry Max Pampers"), and who discarded or ceased using the Dry Max Pampers because of concerns about health effects including, but not limited to: severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments linked to the Dry Max Pampers.

T.      **Ohio Class**:  All persons in Ohio who purchased or acquired (including by gift) Pampers brand diapers or "Easy Ups" containing "Dry Max" technology ("Dry Max Pampers"), and who discarded or ceased using the Dry Max Pampers because of concerns about health effects including, but not limited to: severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments linked to the Dry Max Pampers.

U.      **Oregon Class**:  All persons in Oregon who purchased or acquired (including by gift) Pampers brand diapers or "Easy Ups" containing "Dry Max" technology ("Dry Max Pampers"), and who discarded or ceased using the Dry Max Pampers because of concerns about health effects including, but not limited to: severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments linked to the Dry Max Pampers.

V.      **Pennsylvania Class**:  All persons in Pennsylvania who purchased or acquired (including by gift) Pampers brand diapers or "Easy Ups" containing "Dry Max" technology ("Dry Max Pampers"), and who discarded or ceased using the Dry Max Pampers because of concerns about health effects including, but not limited to: severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments linked to the Dry Max Pampers.

W.      **South Carolina Class**:  All persons in South Carolina who purchased or acquired (including by gift) Pampers brand diapers or "Easy Ups" containing "Dry Max" technology ("Dry Max Pampers"), and who discarded or ceased using the Dry Max Pampers because of concerns about health effects including, but not limited to: severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments linked to the Dry Max Pampers.

X.      **Texas Class**:  All persons in Texas who purchased or acquired (including by gift) Pampers brand diapers or "Easy Ups" containing "Dry Max" technology ("Dry Max Pampers"), and who discarded or ceased using the Dry Max Pampers because of concerns about health effects including, but not limited to: severe

rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments linked to the Dry Max Pampers.

Y.      **Washington Class**:  All persons in Washington who purchased or acquired (including by gift) Pampers brand diapers or "Easy Ups" containing "Dry Max" technology ("Dry Max Pampers"), and who discarded or ceased using the Dry Max Pampers because of concerns about health effects including, but not limited to: severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments linked to the Dry Max Pampers.

Z.      **West Virginia Class**:  All persons in West Virginia who purchased or acquired (including by gift) Pampers brand diapers or "Easy Ups" containing "Dry Max" technology ("Dry Max Pampers"), and who discarded or ceased using the Dry Max Pampers because of concerns about health effects including, but not limited to: severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments linked to the Dry Max Pampers.

AA.     **Wisconsin Class**:  All persons in Wisconsin who purchased or acquired (including by gift) Pampers brand diapers or "Easy Ups" containing "Dry Max" technology ("Dry Max Pampers"), and who discarded or ceased using the Dry Max Pampers because of concerns about health effects including, but not limited to: severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments linked to the Dry Max Pampers.

BB.     **Multistate Class**:  All persons in Alaska, Arizona, Arkansas, the District of Columbia, Delaware, Georgia, Hawaii, Idaho, Indiana, Iowa, Louisiana, Maryland, Massachusetts, Mississippi, Nevada, New Hampshire, New Mexico, North Dakota, Oklahoma, Rhode Island, South Dakota, Tennessee, Utah, Vermont, Virginia, or Wyoming who purchased or acquired (including by gift) Pampers brand diapers or "Easy Ups" containing "Dry Max" technology ("Dry Max Pampers"), and who discarded or ceased using the Dry Max Pampers because of concerns about health effects including, but not limited to: severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments linked to the Dry Max Pampers.

152.    Excluded from the proposed Classes are (i) persons who purchased or acquired Pampers outside the United States, (ii) P&G Companies, any entity in which P&G has a controlling interest, and P&G Companies' officers, directors, legal representatives, predecessors, successors, and assigns; (iii) the judicial officers to whom this case is assigned; and (iv) any member of the immediate families of excluded persons.

153.    **Numerosity/Impracticability of Joinder**:  The proposed Classes consist of many millions of persons throughout the United States, making individual joinder of all proposed members of the Classes impractical.  The precise number of members can be ascertained through discovery, which will include P&G Companies' sales records, records from P&G Companies' "Pampers Village" and "Gifts to Grow" program, and similar sources.

154.    **Commonality and Predominance**:  All members of the proposed Classes share a united interest in the fair, just, and consistent determination of the questions of law and fact necessary to the adjudication of P&G Companies' liability, which predominate over questions affecting only individual members.  All members of the proposed Classes share a common interest in the determination of all factual and legal issues pertinent to P&G Companies' liability through the disgorgement and restitution of Dry Max Pampers revenue unjustly obtained by P&G Companies.

155.    Plaintiffs' causes of action are set forth more fully below.  In summary, Plaintiffs seek to represent various state-wide classes corresponding to these states' statutory schemes governing consumer protection, deceptive trade practices, and product liability actions.  Plaintiffs also seek to represent a Nationwide Class, bringing common law claims related to the foregoing state statutory schemes, as well as implied warranty claims under the Uniform Commercial Code, which has been adopted nationwide, and the federal Magnuson-Moss Warranty Act.  While there are multiple causes of action brought on behalf of each Class, and while there may be variations between the statutes pertaining to a given claim from state to state, the vast majority of elements for these claims is the same *across* states and can be proven on a basis that transcends the state-specific Classes or individual state laws.  Accordingly, while state-specific Classes are an appropriate structure for purposes of class certification, the core issues in this

case—which are integral to all of Plaintiffs' causes of action—are common to all of the Classes that Plaintiffs seek to represent regardless of the particular statutory schemes in the states in which they live or the specific claims available to them.

156.    The key common liability questions include:

A.    whether and when P&G Companies knew or should have known that the Dry Max Pampers had the capacity to cause severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments on Plaintiffs' and Class Members' preemies, newborns, older babies, and toddlers' sensitive skin when used as directed;

B.    whether and when P&G Companies knew or should have known that the Dry Max Pampers had dangerous defects;

C.    whether P&G Companies withheld from disclosure the true nature of their products in the sale and promotion of the Dry Max Pampers;

D.    whether P&G Companies omitted and concealed material facts from its communications and disclosures to Plaintiffs and the Classes regarding the defects inherent in the Dry Max Pampers;

E.    whether P&G Companies' conduct violated state consumer protection statutes and state fraud and deceptive practice acts;

F.    whether P&G Companies breached implied warranties covering the Dry Max Pampers;

G.    whether P&G Companies were unjustly enriched at the expense of Plaintiffs and the proposed Class Members;

H.      whether P&G Companies negligently designed, manufactured, distributed, marketed, tested and/or sold the Dry Max Pampers;

I.      Whether P&G Companies are strictly liable for defects in design, manufacture, and/or warnings;

J.      whether P&G Companies' conduct implicates matters of public interest or public health;

K.      whether P&G Companies conducted adequate studies and quality tests of the Dry Max Pampers to determine whether and to what extent the Dry Max Pampers were unsafe and/or had the capacity to and, in many cases, did actually harm the babies by causing severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments, on the babies' extremely sensitive and delicate bottoms and other body parts that the Dry Max Pampers are supposed to cover and to protect; and

L.      whether a national class or statewide classes, and/or other subclasses, are superior, within the requirements of Rule 23(b)(3), on Plaintiffs' claims.

157.    The proposed Classes are also united on fundamental questions regarding their members' entitlement to damages and equitable relief, including:

A.      whether members of the proposed Classes are entitled to damages and/or equitable relief based on their payments, in whatever form, for the Dry Max Pampers and related harm and costs incurred as a result of purchase and/or use;

B.      if members of the proposed Classes are so entitled, what is the appropriate scope, extent and measure of damages and equitable relief that should be awarded;

C.      whether the degree of reprehensibility of P&G Companies' conduct warrants the imposition of punitive damages under applicable, controlling authority; and

D.      whether members of the proposed Classes are entitled to attorneys' fees, pre- and post-judgment interest, and costs of suit.

158.    **Typicality**:  Plaintiffs' claims and defenses are typical of the claims and defenses of the proposed Classes because P&G Companies uniformly misrepresented the safety of the Dry Max Pampers, and uniformly and actively suppressed, concealed, and failed to disclose the material risks of exposure associated with the products on the product label and in advertisements.  P&G Companies' uniform conduct deprived Plaintiffs and all members of the proposed Classes of their ability to make an informed decision about whether to use and/or pay for P&G Companies' Dry Max Pampers.

159.    **Adequacy**:  Plaintiffs and their counsel will fairly and adequately assert and protect the interests of all members of the proposed Classes.  Plaintiffs have retained counsel who are competent and experienced in complex class action litigation, including consumer litigation.  Plaintiffs have no interests adverse to those of any absent Class Members with respect to the key common issues of P&G Companies' product design, labeling, and marketing.

160.    Class certification is proper under Fed. R. Civ. P. 23(b)(1)(A), because the prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual members of the Classes and establish incompatible standards of conduct for P&G Companies.

161.    Class certification is proper under Fed. R. Civ. P. 23(b)(1)(B) because the prosecution of separate actions by individual Class Members would create a risk of adjudications with respect to individual Class Members which would, as a practical matter, be dispositive of

the interest of the other members not parties to these adjudications and/or substantially impair their ability to protect these interests.

162.    Class certification is proper under Fed. R. Civ. P. 23(b)(3) because common issues of law and fact predominate over any questions affecting only individual members of the Class, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

163.    Class adjudication is superior to individual litigation, which would foreclose the ability of most members of the proposed Classes to litigate their claims, impose an undue burden on the courts, and result in inconsistent determination of common issues.  The Court may employ issue certification under Rule 23(c)(4)(B) to address any variation of law, fact, or interest from the standpoint of fairness, efficiency, and economy, in order to avoid denial of class treatment which would require reversion to repetitive and piecemeal individual litigation.

164.    The need for Class-wide notice presents no barrier to certification because notice can be effectively disseminated to the proposed Classes by techniques commonly used in consumer and product liability class actions.  Notice may be provided to proposed Class Members under the requirements of Fed. R. Civ. P. 23(c)(2) by such combination of print publication, broadcast publication, internet publication, and/or first class mail that this Court determines best comports with modern Fed. R. Civ. P. 23(c)(2) class notice form, content, and dissemination techniques, as used in other consumer cases and as recommended by the *Manual for Complex Litigation*, 4th and the Federal Judicial Center.

## VI.   CAUSES OF ACTION

165.    To the extent necessary or required by law, the following Counts are pled in the alternative.  In pleading the following Counts in the alternative, Plaintiffs seek to preserve the

most advantageous combination of claims available to each of the Classes under applicable law. While the combination of available claims is likely to differ from Class to Class, Plaintiffs seek to recover the full range of damages and remedies available to each Class for the harms caused by P&G Companies' violations of the law.

**COUNT 1**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**Asserted on behalf of the Nationwide Class**

166.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

167.    Plaintiffs assert this cause of action on behalf of themselves and all other members of the Nationwide Class.

168.    The Uniform Commercial Code § 2-314 provides that, unless excluded or modified, a warranty that goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind.  P&G Companies marketed, promoted, manufactured and/or sold the Dry Max Pampers and placed them into the stream of commerce. P&G Companies knew or had reason to know of the ordinary use for which the Dry Max Pampers were purchased, and impliedly warranted that the Dry Max Pampers were of merchantable quality and fit for such use as diapers.  Contrary to these representations, the Dry Max Pampers were defective as they contained potentially toxic and hazardous physical and/or chemical irritants and were unsafe for use as diapers.

169.    At all times, the states listed below, including the District of Columbia, have codified and adopted the provisions of the Uniform Commercial Code governing the implied warranty of merchantability:  Ala. Code § 7-2-314; Alaska Stat. § 45.02.314; Ariz. Rev. Stat. § 47-2314; Ark. Code § 4-2-314; Cal. Com. Code § 2314; Colo. Rev. St § 4-2-314; Conn. Gen.

Stat. § 42a-2-314; 6 Del. C. § 2-314; D.C. Code § 28:2-314; Fla. Stat. § 672.314; Ga. Code § 11-2-314; Haw. Rev. Stat. § 490:2-314; Idaho Code § 28-2-314; 810 Ill. Comp. Stat. 5/2-314; Ind. Code § 26-1-2-314; Iowa Code § 554.2314; Kan. Stat. § 84-2-314; Ky. Rev. Stat. § 355.2-314; La. Civ. Code art. § 2520; 11 Me. Rev. Stat. § 2-314; Md. Code § 2-314; Mass. Gen. Laws Ch. 106 § 2-314; Mich. Comp. Laws § 440.2314; Minn. Stat. § 336.2-314; Miss. Code § 75-2-314; Mo. Rev. Stat. § 400.2-314; Mont. Code § 30-2-314; Neb. Rev. Stat. U.C.C. § 2-314; Nev. Rev. Stat. U.C.C § 104.2314; N.H. Rev. § 382-A:2-314; N.J. Stat. § 12A:2-314; N.M. Stat. § 55-2-314; N.Y. U.C.C. Law § 2-314; N.C. Gen. Stat. § 25-2-314; N.D. Stat § 41-02-314; Ohio Rev. Code § 1302.27; Okla. Stat. tit. 12A § 2-314; Or. Rev. Stat. § 72.3140; 13 Pa. Stat. § 2314; R.I. Gen. Laws § 6A-2-314; S.C. Code § 36-2-314; S.D. Stat. § 57A-2-314; Tenn. Code § 47-2-314; Tex. Bus. & Com. Code § 2-314; Utah Code § 70A-2-314; Va. Code § 8.2-314; Vt. Stat. 9A § 2-314; W. Va. Code § 46-2-314; Wash. Rev. Code § 62A 2-314; Wis. Stat. § 402.314; and Wyo. Stat. § 34.1-2-314.

170.    As designers, manufacturers, producers, marketers and/or sellers of the Dry Max Pampers, P&G Companies are "merchants" within the meaning of the various states' commercial codes governing the implied warranty of merchantability.

171.    P&G Companies designed, manufactured, distributed, marketed and/or sold the Dry Max Pampers and represented to Plaintiffs and other members of the Nationwide Class that they manufactured and sold high quality and safe diapers and "Easy Ups" that complied with all applicable state and federal laws and regulations.  Further, by selling the Dry Max Pampers to Plaintiffs and other members of the Nationwide Class, P&G Companies have derived a substantial amount of revenue from sale of these products to consumers, and continue to do so.

172.     The Dry Max Pampers are "goods," as defined in the various states' commercial codes governing the implied warranty of merchantability.

173.     As merchants of the Dry Max Pampers, P&G Companies knew that purchasers relied upon them to design, manufacture and/or sell Dry Max Pampers to serve as diapers for their preemies, newborns, older babies, and toddlers that were reasonably safe, and would not endanger their babies' health.

174.     P&G Companies designed, manufactured and/or sold Dry Max Pampers to parents of babies, and they knew that such products would be used by preemies, newborns, older babies, and toddlers.

175.     P&G Companies specifically represented in their marketing and advertising that the Dry Max Pampers were of high quality, safe, and complied with state and federal laws and regulations.  Moreover, P&G Companies specifically marketed and sold the Dry Max Pampers as appropriate diapers and "Easy Ups" for preemies, newborns, older babies, and toddlers, with marketing materials claiming that the products produce "all-around comfort," "keep babies dry and happy," and contain "mild ingredients which are gentle to the skin."

176.     At the time that P&G Companies designed, manufactured, sold and/or distributed the Dry Max Pampers, P&G Companies knew the purpose for which the products were intended and impliedly warranted that the products were of merchantable quality; were free of unreasonably harsh or hazardous chemicals; were free of manufacturing defects; were free of design defects; and were safe and fit for their ordinary purpose—as diapers.

177.     P&G Companies breached their implied warranties in connection with the sale of the Dry Max Pampers to Plaintiffs and the other members of the Nationwide Class.  The Dry Max Pampers were not safe and fit for their ordinary purposes which involved contact with

babies' bottoms and delicate skin.  They were not free of defects, as evidenced by the severe

rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other

ailments, on the babies' extremely sensitive and delicate bottoms and other body parts that the

Dry Max Pampers are supposed to cover and to protect.

178.    As a direct and proximate result of P&G Companies' breach of implied

warranties, Plaintiffs and other members of the Nationwide Class are entitled to damages

available under applicable law, including, but not limited to, the purchase price of the Dry Max

Pampers.

## COUNT 2
## VIOLATION OF THE MAGNUSON-MOSS WARRANTY—FEDERAL TRADE COMMISSION IMPROVEMENT ACT
### (15 U.S.C. §§ 2301 *et seq.*)
### Asserted on behalf of the Nationwide Class

179.    Plaintiffs repeat and reallege each and every allegation contained above as if fully

set forth herein.

180.    Plaintiffs assert this cause of action on behalf of themselves and all other

members of the Nationwide Class.

181.    Plaintiffs are "consumers" within the meaning of the Magnuson-Moss

Warranty—Federal Trade Commission Improvement Act, 15 U.S.C. § 2301(3) ("Magnuson-

Moss Warranty Act").

182.    The P&G Companies are "suppliers" and "warrantors" within the meaning of the

Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

183.    The Dry Max Pampers are "consumer products" within the meaning of the

Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

184.     As set forth more fully in Count 1, the P&G Companies sold Dry Max Pampers subject to the implied warranty of merchantability in the jurisdictions listed in Count 1, which is an "implied warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7).  Defendants breached their implied warranties of merchantability by selling Dry Max Pampers that were defective as they contained potentially toxic and hazardous physical and/or chemical irritants and were unsafe for use as diapers.  The Dry Max Pampers were not safe and fit for their ordinary purposes which involved contact with babies' bottoms and delicate skin. They were not free of defects, as evidenced by the severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments, on the babies' extremely sensitive and delicate bottoms and other body parts that the Dry Max Pampers are supposed to cover and to protect.

185.     The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25.  The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

186.     Affording the P&G Companies a reasonable opportunity to cure their breaches of warranties would be unnecessary and futile.  At the time of sale of the Dry Max Pampers, the P&G Companies knew, should have known, or were reckless in not knowing of Dry Max Pampers' lack of merchantability and unfitness for ordinary use, but nonetheless failed to rectify the situation and/or disclose the defects.  Under the circumstances, affording the P&G Companies notice and a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

187.     In the alternative, Plaintiffs' prior complaints against the P&G Companies, which did not initially seek relief under the Magnuson-Moss Warranty Act, suffice to give the P&G

Companies notice and an opportunity to cure, however P&G Companies have failed to cure the breaches of implied warranty.

188.    As a direct and proximate result of P&G Companies' breach of implied warranties and consequent violations of the Magnuson-Moss Warranty Act, Plaintiffs and other members of the Nationwide Class are entitled to damages available under applicable law, including, but not limited to, the purchase price of the Dry Max Pampers.

<div align="center">

**COUNT 3**
**UNJUST ENRICHMENT**
**Asserted on behalf of the Nationwide Class**

</div>

189.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

190.    Plaintiffs assert this common law cause of action on behalf of themselves and all other members of the Nationwide Class.

191.    At all times relevant hereto, P&G Companies designed, sold, distributed, marketed, and/or manufactured Dry Max Pampers that had the capacity to and, in many cases, did harm preemies, newborns, older babies, and toddlers by causing severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments, on the babies' extremely sensitive and delicate bottoms and other body parts that the Dry Max Pampers are supposed to cover and to protect, but made false and misleading representations that the Dry Max Pampers produce "all-around comfort," "keep babies dry and happy," and contain "mild ingredients which are gentle to the skin."

192.    Plaintiffs and the members of the Nationwide Class conferred upon P&G Companies, without knowledge of the inherent dangers of P&G Companies' Dry Max Pampers, payment for such products, benefits that were non-gratuitous.  P&G Companies accepted or

<div align="center">

- 120 -

</div>

retained the non-gratuitous benefits conferred by Plaintiffs and the members of the Nationwide

Class even though Plaintiffs and the members of the Nationwide Class were not receiving

products of the high quality, nature, fitness or value that had been represented by P&G

Companies and reasonable consumers would have expected.  Retaining the non-gratuitous

benefits conferred upon P&G Companies by Plaintiffs and the members of the Nationwide Class

under these circumstances is unjust and inequitable.

193.    Accordingly, Plaintiffs and the members of the Nationwide Class are entitled to,

and hereby seek, disgorgement and restitution of P&G Companies' wrongful profits, revenue,

and benefits in a manner established by the Court and available under applicable law.

194.    Plaintiffs and the members of the proposed Nationwide Class are entitled to the

imposition of a constructive trust upon P&G Companies such that their enrichment, benefit and

ill-gotten gains may be allocated and distributed equitably by the Court to and/or for the benefit

of Plaintiffs and members of the proposed Nationwide Class.

## COUNT 4
## VIOLATION OF THE ALABAMA DECEPTIVE TRADE PRACTICES ACT "DPTA"
### (Ala. Code § 8-19-1 *et seq.*)
### Asserted on behalf of the Alabama Class

195.    Plaintiffs repeat and reallege each and every allegation contained above as if fully

set forth herein.

196.    Plaintiff Chasitie Ayers-Porter ("Alabama Plaintiff") asserts this cause of action

on behalf of herself, and all other members of the Alabama Class.  The DPTA is codified at Ala.

Code § 8-19-1 *et seq.*  The statute provides relief where a defendant represents that goods have

characteristics, ingredients, uses or benefits that they do not have, or a defendant engages in any

other unconscionable, false, misleading or deceptive act or practice in the conduct of trade or commerce.  Ala. Code § 8-19-5(5) and (27).

197.    Any person who purchases goods for "personal, family, or household purposes" and thereby suffers any ascertainable loss of money or property may bring a private action to recover actual damages or $100, whichever is greater.  *See* Ala. Code § 8-19-10.  Here, Alabama Plaintiff and other members of the Alabama Class bought the Dry Max Pampers for family purposes, and, as described above, suffered ascertainable losses or damages.

198.    P&G Companies had a statutory duty to refrain from acts or practices such as selling the Dry Max Pampers, as if they were safe for babies.

199.    P&G Companies have engaged in unfair, deceptive, and unconscionable practices by:  (1) marketing and selling Dry Max Pampers without warning that they may cause severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments with normal use; and (2) intentionally failing to disclose and/or concealing these known defects and risks, in violation of the DPTA.

200.    P&G Companies acted in the face of prior notice that their conduct was deceptive, unfair, or unconscionable.

201.    As a direct and proximate result of P&G Companies' violations of the DTPA, the Alabama Plaintiff and other members of the Alabama Class have been injured, sustaining ascertainable damages.

202.    Had P&G Companies not engaged in the deceptive conduct described above, the Alabama Plaintiffs and other members of the Alabama Class would not have purchased, paid for, and/or used the Dry Max Pampers.

203.    P&G Companies' deceptive, unconscionable or untruthful representations and material omissions to consumers and the public regarding the true nature of the Dry Max Pampers purchased and used by the Alabama Plaintiff and the other members of the Alabama Class constituted unfair and deceptive acts and practices in violation of Ala. Code § 8-19-5(5) and (27).

204.    The Alabama Plaintiff and other members of the Alabama Class relied on P&G Companies' misrepresentations and/or omissions in buying P&G Companies' Dry Max Pampers.

205.    As a direct and proximate result of P&G Companies' wrongful conduct, the Alabama Plaintiff and other members of the Alabama Class have been injured.

206.    The Alabama Plaintiff and other members of the Alabama Class have been damaged and are entitled to all of the damages, remedies, fees, and costs available under the DTPA.  *See* Ala. Code § 8-19-10(a)(1)(2) and (3).

207.    The Alabama Plaintiff will provide or already has provided any required notice to appropriate entities regarding P&G Companies' unfair and deceptive trade practices.

## COUNT 5
## VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW "UCL"
### (Cal. Bus. & Prof. Code §§ 17200 *et seq.*)
### Asserted on behalf of the California Class

208.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

209.    Plaintiffs Brigette and Joseph Wolfe ("California Plaintiffs") assert this cause of action on behalf of themselves and other members of the California Class.

210.    California Business and Professions Code § 17200 prohibits any "unfair, deceptive, untrue or misleading advertising."  For the reasons set forth above, Defendants

engaged in unfair, deceptive, untrue and misleading advertising in violation of California Business and Professions Code § 17200, in that Defendants' representations and advertising were likely to deceive the public as to the safety of Dry Max Pampers.

211.    P&G Companies have engaged in unfair, unlawful and fraudulent business practices by (1) marketing and selling Dry Max Pampers with design and/or manufacturing defects that had the capacity to and, in many cases, did actually harm the babies by causing severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments, on babies' extremely sensitive and delicate bottoms and other body parts and (2) intentionally failing to disclose and/or concealing these known defects and risks.

212.    P&G Companies intentionally concealed and/or failed to disclose that the Dry Max Pampers have a design and/or manufacturing defect and that the defect had the capacity to and, in many cases, did actually harm the babies by causing severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments, on babies' extremely sensitive and delicate bottoms and other body parts for the purpose of inducing Plaintiffs Brigette and Joseph Wolfe and the other members of the California Class to purchase Dry Max Pampers.

213.    The facts concealed and/or not disclosed by P&G Companies to Plaintiffs Brigette and Joseph Wolfe and the other members of the California Class are material facts that a reasonable person would have considered important in deciding whether or not to purchase and/or use the Dry Max Pampers.

214.    Plaintiffs Brigette and Joseph Wolfe and the other members of the California Class justifiably acted or relied to their detriment on the concealment and/or non-disclosed facts as evidenced by their purchase and/or use of defective Dry Max Pampers.

215.    Had Plaintiffs Brigette and Joseph Wolfe and the other members of the California Class known of the design defect, they would not have purchased and/or used the Dry Max Pampers.

216.    By engaging in the above-described acts and practices, P&G Companies have committed one or more acts of unfair competition within the meaning of Business and Professional Code § 17200 *et seq*.

217.    P&G Companies' acts and practices have deceived and/or are likely to deceive members of the consuming public and members of the California Class.

218.    P&G Companies knowingly sold Plaintiffs Brigette and Joseph Wolfe and the other members of the California Class and other consumers Pampers with defects that have rendered the Dry Max Pampers unusable for the purposes for which they were sold.

219.    The injury to consumers by this conduct is greatly outweighed by any alleged countervailing benefit to consumers or competition under all of the circumstances.  Moreover, in light of P&G Companies' exclusive knowledge of the defects, the injury is not one that Plaintiffs Brigette and Joseph Wolfe and the other members of the California Class could have reasonably avoided.

220.    P&G Companies' acts and practices are unlawful because they violate Cal. Civ. Code §§ 1709 and 1710.  P&G Companies' acts and practices are also unlawful because they violate Cal. Commercial Code § 2313.

221.    Plaintiffs Brigette and Joseph Wolfe and the other members of the California Class have been injured as a direct and proximate result of P&G Companies' violations of the foregoing California statutes.

222.    The California Plaintiffs and other members of the California Class have been damaged and are entitled to all of the damages, remedies, fees, and costs available under Section 17200, *et seq*.

223.    The California Plaintiffs will provide or already have provided any required notice to appropriate entities regarding P&G Companies' unfair and deceptive trade practices.

**COUNT 6**
**VIOLATION OF THE CALIFORNIA CONSUMERS LEGAL REMEDIES ACT "CLRA"**
**(Cal. Civ. Code §§ 1750 *et seq.*)**
**Asserted on behalf of the California Class**

224.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

225.    Plaintiffs Brigette and Joseph Wolfe ("California Plaintiffs") bring this claim on behalf of themselves and the California Class.

226.    This claim arises under the California Consumer Legal Remedies Act, California Civil Code §§ 1750, *et seq*.

227.    At all relevant times, Plaintiffs Brigette and Joseph Wolfe were "consumers" as that term is defined in Cal. Civ. Code. § 1761(d).

228.    At all relevant times, the Dry Max Pampers constituted "goods" as that term is defined in Cal. Civ. Code § 1761(a).

229.    At all relevant times, P&G Companies constituted a "person" as that term is defined in Cal. Civ. Code § 1761(c).

230.    At all relevant times, Plaintiffs' purchases of Dry Max Pampers constituted "transactions" as that term is defined in Cal. Civ. Code § 1761(e).

231.    At all relevant times, P&G Companies provided "services" to Plaintiffs Brigette and Joseph Wolfe within the meaning of Cal. Civ. Code § 1761(b).

232.    The CLRA provides in relevant part that the "following methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful:  (5) representing that goods . . . have . . . approval, characteristics, uses, benefits . . . which they do not have; . . . (7) Representing that goods . . . are of a particular standard, quality or grade . . . if they are of another; . . .  and (9) advertising goods . . . with the intent not to sell them as advertised."  Cal. Civ. Code §§ 1770(a)(5), (7), and (9).

233.    P&G Companies made uniform representations that the Dry Max Pampers were a safe and high quality product that would perform as represented and, as set forth above, made specific representations regarding the capacity and characteristics of the Dry Max Pampers that, as set forth above, were false, deceptive and/or misleading and were made in violation of the CLRA.

234.    P&G Companies intentionally concealed and/or failed to disclose that the Dry Max Pampers have a design and/or manufacturing defect and that the design defect had the capacity to and, in many cases, did actually harm the babies by causing severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments, on babies' extremely sensitive and delicate bottoms and other body parts, for the purpose of inducing Plaintiffs Brigette and Joseph Wolfe and the other members of the California Class to purchase the Dry Max Pampers.

235.    P&G Companies had exclusive knowledge that the Dry Max Pampers have a defect and that the defect had the capacity to and, in many cases, did actually harm the babies by

causing severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments, on babies' extremely sensitive and delicate bottoms and other body parts, facts not known to Plaintiffs Brigette and Joseph Wolfe and the other members of the California Class.  P&G Companies' exclusive knowledge of these material facts gave rise to a duty to disclose such facts, which it failed to perform.

236.    The facts concealed and/or not disclosed by P&G Companies to Plaintiffs Brigette and Joseph Wolfe and the other members of the California Class are material facts that a reasonable person would have considered important in deciding whether or not to purchase the Dry Max Pampers.

237.    Plaintiffs Brigette and Joseph Wolfe and the other members of the California Class justifiably acted or relied to their detriment on the concealment and/or non-disclosed facts as evidenced by their purchase and/or use of the defective Dry Max Pampers.

238.    Had Plaintiffs Brigette and Joseph Wolfe and the other members of the California Class known that the Dry Max Pampers defect had the capacity to and, in many cases, did actually harm the babies by causing severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments, on babies' extremely sensitive and delicate bottoms and other body parts, they would not have purchased and/or used the Dry Max Pampers.

239.    As a direct and proximate result of P&G Companies' violations of the foregoing laws, the California Plaintiffs and the California Class have been injured.

240.    The California Class have been damaged and are entitled to all of the damages, remedies, fees, and costs available under Cal. Civ. Code § 1780.

241.    The California Plaintiffs will provide or already have provided any required notice to appropriate entities regarding P&G Companies' unfair and deceptive trade practices.

## COUNT 7
## VIOLATION OF THE COLORADO CONSUMER PROTECTION ACT "CPA"
### (Col. Rev. Stat. §§ 6-1-101 *et seq.*)
### Asserted on behalf of the Colorado Class

242.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

243.    Plaintiff Kelly Adams ("Colorado Plaintiff") asserts this cause of action on behalf of herself and all other members of the Colorado Class.  The CPA is codified at Colorado Rev. Stat. § 6-1-101 *et seq*.

244.    Dry Max Pampers are property within the meaning of the CPA.

245.    Kelly Adams and the other members of the Colorado Class are people within the meaning of the CPA.

246.    The CPA provides in relevant part that "A person engages in a deceptive trade practice when, in the course of such person's business, vocation, or occupation, such person . . . (e) Knowingly makes a false representation as to the characteristics, ingredients, uses, benefits, alterations, or quantities of goods, food, services, or property; . . . (g) Represents that goods . . . are of a particular standard, quality or grade . . if he knows or should know that they are of another; . . .  and (i) advertising goods . . . with the intent not to sell them as advertised." Colorado Rev. Stat. § 6-1-105(e), (g) and (i).

247.    P&G Companies made uniform representations that the Dry Max Pampers were a safe and high quality product that would perform as represented and, as set forth above, made specific representations regarding the capacity and characteristics of the Dry Max Pampers that,

as set forth above, were false, deceptive and/or misleading and were made in violation of the CPA.

248.    As a direct and proximate result of P&G Companies' wrongful conduct, the Colorado Plaintiff and other members of the Colorado Class suffered injuries and are entitled to all of the damages, remedies, fees, and costs available under applicable law.

249.    The Colorado Plaintiff will provide or already has provided any required notice to appropriate entities regarding P&G Companies' unfair and deceptive trade practices.

**COUNT 8**
**VIOLATION OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT "UTPA"**
**(Conn. Gen. Stat. § 42-110a *et seq.*)**
**Asserted on behalf of the Connecticut Class**

250.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

251.    Plaintiff Diane Samelson ("Connecticut Plaintiff") asserts this cause of action on behalf of herself, and all other members of the Connecticut Class.  The UTPA is codified at Conn. Gen. Stat. § 42-110a *et seq*.  The statute provides relief where a defendant engages "in unfair or deceptive acts or practices in the conduct of any trade or commerce.  *Id.* § 42-110b. Unfair Trade Practices are defined in part as misrepresenting the nature, uses, benefits or qualities of merchandise.  Conn. Agencies Regs. 42-110b-18.

252.    Any person who "suffers any ascertainable loss of money or property" as a result of the deceptive acts of misrepresenting the nature, uses, benefits or qualities of consumer goods, may bring a private action to recover actual damages.  *See* Conn. Gen. Stat. § 42-110g.

253.    P&G Companies had a statutory duty to refrain from misrepresentations about the nature, uses, benefits, or qualities of Dry Max Pampers.

254.    P&G Companies have engaged in unfair, deceptive, and unconscionable practices by: (1) marketing and selling Dry Max Pampers without warning that they may cause severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments with normal use; and (2) intentionally failing to disclose and/or concealing these known defects and risks, in violation of the UTPA.

255.    P&G Companies acted in the face of prior notice that their conduct was deceptive, unfair, or unconscionable.

256.    As a direct and proximate result of P&G Companies' violations of the UTPA, the Connecticut Plaintiff and other members of the Connecticut Class have been injured, sustaining ascertainable damages.

257.    Had P&G Companies not engaged in the deceptive conduct described above, the Connecticut Plaintiff and other members of the Connecticut Class would not have purchased, paid for, and/or used the Dry Max Pampers.

258.    P&G Companies' deceptive, unconscionable or untruthful representations and material omissions to consumers and the public regarding the true nature of the Dry Max Pampers purchased and used by the Connecticut Plaintiff and the other members of the Connecticut Class constituted unfair and deceptive acts and practices in violation of Conn. Gen. Stat. § 42-110b, and the regulations at Conn. Reg. § 42-110b-18.

259.    The Connecticut Plaintiff and other members of the Connecticut Class relied on P&G Companies' misrepresentations and/or omissions in buying P&G Companies' Dry Max Pampers.

260.    As a direct and proximate result of P&G Companies' wrongful conduct, the Connecticut Plaintiff and other members of the Connecticut Class have been injured.

261.    The Connecticut Plaintiff and other members of the Connecticut Class have been damaged and are entitled to all of the damages, remedies, fees, and costs available under the UPTA.  *See* Conn. Gen. Stat. § 42-110g(a) and (d).

262.    The Connecticut Plaintiff will provide or already has provided any required notice to appropriate entities regarding P&G Companies' unfair and deceptive trade practices.

**COUNT 9**
**VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT "DUTPA"**
**(Fl. Stat. §§ 501.201 *et seq.*)**
**Asserted on behalf of the Florida Class**

263.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

264.    Plaintiff Jodi Robins ("Florida Plaintiff") asserts this cause of action on behalf of herself and all other members of the Florida Class.

265.    At all relevant times, Plaintiff Jodi Robins and all members of the Florida Class were consumers within the meaning of the DUTPA.

266.    At all relevant times, P&G Companies engaged in trade and/or commerce within the meaning of the DUTPA.

267.    P&G Companies violated the DUTPA, for example, by:

A.      Omitting and concealing material facts from its communications and disclosures to Plaintiff Jodi Robins and all other members of the Florida Class about the defect in the Dry Max Pampers;

B.      Making false and/or misleading statements of material fact about the Dry Max Pampers, and these statements were likely to deceive the public;

C. Knowing, or recklessly not knowing, that its statements about the Dry Max Pampers were false and/or misleading.

268. By the above conduct, P&G Companies have engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of trade or commerce.

269. The representations and omissions by P&G Companies were likely to deceive reasonable consumers and a reasonable consumer would have relied on these representations or omissions.

270. Had P&G Companies disclosed all material information about the Dry Max Pampers to the Florida Plaintiff and other members of the Florida Class, they would not have purchased and/or used the Dry Max Pampers.

271. The above acts and practices proximately caused Plaintiff Jodi Robins and other members of the Florida Class actual damages and they are entitled to recover such damages, remedies, fees, and costs as well as other relief as allowed by law.

272. The Florida Plaintiff will provide or already has provided any required notice to appropriate entities regarding P&G Companies' unfair and deceptive trade practices.

## COUNT 10
## VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT "CFDBPA"
### (815 Ill. Comp. Stat. 505/1 *et seq.*)
### Asserted on behalf of the Illinois Class

273. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

274. Plaintiffs Stephanie Rios, John Walker, and Karina Walker ("Illinois Plaintiffs") assert this cause of action on behalf of themselves and all other members of the Illinois Class.

The CFDBPA is codified at 815 Ill. Comp. Stat. 505/1, *et seq*. The statute provides consumers with a comprehensive procedure for redressing the violations of applicable law. Accordingly, the conduct at issue in this case falls within the scope of the CFDBPA.

275. The Illinois Plaintiffs and other members of the Illinois Class were "consumers" within the meaning of CFDBPA.

276. P&G Companies engaged in trade and/or commerce within the meaning of CFDBPA.

277. The CFDBPA provides that

Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

815 Ill. Comp. Stat. 505/2.

278. The CFDBPA further provides a private right of action to any person "who suffers actual damage as a result of a violation of this Act committed by any other person." 815 Ill. Comp. Stat. 505/10a.

279. P&G Companies had a statutory duty to refrain from unfair or deceptive acts or practices in the design, development, promotion, sale and/or manufacture of the Dry Max Pampers.

280. P&G Companies have, in the course of P&G Companies' business, engaged in unfair or deceptive acts or practices by: (1) marketing and selling Dry Max Pampers with defects that cause severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections,

sores, scarring and/or other ailments with normal use; and (2) intentionally failing to disclose and/or concealing these known defects and risks.

281.    P&G Companies' misrepresentations and/or omissions were uniformly presented to consumers and the general public, and calculated to lead consumers to believe that the Dry Max Pampers were safe.

282.    The facts intentionally concealed and/or not disclosed by P&G Companies to the Illinois Plaintiffs and the other members of the Illinois Class are material facts that a reasonable person would have considered important in deciding whether or not to purchase the Dry Max Pampers.

283.    The Illinois Plaintiffs and the other members of the Illinois Class justifiably acted or relied to their detriment on the concealment and/or non-disclosed facts as evidenced by their purchase and/or use of the defective Dry Max Pampers.

284.    Had the Illinois Plaintiffs and the other members of the Illinois Class known that the Dry Max Pampers had the capacity to and, in many cases, did actually harm the babies by causing severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments, on babies' extremely sensitive and delicate bottoms and other body parts, they would not have purchased and/or used the Dry Max Pampers.

285.    Had P&G Companies not engaged in the unfair or deceptive conduct described above, the Illinois Plaintiffs and other members of the Illinois Class would not have purchased, paid for, and/or used the Dry Max Pampers.

286.    P&G Companies' unfair or deceptive representations and material omissions to consumers and the public regarding the true nature of the Dry Max Pampers purchased and used

by the Illinois Plaintiffs and the members of the Illinois Class constituted unfair and deceptive acts and practices in violation of 815 Ill. Comp. Stat. 505/1, *et seq*.

287.    As a direct and proximate result of P&G Companies' violations of the CFDBPA, the Illinois Plaintiffs and the other members of the Illinois Class have been injured.

288.    The Illinois Plaintiffs and other members of the Illinois Class have been damaged and are entitled to all of the damages and remedies available under the CFDBPA.  *See* 815 Ill. Comp. Stat. 505/10a.

289.    The Illinois Plaintiffs will provide or already have provided any required notice to appropriate entities regarding P&G Companies' unfair and deceptive trade practices.

<div align="center">

**COUNT 11**
**VIOLATION OF THE KANSAS CONSUMER PROTECTION ACT "CPA"**
**(Kan. Stat. §§ 50-623, *et seq.*)**
**Asserted on behalf of the Kansas Class**

</div>

290.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

291.    Plaintiff Maria McMahon ("Kansas Plaintiff") asserts this cause of action on behalf of herself and all other members of the Kansas Class.  The CPA is codified at Kan. Stat. §§ 50-623 *et seq*.  The statute is broad, applying to the sale of consumer goods for "personal, family, household, business or agricultural purposes."  Kan. Stat. §§ 50-624(b).  Accordingly, the conduct at issue in this case falls within the scope of the CPA.

292.    The CPA prohibits suppliers from engaging in "any deceptive act or practice in connection with a consumer transaction."  Kan. Stat. §§ 50-626(a).  Unconscionable acts or practices are likewise prohibited.  Kan. Stat. §§ 50-627(a).  The CPA further provides that "a consumer" has a private cause of action for violations of the statute.  Kan. Stat. §§ 50-634(d).

P&G Companies had a statutory duty to refrain from unfair or deceptive acts or practices in the design, development, promotion, sale and/or manufacture of the Dry Max Pampers. The CPA should be construed liberally to promote its policies of protecting consumers from suppliers that commit deceptive and unconscionable practices.

293. P&G Companies have engaged in unfair, deceptive, and unconscionable practices by: (1) marketing and selling Dry Max Pampers with defects that cause severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments with normal use; and (2) intentionally failing to disclose and/or concealing these known defects and risks.

294. As a direct and proximate result of P&G Companies' violations of the CPA, the Kansas Plaintiff and other members of the Kansas Class have been injured.

295. Had P&G Companies not engaged in the deceptive conduct described above, the Kansas Plaintiff and other members of the Kansas Class would not have purchased, paid for, and/or used the Dry Max Pampers.

296. P&G Companies' deceptive, unconscionable or untruthful representations and material omissions to consumers and the public regarding the true nature of the Dry Max Pampers purchased and used by the Kansas Plaintiff and the members of the Kansas Class constituted unfair and deceptive acts and practices in violation of Kan. Stat. §§ 50-623, *et seq*.

297. As a direct and proximate result of P&G Companies' wrongful conduct, the Kansas Plaintiff and members of the Kansas Class have been injured.

298. The Kansas Plaintiff and members of the Kansas Class are entitled to all of the damages, remedies, fees, and costs available under applicable law.

299.    The Kansas Plaintiff will provide or already has provided any required notice to appropriate entities regarding P&G Companies' unfair and deceptive trade practices.

<div align="center">

**COUNT 12**
**VIOLATION OF THE KENTUCKY CONSUMER PROTECTION ACT "CPA"**
**(Ky. Rev. Stat. §§ 367.110 *et seq.*)**
**Asserted on behalf of the Kentucky Class**

</div>

300.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

301.    Plaintiff Adona Schank ("Kentucky Plaintiff") asserts this cause of action on behalf of herself, and all other members of the Kentucky Class.  The CPA is codified at Ky. Rev. Stat. § 367.110 *et seq.*  The statute provides that "unfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."  *See* Ky. Rev. Stat. 367.170.

302.    Any person who purchases goods for "personal, family, or household purposes and thereby suffers any ascertainable loss of money or property" may bring a private action to recover actual damages.  *See* Ky. Rev. Stat. § 367.220.  Here, Kentucky Plaintiff and Class members bought and/or used the Dry Max Pampers for family purposes, and, as described above, suffered ascertainable losses or damages.

303.    P&G Companies had a statutory duty to refrain from misrepresentations about Dry Max Pampers which were unfair, misleading and deceptive in that they did not warn about the damages of Dry Max Pampers.

304.    P&G Companies have engaged in unfair, deceptive, and unconscionable practices by:  (1) marketing and selling Dry Max Pampers without warning that they may cause severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other

ailments with normal use; and (2) failing to disclose and/or concealing these known defects and risks, in violation of the CPA.

305.    P&G Companies acted in the face of prior notice that their conduct was deceptive, unfair, or unconscionable.

306.    As a direct and proximate result of P&G Companies' violations of the CPA, the Kentucky Plaintiff and other members of the Kentucky Class have been injured, sustaining ascertainable damages.

307.    Had P&G Companies not engaged in the deceptive conduct described above, the Kentucky Plaintiff and other members of the Kentucky Class would not have purchased, paid for, and/or used the Dry Max Pampers.

308.    P&G Companies' deceptive, unconscionable, false and misleading representations and material omissions to consumers and the public regarding the true nature of the Dry Max Pampers purchased and used by the Kentucky Plaintiff and the members of the Kentucky Class constituted unfair and deceptive acts and practices in violation of Ky. Rev. Stat. § 367.170.

309.    The Kentucky Plaintiff and members of the Kentucky Class relied on P&G Companies' misrepresentations and/or omissions in buying P&G Companies' Dry Max Pampers.

310.    As a direct and proximate result of P&G Companies' wrongful conduct, the Kentucky Plaintiff and members of the Kentucky Class have been injured.

311.    The Kentucky Plaintiff and members of the Kentucky Class have been damaged and are entitled to all of the damages, remedies, fees, and costs available under the CPA.  *See* Ky. Rev. Stat. § 367.220.

312.    The Kentucky Plaintiff will provide or already has provided any required notice to appropriate entities regarding P&G Companies' unfair and deceptive trade practices.

## COUNT 13
## VIOLATION OF THE MAINE UNFAIR TRADE PRACTICES ACT "UTPA"
### (Me. Rev. Stat. tit. 5, §§ 205A, *et seq.*)
### Asserted on behalf of the Maine Class

313.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

314.    Plaintiff Asia Southard ("Maine Plaintiff") asserts this cause of action on behalf of herself and all other members of the Maine Class.  The UTPA is codified at Me. Rev. Stat. tit. 5, §§ 205A *et seq*.  The statute is broad, declaring unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Me. Rev. Stat. tit. 5, §§ 207.  Accordingly, the conduct at issue in this case falls within the scope of the UTPA.

315.    The UTPA further provides that "[a]ny person who purchases . . . goods . . . primarily for personal, family or household purposes" has a private cause of action for violations of the statute.  Me. Rev. Stat. tit. 5 § 213(1).  The Maine Plaintiff and other members of the Maine Class are therefore "persons" who may seek relief under the UTPA.

316.    P&G Companies had a statutory duty to refrain from unfair or deceptive acts or practices in the design, development, promotion, sale and/or manufacture of the Dry Max Pampers.

317.    P&G Companies have engaged in unfair and deceptive practices by:  (1) marketing and selling Dry Max Pampers with defects that cause severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments with normal use; and (2) intentionally failing to disclose and/or concealing these known defects and risks.

318.    As a direct and proximate result of P&G Companies' violations of the UTPA, the Maine Plaintiff and other members of the Maine Class have been injured.

319.    Had P&G Companies not engaged in the deceptive conduct described above, the Maine Plaintiff and other members of the Maine Class would not have purchased, paid for, and/or used the Dry Max Pampers.

320.    P&G Companies' deceptive and unconscionable representations and material omissions to consumers and the public regarding the true nature of the Dry Max Pampers purchased and used by the Maine Plaintiff and the members of the Maine Class constituted unfair and deceptive acts and practices in violation of Me. Rev. Stat. tit. 5, §§ 205A *et seq.*

321.    The Maine Plaintiff and members of the Maine Class relied upon P&G Companies' misrepresentations and/or omissions in buying P&G Companies' Dry Max Pampers.

322.    As a direct and proximate result of P&G Companies' wrongful conduct, the Maine Plaintiff and members of the Maine Class have been injured.

323.    The Maine Plaintiff and members of the Maine Class are entitled to all of the damages, remedies, fees, and costs available under applicable law.

324.    The Maine Plaintiff will provide or already has provided any required notice to appropriate entities regarding P&G Companies' unfair and deceptive trade practices.

## COUNT 14
### VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT "CPA"
#### (Mich. Comp. Laws §§ 445.901 *et seq.*)
#### Asserted on behalf of the Michigan Class

325.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

326.    Plaintiffs Angela and Kenneth Clark, Darcel Darscheid, and Ryan and Stacie Berman ("Michigan Plaintiffs") assert this cause of action on behalf of themselves and all other members of the Michigan Class.  The CPA is codified at Mich. Comp. Laws §§ 445.901 *et seq.*

The statute is broad, applying to "unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce[.]"  Mich. Comp. Laws § 445.903(1).  "Trade or commerce" means "the conduct of a business providing goods, property, or service primarily for personal, family, or household purposes and includes . . . advertising[.]"  Mich. Comp. Laws § 445.902(1)(g).  Accordingly, the conduct at issue in this case falls within the scope of the CPA.

327.    The CPA allows a consumer "who suffers a loss as a result of a violation of" the MCPA to bring a class action for the actual damages caused by violations of the act.  Mich. Comp. Laws. Ann § 445.911(3).

328.    P&G Companies had a statutory duty to refrain from unfair, unconscionable, or deceptive methods, acts or practices in the design, development, promotion, sale and/or manufacture of the Dry Max Pampers.

329.    P&G Companies' actions described above, including P&G Companies' failure to disclose the known defects and risks of using Dry Max Pampers, and their failure to provide the promised benefits of the Dry Max Pampers, constitute unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade of commerce, and are violations of the CPA.

330.    P&G Companies' statements, misrepresentations, and omission are of the type that a reasonable person would rely on.

331.    As the direct and proximate result of P&G Companies' violations of the CPA, the Michigan Plaintiffs and the members of the Michigan Class have suffered a loss.

332.    The Michigan Plaintiffs and other members of the Michigan Class are entitled to all of the damages, remedies, fees, and costs available under the CPA.

333.    The Michigan Plaintiffs will provide or already has provided any required notice to appropriate entities regarding P&G Companies' unfair and deceptive trade practices.

**COUNT 15**
**VIOLATION OF THE MINNESOTA FALSE STATEMENTS**
**IN ADVERTISEMENT ACT**
**(Minn. Stat. § 325F.67)**
**Asserted on behalf of the Minnesota Class**

334.    Plaintiffs repeat and reallege each and every allegation contained above as if fully

set forth herein.

335.    Plaintiffs Suzy Sullivan and Alexandra Rosenbaum assert this cause of action on

behalf of themselves, and all other members of the Minnesota Class.  The Minnesota False

Statements in Advertising Act is codified at Minn. Stat. § 325F.67.

336.    The Minnesota False Statement in Advertisement statute prohibits "any person,

firm, corporation or association who, with intent to sell or in anywise dispose of merchandise..."

from making, publishing, disseminating, circulating or placing before the public any

advertisement containing any "material assertion, representation or statement of fact which is

untrue, deceptive, or misleading."

337.    Minn. Stat. § 8.31, subd. 3a states that any person injured by a violation of any of

the laws referred to in § 8.31, subd. 1, which include Minn. Stat. §§ 325F.67, "may bring a civil

action and recover damages, together with cost and disbursements, including costs of

investigation and reasonable attorney's fees, and receive other equitable relief as determined by

the court."

338.    Defendants produced and published untrue, deceptive and misleading

advertisements and statements on the safety and effectiveness of Dry Max Pampers after learning

of their inherent defects with the intent to sell the Dry Max Pampers.

339.    Defendants continue to represent or otherwise disseminate untrue, deceptive and

misleading information about the safety and effectiveness of Dry Max Pampers with the intent to

induce the public, including Minnesota Plaintiffs and members of the Minnesota Class, to use Dry Max Pampers and discourage the use of other diapers.

340.    Defendants concealed their deceptive practices in order to increase the sale of and profit from the Dry Max Pampers.

341.    Defendants violated the Minnesota False Statements in Advertising Act, Minn. Stat. § 325F.67, by publicly making untrue, deceptive and misleading advertisements and statements about the safety and effectiveness of the Dry Max Pampers.

342.    As a direct and proximate result of Defendants' violations of the Minnesota False Statements in Advertising Act, the Minnesota Plaintiff and other members of the Minnesota Class have been injured.

343.    Had the Defendants not engaged in deceptive conduct described above, the Minnesota Plaintiff and other members of the Minnesota Class would not have purchased, paid for, and/or used the Dry Max Pampers.

344.    Defendants' untrue, deceptive and misleading advertisements and statements to consumers and the public regarding the true nature of the Dry Max Pampers purchased and used by the Minnesota Plaintiff and the members of the Minnesota Class constitute False Statements in Advertising in violation of Minn. Stat. § 325F.67.

345.    The Minnesota False Statement in Advertising Act applies to Plaintiffs' transactions with Defendants because Defendants' deceptive scheme was carried out in Minnesota and affected Plaintiffs and other Class members.

346.    The Minnesota Plaintiffs and members of the Minnesota Class have sustained and will continue to sustain damages for which they are entitled to all of the damages, remedies, fees, and costs available under applicable law.

347.    The Minnesota Plaintiffs will provide or already has provided any required notice to appropriate entities regarding P&G Companies' unfair and deceptive trade practices.

**COUNT 16**
**VIOLATION OF THE MINNESOTA PREVENTION OF CONSUMER FRAUD ACT**
**(Minn. Stat. §§ 325F.68 *et seq.*)**
**Asserted on behalf of the Minnesota Class**

348.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

349.    Plaintiffs Suzy Sullivan and Alexandra Rosenbaum assert this cause of action on behalf of themselves, and all other members of the Minnesota Class.  The Minnesota Consumer Fraud Act is codified at Minn. Stat. §§ 325F.68 to 325F.70.  The Minnesota Consumer Fraud Act prohibits the "act, use or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise . . .."  Merchandise is defined broadly under the Act as "any object, wares, goods, commodities, intangibles, real estate, loans or services."

350.    Minn. Stat. § 8.31, subd. 3a states that any person injured by a violation of any of the laws referred to in § 8.31, subd. 1, which include Minn. Stat. §§ 325F.68 to 325F.70, "may bring a civil action and recover damages, together with cost and disbursements, including costs of investigation and reasonable attorney's fees, and receive other equitable relief as determined by the court."

351.    Defendants have engaged in fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice by (1) marketing and selling Dry Max Pampers with defects that cause severe rashes, blisters, welts, bleeding, oozing, chemical

burns, infections, sores, scarring and/or other ailments with normal use; (2) intentionally failing to disclose an/or concealing these known defects and risks; and (3) representing Dry Max Pampers to be a safe, gentle, and healthful choice for babies.

352.    Through these misleading and deceptive statements and false promises, Defendants violated Minn. Stat. § 325F.68-70.

353.    As a direct and proximate result of Defendants' violations of the Minnesota Consumer Fraud Act, the Minnesota Plaintiffs and other members of the Minnesota Class have been injured.

354.    Had the Defendants not engaged in the deceptive conduct described above, the Minnesota Plaintiffs and other members of the Minnesota Class would not have purchased, paid for, and/or used the Dry Max Pampers.

355.    Defendants' misleading and deceptive statements and false promises to consumers and the public regarding the true nature of the Dry Max Pampers purchased and used by the Minnesota Plaintiffs and the other members of the Minnesota Class constitutes violation of Minn. Stat. §§ 325F.68-70.

356.    The Minnesota Prevention of Consumer Fraud Act applies to Defendants' transactions with Minnesota Plaintiffs because Defendants' deceptive scheme was carried out in Minnesota and affected Minnesota Plaintiffs and other members of the Minnesota Class.

357.    The Minnesota Plaintiffs and members of the Minnesota Class have sustained and will continue to sustain damages for which they are entitled to all of the damages, remedies, fees, and costs available under applicable law.

358.    The Minnesota Plaintiffs will provide or already have provided any required notice to appropriate entities regarding P&G Companies' unfair and deceptive trade practices.

## COUNT 17
## VIOLATION OF THE MISSOURI MERCHANDISING PRACTICES ACT "MPA"
### (Mo. Rev. Stat. §§ 407.010 *et seq.*)
### Asserted on behalf of the Missouri Class

359. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

360. Plaintiffs Emily and Ryan Weaver and Whitney Caldwell ("Missouri Plaintiffs") assert this cause of action on behalf of themselves and all other members of the Missouri Class. The MPA is codified at Mo. Rev. Stat. § 407.010 *et seq.* The statute is broad, applying to "any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce." Mo. Rev. Stat. § 407.020(1). Accordingly, the conduct at issue in this case falls within the scope of the MPA.

361. The MPA provides that a "person" has a private cause of action for violations of the statute. Mo. Rev. Stat. § 407.025(1), (3).

362. The Missouri Plaintiffs and other members of the Missouri Class and P&G Companies are "persons" within the meaning of the MPA. Mo. Rev. Stat. § 407.010(5).

363. P&G Companies engaged in "trade" or "commerce" in the state of Missouri within the meaning of the MPA. Mo. Rev. Stat. § 407.010(7).

364. Dry Max Pampers are "merchandise" within the meaning of the MPA. Mo. Rev. Stat. § 407.010(4).

365. P&G Companies had a statutory duty to refrain from unfair or deceptive acts or practices in the design, development, promotion, sale and/or manufacture of the Dry Max Pampers.

- 147 -

366.     P&G Companies have engaged in unfair, deceptive, and unconscionable practices by:  (1) marketing and selling Dry Max Pampers with defects that cause severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments with normal use; and (2) intentionally failing to disclose and/or concealing these known defects and risks.

367.     P&G Companies violated the MPA's express prohibition against "concealment, suppression, or omission of any material fact" in the sale or advertisement of merchandise.  Mo. Rev. Stat. § 407.020(1).

368.     As a direct and proximate result of P&G Companies' violations of the MPA, the Missouri Plaintiffs and other members of the Missouri Class have been injured.

369.     Had P&G Companies not engaged in the deceptive conduct described above, the Missouri Plaintiffs and other members of the Missouri Class would not have purchased, paid for, and/or used the Dry Max Pampers.

370.     The Missouri Plaintiffs and other members of the Missouri Class are entitled to all of the damages, remedies, fees, and costs available under the MPA.

371.     The Missouri Plaintiffs will provide or already have provided any required notice to appropriate entities regarding P&G Companies' unfair and deceptive trade practices.

**COUNT 18**
**VIOLATION OF THE MONTANA CONSUMER PROTECTION ACT "CPA"**
**(Mont. Code §§ 30-14-101 *et seq.*)**
**Asserted on behalf of the Montana Class**

372.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

373. Plaintiff Jennifer Robinson ("Montana Plaintiff") asserts this cause of action on behalf of herself, and all other members of the Montana Class. The CPA is codified at Mont. Code § 30-14-101 *et seq*. The statute provides that "[u]nfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful." Mont. Code § 30-14-103.

374. Any person who purchases goods for "personal, family, or household purposes and thereby suffers any ascertainable loss of money or property" as a result of unfair or deceptive acts may bring a private action to recover actual damages. *See* Mont. Code § 30-14-133. Here, Montana Plaintiff and other Montana Class members bought the Dry Max Pampers for family purposes, and, as described above, suffered ascertainable losses or damages.

375. P&G Companies had a statutory duty to refrain from deceptive representations about Dry Max Pampers.

376. P&G Companies have engaged in unfair, and deceptive, practices by: (1) marketing and selling Dry Max Pampers without warning that they may cause severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments with normal use; and (2) intentionally failing to disclose and/or concealing these known defects and risks, in violation of the CPA.

377. P&G Companies acted in the face of prior notice that their conduct was deceptive.

378. As a direct and proximate result of P&G Companies' violations of the CPA, the Montana Plaintiff and other members of the Montana Class have been injured, sustaining ascertainable damages.

379. Had P&G Companies not engaged in the deceptive conduct described above, the Montana Plaintiffs and other members of the Montana Class would not have purchased, paid for, and/or used the Dry Max Pampers.

380.    P&G Companies' deceptive or untruthful representations and material omissions to consumers and the public regarding the true nature of the Dry Max Pampers purchased and used by the Montana Plaintiff and the members of the Montana Class constituted unfair and deceptive acts and practices in violation of Mont. Code § 30-14-103.

381.    The Montana Plaintiff and members of the Montana Class relied on P&G Companies' misrepresentations and/or omissions in buying P&G Companies' Dry Max Pampers.

382.    As a direct and proximate result of P&G Companies' wrongful conduct, the Montana Plaintiff and members of the Montana Class have been injured.

383.    The Montana Plaintiff and members of the Montana Class are entitled to all of the damages, remedies, fees, and costs available under the CPA.  *See* Mont. Code § 30-14-133.

384.    The Montana Plaintiff will provide or already has provided any required notice to appropriate entities regarding P&G Companies' unfair and deceptive trade practices.

## COUNT 19
## VIOLATION OF THE NEBRASKA CONSUMER PROTECTION ACT "CPA"
### (Neb. Rev. Stat. §§ 59-1601 *et seq.*)
### Asserted on behalf of the Nebraska Class

385.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

386.    Plaintiff Amanda Converse ("Nebraska Plaintiff") asserts this cause of action on behalf of herself and all other members of the Nebraska Class.  The CPA is codified at Neb. Rev. Stat. § 59-1601 *et seq*.  The statute provides consumers with a comprehensive procedure for redressing the violations of applicable law.  Accordingly, the conduct at issue in this case falls within the scope of the CPA.

387. P&G Companies engaged in trade and/or commerce within the meaning of the CPA, Neb. Rev. Stat. § 59-1601.

388. The CPA declares that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce shall be unlawful." Neb. Rev. Stat. § 59-1602.

389. The CPA further provides a private right of action to any person "who is injured in his or her business or property" by a violation of the CPA. Neb. Rev. Stat. § 59-1609.

390. P&G Companies had a statutory duty to refrain from unfair or deceptive acts or practices in the design, development, promotion, sale and/or manufacture of the Dry Max Pampers.

391. P&G Companies have, in the course of P&G Companies' business, engaged in unfair or deceptive acts or practices by: (1) marketing and selling Dry Max Pampers with defects that cause severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments with normal use; and (2) intentionally failing to disclose and/or concealing these known defects and risks.

392. P&G Companies' misrepresentations and/or omissions were uniformly presented to consumers and the general public, and calculated to lead consumers to believe that the Dry Max Pampers were safe.

393. The facts intentionally concealed and/or not disclosed by P&G Companies to the Nebraska Plaintiffs and the other members of the Nebraska Class are material facts that a reasonable person would have considered important in deciding whether or not to purchase the Dry Max Pampers.

394.     The Nebraska Plaintiff and the other members of the Nebraska Class justifiably acted or relied to their detriment on the concealment and/or non-disclosed facts as evidenced by their purchase and/or use of the defective Dry Max Pampers.

395.     Had the Nebraska Plaintiff and the other members of the Nebraska Class known that the Dry Max Pampers had the capacity to and, in many cases, did actually harm the babies by causing severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments, on babies' extremely sensitive and delicate bottoms and other body parts, they would not have purchased and/or used the Dry Max Pampers.

396.     Had P&G Companies not engaged in the unfair or deceptive conduct described above, the Nebraska Plaintiffs and other members of the Nebraska Class would not have purchased, paid for, and/or used the Dry Max Pampers.

397.     P&G Companies' unfair or deceptive representations and material omissions to consumers and the public regarding the true nature of the Dry Max Pampers purchased and used by the Nebraska Plaintiffs and the members of the Nebraska Class constituted unfair and deceptive acts and practices in violation of Neb. Rev. Stat. § 59-1601 *et seq.*

398.     As a direct and proximate result of P&G Companies' violations of the NCPA, the Nebraska Plaintiffs and the other members of the Nebraska Class have been injured in their property.

399.     The Nebraska Plaintiff and members of the Nebraska Class have been damaged and are entitled to all of the damages, remedies, fees and costs available under the CPA.

400.     The Nebraska Plaintiff will provide or already has provided any required notice to appropriate entities regarding P&G Companies' unfair and deceptive trade practices.

**COUNT 20**
**VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT "CFA"**
**(N.J. Stat. §§ 56:8-1 *et seq.*)**
**Asserted on behalf of the New Jersey Class**

401.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

402.    Plaintiff Natalie Papailiou ("New Jersey Plaintiff") asserts this cause of action on behalf of herself and all other members of the New Jersey Class.  The CFA is codified at N.J. Stat. § 56:8-1 *et seq*.

403.    The New Jersey Plaintiff and the members of the New Jersey Class, as well as P&G Companies, are "persons" within the meaning of the CFA, N.J. Stat. § 56:8-1(d).

404.    At all times material hereto, P&G Companies conducted trade and commerce in New Jersey and elsewhere within the meaning of the CFA.

405.    The CFA is, by its terms, a cumulative remedy, such that remedies under its provisions can be awarded in addition to those provided under separate statutory schemes.

406.    P&G Companies have engaged in deceptive practices related to the sale of the defective Dry Max Pampers, including: (1) marketing and selling Dry Max Pampers with design defects that cause severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments and/or created a substantial risk that the aforementioned health effects would occur with normal use; and (2) intentionally failing to disclose and/or concealing these known defects and risks.

407.    P&G Companies consciously failed to disclose material facts to the New Jersey Plaintiffs and the other members of the New Jersey Class with respect to the alleged defects.

408.     P&G Companies' unconscionable conduct described herein included the omission and concealment of material facts concerning the Dry Max Pampers.

409.     P&G Companies intended that the New Jersey Plaintiffs and the other members of the New Jersey Class would purchase the Dry Max Pampers.

410.     Had P&G Companies disclosed all material information regarding the Dry Max Pampers to the New Jersey Plaintiffs and the other members of the New Jersey Class, they would not have purchased and/or used the Dry Max Pampers.

411.     The foregoing acts, misrepresentations, omissions, and unconscionable commercial practices caused the New Jersey Plaintiffs and the other members of the New Jersey Class to suffer an ascertainable loss in the form of, among other things, monies spent to replace the Dry Max Pampers, and they are entitled to recover all damages, remedies, fees, and costs available under applicable law.

412.     The New Jersey Plaintiff will provide or already has provided any required notice to appropriate entities regarding P&G Companies' unfair and deceptive trade practices.

### COUNT 21
### VIOLATION OF THE NEW YORK DECEPTIVE PRACTICES ACT
### (N.Y. Gen Bus. Law §§ 349, 350)
### Asserted on behalf of the New York Class

413.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

414.     Plaintiffs Shannon D'Andrea, Mariah MaLoon, and Lisa Saacks ("New York Plaintiffs") assert this cause of action on behalf of themselves and all other members of the New York Class.

415.     New York's General Business Law prohibits unfair, deceptive, and unconscionable practices in consumer sales transactions.  Specifically, N.Y. Gen. Bus. Law § 349 makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state."

416.     N.Y. Gen. Bus. Law § 350 makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce[.]"

417.     N.Y. Gen. Bus. Law § 349(h) provides that "any person who has been injured by reason of any violation of this section may bring . . . an action to recover his damages or fifty dollars, whichever is greater . . . The court may award reasonable attorney's fees to a prevailing plaintiff."

418.     By reason of the deceptive conduct alleged above, P&G Companies engaged in consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner.  P&G Companies' conduct caused tens of thousands of parents and care-givers to purchase Dry Max Pampers under the false pretense that they were safe.

419.     Plaintiffs and the New York Class also seek treble damages pursuant to N.Y. Gen. Bus. Law §349(h) because P&G Companies' conduct was willful and knowing.  P&G Companies acted in the face of prior notice that their conduct was deceptive, unfair, or unconscionable.

420.    P&G Companies had a statutory duty to refrain from unfair or deceptive acts or practices in the design, development, promotion, sale and/or manufacture of the Dry Max Pampers.

421.    P&G Companies had a statutory duty pursuant to N.Y. Gen. Bus. Law § 350 to refrain from false statements concerning the design, development, promotion, sale and/or manufacture in advertisements for the Dry Max Pampers.

422.    P&G Companies have engaged in unfair, deceptive, and unconscionable practices by:  (1) marketing and selling Dry Max Pampers with defects that cause severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments with normal use; and (2) intentionally failing to disclose and/or concealing these known defects and risks.

423.    Indeed, it is well established in New York jurisprudence that material omissions and misrepresentations concerning a product that are misleading to a reasonable consumer constitute a violation of N.Y. Gen. Bus. Law §§ 349, 350.

424.    As a direct and proximate result of P&G Companies' violations of N.Y. Gen. Bus. Law §§ 349, 350 the New York Plaintiffs and other members of the New York Class have been injured.

425.    Had P&G Companies not engaged in the deceptive conduct described above, the New York Plaintiffs and other members of the New York Class would not have purchased, paid for, and/or used the Dry Max Pampers.

426.    P&G Companies' deceptive, unconscionable or untruthful representations and material omissions to consumers and the public regarding the true nature of the Dry Max Pampers purchased and used by the New York Plaintiffs and the members of the New York

Class constituted unfair and deceptive acts and practices in violation of N.Y. Gen. Bus. Law §

349 *et seq*.

427. The New York Plaintiffs and members of the New York Class relied upon P&G

Companies' misrepresentations and/or omissions in buying P&G Companies' Dry Max Pampers

as required by N.Y. Gen. Bus. Law § 350.

428. As a direct and proximate result of P&G Companies' wrongful conduct, the New

York Plaintiffs and members of the New York Class have been damaged.

429. The New York Plaintiffs and members of the New York Class are entitled to all

of the damages, remedies, fees, and costs available under applicable law.

430. The New York Plaintiffs will provide or already have provided any required

notice to appropriate entities regarding P&G Companies' unfair and deceptive trade practices.

**COUNT 22**
**VIOLATION OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE**
**PRACTICES ACT ("UDTPA")**
**(N.C. Gen. Stat. §§ 75-1.1 *et seq*.)**
**Asserted on behalf of the North Carolina Class**

431. Plaintiffs repeat and reallege each and every allegation contained above as if fully

set forth herein.

432. Plaintiffs Jeni McAllister and Leah Robison ("North Carolina Plaintiffs") assert

this cause of action on behalf of themselves and all other members of the North Carolina Class.

The UDTPA is codified at N.C. Gen. Stat. § 75-1.1 *et seq*.

433. Pursuant to N.C. Gen. Stat. §75-1.1(a), unfair methods of competition in or

affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are

declared unlawful.

434.    At all relevant times, P&G Companies' acts and commissions were in and affected commerce.

435.    P&G Companies omitted and concealed material facts from their communications and disclosures to the North Carolina Plaintiffs and all other members of the North Carolina Class regarding the defects in the Dry Max Pampers.

436.    P&G Companies' acts and omissions had a tendency or capacity to deceive the North Carolina Plaintiffs and the other members of the North Carolina Class.

437.    The North Carolina Plaintiffs and the other members of the North Carolina Class were injured by reason of P&G Companies' acts and omissions.

438.    P&G Companies' conduct as described herein was unfair, deceptive, violating of public policy, and substantially injurious to the North Carolina Plaintiffs and the other members of the North Carolina Class.

439.    The North Carolina Plaintiffs and the other members of the North Carolina Class have suffered actual damages, and are entitled to recover the damages, remedies, fees, and costs available under applicable law.

440.    The North Carolina Plaintiffs will provide or already have provided any required notice to appropriate entities regarding P&G Companies' unfair and deceptive trade practices.

**COUNT 23**
**VIOLATION OF THE OHIO CONSUMER SALES PRACTICES ACT "CSPA"**
**(Ohio Rev. Code §§ 1345.01 *et seq.*)**
**Asserted on behalf of the Ohio Class and the Multistate Class**

441.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

442.    Plaintiff Victoria Katona ("Ohio Plaintiff") asserts this cause of action on behalf of herself, all other members of the Ohio Class, and the Multistate Class.  The CSPA is codified

at Ohio Rev. Code § 1345.01 *et seq.* The statute is broad, applying to the sale of consumer goods "to an individual for purposes that are primarily personal, family, or household [uses]." Ohio Rev. Code § 1345.01(A). Accordingly, the conduct at issue in this case falls within the scope of the CSPA.

443. The CSPA prohibits unfair, deceptive, and unconscionable practices in consumer sales transactions. Ohio Rev. Code § 1345.02(A). The CSPA further provides that "a consumer" has a private cause of action for violations of the statute. Ohio Rev. Code § 1345.09.

444. P&G Companies had a statutory duty to refrain from unfair or deceptive acts or practices in the design, development, promotion, sale and/or manufacture of the Dry Max Pampers.

445. P&G Companies have engaged in unfair, deceptive, and unconscionable practices by: (1) marketing and selling Dry Max Pampers with defects that cause severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments with normal use; and (2) intentionally failing to disclose and/or concealing these known defects and risks.

446. P&G Companies acted in the face of prior notice that their conduct was deceptive, unfair, or unconscionable. Indeed, it is well established in CSPA jurisprudence that material omissions and misrepresentations concerning a product constitute a violation of the statute. It is also considered a deceptive act or practice for purposes of the CSPA if a supplier makes representations, claims, or assertions of fact in the absence of a reasonable basis in fact. *See* Ohio Admin. Code § 109:4-3-10(A).

447. The facts concealed and/or not disclosed by P&G Companies to the Ohio Plaintiff, the other members of the Ohio Class, and the members of the Multistate Class are

material facts that a reasonable person would have considered important in deciding whether or not to purchase the Dry Max Pampers.

448.    The Ohio Plaintiff, the other members of the Ohio Class, and the members of the Multistate Class justifiably acted or relied to their detriment on the concealment and/or non-disclosed facts as evidenced by their purchase and/or use of the defective Dry Max Pampers.

449.    Had the Ohio Plaintiff, the other members of the Ohio Class, and the members of the Multistate Class known that the Dry Max Pampers had the capacity to and, in many cases, did actually harm the babies by causing severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments, on babies' extremely sensitive and delicate bottoms and other body parts, they would not have purchased and/or used the Dry Max Pampers.

450.    Had P&G Companies not engaged in the unfair or deceptive conduct described above, the Ohio Plaintiff, the other members of the Ohio Class, and the members of the Multistate Class would not have purchased, paid for, and/or used the Dry Max Pampers.

451.    P&G Companies' deceptive, unconscionable or untruthful representations and material omissions to consumers and the public regarding the true nature of the Dry Max Pampers purchased and used by the Ohio Plaintiff and the members of the Ohio Class, as well as the members of the Multistate Class, constituted unfair and deceptive acts and practices in violation of Ohio Rev. Code § 1345.01 *et seq.*

452.    As a direct and proximate result of P&G Companies' violations of the CSPA, the Ohio Plaintiff and other members of the Ohio Class, as well as the members of the Multistate Class have been injured.

453.     The Ohio Plaintiff and members of the Ohio Class, as well as the members of the

Multistate Class, have been damaged and are entitled to all of the damages, remedies, fees, and

costs available under the CSPA.

454.     The Ohio Plaintiff will provide or already has provided any required notice to

appropriate entities regarding P&G Companies' unfair and deceptive trade practices.

**COUNT 24**
**VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND**
**CONSUMER PROTECTION LAW "UTPCPL"**
**(73 Pa. Cons. Stat. §§ 201-1 *et seq.*)**
**Asserted on behalf of the Pennsylvania Class**

455.     Plaintiffs repeat and reallege each and every allegation contained above as if fully

set forth herein.

456.     Plaintiffs Gayle Hironimus and Nicole A. Tepper ("Pennsylvania Plaintiffs")

asserts this cause of action on behalf of themselves and all other members of the Pennsylvania

Class.  The UTPCPL is codified at 73 Pa. Cons. Stat. § 201-1 *et seq*.  The statute provides relief,

inter alia, where a defendant represents that goods have characteristics, ingredients, uses or

benefits that they do not have, or defendant engages in any other fraudulent or deceptive conduct

which creates a likelihood of confusion or of misunderstanding.  73 Pa. Cons. Stat. § 201-2(4).

The conduct at issue in this case falls within the scope of the UTPCPL.

457.     P&G Companies engaged in trade and/or commerce within the meaning of

UTPCPL.  73 Pa. Cons. Stat. § 201-2.

458.     The UTPCPL declares that "[u]nfair methods of competition and unfair or

deceptive acts or practices in the conduct of any trade or commerce" unlawful.  73 Pa. Cons.

Stat. § 201-3.

459.    The UTPCPL further provides a private right of action to any person "who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal."  73 Pa. Cons. Stat. § 201-9.2.

460.    P&G Companies had a statutory duty to refrain from unfair or deceptive acts or practices in the design, development, promotion, sale and/or manufacture of the Dry Max Pampers.

461.    P&G Companies have, in the course of P&G Companies' business, engaged in unfair or deceptive acts or practices by:  (1) marketing and selling Dry Max Pampers with defects that cause severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments with normal use; and (2) intentionally failing to disclose and/or concealing these known defects and risks.

462.    P&G Companies' misrepresentations and/or omissions were uniformly presented to consumers and the general public, and calculated to lead consumers to believe that the Dry Max Pampers were safe.  P&G Companies acted in the face of prior notice that their conduct was deceptive, unfair, or unconscionable.

463.    The facts intentionally concealed and/or not disclosed by P&G Companies to the Pennsylvania Plaintiffs and the other members of the Pennsylvania Class are material facts that a reasonable person would have considered important in deciding whether or not to purchase the Dry Max Pampers.

464.    The Pennsylvania Plaintiffs and the other members of the Pennsylvania Class justifiably acted or relied to their detriment on the concealment and/or non-disclosed facts as evidenced by their purchase and/or use of the defective Dry Max Pampers.

465.    Had the Pennsylvania Plaintiffs and the other members of the Pennsylvania Class known that the Dry Max Pampers had the capacity to and, in many cases, did actually harm the babies by causing severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments, on babies' extremely sensitive and delicate bottoms and other body parts, they would not have purchased and/or used the Dry Max Pampers.

466.    Had P&G Companies not engaged in the unfair or deceptive conduct described above, the Pennsylvania Plaintiffs and other members of the Pennsylvania Class would not have purchased, paid for, and/or used the Dry Max Pampers.

467.    P&G Companies' unfair or deceptive representations and material omissions to consumers and the public regarding the true nature of the Dry Max Pampers purchased and used by the Pennsylvania Plaintiffs and the members of the Pennsylvania Class constituted unfair and deceptive acts and practices in violation of 73 Pa. Cons. Stat. 201-1 *et seq*.

468.    As a direct and proximate result of P&G Companies' violations of the UTPCPL, the Pennsylvania Plaintiffs and the other members of the Pennsylvania Class have been injured.

469.    The Pennsylvania Plaintiffs and members of the Pennsylvania Class have been damaged and are entitled to all of the damages, remedies, fees, and costs available under the UTPCPL.

470.    The Pennsylvania Plaintiffs will provide or already has provided any required notice to appropriate entities regarding P&G Companies' unfair and deceptive trade practices.

**COUNT 25**
**VIOLATION OF THE SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT**
**"UTPA"**
**(S.C. Code §§ 39-5-10 *et seq.*)**
**Asserted on behalf of the South Carolina Class**

471.    Plaintiffs repeat and reallege each and every allegation contained above as if fully

set forth herein.

472.    Plaintiff Meredith Bottar ("South Carolina Plaintiff") asserts this cause of action

on behalf of herself and all other members of the South Carolina Class.  The UTPA is codified at

S.C. Code §§ 39-5-10 *et seq*.  The statute is broad, declaring unlawful "unfair methods of

competition and unfair or deceptive acts or practices in the conduct of any trade or

commerce…."  S.C. Code § 39-5-20(a).  Accordingly, the conduct at issue in this case falls

within the scope of the UPTA.

473.    The UPTA further provides that "any person" has a private cause of action for

violations of the statute.  S.C. Code § 39-5-140(a).

474.    P&G Companies had a statutory duty to refrain from unfair or deceptive acts or

practices in the design, development, promotion, sale and/or manufacture of the Dry Max

Pampers.

475.    P&G Companies have engaged in unfair and deceptive practices by:  (1)

marketing and selling Dry Max Pampers with defects that cause severe rashes, blisters, welts,

bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments with normal

use; and (2) intentionally failing to disclose and/or concealing these known defects and risks.

476.    P&G Companies acted in the face of prior notice that their conduct was deceptive

and unfair.  As a direct and proximate result of P&G Companies' violations of the UPTA, the

South Carolina Plaintiff and other members of the South Carolina Class have been injured.

477.    The public interest of South Carolinians is served when consumer products, such as diapers, promote health and do not cause severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments with normal use.

478.    Had P&G Companies not engaged in the deceptive conduct described above, the South Carolina Plaintiff and other members of the South Carolina Class would not have suffered actual, ascertainable damages caused by purchasing, paying for, and/or using the Dry Max Pampers.

479.    P&G Companies' deceptive or untruthful representations and material omissions to consumers and the public regarding the true nature of the Dry Max Pampers purchased and used by the South Carolina Plaintiff and the members of the South Carolina Class constituted unfair and deceptive acts and practices in violation of S.C. Code §§ 39-5-10 *et seq*.

480.    The South Carolina Plaintiff and members of the South Carolina Class relied upon P&G Companies' misrepresentations and/or omissions in buying Dry Max Pampers.

481.    As a direct and proximate result of P&G Companies' wrongful conduct, the South Carolina Plaintiff and members of the South Carolina Class have been damaged.

482.    The South Carolina Plaintiff and members of the South Carolina Class are entitled to all of the damages, remedies, fees, and costs available under applicable law.

483.    The South Carolina Plaintiff will provide or already has provided any required notice to appropriate entities regarding P&G Companies' unfair and deceptive trade practices.

**COUNT 26**
**VIOLATION OF THE TEXAS DECEPTIVE TRADE PRACTICES—CONSUMER PROTECTION ACT "DTPA"**
**(Tex. Bus. & Com. Code §§ 17.41 *et seq.*)**
**Asserted on behalf of the Texas Class**

484.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

485.    Plaintiffs Brandon and Jessica Ehrhart, Robert Davenport, and Amy Young ("Texas Plaintiffs") assert this cause of action on behalf of themselves and all other members of the Texas Class.  The DTPA is codified at Tex. Bus. & Com. Code §§ 17.41 *et seq*.

486.    At all relevant times, the Texas Plaintiff and all members of the Texas Class were consumers within the meaning of the DTPA, Tex. Bus. & Com. Code §§ 17.45(4).

487.    At all relevant times, P&G Companies engaged in trade and/or commerce within the meaning of the DTPA, which broadly prohibits unfair and unconscionable acts.  Tex. Bus. & Com. Code §§ 17.45(5), 17.50(a)(3).

488.    The practices of P&G Companies violated DTPA for, inter alia, one or more of the following reasons:

A.    P&G Companies omitted and concealed material facts from its communications and disclosures to Texas Plaintiffs and all members of the Texas Class regarding the defects inherent in the Dry Max Pampers;

B.    P&G Companies made false and/or misleading statements of material fact regarding the Dry Max Pampers, which were likely to deceive the public;

C.    P&G Companies knew, or was reckless in not knowing, that their statements about the Dry Max Pampers were false and/or misleading; and/or

       D.     P&G Companies represented that the Dry Max Pampers were of a particular standard, quality, or grade, when they were not.

489.    By the conduct described herein, P&G Companies have engaged in unconscionable, unfair and/or deceptive acts or practices in the conduct of trade or commerce.

490.    The representations and omissions by P&G Companies were likely to deceive reasonable consumers and a reasonable consumer would have relied on these representations and omissions.

491.    Had P&G Companies disclosed all material information regarding the Dry Max Pampers to the Texas Plaintiffs and all of the Texas Class members, they would not have purchased the Dry Max Pampers.

492.    The foregoing acts and practices proximately caused the Texas Plaintiffs and other members of the Texas Class to suffer actual damages.

493.    The Texas Plaintiffs and members of the Texas Class are entitled to all of the damages, remedies, fees, and costs available under the DTPA.

494.    The Texas Plaintiffs will provide or already have provided any required notice to appropriate entities regarding P&G Companies' unfair and deceptive trade practices.

**COUNT 27**
**VIOLATION OF THE WASHINGTON CONSUMER PROTECTION ACT "CPA"**
**(Rev. Code Wash. §§ 19.86 *et seq.*)**
**Asserted on behalf of the Washington Class**

495.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

496.    Plaintiffs Kristina Atwood, Amber Beck, and Brandon Hulse ("Washington Plaintiffs") assert this cause of action on behalf of themselves and all other members of the

Washington Class. The CPA is codified at Rev. Code Wash. § 19.86 *et seq*. The statute

provides consumers with a comprehensive procedure for redressing the violations of applicable

law. Accordingly, the conduct at issue in this case falls within the scope of the CPA.

497. The CPA declares "[u]nfair methods of competition and unfair or deceptive acts

or practices in the conduct of any trade or commerce" unlawful. Rev. Code. Wash. § 19.86.020.

The CPA further provides a private right of action to any person "injured in his or her business or

property." Rev. Code Wash. § 19.86.090.

498. P&G Companies had a statutory duty to refrain from unfair or deceptive acts or

practices in the design, development, promotion, sale and/or manufacture of the Dry Max

Pampers.

499. P&G Companies have, in the course of P&G Companies' business, engaged in

unfair or deceptive acts or practices by: (1) marketing and selling Dry Max Pampers with

defects that cause severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections,

sores, scarring and/or other ailments with normal use; and (2) intentionally failing to disclose

and/or concealing these known defects and risks.

500. P&G Companies' acts or practices have been "injurious to the public interest"

because they injured other persons, had the capacity to injure other persons and/or have the

capacity to injure other persons. Rev. Code Wash. § 19.86.093.

501. The facts concealed and/or not disclosed by P&G to the Washington Plaintiffs and

the other members of the Washington Class are material facts that a reasonable person would

have considered important in deciding whether or not to purchase the Dry Max Pampers.

502.     The Washington Plaintiffs and the other members of the Washington Class justifiably acted or relied to their detriment on the concealment and/or non-disclosed facts as evidenced by their purchase and/or use of the defective Dry Max Pampers.

503.     Had the Washington Plaintiffs and the other members of the Washington Class known that the Dry Max Pampers had the capacity to and, in many cases, did actually harm the babies by causing severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments, on babies' extremely sensitive and delicate bottoms and other body parts, they would not have purchased and/or used the Dry Max Pampers.

504.     Had P&G Companies not engaged in the unfair or deceptive conduct described above, the Washington Plaintiffs and other members of the Washington Class would not have purchased, paid for, and/or used the Dry Max Pampers.

505.     P&G Companies' unfair or deceptive representations and material omissions to consumers and the public regarding the true nature of the Dry Max Pampers purchased and used by the Washington Plaintiffs and the members of the Washington Class constituted unfair and deceptive acts and practices in violation of Rev. Code Wash. § 19.86 *et seq.*

506.     As a direct and proximate result of P&G Companies' violations of the CPA, the Washington Plaintiffs and the other members of the Washington Class have been injured in their property.

507.     The Washington Plaintiffs and members of the Washington Class have been damaged and are entitled to all of the damages, remedies, fees, and costs available under the CPA.  *See* Rev. Code Wash. § 19.86.090.

508.     The Washington Plaintiffs will provide or already have provided any required notice to appropriate entities regarding P&G Companies' unfair and deceptive trade practices.

- 169 -

**COUNT 28**
**VIOLATION OF THE WEST VIRGINIA CONSUMER PROTECTION ACT "CPA"**
**(W. Va. Code §§ 46 A-6-101 *et seq.*)**
**Asserted on behalf of the West Virginia Class**

509.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

510.     Plaintiff Melanie Braun ("West Virginia Plaintiff") asserts this cause of action on behalf of herself and all other members of the West Virginia Class.  The CPA is codified at W. Va. Code § 46 A-6-101 *et seq.*  The statute provides relief where a defendant represents that goods have characteristics, ingredients, uses or benefits that they do not have, or defendant engages in any other deceptive conduct which creates a likelihood of confusion or of misunderstanding.  W. Va. Code § 46 A-102(7)(E) and (L).

511.     The statute also provides for relief if a defendant uses any deception, fraud, misrepresentation, concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission in connection with the sale, or advertisement of any goods or services, and if any advertising for sale of goods is false, misleading, or deceptive, or omits to state material information which is necessary to make the statements therein not false, misleading or deceptive.  W. Va. Code § 46 A-102(7)(M) and (N). Any person or consumer who purchases goods and suffers any ascertainable loss of money or property may bring a private action to recover actual damages, or $200, whichever is greater.

512.     P&G Companies had a statutory duty to refrain from misrepresentations about Dry Max Pampers which created a likelihood of confusion or misunderstanding about the Dry Max Pampers.

513.     P&G Companies have engaged in unfair, deceptive, and unconscionable practices by: (1) marketing and selling Dry Max Pampers without warning that they may cause severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments with normal use; and (2) intentionally failing to disclose and/or concealing these known defects and risks, in violation of the CPA.

514.     P&G Companies acted in the face of prior notice that their conduct was deceptive, unfair, or unconscionable.

515.     As a direct and proximate result of P&G Companies' violations of the CPA, the West Virginia Plaintiff and other members of the West Virginia Class have been injured, sustaining ascertainable damages for the cost of used, unused and discarded Dry Max Pampers and for medical bills, medicines and over-the-counter remedies for burns, blisters and rashes.

516.     Had P&G Companies not engaged in the deceptive conduct described above, the West Virginia Plaintiff and other members of the West Virginia Class would not have purchased, paid for, and/or used the Dry Max Pampers.

517.     P&G Companies' deceptive, misleading or untruthful representations and material omissions to consumers and the public regarding the true nature of the Dry Max Pampers purchased and used by the West Virginia Plaintiff and the members of the West Virginia Class constituted unfair and deceptive acts and practices in violation of W. Va. Code § 46 A-102(7)(E), (L), (M), and (N).

518.     The West Virginia Plaintiff and members of the West Virginia Class relied on P&G Companies' misrepresentations and/or omissions in buying P&G Companies' Dry Max Pampers.

519.    As a direct and proximate result of P&G Companies' wrongful conduct, the West Virginia Plaintiff and members of the West Virginia Class have been injured.

520.    The West Virginia Plaintiff and members of the West Virginia Class are entitled to all of the damages, remedies, fees, and costs available under the CPA.   *See* W. Va. Code § 46 A-6-106(a).

521.    The West Virginia Plaintiff will provide or already has provided any required notice to appropriate entities regarding P&G Companies' unfair and deceptive trade practices.

**COUNT 29**
**VIOLATION OF THE WISCONSIN DECEPTIVE TRADE PRACTICES ACT "DTPA"**
**(Wis. Stat. § 100.18)**
**Asserted on behalf of the Wisconsin Class**

522.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

523.    Plaintiff Cassie Raether ("Wisconsin Plaintiff") asserts this cause of action on behalf of herself and all other members of the Wisconsin Class.

524.    The DTPA is codified at Wis. Stat. § 100.18.  The DTPA provides a private cause of action for any "advertisement, announcement, statement or representation" containing "any assertion, representation or statement of fact which is untrue, deceptive or misleading" and which causes pecuniary loss.  Wis. Stat. § 100.18(1) and (11)(b)2.

525.    P&G Companies had a statutory duty to refrain from making untrue, deceptive, or misleading statements in the sale, promotion, and advertisement of the Dry Max Pampers.

526.    P&G Companies' statements and representations about the safety and quality of the Dry Max Pampers, as set forth above, as well as their failure to disclose the known defects and risks of the Dry Max Pampers, were untrue, deceptive and misleading.

527. P&G Companies made these statements and representations to the public with the intent to induce an obligation.

528. P&G Companies' statements and representations materially induced the Wisconsin Plaintiff and other members of the Wisconsin Class to purchase the Dry Max Pampers. Had P&G Companies not engaged in the deceptive conduct described above, the Wisconsin Plaintiff and other members of the Wisconsin Class would not have purchased, paid for, and/or used the Dry Max Pampers.

529. As a direct and proximate result of P&G Companies' violations of the DTPA, the Wisconsin Plaintiff and other members of the Wisconsin Class have suffered a pecuniary loss.

530. The Wisconsin Plaintiff and other members of the Wisconsin Class are entitled to recover their pecuniary loss, as well as all of the damages, remedies, fees, and costs available under the DTPA. Wis. Stat. § 100.18(11)(b)2.

531. The Wisconsin Plaintiff will provide or already has provided any required notice to appropriate entities regarding P&G Companies' unfair and deceptive trade practices.

**COUNT 30**
**NEGLIGENCE – DESIGN, MANUFACTURING DEFECT AND FAILURE TO WARN**
**(PRODUCTS LIABILITY)**
**Asserted on behalf of the Nationwide Class**

532. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

533. Plaintiffs assert this common law cause of action on behalf of themselves and all other members of the Nationwide Class.

534. P&G Companies designed, manufactured, sold, and/or distributed Dry Max Pampers to parents of preemies, newborns, older babies, and toddlers.

535.    The Dry Max Pampers had the capacity to, and in many cases did, actually harm the preemies, newborns, older babies, and toddlers by causing severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments, on babies' extremely sensitive and delicate bottoms and other body parts that the Dry Max Pampers are supposed to cover and to protect when they left the hands of P&G Companies.

536.    P&G Companies had a duty to exercise reasonable care in the design, manufacture, sale and/or distribution of the Dry Max Pampers, including a duty to ensure that the Dry Max Pampers did not have the capacity to harm babies by causing severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments, on babies' extremely sensitive and delicate bottoms and other body parts that the Dry Max Pampers are supposed to cover and to protect.

537.    The dermatological hazards associated with the foreseeable use of the Dry Max Pampers are inherent in the product.  No action, except discarding the product and/or discontinuing its use by the parent or caregiver, can reduce or eliminate the danger to the babies.

538.    P&G Companies failed to exercise reasonable care in the design, manufacture, sale, and/or distribution, of the Dry Max Pampers.

539.    Specifically, P&G Companies were negligent in their design, manufacture, testing, inspection, sale and/or distribution of the Dry Max Pampers in that they:

    A.    Failed to use reasonable care in designing and/or manufacturing the Dry Max Pampers so as to avoid the harm of causing severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments, on babies' extremely sensitive and delicate bottoms and other body parts that the Dry Max Pampers are supposed to cover and to protect;

- 174 -

B.      Failed to conduct adequate quality testing of the Dry Max Pampers to determine the safety of the Dry Max Pampers prior to sale;

C.      Failed to accompany the Dry Max Pampers with proper warnings regarding the possible adverse effects associated with severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments, on babies' extremely sensitive and delicate bottoms and other body parts that the Dry Max Pampers are supposed to cover and to protect.

540.    Despite the fact that P&G Companies knew or should have known that the Dry Max Pampers could cause adverse health effects to babies, P&G Companies continued to market and sell the Dry Max Pampers to consumers, including Plaintiffs and other members of the Nationwide Class, despite the fact that the Dry Max Pampers had the capacity, and in many cases, did actually harm the babies by causing severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments, on the babies' extremely sensitive and delicate bottoms and other body parts that the Dry Max Pampers are supposed to cover and to protect.

541.    P&G Companies knew or should have known that Plaintiffs and other members of the Nationwide Class, as well as their babies, would foreseeably be put at risk and suffer adverse health effects as a result of P&G Companies' failure to warn of severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments, on babies' extremely sensitive and delicate bottoms and other body parts that the Dry Max Pampers are supposed to cover and to protect.

542.    P&G Companies' negligence proximately caused Plaintiffs and other members of the Nationwide Class, as well as their babies, to be injured, including but not limited to severe

rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments, on babies' extremely sensitive and delicate bottoms and other body parts that the Dry Max Pampers are supposed to cover and to protect.

543.     Plaintiffs do not allege negligence claims based on an injury to the Dry Max Pampers themselves; Plaintiffs' negligence claims relate to injuries that they and members of the Nationwide Class, as well as their babies, sustained as a result of the Dry Max Pampers.

**COUNT 31**
**STRICT LIABILITY- DESIGN DEFECT/MANUFACTURING DEFECT AND FAILURE TO WARN (PRODUCT LIABILITY)**
**Asserted on behalf of the Nationwide Class**

544.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

545.     Plaintiffs assert this common law cause of action on behalf of themselves and all other members of the Nationwide Class.

546.     P&G Companies designed, manufactured, sold and/or distributed Dry Max Pampers to parents of preemies, newborns, older babies, and toddlers.

547.     The Dry Max Pampers that P&G Companies designed, manufactured, sold and/or distributed were defective in design and/or manufacturing.  Further, the Dry Max Pampers were defective when they left the control of the P&G Companies such that:  (1) the foreseeable risks exceeded the benefits associated with the design or manufacturing with same, or (2) they were unreasonably dangerous, more dangerous than an ordinary consumer would expect, and/or more dangerous than other diapering products, including but not limited to their previous line of Pampers.

548.    P&G Companies knew or should have known that the Dry Max Pampers contained a non-obvious danger to preemies,' newborns,' older babies,' and toddlers' tender skin.  Moreover, the presence of irritating chemicals was a known danger.

549.    P&G Companies knew that Plaintiffs and other members of the Nationwide Class would use the products without first inspecting them for unreasonably irritating chemicals that may react with babies' excrement in the diaper.  However, P&G Companies failed to inform Plaintiffs and other members of the Nationwide Class as to the adverse health and safety effects that the Dry Max Pampers could have on young babies.

550.    The Dry Max Pampers were expected to and did reach Plaintiffs and other members of the Nationwide Class without substantial change in condition.

551.    The Dry Max Pampers P&G Companies designed, manufactured, sold and/or distributed were defective due to inadequate warning and inadequate inspection and testing, and inadequate reporting regarding the results of quality-control testing and safety inspections, or lack thereof.

552.    Had Plaintiffs and other members of the Nationwide Class been warned about the capacity of the Dry Max Pampers to cause preemies, newborns, older babies, and toddlers to suffer from severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments, they would not have purchased, acquired, or otherwise obtained the Dry Max Pampers, nor would they have used the Dry Max Pampers.

553.    As a direct and proximate result of the defective condition of the Dry Max Pampers as designed, manufactured, sold and/or distributed by P&G Companies, Plaintiffs and other members of the Nationwide Class, as well as their babies, have been injured, including the

capacity to experience severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments.

554.    Plaintiffs do not allege strict liability claims based on an injury to the Dry Max Pampers themselves; Plaintiffs' strict liability claims relate to injuries that they and members of the Nationwide Class, as well as their babies, sustained as a result of the Dry Max Pampers.

**COUNT 32**
**VIOLATION OF THE COLORADO PRODUCT LIABILITY ACT "PLA"**
**(Col. Rev. Stat. §§ 13-21-401 *et seq.*)**
**Asserted on behalf of the Colorado Class**

555.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

556.    Plaintiff Kelly Adams ("Colorado Plaintiff") asserts this cause of action on behalf of herself and all other members of the Colorado Class.  The PLA is codified at Colorado Rev. Stat. § 13-21-401 *et seq.*  The statute allows actions "against a manufacturer or seller of a product, regardless of the substantive legal theory or theories upon which the action is brought, for or on account of personal injury, death, or property damage caused by or resulting from the manufacture, construction, design, formula, installation, preparation, assembly, testing, packaging, labeling, or sale of any product, or the failure to warn or protect against a danger or hazard in the use, misuse, or unintended use of any product."  Colo. Rev. Stat. § 13-21-401(2).

557.    P&G Companies' Dry Max Pampers are a product within the meaning of the PLA.

558.    Kelly Adams and other members of the Colorado Class are consumers within the meaning of the PLA.

559. The Dry Max Pampers were in a defective condition unreasonably dangerous to Kelly Adams and other members of the Colorado Class and/or P&G Companies failed to warn of the dangers of Dry Max Pampers.

560. P&G Companies sold Pampers and is engaged in the business of selling Dry Max Pampers.

561. P&G Companies expected the Dry Max Pampers to reach Kelly Adams and other members of the Colorado Class in the condition in which they were sold, and they did reach Kelly Adams and other members of the Colorado Class in the condition in which they were sold.

562. P&G Companies knew of the harms Dry Max Pampers cause, or could have known of those risks in light of available scientific and technical knowledge. Moreover, P&G Companies knew of dangers that were not open and obvious to Colorado consumers of Dry Max Pampers.

563. The defects in the Dry Max Pampers did actually harm the babies by causing severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments, on babies' extremely sensitive and delicate bottoms and other body parts.

564. As a result of defects in the Dry Max Pampers, Plaintiff Kelly Adams and the members of the Colorado Class sustained damages.

565. The Colorado Plaintiff and other members of the Colorado Class are entitled to all of the damages, remedies, fees, and costs available under applicable law.

566. The Colorado Plaintiff does not allege this claim based on an injury to the Dry Max Pampers themselves; the Colorado Plaintiff's Connecticut Product Liability Act claim relates to injuries that she and the other Colorado Class members, as well as their children, sustained as a result of the Dry Max Pampers.

**COUNT 33**
**VIOLATION OF THE CONNECTICUT PRODUCT LIABILITY STATUTE**
**(Conn. Gen. Stat. §§ 52-572m *et seq.*)**
**Asserted on behalf of the Connecticut Class**

567.　Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

568.　Plaintiff Diane Samelson ("Connecticut Plaintiff") asserts this cause of action under the Connecticut Product Liability Statute, Conn. Gen. Stat. § 52-572m *et seq.*, on behalf of herself and all other members of the Connecticut Class.

569.　P&G Companies manufactured, constructed, designed, formulated, sold and/or distributed Dry Max Pampers to parents of preemies, newborns, older babies, and toddlers within the meaning of Conn. Gen. Stat. § 52-572m(e).

570.　The Dry Max Pampers that P&G Companies designed, manufactured, sold and/or distributed were defective in design and/or manufacturing.  Further, the Dry Max Pampers were defective when they left the control of the P&G Companies such that:  (1) the foreseeable risks exceeded the benefits associated with the design or manufacturing with same, or (2) they were unreasonably dangerous, more dangerous than an ordinary consumer would expect, and/or more dangerous than other diapering products, including but not limited to P&G Companies' previous line of Pampers.  The defects in the design or formulation of the Dry Max Pampers were a proximate cause of the injuries to the babies who used the Dry Max Pampers.

571.　P&G Companies knew or should have known that the Dry Max Pampers contained a non-obvious danger to preemies,' newborns,' older babies,' and toddlers' tender skin.  Moreover, the presence of irritating chemicals was a known danger.

572.     P&G Companies knew that the Connecticut Plaintiff and other members of the Connecticut Class members would use the Dry Max Pampers without first inspecting them for unreasonably irritating chemicals that may react with babies' excrement in the diaper.  However, P&G Companies failed to inform the Connecticut Plaintiff and other members of the Connecticut Class about the adverse health and safety effects that the Dry Max Pampers could have on young children.

573.     The Dry Max Pampers were expected to and did reach the Connecticut Plaintiff and other members of the Connecticut Class without substantial change in condition.

574.     The Dry Max Pampers that P&G Companies manufactured, constructed, designed, formulated, sold and/or distributed were defective and unreasonably dangerous due to inadequate warning or instruction within the meaning of Conn. Gen. Stat. § 52-572q(a).

575.     The Dry Max Pampers that P&G Companies manufactured, constructed, designed, formulated, sold and/or distributed did not conform to representations made by P&G Companies.

576.     The Dry Max Pampers that P&G Companies manufactured, constructed, designed, formulated, sold and/or distributed were defective due to inadequate testing, as well as inadequate reporting regarding the results of quality-control testing and safety inspections, or lack thereof.

577.     Had the Connecticut Plaintiff and other members of the Connecticut Class been warned about the capacity of the Dry Max Pampers to cause preemies, newborns, older babies, and toddlers to suffer from severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments, they would not have purchased, acquired, or

otherwise obtained the Dry Max Pampers, nor would they have used the Dry Max Pampers and claimants would not have suffered the harm.  Conn. Gen. Stat. § 52-572q(c).

578.     As a direct and proximate result of the defective condition of the Dry Max Pampers as designed, manufactured, sold and/or distributed by P&G Companies, the Connecticut Plaintiff and other members of the Connecticut Class, as well as their children, have been injured, including the capacity to experience severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments.

579.     The Connecticut Plaintiff and other members of the Connecticut Class are entitled to all of the damages, remedies, fees, and costs available under applicable law.

580.     The Connecticut Plaintiff does not allege this Connecticut Product Liability Act claim based on an injury to the Dry Max Pampers themselves; the Connecticut Plaintiff's Connecticut Product Liability Act claim relates to injuries that they and Class members, as well as their children, sustained as a result of the Dry Max Pampers.

**COUNT 34**
**VIOLATION OF THE KANSAS PRODUCT LIABILITY LAW**
**(Kan. Stat. § 60-3302)**
**Asserted on behalf of the Kansas Class**

581.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

582.     Plaintiff Maria McMahon ("Kansas Plaintiff") asserts this cause of action under Kan. Stat. § 60-3302, on behalf of herself and all other members of the Kansas Class.

583.     P&G Companies designed, manufactured, constructed, remanufactured, sold and/or distributed Dry Max Pampers to parents of preemies, newborns, older babies, and toddlers.

584.     The Kansas Plaintiff and other members of the Kansas Class used the Dry Max Pampers in a manner reasonably anticipated by P&G Companies.

585.     The Dry Max Pampers were in a defective condition due to defective design and/or manufacture, and therefore were unreasonably dangerous when put to a reasonably anticipated use.

586.     The Kansas Plaintiff and other members of the Kansas Class were damaged as a direct result of such defective condition, which existed when the Dry Max Pampers were sold.

587.     In addition, or in the alternative, the Dry Max Pampers were then unreasonably dangerous when put to a reasonably anticipated use without knowledge of their characteristics, and the Kansas Plaintiff and other members of the Kansas Class were damaged as a direct result of the product being sold without an adequate warning.

588.     As a direct and proximate result of P&G Companies' wrongful conduct, the Kansas Plaintiff and other members of the Kansas Class have been injured, including the capacity to experience severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments.

589.     The Kansas Plaintiff and other members of the Kansas Class are entitled to all of the damages, remedies, fees, and costs available under applicable law.

590.     The Kansas Plaintiff does not allege this claim based on an injury to the Dry Max Pampers themselves; the Kansas Plaintiff's claim relates to injuries that she and Kansas Class members, as well as their babies, sustained as a result of the Dry Max Pampers.

## COUNT 35
## VIOLATION OF THE KENTUCKY PRODUCT LIABILITY ACT
### (Ky. Rev. Stat. §§ 411.300 *et seq.*)
### Asserted on behalf of the Kentucky Class

591.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

592.    Plaintiff Adona Schank ("Kentucky Plaintiff") asserts this cause of action under the Kentucky Product Liability Act, Ky. Rev. Stat. § 411.300 *et seq.*, on behalf of herself and all other members of the Kentucky Class.

593.    P&G Companies manufactured, constructed, designed, formulated, sold and/or distributed Dry Max Pampers to parents of preemies, newborns, older babies, and toddlers.

594.    The Dry Max Pampers that P&G Companies designed, manufactured, sold and/or distributed were defective in design and/or manufacturing.  Further, the Dry Max Pampers were defective when they left the control of the P&G Companies such that:  (1) the foreseeable risks exceeded the benefits associated with the design or manufacturing with same, or (2) they were unreasonably dangerous, more dangerous than an ordinary consumer would expect, and/or more dangerous than other diapering products, including but not limited to P&G Companies' previous line of Pampers.  The defects in the design or formulation of the Dry Max Pampers were a proximate cause of the injuries to the babies who used the Dry Max Pampers.

595.    P&G Companies knew or should have known that the Dry Max Pampers contained a non-obvious danger to preemies,' newborns,' older babies,' and toddlers' tender skin.  Moreover, the presence of irritating chemicals was a known danger.

596.    P&G Companies knew that the Kentucky Plaintiff and other members of the Kentucky Class would use the Dry Max Pampers without first inspecting them for unreasonably

- 184 -

irritating chemicals that may react with babies' excrement in the diaper. However, P&G Companies failed to inform the Kentucky Plaintiff and other members of the Kentucky Class about the adverse health and safety effects that the Dry Max Pampers could have on young children.

597.    The Dry Max Pampers were expected to and did reach the Kentucky Plaintiff and other members of the Kentucky Class without substantial change in condition.

598.    The Dry Max Pampers that P&G Companies manufactured, constructed, designed, formulated, sold and/or distributed were defective and unreasonably dangerous due to inadequate warning or instruction.

599.    The Dry Max Pampers that P&G Companies manufactured, constructed, designed, formulated, sold and/or distributed did not conform to representations made by P&G Companies.

600.    The Dry Max Pampers that P&G Companies manufactured, constructed, designed, formulated, sold and/or distributed were defective due to inadequate testing, as well as inadequate reporting regarding the results of quality-control testing and safety inspections, or lack thereof.

601.    Had the Kentucky Plaintiff and other members of the Kentucky Class been warned about the capacity of the Dry Max Pampers to cause preemies, newborns, older babies, and toddlers to suffer from severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments, they would not have purchased, acquired, or otherwise obtained the Dry Max Pampers, nor would they have used the Dry Max Pampers. Therefore the lack of any warning was a proximate cause of the harm for which damages are sought.

602.     As a direct and proximate result of the defective condition of the Dry Max Pampers as designed, manufactured, sold and/or distributed by P&G Companies, the Kentucky Plaintiff and other members of the Kentucky Class, as well as their children, have been injured, including the capacity to experience severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments.

603.     The Kentucky Plaintiff and other members of the Kentucky Class are entitled to all of the damages, remedies, fees, and costs available under applicable law.

604.     The Kentucky Plaintiff does not allege this Product Liability Act claim based on an injury to the Dry Max Pampers themselves; the Kentucky Plaintiff's Kentucky Product Liability Act claim relates to injuries that they and Class members, as well as their children, sustained as a result of the Dry Max Pampers.

**COUNT 36**
**VIOLATION OF THE MAINE PRODUCT LIABILITY LAW**
**(14 Me. Rev. Stat. § 221)**
**Asserted on behalf of the Maine Class**

605.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

606.     Plaintiff Asia Southard ("Maine Plaintiff") asserts this cause of action under 14 Me. Rev. Stat. § 221, on behalf of herself and all other members of the Maine Class.

607.     P&G Companies designed, manufactured, constructed, remanufactured, sold and/or distributed Dry Max Pampers to parents of preemies, newborns, older babies, and toddlers.  P&G Companies transferred the Dry Max Pampers in the course of its business.

608.     The Maine Plaintiff and other members of the Maine Class used the Dry Max Pampers in a manner reasonably anticipated by P&G Companies.

609.     The Dry Max Pampers were in a defective condition due to defective design and/or manufacture, and therefore were unreasonably dangerous when put to a reasonably anticipated use.

610.     The Maine Plaintiff and other members of the Maine Class were damaged as a direct result of such defective condition, which existed when the Dry Max Pampers were sold.

611.     In addition, or in the alternative, the Dry Max Pampers were then unreasonably dangerous when put to a reasonably anticipated use without knowledge of their characteristics, and the Maine Plaintiff and other members of the Maine Class were damaged as a direct result of the product being sold without an adequate warning.

612.     As a direct and proximate result of P&G Companies' wrongful conduct, the Maine Plaintiff and other members of the Maine Class have been injured, including the capacity to experience severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments.

613.     The Maine Plaintiff and other members of the Maine Class are entitled to all of the damages, remedies, fees, and costs available under applicable law.

614.     The Maine Plaintiff does not allege this claim based on an injury to the Dry Max Pampers themselves; the Maine Plaintiff's claim relates to injuries that she and Maine Class members, as well as their babies, sustained as a result of the Dry Max Pampers.

**COUNT 37**
**VIOLATION OF THE MISSOURI PRODUCT LIABILITY LAW**
**(Mo. Rev. Stat. § 537.760)**
**Asserted on behalf of the Missouri Class**

615.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

616.     Plaintiffs Emily and Ryan Weaver and Whitney Caldwell ("Missouri Plaintiffs") assert this cause of action under Mo. Rev. Stat. § 537.760, on behalf of themselves and all other members of the Missouri Class.

617.     P&G Companies designed, manufactured, constructed, remanufactured, sold and/or distributed Dry Max Pampers to parents of preemies, newborns, older babies, and toddlers.  P&G Companies transferred the Dry Max Pampers in the course of its business.

618.     The Missouri Plaintiffs and other members of the Missouri Class used the Dry Max Pampers in a manner reasonably anticipated by P&G Companies.

619.     The Dry Max Pampers were in a defective condition due to defective design and/or manufacture, and therefore were unreasonably dangerous when put to a reasonably anticipated use.

620.     The Missouri Plaintiffs and other members of the Missouri Class were damaged as a direct result of such defective condition, which existed when the Dry Max Pampers were sold.

621.     In addition, or in the alternative, the Dry Max Pampers were then unreasonably dangerous when put to a reasonably anticipated use without knowledge of their characteristics, and the Missouri Plaintiffs and other members of the Missouri Class were damaged as a direct result of the product being sold without an adequate warning.

622.     As a direct and proximate result of P&G Companies' wrongful conduct, the Missouri Plaintiffs and other members of the Missouri Class have been injured, including the capacity to experience severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments.

623.    The Missouri Plaintiffs and other members of the Missouri Class are entitled to all of the damages, remedies, fees, and costs available under applicable law.

624.    The Missouri Plaintiffs do not allege this claim based on an injury to the Dry Max Pampers themselves; the Missouri Plaintiffs' claim relates to injuries that they and Missouri Class members, as well as their babies, sustained as a result of the Dry Max Pampers.

**COUNT 38**
**VIOLATION OF THE NEBRASKA PRODUCT LIABILITY LAW**
**(Neb. Rev. Stat. §§ 25-21, 180 *et seq.*)**
**Asserted on behalf of the Nebraska Class**

625.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

626.    Plaintiff Amanda Converse ("Nebraska Plaintiff") asserts this cause of action under Neb. Rev. Stat. § 25-21, 180 *et seq.*, on behalf of herself and all other members of the Nebraska Class.

627.    P&G Companies designed, manufactured, constructed, remanufactured, sold and/or distributed Dry Max Pampers to parents of preemies, newborns, older babies, and toddlers.  P&G Companies transferred the Dry Max Pampers in the course of its business.

628.    The Nebraska Plaintiff and other members of the Nebraska Class used the Dry Max Pampers in a manner reasonably anticipated by P&G Companies.

629.    The Dry Max Pampers were in a defective condition due to defective design and/or manufacture, and therefore were unreasonably dangerous when put to a reasonably anticipated use.

630.    The Nebraska Plaintiff and other members of the Nebraska Class were damaged as a direct result of such defective condition, which existed when the Dry Max Pampers were sold.

631.    In addition, or in the alternative, the Dry Max Pampers were then unreasonably dangerous when put to a reasonably anticipated use without knowledge of their characteristics, and the Nebraska Plaintiff and other members of the Nebraska Class were damaged as a direct result of the product being sold without an adequate warning.

632.    As a direct and proximate result of P&G Companies' wrongful conduct, the Nebraska Plaintiff and other members of the Nebraska Class have been injured, including the capacity to experience severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments.

633.    The Nebraska Plaintiff and other members of the Nebraska Class are entitled to all of the damages, remedies, fees, and costs available under applicable law.

634.    The Nebraska Plaintiff does not allege this claim based on an injury to the Dry Max Pampers themselves; the Nebraska Plaintiff's claim relates to injuries that she and Nebraska Class members, as well as their babies, sustained as a result of the Dry Max Pampers.

**COUNT 39**
**VIOLATION OF THE NEW JERSEY PRODUCT LIABILITY ACT**
**(N.J. Stat. §§ 2A:58C-1 *et seq.*)**
**Asserted on behalf of the New Jersey Class**

635.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

636. Plaintiff Natalie Papailiou ("New Jersey Plaintiff") asserts this cause of action under the New Jersey Product Liability Act, N.J. Stat. § 2A:58C-1 *et seq.*, on behalf of herself and all other members of the New Jersey Class.

637. P&G Companies manufactured, constructed, designed, formulated, sold and/or distributed Dry Max Pampers to parents of preemies, newborns, older babies, and toddlers, within the meaning of N.J. Stat. § 2A:58C-1 *et seq*.

638. The Dry Max Pampers that P&G Companies designed, manufactured, sold and/or distributed were defective in design and/or manufacturing. Further, under N.J. Stat. § 2A:58C-2, the Dry Max Pampers were not reasonably fit, suitable or safe for their intended purpose because they: deviated from the design specifications, formulae, or performance standards of the manufacturer or from otherwise identical units manufactured to the same manufacturing specifications or formulae, failed to contain adequate warnings or instructions, and/or were designed in a defective manner.

639. P&G Companies knew or should have known that the Dry Max Pampers contained a non-obvious danger to babies' tender skin.

640. P&G Companies knew that Plaintiffs and other members of the New Jersey Class would use the products without first inspecting them for unreasonably irritating chemicals that may react with babies' excrement in the diaper. However, P&G Companies failed to inform Plaintiffs and other members of the New Jersey Class as to the adverse health and safety effects that the Dry Max Pampers could have on babies.

641. The Dry Max Pampers were expected to and did reach New Jersey Plaintiff and other members of the New Jersey Class without substantial change in condition.

642.     Had the New Jersey Plaintiff and other members of the New Jersey Class been warned about the capacity of the Dry Max Pampers to cause babies to suffer from severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments, they would not have purchased, acquired, or otherwise obtained the Dry Max Pampers, nor would they have used the Dry Max Pampers.

643.     P&G Companies had a continuing duty to warn the New Jersey Plaintiff and other members of the New Jersey Class of the capacity of the Dry Max Pampers to cause preemies, newborns, older babies, and toddlers to suffer from severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments.

644.     As a direct and proximate result of the defective condition of the Dry Max Pampers as designed, manufactured, sold and/or distributed by P&G Companies, the New Jersey Plaintiff and other members of the New Jersey Class, as well as their children, have been injured, including the capacity to experience severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments.

645.     The New Jersey Plaintiff and other members of the New Jersey Class are entitled to all of the damages, remedies, fees, and costs available under applicable law.

646.     The New Jersey Plaintiff does not allege this New Jersey Product Liability Act claim based on an injury to the Dry Max Pampers themselves; the New Jersey Product Liability Act claim relates to injuries that they and Class members, as well as their babies, sustained as a result of the Dry Max Pampers.

**COUNT 40**
**VIOLATION OF THE NORTH CAROLINA PRODUCT LIABILITY ACT**
**(N.C. Gen. Stat. § 99B-1)**
**Asserted on behalf of the North Carolina Class**

647.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

648.    Plaintiffs Jeni McAllister and Leah Robison ("North Carolina Plaintiffs") assert this cause of action under the North Carolina Product Liability Act, N.C. Gen. Stat. § 99B-1, on behalf of themselves and all other members of the North Carolina Class.

649.    P&G Companies manufactured, constructed, designed, formulated, sold and/or distributed Dry Max Pampers to parents of preemies, newborns, older babies, and toddlers within the meaning of N.C. Gen. Stat. § 99B-1(2).

650.    The  Dry Max Pampers that P&G Companies designed, manufactured, sold and/or distributed were defective in design and/or manufacturing.  Further, the Dry Max Pampers were defective when they left the control of the P&G Companies such that:  (1) the foreseeable risks exceeded the benefits associated with the design or manufacturing with same, or (2) they were unreasonably dangerous, more dangerous than an ordinary consumer would expect, and/or more dangerous than other diapering products, including but not limited to P&G Companies' previous line of Pampers.  The defects in the design or formulation of the Dry Max Pampers were a proximate cause of the injuries to the babies who used the Dry Max Pampers.

651.    P&G Companies knew or should have known that the Dry Max Pampers contained a non-obvious danger to preemies,' newborns,' older babies,' and toddlers' tender skin.  Moreover, the presence of irritating chemicals was a known danger.

652.    P&G Companies knew that the North Carolina Plaintiffs and other members of the North Carolina Class would use the Dry Max Pampers without first inspecting them for unreasonably irritating chemicals that may react with babies' excrement in the diaper.  However, P&G Companies failed to inform the North Carolina Plaintiffs and other members of the North Carolina Class about the adverse health and safety effects that the Dry Max Pampers could have on young children.

653.    The Dry Max Pampers were expected to and did reach the North Carolina Plaintiffs and other members of the North Carolina Class without substantial change in condition.

654.    The Dry Max Pampers that P&G Companies manufactured, constructed, designed, formulated, sold and/or distributed were defective and unreasonably dangerous due to inadequate warning or instruction within the meaning of N.C. Gen. Stat. § 99B-5.

655.    The Dry Max Pampers that P&G Companies manufactured, constructed, designed, formulated, sold and/or distributed did not conform to representations made by P&G Companies.

656.    The Dry Max Pampers that P&G Companies manufactured, constructed, designed, formulated, sold and/or distributed were defective due to inadequate testing, as well as inadequate reporting regarding the results of quality-control testing and safety inspections, or lack thereof.

657.    Had the North Carolina Plaintiffs and other members of the North Carolina Class been warned about the capacity of the Dry Max Pampers to cause preemies, newborns, older babies, and toddlers to suffer from severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments, they would not have purchased, acquired,

or otherwise obtained the Dry Max Pampers, nor would they have used the Dry Max Pampers. Therefore the lack of any warning was a proximate cause of the harm for which damages are sought.

658.     As a direct and proximate result of the defective condition of the Dry Max Pampers as designed, manufactured, sold and/or distributed by P&G Companies, the North Carolina Plaintiffs and other members of the North Carolina Class, as well as their children, have been injured, including the capacity to experience severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments.

659.     The North Carolina Plaintiffs and other members of the North Carolina Class are entitled to all of the damages, remedies, fees, and costs available under applicable law.

660.     The North Carolina Plaintiffs do not allege this North Carolina Product Liability Act claim based on an injury to the Dry Max Pampers themselves; the North Carolina Plaintiffs' North Carolina Product Liability Act claim relates to injuries that they and Class members, as well as their children, sustained as a result of the Dry Max Pampers.

<div align="center">

**COUNT 41**
**OHIO PRODUCT LIABILITY ACT**
**(Ohio Rev. Code §§ 2307.71 *et seq.*)**
**Asserted on Behalf of the Ohio Class and the Multistate Class**

</div>

661.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

662.     Plaintiff Victoria Katona ("Ohio Plaintiff") asserts this cause of action under the Ohio Product Liability Act, Ohio Rev. Code § 2307.71 *et seq.*, on behalf of herself and all other members of the Ohio Class, as well as the Multistate Class.

663.     P&G Companies manufactured, constructed, designed, formulated, sold and/or distributed Dry Max Pampers to parents of preemies, newborns, older babies, and toddlers, within the meaning of Ohio Rev. Code § 2307.71 *et seq.*

664.     The Dry Max Pampers that P&G Companies designed, manufactured, sold and/or distributed were defective in design and/or manufacturing.  Further, the Dry Max Pampers were defective when they left the control of the P&G Companies such that:  (1) the foreseeable risks exceeded the benefits associated with the design or manufacturing with same, or (2) they were unreasonably dangerous, more dangerous than an ordinary consumer would expect, and/or more dangerous than other diapering products, including but not limited to their previous line of Pampers.

665.     P&G Companies knew or should have known that the Dry Max Pampers contained a non-obvious danger to preemies,' newborns,' older babies,' and toddlers' tender skin.  Moreover, the presence of irritating chemicals was a known danger.

666.     P&G Companies knew that Plaintiffs and other members of the Ohio Class and Multistate Class would use the products without first inspecting them for unreasonably irritating chemicals that may react with babies' excrement in the diaper.  However, P&G Companies failed to inform Plaintiffs and members of the Class as to the adverse health and safety effects that the Dry Max Pampers could have on young children.

667.     The Dry Max Pampers were expected to and did reach Plaintiffs and other members of the Ohio Class and Multistate Class without substantial change in condition.

668.     The Dry Max Pampers that P&G Companies manufactured, constructed, designed, formulated, sold and/or distributed were defective due to inadequate warning or instruction within the meaning of Ohio Rev. Code § 2307.71 *et seq.*

669.    The Dry Max Pampers that P&G Companies manufactured, constructed, designed, formulated, sold and/or distributed did not conform to representations made by P&G Companies within the meaning of Ohio Rev. Code § 2307.71 *et seq.*

670.     The Dry Max Pampers that P&G Companies manufactured, constructed, designed, formulated, sold and/or distributed were defective due to inadequate inspection and testing, as well as inadequate reporting regarding the results of quality-control testing and safety inspections, or lack thereof.

671.    Had the Ohio Plaintiff and other members of the Ohio Class and the Multistate Class been warned about the capacity of the Dry Max Pampers to cause preemies, newborns, older babies, and toddlers to suffer from severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments, they would not have purchased, acquired, or otherwise obtained the Dry Max Pampers, nor would they have used the Dry Max Pampers.

672.    As a direct and proximate result of the defective condition of the Dry Max Pampers as designed, manufactured, sold and/or distributed by P&G Companies, the Ohio Plaintiff and other members of the Ohio Class and the Multistate Class, as well as their babies, have been injured, including the capacity to experience severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments.

673.    The Ohio Plaintiff and other members of the Ohio Class and the Multistate Class, are entitled to all of the damages, remedies, fees, and costs available under applicable law.

674.    The Ohio Plaintiff does not allege this Ohio Product Liability Act claim based on an injury to the Dry Max Pampers themselves; the Ohio Plaintiff's Ohio Product Liability Act claim relates to injuries that she and Ohio Class Members and Multistate Class members, as well as their babies, sustained as a result of the Dry Max Pampers.

## COUNT 42
## VIOLATION OF THE OREGON PRODUCT LIABILITY LAW
### (Or. Rev. Stat. §§ 30.900 *et seq.*)
### Asserted on behalf of the Oregon Class

675. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

676. Plaintiffs Morgan Maue, Robin York, and Crissy Beach ("Oregon Plaintiffs") assert this cause of action under Or. Rev. Stat. § 30.900 *et seq.*, on behalf of themselves and all other members of the Oregon Class.

677. P&G Companies designed, manufactured, constructed, remanufactured, sold and/or distributed Dry Max Pampers to parents of preemies, newborns, older babies, and toddlers. P&G Companies transferred the Dry Max Pampers in the course of its business.

678. The Oregon Plaintiffs and other members of the Oregon Class used the Dry Max Pampers in a manner reasonably anticipated by P&G Companies.

679. The Dry Max Pampers were in a defective condition due to defective design and/or manufacture, and therefore were unreasonably dangerous when put to a reasonably anticipated use.

680. The Oregon Plaintiffs and other members of the Oregon Class were damaged as a direct result of such defective condition, which existed when the Dry Max Pampers were sold.

681. In addition, or in the alternative, the Dry Max Pampers were then unreasonably dangerous when put to a reasonably anticipated use without knowledge of their characteristics, and the Oregon Plaintiffs and other members of the Oregon Class were damaged as a direct result of the product being sold without an adequate warning.

682. As a direct and proximate result of P&G Companies' wrongful conduct, the Oregon Plaintiffs and other members of the Oregon Class have been injured, including the

capacity to experience severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments.

683.    The Oregon Plaintiff and other members of the Oregon Class are entitled to all of the damages, remedies, fees, and costs available under applicable law.

684.    The Oregon Plaintiffs do not allege this claim based on an injury to the Dry Max Pampers themselves; the Oregon Plaintiffs' claim relates to injuries that they and Oregon Class members, as well as their babies, sustained as a result of the Dry Max Pampers.

<div align="center">

**COUNT 43**
**VIOLATION OF THE SOUTH CAROLINA PRODUCTS LIABILITY LAW**
**(S.C. Code § 15-73-10)**
**Asserted on behalf of the South Carolina Class**

</div>

685.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

686.    Plaintiff Meredith Bottar ("South Carolina Plaintiff") assert this cause of action under S.C. Code § 15-73-10, on behalf of herself and all other members of the South Carolina Class.

687.    P&G Companies designed, manufactured, constructed, remanufactured, sold and/or distributed Dry Max Pampers to parents of preemies, newborns, older babies, and toddlers.  P&G Companies transferred the Dry Max Pampers in the course of its business.

688.    The South Carolina Plaintiff and other members of the South Carolina Class used the Dry Max Pampers in a manner reasonably anticipated by P&G Companies.

689.    The Dry Max Pampers were in a defective condition due to defective design and/or manufacture, and therefore were unreasonably dangerous when put to a reasonably anticipated use.

690. The South Carolina Plaintiff and other members of the South Carolina Class were damaged as a direct result of such defective condition, which existed when the Dry Max Pampers were sold.

691. In addition, or in the alternative, the Dry Max Pampers were then unreasonably dangerous when put to a reasonably anticipated use without knowledge of their characteristics, and the South Carolina Plaintiff and other members of the South Carolina Class were damaged as a direct result of the product being sold without an adequate warning.

692. As a direct and proximate result of P&G Companies' wrongful conduct, the South Carolina Plaintiff and other members of the South Carolina Class have been injured, including the capacity to experience severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments.

693. The South Carolina Plaintiff and other members of the South Carolina Class are entitled to all of the damages, remedies, fees, and costs available under applicable law.

694. The South Carolina Plaintiff does not allege this claim based on an injury to the Dry Max Pampers themselves; the South Carolina Plaintiff's claim relates to injuries that she and the South Carolina Class members, as well as their babies, sustained as a result of the Dry Max Pampers.

## COUNT 44
## VIOLATION OF THE TEXAS PRODUCT LIABILITY LAW
### (Tex. Civ. Prac. & Rem. Code § 82.005)
### Asserted on behalf of the Texas Class

695. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

696.     Plaintiffs Brandon and Jessica Ehrhart, Robert Davenport, and Amy Young ("Texas Plaintiffs") assert this cause of action under Tex. Civ. Prac. & Rem. Code § 82.005, on behalf of themselves and all other members of the Texas Class.

697.     P&G Companies designed, manufactured, constructed, remanufactured, sold and/or distributed Dry Max Pampers to parents of preemies, newborns, older babies, and toddlers.  P&G Companies transferred the Dry Max Pampers in the course of its business.

698.     The Texas Plaintiffs and other members of the Texas Class used the Dry Max Pampers in a manner reasonably anticipated by P&G Companies.

699.     The Dry Max Pampers were in a defective condition due to defective design and/or manufacture, and therefore were unreasonably dangerous when put to a reasonably anticipated use.

700.     The Texas Plaintiffs and other members of the Texas Class were damaged as a direct result of such defective condition, which existed when the Dry Max Pampers were sold.

701.     In addition, or in the alternative, the Dry Max Pampers were then unreasonably dangerous when put to a reasonably anticipated use without knowledge of their characteristics, and the Texas Plaintiffs and other members of the Texas Class were damaged as a direct result of the product being sold without an adequate warning.

702.     As a direct and proximate result of P&G Companies' wrongful conduct, the Texas Plaintiffs and other members of the Texas Class have been injured, including the capacity to experience severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments, and therefore are entitled to all damages and remedies available under Texas product liability law.

703.    The Texas Plaintiffs and other members of the Texas Class are entitled to all of the damages, remedies, fees, and costs available under applicable law.

704.    The Texas Plaintiffs do not allege this claim based on an injury to the Dry Max Pampers themselves; the Texas Plaintiffs' claim relates to injuries that they and Texas Class members, as well as their babies, sustained as a result of the Dry Max Pampers.

**COUNT 45**
**VIOLATION OF THE WASHINGTON PRODUCT LIABILITY ACT "PLA"**
**(Rev. Code Wash. §§ 7.72 *et seq.*)**
**Asserted on behalf of the Washington Class**

705.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

706.    Plaintiffs Kristina Atwood, Amber Beck, and Brandon Hulse ("Washington Plaintiffs") assert this cause of action under the Washington Product Liability Act, Rev. Code Wash. § 7.72 *et seq.*, on behalf of themselves and all other members of the Washington Class.

707.    P&G Companies designed, produced, made, manufactured, fabricated, constructed, remanufactured, sold and/or distributed Dry Max Pampers to parents of preemies, newborns, older babies, and toddlers, within the meaning of Rev. Code Wash. § 7.72.010.

708.    The Dry Max Pampers were defective in design and/or construction, rendering them not reasonably safe.  Further, the Dry Max Pampers were defective when they left the control of the P&G Companies such that:  (1) the foreseeable risks outweighed the utility associated with the design or construction; (2) the foreseeable risks outweighed the burden on P&G Companies to design a product that would have prevented those harms and the adverse effect that an alternative design that was practical and feasible would have on the usefulness of the Dry Max Pampers; (3) when the Dry Max Pampers left the control of P&G Companies, they deviated in some material way from the design specifications or performance standards of P&G

Companies, or deviated in some material way from otherwise identical units of the same product line; (4) the Dry Max Pampers did not conform to the implied warranty; and/or (5) the Dry Max Pampers were unreasonably dangerous, more dangerous than an ordinary consumer would expect, and/or more dangerous than other diapering products, including but not limited to the P&G Companies' previous line of Pampers. *See* Rev. Code. Wash. § 7.72.030.

709. P&G Companies knew or should have known that the Dry Max Pampers contained a non-obvious danger to preemies,' newborns,' older babies,' and toddlers' tender skin. Moreover, the presence of irritating chemicals was a known danger. As such, the Dry Max Pampers were not reasonably safe within the meaning of Rev. Code Wash. § 7.72.030.

710. P&G Companies knew or should have known that the Washington Plaintiffs and other members of the Washington Class would use the products without first inspecting them for unreasonably irritating chemicals that may react with babies' excrement in the diaper. However, P&G Companies failed to inform Plaintiffs and other members of the Washington Class as to the adverse health and safety effects that the Dry Max Pampers could have on young children. P&G Companies could have provided warnings that would have been adequate but did not do so. As such, the Dry Max Pampers were not reasonably safe because adequate warnings or instructions were not provided with the product within the meaning of Rev. Code Wash. § 7.72.030.

711. After P&G Companies manufactured the Dry Max Pampers and learned or should have learned of the danger connected to the Dry Max Pampers after they were manufactured, P&G Companies nevertheless failed to warn or instruct the Washington Plaintiffs and other members of the Washington Class of defects that made the Dry Max Pampers not reasonably safe. As such P&G Companies violated its post-sale duty to warn under Rev. Code Wash. § 7.72.030, failing to act as a reasonably prudent manufacturer.

712.    The Dry Max Pampers were expected to and did reach Plaintiffs and other members of the Class without substantial change in condition.

713.    The Dry Max Pampers that P&G Companies manufactured, constructed, designed, formulated, sold and/or distributed did not conform to representations made by P&G Companies, within the meaning of Rev. Code Wash § 7.72.030.

714.    The Washington Plaintiffs and other members of the Washington Class justifiably acted or relied to their detriment on the concealment and/or non-disclosed facts as evidenced by their purchase and/or use of the defective Dry Max Pampers.

715.    The Dry Max Pampers that P&G Companies manufactured, constructed, designed, formulated, sold and/or distributed were defective due to inadequate inspection and testing, as well as inadequate reporting regarding the results of quality-control testing and safety inspections, or lack thereof.

716.    Had the Washington Plaintiffs and other members of the Washington Class been warned about the capacity of the Dry Max Pampers to cause preemies, newborns, older babies, and toddlers to suffer from severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments, they would not have purchased, acquired, or otherwise obtained the Dry Max Pampers, nor would they have used the Dry Max Pampers.

717.    As a direct and proximate result of the defective condition of the Dry Max Pampers as designed, manufactured, sold and/or distributed by P&G Companies, as well as the inadequate pre- and post-sale warnings or instructions, the Washington Plaintiffs and other members of the Washington Class, as well as their babies, have been injured, including the capacity to experience severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments.

718.    The Washington Plaintiffs and other members of the Washington Class are entitled to all of the damages, remedies, fees, and costs available under applicable law.

719.    P&G Companies is subject to strict liability for the harm caused to the Washington Plaintiffs and other members of the Washington Class, pursuant to Rev. Code Wash. § 7.72.030.

720.    The Washington Plaintiffs do not allege this Washington Product Liability Act claim based on an injury to the Dry Max Pampers themselves; the Washington Plaintiffs' Washington Product Liability Act claim relates to injuries that they and Washington Class members, as well as their babies, sustained as a result of the Dry Max Pampers.

## VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, for themselves and all others similarly situated, respectfully request that this Court enter a judgment against P&G Companies and in favor of Plaintiffs and the Class, and grant the following relief:

A.    Determine that this action may be maintained as a class action with respect to a national class and with subclasses corresponding to the several states' laws, pursuant to the appropriate subsections of Rule 23 of the Federal Rules of Civil Procedure; that the Court certify a class action with respect to particular issues if appropriate; that the Court designate and appoint the named Plaintiffs to serve as Class Representatives, designate and appoint the undersigned counsel as Class Counsel, and designate and appoint Keller Rohrback L.L.P. and Keller Rohrback P.L.C. as Lead Class Counsel;

B.    Require that P&G Companies ensure that the Dry Max Pampers lack the capacity to cause severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments, on babies' extremely sensitive and

delicate bottoms and other body parts that the Dry Max Pampers are supposed to cover and to protect;

C.  Require P&G Companies to submit product testing results on a regular basis to ensure that their products lack the capacity to cause severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments, on babies' extremely sensitive and delicate bottoms and other body parts that the Dry Max Pampers are supposed to cover and to protect;

D.  Award damages to Plaintiffs and members of the Classes for medical expenses;

E.  Award costs to Plaintiffs and members of the Classes for appropriate treatment for those who experience the severe rashes, blisters, welts, bleeding, oozing, chemical burns, infections, sores, scarring and/or other ailments related to the Dry Max Pampers;

F.  Award damages to Plaintiffs and members of the Classes for payments, in whatever form, rendered for the worthless Dry Max Pampers;

G.  Declare the conduct of P&G Companies as alleged herein to be unlawful;

H.  Grant Class Members awards of actual, compensatory, treble, punitive and/or exemplary damages in such amount to be determined at trial and as provided by applicable law;

I.  Grant Class Members their costs of suit, including reasonable attorneys' fees, costs, and expenses as provided by law;

J.  Grant Class Members both pre-judgment and post-judgment interest as provided by law; and

K.      Grant Class Members such other, further, and different relief as the nature

of the case may require or as may be determined to be just, equitable, and proper by this

Court.

**JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury on all issues so triable.

DATED this 23rd day of August, 2010.

<div style="margin-left: 40%;">

/s/ Gretchen Freeman Cappio

Lynn Lincoln Sarko, *Pro Hac Vice*
lsarko@kellerrohrback.com
Michael D. Woerner, *Pro Hac Vice*
mwoerner@kellerrohrback.com
Gretchen Freeman Cappio, *Pro Hac Vice*
gcappio@kellerrohrback.com
Gretchen S. Obrist, *Pro Hac Vice*
gobrist@kellerrohrback.com
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel: (206) 623-1900 / Fax: (206) 623-3384

David S. Preminger, *Pro Hac Vice*
dpreminger@kellerrohrback.com
KELLER ROHRBACK L.L.P.
770 Broadway, 2nd Floor
New York, NY 10003
Tel: (646) 495-6198 / Fax: (646) 495-6197

Gary D. Greenwald   0024480
ggreenwald@kellerrohrback.com
*Trial Attorney for Plaintiffs*

Mark D. Samson, *Pro Hac Vice*
msamson@kellerrohrback.com
KELLER ROHRBACK P.L.C.
3101 North Central Avenue, Suite 1400
Phoenix, AZ  85012
Tel: (602) 248-0088 / Fax: (602) 248-2822

*Interim Lead Counsel for Plaintiffs*

</div>

- 207 -

**OTHER COUNSEL:**

Donald S. Varian, Jr.  0013027
varianlaw@aol.com
195 South Main Street, Suite 400
Akron, OH 44308
Tel: (330) 434-4100 / Fax: (330) 434-4110

Todd S. Collins
tcollins@bm.net
Neil F. Mara
nmara@bm.net
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103-6365
Tel: (215) 875-3000 / Fax: (215) 875-4604

Joseph C. Kohn
jkohn@kohnswift.com
George S. Croner
gcroner@kohnswift.com
Craig W. Hillwig
chillwig@kohnswift.com
Christina Donato Saler
cdsaler@kohnswift.com
KOHN, SWIFT & GRAF, P.C.
One South Broad Street, Suite 2100
Philadelphia, PA  19107
Tel: (215) 238-1700 / Fax: (215) 238-1968

Gerard V. Mantese
gmantese@manteselaw.com
David Honigman
dhonigman@manteselaw.com
MANTESE, HONIGMAN, ROSSMAN AND
WILLIAMSON, P.C.
1361 E. Big Beaver Road
Troy, MI  48083
Tel: (248) 457-9200 / Fax: (248) 457-9201

Thomas M. Mullaney
tmm@mullaw.org
LAW OFFICES OF THOMAS M. MULLANEY

275 Madison Avenue, 37th Floor
New York, NY  10016
Tel: (212) 223-0800 / Fax: (212) 661-9860

Daniel E. Gustafson
dgustafson@gustasfongluek.com
Karla M. Gluek
kgluek@gustafsongluek.com
Amanda M. Williams
awilliams@gustafsongluek.com
GUSTAFSON GLUEK PLLC
650 Northstar East
608 Second Avenue South
Minneapolis, MN  55402
Tel: (612) 333-8844 / Fax: (612) 339-6622

Richard J. Arsenault
rarsenault@nbalawfirm.com
NEBLETT, BEARD & ARSENAULT
2220 Bonaventure Court
P.O. Box 1190
Alexandria, LA  71309-1190
Tel: (318) 487-9874 / Fax: (318) 561-2591

Nicholas J. Drakulich
njd@draklaw.com
THE DRAKULICH FIRM, A PROFESSIONAL
LAW CORPORATION
2727 Camino Del Rio South, Suite 322
San Diego, CA  92108
Tel: (858) 755-5887 / Fax: (858) 755-6456

Joseph F. Devereux, Jr.
jfdevereuxjr@devereusmurphy.com
Joseph F. Devereux, III
jfdiii@devereuxmurphy.com
DEVEREUX MURPHY LLC
The Plaza at Clayton
190 Carondelet, Suite 1100
St. Louis, MO  63105
Tel: (314) 721-1516 / Fax: (314) 721-4434

Dianne M. Nast
dnast@rodanast.com
RODANAST, P.C.

801 Estelle Drive
Lancaster, PA  17601
Tel: (717) 892-3000 / Fax: (717) 892-1200

David S. Corwin
dcorwin@shercorwin.com
SHER CORWIN, LLC
190 Carondelet Plaza, Suite 1100
Clayton, MO  63105
Tel: (314) 721-5200 / Fax: (314) 721-5201

<u>CERTIFICATE OF SERVICE</u>

I, the undersigned, hereby certify that on August 23, 2010, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all parties so registered.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:  August 23, 2010

/s/ Gretchen Freeman Cappio