IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| IN RE DRY MAX PAMPERS LITIGATION | : | CASE NO. 1:10-cv-00301 TSB |
| | : | (Judge Timothy S. Black) |
| | : | **MOTION OF DEFENDANTS THE PROCTER & GAMBLE COMPANY,** |
| | : | **THE PROCTER & GAMBLE PAPER PRODUCTS COMPANY** |
| | : | **AND THE PROCTER & GAMBLE DISTRIBUTING LLC TO STRIKE** |
| | : | **PLAINTIFFS' CLASS ALLEGATIONS** |
| | : | |

Pursuant to Fed. R. Civ. P. 12(f), 23(c)(1)(A) and 23(d)(1)(D), Defendants The

Procter & Gamble Company, The Procter & Gamble Paper Products Company and The Procter

& Gamble Distributing LLC (collectively "Procter & Gamble") move to strike the class action

allegations of Plaintiffs'[1] Consolidated Class Action Complaint ("Complaint") [Doc. No. 25].

For the reasons demonstrated in the accompanying memorandum, the class

allegations should be stricken from the Complaint.

---

[1] Angela Clark, Kenneth Clark, Kelly Adams, Kristina Atwood, Chasitie Ayers-Porter, Crissy Beach, Amber Beck, Ryan Berman, Stacie Berman, Meredith Bottar, Melanie Braun, Gina Brown, Whitney Caldwell, Amanda Converse, Shannon D'Andrea, Angelina Davenport, Robert Davenport, Darcel Darscheid, Brandon Ehrhart, Jessica Ehrhart, Gayle Hironimus, Brandon Hulse, Victoria Katona, Mariah MaLoon, Morgan Maue, Robin York, Jeni McAllister, Maria McMahon, Natalie Papailiou, Cassie Raether, Stephanie Rios, Jodi Robins, Jennifer Robinson, Leah Robison, Alexandra Rosenbaum, Lisa Saacks, Diane Samelson, Adona Schank, Asia Southard, Suzy Sullivan, Nicole A. Tepper, John Walker, Karina Walker, Emily Weaver, Ryan Weaver, Brigette Wolfe, Joseph Wolfe, and Amy Young (collectively, "Plaintiffs").

Respectfully submitted,

OF COUNSEL:

Robert F. Ruyak (*pro hac vice pending*)
Edward Han (*pro hac vice pending*)
HOWREY LLP
1299 Pennsylvania Avenue, N.W.
Washington, DC  20004
Telephone:  (202) 783-0800
Telecopier:  (202) 383-6610

Joanne E. Caruso (*pro hac vice pending*)
HOWREY LLP
550 South Hope St.
Suite 1100
Los Angeles, CA  90071
Telephone:  (213) 892-1800
Telecopier:  (213) 892-2300

s/ D. Jeffrey Ireland
D. Jeffrey Ireland  (0010443)
    Trial Attorney
Brian D. Wright (0075359)
Bruke H. Sullivan (0082765)
FARUKI IRELAND & COX P.L.L.
500 Courthouse Plaza, S.W.
10 North Ludlow Street
Dayton, OH  45402
Telephone:  (937) 227-3710
Telecopier:  (937) 227-3749
Email:  djireland@ficlaw.com

Attorneys for Defendants
The Procter & Gamble Company,
The Procter & Gamble Paper Products
Company and The Procter & Gamble
Distributing LLC

# **TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ................................................................................1

ARGUMENT ..........................................................................................................3

I.      THE PUTATIVE CLASS DEFINITIONS ARE INADEQUATE .....................3

II.     INDIVIDUAL ISSUES OF FACT AND LAW PREDOMINATE....................5

        A.      Factual Differences Among Putative Class Members Would Raise
                Individual Issues Precluding Class Certification ...................................5

                1.      Differences Among Class Members As To Causation ..............5

                        a.      Whether Individual Class Members Actually Used Dry
                                Max and For How Long...............................................7

                        b.      Medical Conditions of Class Members' Children ..........8

                        c.      Treatment and Diagnoses of Alleged Symptoms............9

                        d.      Progression of Alleged Symptoms...............................11

                        e.      Frequency of Diaper Changes......................................12

                        f.      Diet.........................................................................13

                        g.      Age...........................................................................14

                        h.      Exposure To Media Reports About Dry Max...............14

                2.      Differences Among Class Members As To Reliance ..............15

        B.      Differences In State Law Preclude Class Certification..........................16

                1.      The Nationwide Class Cannot Be Certified...........................17

                2.      The Multistate Class Cannot Be Certified .............................20

III.    THIS CASE WOULD NOT BE MANAGEABLE AS A CLASS ACTION..................22

IV.     PLAINTIFFS ARE NOT TYPICAL OF OR ADEQUATE TO REPRESENT
        MEMBERS OF THE PUTATIVE CLASSES ...............................................23

V.      PLAINTIFFS' PROPOSED CLASS CANNOT BE CERTIFIED UNDER
        RULE 23(B)(1) ...........................................................................................24

VI.     CONCLUSION............................................................................................25

## **TABLE OF AUTHORITIES**

Page(s)

### **CASES**

Aird v. Ford Motor Co., 86 F.3d 216 (D.C. Cir. 1996) ................................................. 19-20

Alexander Grant & Co. v. McAlister, 116 F.R.D. 583 (S.D. Ohio 1987) ........................25

In re Am. Med. Sys. ("AMS"), 75 F.3d 1069 (6th Cir. 1996) ...........................2, 16, 17, 24

Bacon  v. Honda of Am. Mfg., 205 F.R.D. 466 (S.D. Ohio 2001) .....................................25

Ball v. Union Carbide Corp., 212 F.R.D. 380 (E.D. Tenn. 2002), aff'd 376 F.3d
    554 (6th Cir. 2004).................................................................................................. 13-14

Barbarin v. GM Corp., No. 84-0888, 1993 U.S. Dist. LEXIS 20980 (D.D.C.
    Sept. 22, 1993) ............................................................................................................20

In re Baycol Prods. Litig., 218 F.R.D. 197 (D. Minn. 2003)............................. 5, 16-17, 22

Bearden v. Honeywell Int'l., No. 3:09-01035, 2010 U.S. Dist. LEXIS 28331
    (M.D. Tenn. Mar. 24, 2010).........................................................................................3

In re Bendectin Prods. Liab. Litig., 749 F.2d 300 (6th Cir. 1984)............................... 24-25

In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig., 288 F.3d 1012 (7th Cir.
    2002) ......................................................................................................................21, 23

Chamberlain v. Am. Tobacco Co., No. 1:96 CV 2005, 1999 U.S. Dist. LEXIS
    5843 (N.D. Ohio Apr. 12, 1999).................................................................................23

Clay v. Am. Tobacco Co., 188 F.R.D. 483 (S.D. Ill. 1999) ........................................ 18-19

In re Dalkon Shield Prods. Liab. Litig., 693 F.2d 847 (9th Cir. 1982)...............................5

Delahunt v. Cytodyne Techs., 241 F. Supp. 2d 827 (S.D. Ohio 2003).............................20

Duncan v. Northwest Airlines, Inc., 203 F.R.D. 601 (W.D. Wash. 2001) ........................17

Ellsworth v. Sherne Lingerie, Inc., 495 A.2d 348 (Md. 1985) ..........................................22

In re Ford Motor Co. Ignition Switch Prods. Liab. Litig., 174 F.R.D. 332 (D.N.J.
    1997) ......................................................................................................................20, 23

Foster v. St. Jude Med. Inc., 229 F.R.D. 599 (D. Minn. 2005) .........................................19

Gartin v. S&M Nutec LLC, 245 F.R.D. 429 (C.D. Cal. 2007)..........................................13

Gevedon v. Purdue Pharma, 212 F.R.D. 333 (E.D. Ky. 2002)............................................4

Hovsepian v. Apple, Inc., No. 08-5788, 2009 U.S. Dist. LEXIS 117562 (N.D.
     Cal. Dec. 17, 2009) ......................................................................................3

Ilhardt v. A.O. Smith Corp., 168 F.R.D. 613 (S.D. Ohio 1996).......................................17

Jones v. Allercare, Inc., 203 F.R.D. 290 (N.D. Ohio 2001) ............................12, 16, 23, 24

Jones v. Meat Packers Equip. Co., 723 F.2d 370 (4th Cir. 1983).....................................22

Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487 (1941) .............................................16

Loreto v. The Procter & Gamble Co., No. 1:09-cv-815, 2010 U.S. Dist. LEXIS
     91699 (S.D. Ohio Sept. 3, 2010)......................................................................20

McDonnell Douglas Corp. v. Dist. Court, 523 F.2d 1083 (9th Cir. 1975) .......................25

Muncie Power Prods. v. United Techs. Auto., Inc., 328 F.3d 870 (6th Cir. 2003) ...........16

Napier v. Laurel County, No. 6:06-368, 2008 U.S. Dist. LEXIS 14524 (E.D. Ky.
     Feb. 26, 2008) ..............................................................................................4

Newton v. So. Wood Piedmont Co., 163 F.R.D. 625 (S.D. Ga. 1995)................................8

Norris v. Baxter Heathcare Corp., 397 F.3d 878 (10th Cir. 2005) ....................................6

Ortiz v. Fibreboard Corp., 527 U.S. 815 (1999) ...............................................................25

In re Paxil Litig., 212 F.R.D. 539 (C.D. Cal. 2003)..............................................16, 23, 24

Perez v. Metabolife Int'l, Inc., 218 F.R.D. 262 (S.D. Fla. 2003) ......................................3

In re Phenylpropanolamine Prods. Liab. Litig., 208 F.R.D. 625 (W.D. Wash.
     2002) ............................................................................................................8

Pilgrim v. UHC, No. 5:09CV879, 2010 U.S. Dist. LEXIS 28298 (N.D. Ohio
     Mar. 25, 2010)...................................................................................3, 16, 20

In re Prempro Prods. Liab. Litig., 230 F.R.D. 555 (E.D. Ark. 2006) ........ 16, 19, 20-21, 23

Reilly v. Gould, Inc., 965 F. Supp. 588 (M.D. Pa. 1997) ..................................5, 14, 23, 24

In re Rezulin Prods. Liab. Litig., 210 F.R.D. 61 (S.D.N.Y. 2002) ......................2-3, 9, 14

In re Rhone-Poulenc Rorer, Inc., 51 F.3d 1293 (7th Cir. 1995) ........................................17

Sellon v. GM Corp., 571 F. Supp. 1094 (D. Del. 1983) ....................................................17

Sensenbrenner v. Rust, Orling & Neale, 374 S.E.2d 55 (Va. 1988)...................................18

Simer v. Rios, 661 F.2d 655 (7th Cir. 1981)...................................................................3-4

Snow v. Atofina Chems., Inc., No. 01-72648, 2003 U.S. Dist. LEXIS 27295
    (E.D. Mich. Mar. 31, 2003) ....................................................................................8, 9

Sprague v. GMC, 133 F.3d 388 (6th Cir. 1998) .........................................................15, 16

Sterling v. Velsicol Chem. Corp., 855 F.2d 1188 (6th Cir. 1988).......................................2

Szabo v. Bridgeport Machs., Inc., 249 F.3d 672 (7th Cir. 2001)......................................19

Taylor v. CSX Transp., Inc., 264 F.R.D. 281 (N.D. Ohio 2007)........................ 8, 9, 10-11

In re Telectronics Pacing Sys., 221 F.3d 870 (6th Cir. 2000)...........................................25

Thornton v. State Farm Mut. Auto Ins. Co., No. 1:06-cv-00018, 2006 U.S. Dist.
    LEXIS 83972 (N.D. Ohio Nov. 17, 2006) ...................................................................3

Walsh v. Ford Motor Co., 807 F.2d 1000 (D.C. Cir. 1986)..............................................19

In re Welding Fume Prod. Liab. Litig., 245 F.R.D. 279 (N.D. Ohio 2007) .........7-8, 23-24

Zapka v Coca-Cola Co., No. 99 CV 8238, 2000 U.S. Dist. LEXIS 16552 (N.D.
    Ill. Oct. 26, 2000)..................................................................................................4, 20

## STATUTES AND RULES

15 U.S.C. § 2301(7) ......................................................................................................19

Alaska Stat. § 09.17.060 ...............................................................................................22

Alaska Stat. § 45.50.531 ...............................................................................................21

Conn. Gen. Stat. § 52-572n(a) .......................................................................................18

Fed. R. Civ. P. 12(f)........................................................................................................1

Fed. R. Civ. P. 23(c)(1)(A) ..........................................................................................1, 3

Fed. R. Civ. P. 23(b)(3)...............................................................................................5, 22, 24

Fed. R. Civ. P. 23(b)(1)(A) .................................................................................24, 25

Fed. R. Civ. P. 23(b)(1)(B) .........................................................................................25

Fed. R. Civ. P. 23(a)(3) ...............................................................................................23

Fed. R. Civ. P. 23(a)(4) ...............................................................................................24

Fed. R. Civ. P. 23(d)(1)(D) .....................................................................................1, 3

Ga. Code Ann. § 10-1-399(a) .....................................................................................21

La. Rev. Stat. Ann. § 9:2800.52 .................................................................................18

La. Rev. Stat. Ann. 51:1409(A) ..................................................................................21

N.C. Gen. Stat. § 99B-1.1 ..................................................................................... 17-18

N.D. Cent. Code § 32-03.2-02 ....................................................................................22

Ohio Rev. Code Ann. § 2307.71(B) ...........................................................................18

Wyo. Stat. Ann. § 1-1-109(b) .....................................................................................22

**MISCELLANEOUS**

Advisory Comm. Note to 1966 Revision of Fed. R. Civ. P. 23...........................................5

**MEMORANDUM IN SUPPORT OF MOTION OF DEFENDANTS THE PROCTER &
GAMBLE COMPANY, THE PROCTER & GAMBLE PAPER PRODUCTS COMPANY
AND THE PROCTER & GAMBLE DISTRIBUTING LLC TO
STRIKE PLAINTIFFS' CLASS ALLEGATIONS**

Defendants The Procter & Gamble Company, The Procter & Gamble Paper

Products Company, and The Procter & Gamble Distributing LLC (collectively, "Procter &

Gamble") respectfully submit this memorandum in support of their motion to strike, pursuant to

Fed. R. Civ. P. 12(f), 23(c)(1)(A) and 23(d)(1)(D), the class action allegations of Plaintiffs'

Consolidated Class Action Complaint ("Complaint").

## PRELIMINARY STATEMENT

It is clear on the face of the Complaint – which purports to assert 45 separate

causes of action on behalf of 28 distinct classes – that a class action in this case would be

(1) dominated by individual factual and legal issues affecting only some class members and

(2) utterly unmanageable.  Complaint, ¶ 151 (seeking to represent a nationwide class (¶ 151A),

26 individual state classes (¶¶ 151B-AA), and a "Multistate Class" (¶ 151BB)).  Although

Plaintiffs allege, "on information and belief," that Procter & Gamble's Pampers with Dry Max

diapers caused their children's diaper rash, a substantial percentage of all diapered infants

suffered rashes – including severe rashes with symptoms similar to those alleged by Plaintiffs –

long before Procter & Gamble sold the first Dry Max diaper.  Thus, in evaluating causation and

other elements of and defenses to Plaintiffs' claims, the Court and jury will have to consider

myriad individual factual issues affecting each member of each putative class, including:

whether he or she actually used Dry Max diapers; the duration of such use; what representations

by Procter & Gamble, if any, caused him or her to purchase the diapers; how long it took for

symptoms to develop after the first use of the diapers; how long it took for symptoms to recede

after the last use; whether the infant had any medical conditions unrelated to Dry Max that may

have contributed to the symptoms; what diagnoses were made by doctors; what treatments were

administered; each baby's age and diet, the frequency of diaper changes, and why he or she

stopped using Dry Max. Plaintiffs' own allegations show that the proof as to each individual

class members will vary widely as to each of these issues.

Differences among various states' laws raise even more individual issues and

render the case completely unmanageable as a class action. The Court would have to instruct the

jury on the law of negligence, strict liability, unjust enrichment and warranty, and on the

consumer protection and products liability statutes, of 50 states and the District of Columbia.

Confronted with the variations among state laws, Plaintiffs do not even commit as to which

causes of action each class will actually assert, apparently leaving that for the Court and the jury

to sort out: "In pleading the...Counts in the alternative, Plaintiffs seek to preserve the most

advantageous combination of claims available to each of the Classes under applicable law."

Complaint, ¶ 165.

In <u>In re Am. Med. Sys. ("AMS")</u>, 75 F.3d 1069, 1084 (6th Cir. 1996), the Sixth

Circuit issued a writ of mandamus instructing this court to decertify a class in a products liability

case, holding: "In complex, mass, toxic tort accidents, where no one set of operative facts

establishes liability, no single proximate cause applies to each potential class member..., and

individual issues outnumber common issues, the district court should properly question the

appropriateness of a class action for resolving the controversy." (Quoting <u>Sterling v. Velsicol</u>

<u>Chem. Corp.</u>, 855 F. 2d 1188, 1196-7 (6th Cir. 1988)). The Court held that in "products liability

litigation of the sort involved here the factual and legal issues often <u>do</u> differ dramatically from

individual to individual because there is no common cause of injury." <u>Id</u>. (emphasis in original).

As another court observed, citing numerous cases, "It...is not surprising that all relevant Court of

Appeals and the bulk of relevant district court decisions have rejected class certification in

products liability cases." In re Rezulin Prods. Liab. Litig., 210 F.R.D. 61, 65-66 (S.D.N.Y. 2002).  For the reasons set forth herein, this Court should reject Plaintiffs' class allegations.

## ARGUMENT

"Under Rules 23(c)(1)(A) and 23(d)(1)(D), as well as pursuant to Rule 12(f), this Court has authority to strike class allegations prior to discovery if the complaint demonstrates that a class action cannot be maintained." Bearden v. Honeywell Int'l., No. 3:09-01035, 2010 U.S. Dist. LEXIS 28331, at *30 (M.D. Tenn. Mar. 24, 2010) (quoting Hovsepian v. Apple, Inc., No. 08-5788, 2009 U.S. Dist. LEXIS 117562, at *5 (N.D. Cal. Dec. 17, 2009)); see Fed. R. Civ. P. 23(c)(1)(A) ("At an early practicable time...the court must determine by order whether to certify the action as a class action"); Fed. R. Civ. P. 23(d)(1)(D) ("the court may issue orders...to eliminate allegations about representation of absent persons..."); Thornton v. State Farm Mut. Auto Ins. Co., No. 1:06-cv-00018, 2006 U.S. Dist. LEXIS 83972, at *14-15 (N.D. Ohio Nov. 17, 2006) (granting motion to strike class allegations where "[n]o point would be served by further discovery"); Pilgrim v. UHC, No. 5:09CV879, 2010 U.S. Dist. LEXIS 28298, at *13 (N.D. Ohio Mar. 25, 2010) (granting motion to strike class allegations where there was "no amount of discovery that could remedy the problems identified by the Court...").  Because it is clear on the face of the Complaint that the requirements of Rule 23 cannot be met and no amount of discovery will cure the defects, the Court should, in the interests of judicial economy, strike Plaintiffs' class allegations.

I.          THE PUTATIVE CLASS DEFINITIONS ARE INADEQUATE

"The first step in determining whether a class should be certified is to decide whether the Plaintiffs have identified a class that exists and can be precisely defined." Perez v. Metabolife Int'l, Inc., 218 F.R.D. 262, 266 (S.D. Fla. 2003) (citing Simer v. Rios, 661 F.2d 655, 669 (7th Cir. 1981)).  "Important elements of defining a class include (1) specifying a particular

3

group that was harmed during a particular time frame, in a particular location, in a particular way; and (2) facilitating a court's ability to ascertain its membership in some objective manner." Napier v. Laurel County, No. 6:06-368, 2008 U.S. Dist. LEXIS 14524, at *16 (E.D. Ky. Feb. 26, 2008). Here, the definition of each of the 28 putative classes depends on the mental state of each class member – i.e., whether he or she "discarded or ceased using the Dry Max Pampers because of concerns about health effects...." Complaint, ¶ 151. Where, however, the "description of the purported class depends upon the state of mind of a particular individual, rendering it difficult, if not impossible, to determine whether any given individual is within or without the alleged class, certification is not appropriate." Gevedon v. Purdue Pharma, 212 F.R.D. 333, 335-36 (E.D. Ky. 2002) (quotation marks omitted); Zapka v Coca-Cola Co., No. 99 CV 8238, 2000 U.S. Dist. LEXIS 16552, at *7 (N.D. Ill. Oct. 26, 2000) ("An identifiable class does not exist if membership in the class is contingent on the state of mind of the prospective members"); Napier, 2008 U.S. Dist. LEXIS 14524, at *24 ("Many of the benefits...of a proper class action would be lost if this Court were required to make individual factual inquiries in order to determine the members of the proposed class"). The Complaint's allegations that several Plaintiffs stopped using Dry Max for reasons unrelated to "concerns about health effects" and therefore fail to meet their own class definitions demonstrates the inadequacy of those definitions:

- "Ms. Robinson ran out of the Dry Max Pampers and bought a different brand of disposable diaper that was on sale at a local store." Id. ¶ 37.
- "Ms. Sullivan ran out of diapers. Because the store was out of Dry Max Pampers in her daughter's size, she bought a different brand of...diapers." Id. ¶ 44.
- "Ms. McMahon continued using the Dry Max Pampers...until her diaper supply ran out. At that time, she happened to switch to a different brand...." Id. ¶ 32.
- "Ms. McAllister switched to using Pampers non-Dry-Max Swaddlers Size 1, because her daughter had outgrown the newborn-size diapers." Id. ¶ 31.
- "[T]he Dry Max Pampers no longer fit[] the baby, so Ms. Southard switched back to his older, smaller diapers, which were a non-Pampers brand." Id. ¶ 43.

For this reason alone, the class allegations of the Complaint should be stricken.

II.        INDIVIDUAL ISSUES OF FACT AND LAW PREDOMINATE

Plaintiffs assert that "[c]lass certification is proper under Fed. R. Civ. P. 23(b)(3) ..." (Complaint, ¶ 162) but Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members...." Because the factual circumstances surrounding the symptoms alleged by each putative class member differ and each class member is subject to different state laws, individual issues would predominate.

A.        Factual Differences Among Putative Class Members Would Raise Individual Issues Precluding Class Certification

Products liability cases are generally not susceptible to class treatment because of myriad factual issues affecting individual class members. In re Baycol Prods. Litig., 218 F.R.D. 197, 203-04 (D. Minn. 2003) ("in a products liability case, individual issues must be considered in determining proximate cause and the alleged tortfeasor's affirmative defenses may depend on facts peculiar to each plaintiff") (citing In re Dalkon Shield Prods. Liab. Litig., 693 F.2d 847, 853 (9th Cir. 1982)); Reilly v. Gould, Inc., 965 F. Supp. 588, 602-03 (M.D. Pa. 1997) ("A mass [tort case] resulting in injuries to numerous persons is ordinarily not appropriate for a class action because of the likelihood that significant questions, not only of damages but of liability and defenses of liability, would be present, affecting the individuals in different ways. In these circumstances an action would degenerate in practice into multiple lawsuits separately tried") (quoting Advisory Comm. Note to 1966 Revision of Fed. R. Civ. P. 23). Like most products liability cases, this case presents myriad individual factual issues, precluding class certification.

1.        Differences Among Class Members As To Causation

Although Plaintiffs must establish that the symptoms they allege were caused by some defect in Pampers with Dry Max, the Complaint cites no testing or scientific analysis of the product to demonstrate such a causative link. Leaving aside pure speculation and conjecture,

Plaintiffs rely on nothing more than a purported "correlation" between their use of Dry Max and the appearance of the alleged symptoms. Complaint, ¶¶ 10-49 ("use of Dry Max Pampers directly correlated with [Plaintiffs' children's] medical condition..."). It is axiomatic, however, that "correlation does not equal causation." See, e.g., Norris v. Baxter Heathcare Corp., 397 F.3d 878, 885 (10th Cir. 2005) ("reports that...some women with breast implants developed disease do not provide an adequate scientific basis from which to conclude that breast implants in fact cause disease"). Indeed, each Plaintiff is able to plead causation only "[o]n information and belief" that "Dry Max Pampers caused [the alleged] medical condition." Complaint, ¶¶ 10-49.

Numerous medical conditions *unrelated to the use of Pampers with Dry Max* could have caused the symptoms alleged by each individual Plaintiff. As the U.S. Consumer Products Safety Commission observed – in announcing that it had "not identified any specific cause linking Dry Max diapers to diaper rash" – "Most babies exhibit diaper rash at least once in their lifetime." Exhibit 1 (Consumer Prod. Safety Comm'n, "No Specific Cause Found Yet Linking Dry Max Diapers to Diaper Rash" at 1 (Sept. 2, 2010)). A medical journal article cited in one of the complaints consolidated into this action describes a condition called "irritant contact diaper dermatitis" ("IDD") – "a common inflammatory eruption of the skin in the diaper area" that causes symptoms remarkably similar to those alleged by Plaintiffs:

> IDD initially presents with asymptomatic erythema [redness], and can progress to widespread painful, confluent erythema with maceration, erosions, and frank ulceration. IDD commonly...affects the convex skin surfaces in close contact with the diaper including the buttocks, genitalia, lower abdomen, and upper thighs. IDD complicated by Candida [a yeast-like fungus] presents with beefy red intertriginous plaques and satellite papules and pustules [inflamed elevations of the skin filled with pus; swellings similar to blisters or pimples] in the diaper area.

Exhibit 2 (Humphrey, S., M.D., et al., "Practical Management Strategies for Diaper Dermatitis," 11 Skin Therapy Letter, No. 7 (Sept. 2006) at 1-2) (cited in Tatum Complaint at ¶ 17, n.11, attached as Exhibit 3) (footnotes omitted). (Several other medical conditions – e.g., bacterial

infection, Jacquet erosive diaper dermatitis, psoriasis, and allergic contact dermatitis – cause

similar diaper-area symptoms. Exhibit 2 at 2, Table 1. Because IDD results from "the combined

influence of moisture, warmth, urine, feces, friction, and secondary infection" and "[i]t is

difficult to completely eradicate these predisposing factors in a diapered child," IDD is "seen in

25% of children wearing diapers." Id. at 1. Thus, all of the Plaintiffs together represent a tiny

fraction of the "millions" of Dry Max users (Complaint, ¶ 153) whose children could be expected

to suffer from IDD even if Dry Max were entirely free of defects.

a.    Whether Individual Class Members Actually Used Dry
Max and For How Long

Plaintiffs will be unable to establish at trial that Dry Max caused the alleged

symptoms unless they can show that they actually used Dry Max. Yet, it is apparent on the face

of the Complaint that, in many cases, whether an individual claimant actually used Pampers with

Dry Max – or used them exclusively when the symptoms allegedly occurred – will be in doubt.

Indeed, several Plaintiffs could allege that they used Dry Max only "on information and belief":

- "Ms. Darscheid had many different types of diapers in her home, including Pampers Swaddlers, having received several diaper packs as baby shower gifts.... [T]he Pampers Swaddlers...on information and belief contained Dry Max...." Complaint, ¶ 24 (emphasis added).

- "Ms. Robins purchased a promotional 20-count package of...Pampers Cruisers with Dry Max for her daughter. At the same time, she purchased a large box of Pampers Cruisers, her regular diaper.... [T]he Pampers Cruisers...on information and belief contained Dry Max...." Id. ¶ 36 (emphasis added).

- "As Ms. Rosenbaum still had some non-Dry Max Cruisers to use up from her old supply, she used the Dry Max Pampers and the non-Dry Max diapers interchangeably for a time." Id. ¶ 39.

- The Walkers, Ms. Samelson, and Ms. Young purchased and used Pampers, which "on information and belief contained Dry Max...." Id. ¶ 41, 46, 49.

When products are similar in appearance to users, the question of what product each person

actually used is a highly individualized inquiry. In re Welding Fume Prod. Liab. Litig., 245

7

F.R.D. 279, 310 (N.D. Ohio 2007); In re Phenylpropanolamine Prods. Liab. Litig., 208 F.R.D.

625, 631-32 (W.D. Wash. 2002).

       In addition, the duration of use varied widely.  Some Plaintiffs used Pampers with

Dry Max for as little as two days:

- The Weavers used a total of two Dry Max diapers over the course of two days. Complaint, ¶ 47.)
- Ms. Beck used Dry Max Pampers for two days.  Id. ¶ 15.

Others allegedly used Pampers with Dry Max for several months.

- Ms. Rosenbaum purchased Pampers with Dry Max in the fall of 2009 and continued using them until April 30, 2010.  Id. ¶ 39.
- Ms. Young used Pampers with Dry Max from January 2010, at the latest, until May 2010.  Id. ¶ 49.

In mass tort cases, courts routinely find that variations in the extent of exposure raise individual

issues precluding class certification.  Taylor v. CSX Transp., Inc., 264 F.R.D. 281, 294 (N.D.

Ohio 2007) ("individual issues," including "length of exposure," "not only predominate, but

overwhelm the common questions"); Welding Fume, 245 F.R.D. at 310, 311 (class certification

denied where the risk of injury depended on "the *degree* of exposure") (emphasis in original);

Snow v. Atofina Chems., Inc., No. 01-72648, 2003 U.S. Dist. LEXIS 27295, at *29 (E.D. Mich.

Mar. 31, 2003) (class certification denied where "each claim of personal injury will require

individual proofs regarding: duration and level of exposure..."); Newton v. So. Wood Piedmont

Co., 163 F.R.D. 625, 633 (S.D. Ga. 1995) ("each putative class member has allegedly been

exposed in a manner that is plaintiff-specific....  As a result, the proposed class lacks the requisite

degree of commonality...").

       b.    Medical Conditions of Class Members' Children

       It is apparent on the face of the Complaint that several of the Plaintiffs' children

suffered from various medical conditions, affecting the likelihood that something other than a

defect in Pampers with Dry Max caused the alleged symptoms.  For example:

- Two of the Plaintiffs' children were born prematurely.  Complaint, ¶ 15 ("Ms. Beck's daughter was born prematurely, and spent several weeks in the Neonatal Intensive Care Unit..."); id. ¶ 29 (Ms. Maloon's daughter "was born prematurely...").  A medical article cited in the Complaint confirms a "clinically significant difference between the skin of a premature and term infant...." Exhibit 4 (E.C. Siegfried, M.D., "Neonatal Skin and Skin Care," 16 Pediatric Dermatology, No. 3 at 437) (cited in Complaint, ¶ 60, nn.16, 17).  In premature infants, "[d]esiccated skin is even more easily injured, providing a portal of entry for invading microbes and increasing the risk of disseminated infection." Id.

- Ms. Schank's daughter was treated with "an antibiotic for an unrelated case of Strep Throat"; later tests on her diaper area symptoms "confirmed a positive result for MRSA" – Methicillin-resistant Staphylococcus aureus.  Complaint, ¶ 42. "Staphylococcus aureus...infections are associated with IDD." Exhibit 2 at 2. MRSA is often contracted in a hospital setting, see Napier, 2008 U.S. Dist. LEXIS 14524, at *8 (referring to "recent epidemic of MRSA in...hospitals..."); "Ms. Schank is currently a nursing student...."  Complaint, ¶ 42.

- Ms. Rios's daughter evidently had other skin problems; she was taken to a dermatologist for a purportedly "unrelated appointment." Id. ¶ 35.

- Mses. Robison, Rosenbaum, and Tepper's children had suffered from diaper rash before they used Pampers with Dry Max. Id. ¶¶ 38, 39, 45.

Where medical conditions affecting individual plaintiffs materially impact proof of causation, the class cannot be certified. Taylor, 264 F.R.D. at 294 ("issues of causation...will necessitate discussion of Plaintiffs' different medical history, family history,...risk factors....  [V]iewed together [these issues] not only predominate, but overwhelm the common questions..."); Snow, 2003 U.S. Dist. LEXIS 27295, at *25 ("prior medical histories may mean that certain individuals are more susceptible than others to future medical injuries"); Rezulin, 210 F.R.D. at 66 ("whether Rezulin caused physical injury to a specific class member will depend on his or her unique characteristics such as family and medical background [and] preexisting medical conditions...").

c.     Treatment and Diagnoses of Alleged Symptoms

According to the Complaint, many Plaintiffs administered various medications at about the same time as they ceased using Pampers with Dry Max, before the symptoms receded. On their face, such allegations raise individual issues of causation – i.e., whether the symptoms

9

in each case responded to the change in diaper brands or to the medication. For example:

- "The doctor prescribed Nystatin [a treatment for yeast infections (Complaint, ¶¶ 12, 42, 48)] and an antibiotic for the twins' severe rashes.... After this appointment, Ms. Ayers-Porter...switched to another brand of diapers." Id. ¶ 13.

- "The doctor diagnosed the baby with a staph infection and prescribed Mupirocin.... The Walkers discontinued use of the Dry Max Pampers that day...." Id. ¶ 46.

- "Dr. Katona took the baby to see his pediatrician, who prescribed a stronger hydrocortisone cream, Nystatin, and another prescription cream. That evening, while her husband was filling the prescriptions...Dr. Katona had the sudden realization that it could be the diaper causing the baby's rash.... That night, the baby was dressed in [a] non-Pampers brand diaper[]. Id. ¶ 28.

- "On or about May 6, 2010, Ms. Maloon switched to another brand of diapers. At this point, the rash was able to start healing with the help of medical treatment.... [On May 7, a] doctor prescribed Silver Sulfadiazine.... [On May 13, the doctor] prescribed a compound of zinc oxide ointment, Maalox, hydrocortisone cream, and Nystatin Cream.... [T]he rash and sores finally resolved on or about June 2, 2010." Id. ¶ 29 (emphasis added).

- On April 29, 2010, "Ms. Robins discontinued use of all Pampers-brand diapers.... On May 6,...her daughter's rash had only slightly healed.... [T]he doctor prescribed prednisone, a higher strength cortisone cream, and zinc oxide.... By May 14 or 15, 2010, the baby's skin was healed.... Id. ¶ 36.

In the aggregate, Plaintiffs used dozens of different treatments in various combinations at various points in the progression of the alleged symptoms.[1] A determination as to whether the resolution of the symptoms alleged by each Plaintiff can be attributed to a change in the type of diaper, as opposed to medical treatments, depends on individual issues – e.g., the particular symptoms, when they receded, the specific treatments, and when they were administered. Taylor, 264

---

[1] The treatments included, inter alia, A&D ointment (Complaint, ¶¶ 11, 28, 36, 46), amoxicillin (id. ¶ 43), Aquaphor (id. ¶¶ 34, 45), Bacitracin (id. ¶¶ 36, 44), Bactroban (id. ¶ 27), Balmex (id. ¶ 24), Benadryl (id. ¶ 34), Boudreaux's Butt Paste (id. ¶¶ 24, 31, 49), Cefdinir antibiotic (id. ¶ 10), Cholestrymen (id. ¶ 21), corn starch (id. ¶ 11, 33), Cortaid (id. ¶ 36), cortisone (id. ¶¶ 17, 29, 48), Critic-Aid (id. ¶ 46), Dermoplast (id. ¶ 23), Desitin (id. ¶¶ 11, 15-17, 22, 31, 48), Diflucan (id. ¶ 42), Lotrimin (id. ¶ 17, 41), Maalox (id. ¶¶ 28, 29), Magic Barrier Cream (id. ¶¶ 21, 42), miconazole nitrate (id. ¶ 37), Monistat (id. ¶ 17), Motrin (id. ¶¶ 46, 49), Mupirocin (id. ¶¶ 29, 31, 46), Mustela (id. ¶ 41), Neosporin (id. ¶¶ 14, 20, 31), Nystatin (id. ¶¶ 12-13, 18, 23-24, 28-29, 42-43), Oxystat (id. ¶ 49), silver sulfadiazine (Silvadene) (id. ¶¶ 11, 29, 42), Triple Paste (id. ¶¶ 22, 33, 41), Vusion (id. ¶ 17), zinc oxide (id. ¶¶ 19, 20, 29, 37).

F.R.D. at 294 ("issues of causation [including] symptoms and treatment...not only predominate, but overwhelm the common questions Plaintiffs seek to certify").

Furthermore, the Complaint alleges that most Plaintiffs consulted doctors regarding their children's symptoms and, in several cases, those doctors rendered diagnoses unrelated to any alleged defect in Pampers with Dry Max. For example:

- Mses. Atwood, Robins, Schank, Wolfe and Young's doctors suspected yeast infections. Complaint, ¶¶ 12, 36, 42, 48, 49.
- The Walker's doctor diagnosed their child with a staph infection. Id. ¶¶ 46.
- Mses. Adams, Darscheid, and Robins's doctors suspected allergic reactions. Id. ¶¶ 11, 24, 36.
- Ms. Raether's doctor diagnosed her child with eczema. Id. ¶¶ 34.
- Mses. Rio and Tepper's doctors diagnosed their children with diaper rash. Id. ¶¶ 35, 45.

These diagnoses would be individual to each Plaintiff and highly probative of causation, precluding a finding that common issues would predominate at trial.

d.    Progression of Alleged Symptoms

Because Plaintiffs rely heavily on an alleged "correlation" between their use of Pampers with Dry Max and their children's symptoms, the degree to which the initial use of Dry Max coincided in time with the onset of symptoms is critically important. The allegations of the Complaint show, however, that the time it took for symptoms to develop differed dramatically from one Plaintiff to the next. In some cases, symptoms developed within a few hours:

- "After using just one of the Dry Max Pampers, Ms. Beck's daughter developed a severe rash...." Complaint, ¶ 15.
- "Less than two hours after she used the first Dry Max Pampers, [Ms. Ehrhart] noticed a rash was developing on her son's diaper area." Id. ¶ 25.
- "Within three hours of Ms. Weaver's first use of the Dry Max Pampers,...she noticed that blisters had started to form on her son's thighs...." Id. ¶ 47.

In other cases, symptoms did not develop for several days:

11

- "Within a week after starting to use [Pampers with Dry Max], the Davenports noticed that their son was developing a...rash in his diaper area." Id. ¶ 23.

- Ms. Tepper began using Pampers with Dry Max "on or about May 23.... [O]n or about May 27, her son's entire diaper area...became extremely sensitive to the touch but there were no visible skin eruptions." Id. ¶ 45.

- "Within three or four days of Ms. Beach's first use of the Dry Max Pampers, her son suddenly developed a red, blistering, oozing, bleeding rash...." Id. ¶ 14.

Equally important to Plaintiffs' "correlation" theory is the time it took for the symptoms to resolve after they stopped using Dry Max diapers. Again, this time period varied dramatically. In some cases, the symptoms were completely resolved in one or two days:

- "Within 24 hours of her last use of the Dry Max Pampers, Ms. D'Andrea observed that the bright red rash was almost completely gone." Complaint, ¶ 22.

- "Within 24 hours after they stopped using the Pampers Cruisers, [the Davenports] noticed an improvement in their son's symptoms.... Within 48 hours, their son's rash had completely cleared." Id. ¶ 23.

In other cases, the symptoms persisted for many weeks:

- After Mr. Maue and Ms. York discontinued the use of Pampers with Dry Max, "[t]heir daughter continued to experience the severe rash.... For approximately six more weeks, their daughter bore a small open wound in the area that experienced the severe blistering rash." Id. ¶ 30.

- After the Wolfes stopped using Dry Max Pampers, "it took approximately four weeks before the open sores had healed...." Id. ¶ 48.

Such dramatic differences in the progression of the alleged symptoms preclude class certification. Jones v. Allercare, Inc., 203 F.R.D. 290, 301-02 (N.D. Ohio 2001) (class certification denied where the "severity and duration [of plaintiffs' symptoms were] not typical of the symptoms of the proposed class members").

e.    Frequency of Diaper Changes

According to the Complaint, Plaintiffs changed their children's diapers with different frequency and altered the frequency of changes:

- Ms. Adams changed her son's diaper "multiple times an hour." Complaint, ¶ 11.

- Ms. Davenport "increased the frequency of diaper changes, eventually changing diapers every 15 to 20 minutes...." Id. ¶ 23.

- The Walkers' daughter's changes were "about two hours apart." Id. ¶ 46.

A "severe presentation of IDD typically occurs in the context of...infrequent diaper changes...." Exhibit 2 at 2. This is another individual issue that materially affects each putative class member's ability to prove causation and would dominate any class-wide trial.

f.    Diet

The diet of each Plaintiff's child, because it affects the characteristics of urine and feces and could trigger allergic reactions, is an individual issue that would significantly affect proof of causation at trial. (See, e.g., Exhibit 2 at 1-2 (chemistry of urine and feces is one of four "key factors" that contribute to diaper dermatitis); Exhibit 5 (Pigatto, Paolo, et al., "Contact Dermatitis in Children," 36 Italian Journal of Pediatrics 2, at 2 (2010) (cited in Complaint, ¶ 4, n.3) (perianal dermatitis can be caused by "undigested food particles that cause mechanical irritation during defecation"). The Complaint acknowledges the possible role of diet in causing the alleged symptoms and indicates that the Plaintiffs' children had different diets:

- Ms. Darscheid's and Ms. MaLoon's doctors instructed them to alter their diets in case allergens were being passed to their infants via breast-milk. Complaint, ¶¶ 24, 29.)
- Ms. Brown was concerned that her daughter's alleged symptoms were caused by the introduction of a "new food." Id. ¶ 19.
- Ms. Adams tried four different milk formulas while her son was experiencing the alleged symptoms. Id. ¶ 11.
- Ms. Hironimus' son's diet consisted of "formula, water, and certain fruits and vegetables." Id. ¶ 26.
- Ms. Saacks' daughter ate "rice and lentils." Id. ¶ 40.

Diet has been found, in products liability cases, to be an individual issue that precludes class certification. Gartin v. S&M Nutec LLC, 245 F.R.D. 429, 434, 436 (C.D. Cal. 2007) (denying class certification where individualized issues of fact predominated because gastrointestinal health and diet directly affected causation); Ball v. Union Carbide Corp., 212 F.R.D. 380, 391

(E.D. Tenn. 2002) (individualized issues of fact predominated because dietary habits were directly related to exposure to toxins), aff'd 376 F.3d 554 (6th Cir. 2004).

g.    Age

The Complaint indicates that the ages of Plaintiffs' children varied widely. Mr. Maue and Mses. York and Young's children were newborns when they used Pampers with Dry Max. Complaint, ¶¶ 30, 49. At the other extreme, both the Bermans and Mr. Hulse had a child who was approximately three years old at the time of the Complaint. Id. ¶¶ 16, 27. Courts have found that differences in age among plaintiffs raise individual issues in product liability cases. See, e.g., Reilly, 965 F. Supp. at 604 (denying certification where "the extent and tolerance of...exposure [to lead] will vary, depending on the age and sex of the party"); Rezulin, 210 F.R.D. at 66 ("whether Rezulin caused physical injury to a specific class member will depend on his or her unique characteristics such as...age...").

h.    Exposure To Media Reports About Dry Max

Because proof of causation will depend heavily on Plaintiffs' perception, recollection, and interpretation of events, whether they were exposed to – and the extent to which they were influenced by – media or social media reports regarding Pampers with Dry Max will be an important issue. The extent and impact of any such exposure would vary with each individual Plaintiff. For example, several Plaintiffs allegedly stopped using Dry Max as a direct result of such reports. Complaint, ¶¶ 15, 16, 17, 23, 24, 27, 34, 35, 39, 40, 42. Mses. Converse, McAllister, Robinson and York, however, stopped using Dry Max before they became aware of such reports. Id. ¶¶ 21, 30, 31, 37.

These and other individual issues materially affect each class member's ability to prove causation and would dominate any class-wide trial, precluding certification.

14

2.    Differences Among Class Members As To Reliance

In support of some of their claims, Plaintiffs expressly allege that they relied on Procter & Gamble's representations about Dry Max in buying that product. E.g., Complaint, ¶¶ 204, 214, 237. Reliance, however, is an inherently individual issue, requiring the Court to inquire what advertisements or other statements each claimant saw, if any, and whether that information influenced that claimant's decision to purchase the product. Sprague v. GMC, 133 F.3d 388, 398 (6th Cir. 1998) (reversing class certification in case involving retirement benefits in part because "Some early retirees might have relied on GM's statements about health care benefits, while for others the statements might have made no difference at all"). Here, it is apparent on the face of the Complaint that some Plaintiffs would have used Pampers with Dry Max regardless of any representations by Procter & Gamble about Dry Max. Several Plaintiffs, for example, were "loyal" Pampers users who purchased Dry Max diapers based on their prior experience with non-Dry Max Pampers:

- "[The Davenports] were loyal Pampers customers, having used Pampers diapers with both of their children since birth without any problems." Complaint, ¶ 23.
- Mses. Beach, Converse, and Saacks were "loyal Pampers mom[s]"; Mses. Robins and Schank were "loyal Pampers users"; and "Ms. Braun was a regular user of Pampers brand diapers." Id. ¶¶ 14, 18, 21, 36, 40, 42.
- "Dr. Katona was a regular user of Pampers brand diapers, having used them for her three-year-old daughter from her birth through toilet training.... In her medical practice, Dr. Katona regularly recommended that parents use Pampers products on their children." Id. ¶ 28.

Other Plaintiffs received diapers from the hospitals where their children were born:

- "At the time the baby was discharged..., Ms. Beck was given a package of Pampers Swaddlers with Dry Max...." Id. ¶ 15.
- "[Mr. Maue and Ms. York] continued using the Dry Max Pampers that had been used in the hospital...." Id. ¶ 30.
- "[Ms McAllister] received...Pampers Swaddlers with Dry Max for her daughter from Rex Hospital..., where her daughter was born." Id. ¶ 31.

15

Thus, instead of being a common issue, reliance would be subject to individualized proof with respect to each putative class member, precluding class certification. Sprague, 133 F.3d at 398; In re Prempro Prods. Liab. Litig., 230 F.R.D. 555, 567 (E.D. Ark. 2006) ("Whether a plaintiff saw an advertisement [and]...whether that plaintiff relied on the advertisements...are all individual questions of fact"); In re Paxil Litig., 212 F.R.D. 539, 548 (C.D. Cal. 2003) ("some of those patients may have ingested Paxil...before the advertisements at issue were aired or may have never seen the advertisements.... [T]he Court has significant doubts with respect to Plaintiffs' ability to show reliance, other than on a tedious case by case basis").

B.    Differences In State Law Preclude Class Certification

Because the putative classes include residents of every state, most of which were injured in their home state, adjudicating this case as a class action would require application of 51 different states' statutory and common law. A federal court exercising diversity jurisdiction – which Plaintiffs invoke with regard to all but one (Count 2) of the 45 counts of the Complaint – must apply the choice of law rules of the forum state. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487 (1941). "Under Ohio law, in a tort case such as the one pled herein, the law of the state in which the … injury occurred usually controls...." Pilgrim, 2010 U.S. Dist. LEXIS 28298, at *7; Muncie Power Prods. v. United Techs. Auto., Inc., 328 F.3d 870, 873 (6th Cir. 2003).

In products liability cases, the need to apply differing state laws to each class member precludes class certification. In AMS, 75 F.3d at 1085, the Sixth Circuit decertified a class in a products liability case, ruling "If more than a few of the laws of the fifty states differ, the district judge would face an impossible task of instructing a jury on the relevant law." Jones v. Allercare, 203 F.R.D. at 304 (denying class certification in products liability context in part because of differences in state law); Baycol, 218 F.R.D. at 208 ("Differences in state law, no matter how slight, are important and must be determined prior to certification because such

16

differences 'may swamp any common issues and defeat predominance'") (citation omitted).

       1.      The Nationwide Class Cannot Be Certified

      Differences among the states' laws of negligence, strict liability, unjust

enrichment, and breach of warranty preclude certification of the putative nationwide class.

Counts 1, 3, 30, 31.  As to negligence, in AMS, the Sixth Circuit held that the district court

abused its discretion in certifying a nationwide class because it "failed to consider how the law of

negligence differs from jurisdiction to jurisdiction...."  75 F.3d at 1085.  The Court of Appeals

quoted In re Rhone-Poulenc Rorer, Inc., 51 F.3d 1293, 1300-01 (7th Cir. 1995), in which the

Seventh Circuit held:

> "The law of negligence, including subsidiary concepts such as duty of care,
> foreseeability, and proximate clause, may...differ among the states only in
> nuance,...[b]ut nuance can be important, and its significance is suggested by a
> comparison of differing state pattern instructions on negligence and differing
> judicial formulations of the meaning of negligence and the subordinate
> concepts.... [Citing numerous cases.]...[T]he states of the United States sing
> negligence with a different pitch."

Id. at 1300-01 (citing "differing state views on the role of industry practice or custom in

determining the existence of negligence"); Duncan v. Northwest Airlines, Inc., 203 F.R.D. 601,

613-14 (W.D. Wash. 2001) ("the laws of negligence...differ from state to state and often remain

ambiguous...."; citing "the various schemes...for allocating comparative fault").

      Differences in the states' laws regarding strict liability also preclude certification

of a nationwide class.  Ilhardt v. A.O. Smith Corp., 168 F.R.D. 613, 620 (S.D. Ohio 1996)

(adjudication of the case would require applying "the varying and inconsistent laws of more than

40 states concerning what constitutes a product defect under strict products liability").  Some

jurisdictions do not recognize strict liability.  E.g., Sellon v. GM Corp., 571 F. Supp. 1094, 1102

(D. Del. 1983) ("Delaware state...decisions have unanimously declined to recognize a cause of

action in strict tort liability..."); North Carolina Gen. Stat. § 99B-1.1 ("There shall be no strict

liability in tort in product liability actions"); <u>Sensenbrenner v. Rust, Orling & Neale</u>, 374 S.E.2d 55, 57 n.4 (Va. 1988) ("Virginia law... does not permit tort recovery on a strict-liability theory in products-liability cases"). The fact that many class members would not even have a strict liability claim precludes a finding that common issues predominate.

Moreover, as further discussed in Defendants' Motion to Dismiss the Consolidated Class Action Complaint filed concurrently herewith ("MTD"), some jurisdictions have abrogated common law negligence and strict liability claims in favor of statutory causes of action (MTD, pp. 26-27), rendering nationwide negligence or strict liability classes are inappropriate. <u>E.g.</u>, Ohio Rev. Code Ann. § 2307.71(B) (the Ohio Products Liability Act ["OPLA"] is "intended to abrogate all common law product liability claims or causes of action"); Conn. Gen. Stat. § 52-572n(a) (Connecticut Product Liability Act claims must be asserted "in lieu of all other claims...including actions of negligence, strict liability and warranty, for harm caused by a product"); La. Rev. Stat. Ann. § 9:2800.52 (Louisiana Products Liability Act "establishes the exclusive theories of liability for manufacturers for damage caused by their products"). Putative class members from such jurisdictions would be ineligible to assert these common law claims, precluding a finding that questions of negligence and strict liability are common to the entire class.

Differences in various states' law of unjust enrichment similarly preclude a finding that common issues predominate:

> "The actual definition of "unjust enrichment" varies from state to state. Some states do not specify the misconduct necessary to proceed, while others require that the misconduct include dishonesty or fraud.... Other states only allow a claim of unjust enrichment when no adequate legal remedy exists.... Many states, but not all, permit an equitable defense of unclean hands.... [T]he claim of unjust enrichment is packed with individual issues and would be unmanageable."

Clay v. Am. Tobacco Co., 188 F.R.D. 483, 501 (S.D. Ill. 1999) (citations omitted); see Prempro, 230 F.R.D. at 563 ("A review of the unjust enrichment...claims reveals that these laws cannot reasonably be grouped in a comprehensive manner that does not seriously impinge on the integrity of the law of each state").  Procter & Gamble's Motion to Dismiss identifies several defenses to unjust enrichment claims available in particular states but not common to all members of the putative nationwide class.  MTD, pp. 28-29.

Nor can a nationwide class action for breach of warranty be certified, due to variations in states' laws regarding formation and breach of implied warranties.  Szabo v. Bridgeport Machs., Inc., 249 F.3d 672, 674 (7th Cir. 2001) (variations in state law "account for the fact that few warranty cases ever have been certified as class actions – let alone as nationwide classes, with the additional choice-of-law problems that complicate such a venture"); Foster v. St. Jude Med. Inc., 229 F.R.D. 599, 605 (D. Minn. 2005) ("The application of the laws of the fifty states makes class treatment of [negligence, implied warranty, express warranty, and strict liability] claims unwarranted"); Walsh v. Ford Motor Co., 807 F.2d 1000, 1016-17 (D.C. Cir. 1986) ("The Uniform Commercial Code is not uniform").  As shown in Procter & Gamble's Motion to Dismiss, some putative class members will be subject to defenses unique to their states' warranty laws, such as lack of notice or privity.  MTD, pp. 15-17, App. A, B.

Because the Magnuson-Moss Warranty Act incorporates state law regarding the existence and breach of a warranty, differences in states' breach of warranty laws would also lead to differing application of that Act.  15 U.S.C. § 2301(7) (defining "implied warranty" as "an implied warranty arising under State law"); Walsh, 807 F.2d at 1016 (nationwide class certification of a Magnuson-Moss claim may be improper due to divergences in states' laws regarding breach of warranty) (class certification denied upon remand, see Aird v. Ford Motor

Co., 86 F.3d 216, 218 (D.C. Cir. 1996)); In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.,

174 F.R.D. 332, 350-51 (D.N.J. 1997) (denying class certification of a Magnuson-Moss claim

due in part to differences in states breach of warranty laws); Barbarin v. GM Corp., No. 84-0888,

1993 U.S. Dist. LEXIS 20980, at *10 (D.D.C. Sept. 22, 1993) (denying class certification of a

Magnuson-Moss claim on predominance grounds due in part to "the vagaries of the law of

warranties of the several states").

2.    The Multistate Class Cannot Be Certified

Plaintiffs' claims under the Ohio Consumer Sales Practices Act (the "OCSPA")

and the OPLA (Counts 23 and 41) on behalf of the putative "Multistate Class" – which includes

the residents of 26 states (Complaint, ¶ 151(BB)) – cannot be certified.  As shown above, the

claims of those states' residents are governed by the laws of the jurisdictions where their injuries

allegedly occurred, not Ohio law.  Pilgrim, 2010 U.S. Dist. LEXIS 28298, at *8 (plaintiffs'

"position that Ohio law [the OCSPA] should govern all the claims in this action" on behalf of a

nationwide class "is untenable").  Indeed, out-of state class members would lack standing under

the OCSPA and the OPLA.  Loreto v. The Procter & Gamble Co., No. 1:09-cv-815, 2010 U.S.

Dist. LEXIS 91699, at *17 (S.D. Ohio Sept. 3, 2010) (out-of-state plaintiffs in products liability

case "have no standing to pursue claims under the OCSPA..."); Delahunt v. Cytodyne Techs.,

241 F. Supp. 2d 827, 839 (S.D. Ohio 2003) ("[OSCPA] claims asserted on behalf of proposed

class members whose purchase of [the product] did not take place in Ohio are barred...").

Variations in states' consumer protection acts would cause individual issues to

predominate.  Zapka, 2000 U.S. Dist. LEXIS 16552, at *12-13 ("The differences in the required

proofs of the states[' consumer protection] statutes demonstrate that a nationwide certification

would not be manageable because of the multiple and different variables that would have to be

proved as to each class member"); Prempro, 230 F.R.D. at 563 ("A review of the...consumer

20

fraud/unfair competition claims reveals that these laws cannot reasonably be grouped in a comprehensive manner that does not seriously impinge on the integrity of the law of each state"); In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig., 288 F.3d 1012, 1018 (7th Cir. 2002) ("State consumer-protection laws vary considerably, and courts must respect these differences rather than apply one state's law to sales in other states with different rules").

Indeed, the Complaint reflects significant differences among the states' consumer protection statutes. The allegations regarding 26 such statutes (Counts 4 though 29, Complaint, ¶¶ 195-531), which span 53 pages and over 300 paragraphs, *recite different elements from state to state as required by each state's statute*. For example, Plaintiffs allege individual reliance as an element of claims under some consumer protection acts (Complaint, ¶¶ 204, 214, 237, 259, 283, 309, 321, 381, 394, 427, 448, 464, 480, 502, 518) but not under other statutes. (See Counts 7, 9, 11, 14-17, 20, 22, 26, 29.) Moreover, some members of the putative Multistate Class would be subject to the unique defense that their state's statute prohibits class actions – e.g., Ga. Code Ann. § 10-1-399(a) (authorizing "an action individually, but not in a representative capacity"), La. Rev. Stat. Ann. 51:1409(A) (same), Alaska Stat. § 45.50.531 (repealing provision that had allowed class actions). MTD, pp. 24-25. Again, putative class members from some (but not all) states may be subject to a notice requirement. Id., pp. 21-23.

The differences among the various jurisdictions' products liability statutes also preclude certification of the Multistate Class. Again, Plaintiffs' Consolidated Complaint illustrates the significant differences among the states' product liability statutes. See Counts 32 though 45, Complaint, ¶¶ 555-720. For example:

- Plaintiffs have alleged defects in different ways to accommodate the different elements of a defect required by the various products liability statutes. Compare Complaint, ¶¶ 570, 594, 664 with ¶ 638 and ¶ 708.

- Plaintiffs have alleged that the product posed a non-obvious risk as an element of some product liability act Counts.  Complaint, ¶¶ 562, 571, 595, 639, 651, 665, 709.  Under other products liability acts, Plaintiffs have made no such allegation. See Counts 34, 36, 37, 38, 42, 43, 44.

There is no reason to believe that the statutes governing the claims of Multistate Class members would be any more uniform than those specifically identified by Plaintiffs.  For example, the products liability laws of some states included in the Multistate Class provide for the complete defense of contributory negligence – e.g., Maryland (see Ellsworth v. Sherne Lingerie, Inc., 495 A.2d 348, 357 (Md. 1985) ("A plaintiff in a products liability case may plead alternative causes of action, and if the plaintiff alleges negligence in addition to strict liability, a defendant may be entitled to instructions on contributory negligence, assumption of risk, and misuse.")); Virginia (Jones v. Meat Packers Equip. Co., 723 F.2d 370, 373 (4th Cir. 1983) (in products liability context, "[i]n Virginia, contributory negligence is a complete bar to an action based on negligence."))  Other states' product liability statutes apply various comparative negligence rules – e.g., Alaska Stat. § 09.17.060 (pure comparative negligence); N.D. Cent. Code § 32-03.2-02 (recovery permitted only if plaintiff's fault is not "as great as the combined fault of all other persons"); Wyo. Stat. Ann. § 1-1-109(b) (recovery permitted only if plaintiff's fault is "not more than fifty percent (50%) of the total fault of all actors").

III.       THIS CASE WOULD NOT BE MANAGEABLE AS A CLASS ACTION

Plaintiffs' effort to overcome the problems arising from differences among various states' laws by alleging 26 single-state classes is futile because such a case would be unmanageable: the jury, for example, would have to be instructed on the consumer protection and products liability laws of 26 states; a special verdict form could be over 100 pages long.  Under Rule 23(b)(3), Plaintiffs must establish that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy," which "requires the Court to determine whether the class action is manageable."  Baycol, 218 F.R.D. at 206, 209.  Courts

consistently hold that multiple subclasses render a case unmanageable. Prempro, 230 F.R.D.

at 565 ("While a multitude of subgroups might solve the variation of laws problem, it would lead

to monumental case management problems"); Ford Ignition, 174 F.R.D. at 342 ("if the court

were to certify the proposed nationwide...class in this case, it would be compelled to establish

countless subclasses taking into account...differences in state law..., thereby rendering this case

unmanageable..."); Paxil 212 F.R.D. at 545 (adding subclasses to overcome differences among

states' laws may "undermine whatever benefits class certification might otherwise provide").

       Moreover, individual factual issues, as well as differences in state law, render the

case unmanageable. Reilly, 965 F. Supp. at 605 ("because of the potential inability to manage

the class, and because each plaintiff's claim must be given individual attention, class status is not

the superior method of litigation"); Chamberlain v. Am. Tobacco Co., No. 1:96 CV 2005, 1999

U.S. Dist. LEXIS 5843,*52 (N.D. Ohio Apr. 12, 1999) (superiority requirement not met because

"numerous individual issues" created "obvious manageability problems"); Bridgestone, 288 F.3d

at 1018 ("Because these [product liability] claims must be adjudicated under the law of so many

jurisdictions, a single nationwide class is not manageable. Lest we soon see a Rule 23(f) petition

to review the certification of 50 state classes, we add that this litigation is not manageable as a

class action even on a statewide basis").

IV.       PLAINTIFFS ARE NOT TYPICAL OF OR ADEQUATE TO REPRESENT
           MEMBERS OF THE PUTATIVE CLASSES

       Given the multitude of individual issues that every claimant must address to prove

his or her claim, Plaintiffs cannot satisfy the requirement of Rule 23(a)(3), that "the claims or

defenses of the representative parties are typical of the claims or defenses of the class." Courts

routinely find that, "where plaintiffs' claims depend on individual facts, the typicality

requirement is not met." Jones v. Allercare, 203 F.R.D. at 301; Welding Fumes, 245 F.R.D.

at 308 ("under the typicality prong, a court must ask whether...each class member's claim involves so many distinct factual or legal questions as to make class certification inappropriate"); Reilly, 965 F. Supp. at 600 (typicality requirement not met because "factual disparity" among plaintiffs turned the case into "a hodge-podge of factually and legally different issues dispersed among different plaintiffs").

Nor can Plaintiffs meet the requirement under Rule 23(a)(4) that "the representative parties will fairly and adequately protect the interests of the class" because "in the absence of typical claims, the class representative has no incentives to pursue the claims of the other class members. AMS, 75 F.3d at 1083; Jones v. Allercare, 203 F.R.D. at 302 ("typicality is subsumed in the adequacy of representation.... As stated above, plaintiffs' claims are not typical of the class. Therefore, plaintiffs cannot adequately represent the class"); Paxil, 212 F.R.D. at 549-50 (individualized need to prove actual causation defeats typicality and renders named plaintiffs inadequate to represent absent plaintiffs); Reilly, 965 F. Supp. at 600 ("Because there is no typicality, we conclude that representativeness is also lacking"). Because Plaintiffs' cannot meet the typicality and adequacy requirements of Rule 23(a), no class can be certified.

V.      PLAINTIFFS' PROPOSED CLASS CANNOT BE CERTIFIED UNDER RULE 23(B)(1)

As an alternative to Rule 23(b)(3), Plaintiffs assert that "class certification is proper under Fed. R. Civ. P. 23(b)(1)(A)." Complaint, ¶ 160. The Sixth Circuit, however, has rejected class certification under Rule 23(b)(1)(A), which addresses the risk of "inconsistent or varying adjudications...that would establish incompatible standards of conduct for the defendant," in products liability cases: "The fact that some plaintiffs may be successful in their suits against a defendant while others may not is clearly not a ground for invoking Rule 23(b)(1)(A)...[C]lass certification...therefore cannot stand on this ground." In re Bendectin

Prods. Liab. Litig., 749 F.2d 300, 305 (6th Cir. 1984) (citing, inter alia, McDonnell Douglas

Corp. v. Dist. Court, 523 F.2d 1083, 1086 (9th Cir. 1975)). This Court has held that Rule

23(b)(1)(A) requires "more than the mere possibility that inconsistent judgments and resolutions

of identical questions of law would result if numerous actions are held instead of one class

action." Alexander Grant & Co. v. McAlister, 116 F.R.D. 583, 589 (S.D. Ohio 1987); Bacon v.

Honda of Am. Mfg., 205 F.R.D. 466, 483 (S.D. Ohio 2001) (denying class certification under

Rule 23(b)(1)(A)).

    Plaintiffs' assertion that "[c]lass certification is proper under Fed. R. Civ. P.

23(b)(1)(B)" (Complaint, ¶ 161) is also easily dismissed. The U.S. Supreme Court has narrowed

the scope of Rule 23(b)(1)(B) to "limited fund" cases characterized by "the inadequacy of the

fund [available for satisfying claims] to pay all the claims." Ortiz v. Fibreboard Corp., 527 U.S.

815, 838 (1999). Following Ortiz, the Sixth Circuit has rejected class certification under

Rule 23(b)(1)(B) in the products liability context, expressing grave doubt that certification under

the Rule could ever be appropriate in the context of a mass tort. In re Telectronics Pacing Sys.,

221 F.3d 870, 877-78, 881 (6th Cir. 2000). The mere fact that a company has limited funds is

not enough to justify a class action under Rule 23(b)(1)(B). Id. at 880. In any event, the

suggestion that Procter & Gamble, one of the largest corporations on the planet with annual

revenues in excess of $70 billion, lacks sufficient funds to pay claims for cases of alleged diaper

rash – none of which appears to have resulted in any permanent injury – is ludicrous.

VI.   CONCLUSION

    For the foregoing reasons, the class allegations should be stricken from the

Complaint, without leave to replead.

Respectfully submitted,

OF COUNSEL:

Robert F. Ruyak (*pro hac vice pending*)
Edward Han (*pro hac vice pending*)
HOWREY LLP
1299 Pennsylvania Avenue, N.W.
Washington, DC 20004
Telephone: (202) 783-0800
Telecopier: (202) 383-6610

Joanne E. Caruso (*pro hac vice pending*)
HOWREY LLP
550 South Hope St.
Suite 1100
Los Angeles, CA 90071
Telephone: (213) 892-1800
Telecopier: (213) 892-2300

s/ D. Jeffrey Ireland
D. Jeffrey Ireland (0010443)
   Trial Attorney
Brian D. Wright (0075359)
Bruke H. Sullivan (0082765)
FARUKI IRELAND & COX P.L.L.
500 Courthouse Plaza, S.W.
10 North Ludlow Street
Dayton, OH 45402
Telephone: (937) 227-3710
Telecopier: (937) 227-3749
Email: djireland@ficlaw.com

Attorneys for Defendants
The Procter & Gamble Company,
The Procter & Gamble Paper Products
Company and The Procter & Gamble
Distributing LLC

## CERTIFICATE OF SERVICE

I certify that on the 20th day of October, 2010, I electronically filed the foregoing Motion of Defendants The Procter & Gamble Company, The Procter & Gamble Paper Products Company and The Procter & Gamble Distributing LLC to Strike Plaintiffs' Class Allegations with the Clerk of Courts using the CM/ECF system, which will send notification of such filing to CM/ECF participants:

Gary D. Greenwald
Mark D. Samson
KELLER ROHRBACK P.L.C.
3101 North Central Avenue, Suite 1400
Phoenix, AZ  85012

Lynn Lincoln Sarko
Michael D. Woerner
Gretchen Freeman Cappio
Gretchen S. Obrist
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA  98101

David S. Preminger
KELLER ROHRBACK L.L.P.
770 Broadway, 2nd Floor
New York, NY  10003

Interim Lead Counsel for Plaintiffs

Craig W. Hillwig
Christina Donato Saler
Joseph C. Kohn
George S. Croner
KOHN, SWIFT & GRAF, P.C.
One South Broad Street, Suite 2100
Philadelphia, PA  19107

Thomas M. Mullaney
LAW OFFICES OF THOMAS M. MULLANEY
275 Madison Avenue, 37th Floor
New York, NY  10016

Attorneys for Plaintiffs

and I hereby certify that I have mailed by first class U.S. mail, postage prepaid, the document to the non-CM/ECF participants:

Donald S. Varian, Jr.
195 South Main Street, Suite 400
Akron, OH 44308

Todd S. Collins
Neil F. Mara
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103-6365

Gerard V. Mantese
David Honigman
MANTESE, HONIGMAN, ROSSMAN AND WILLIAMSON, P.C.
1361 E. Big Beaver Road
Troy, MI 48083

Daniel E. Gustafson
Karla M. Gluek
Amanda M. Williams
GUSTAFSON GLUEK PLLC
650 Northstar East
608 Second Avenue South
Minneapolis, MN 55402

Richard J. Arsenault
NEBLETT, BEARD & ARSENAULT
2220 Bonaventure Court
PO Box 1190
Alexandria, LA 71309-1190

Nicholas J. Drakulich
THE DRAKULICH FIRM
A Professional Law Corporation
2727 Camino Del Rio South, Suite 322
San Diego, CA 92108

Joseph F. Devereux, Jr.
Joseph F. Devereux III
DEVEREUX MURPHY LLC
The Plaza at Clayton
190 Carondelet, Suite 1100
St. Louis, MO 63105

Dianne M. Nast
RODANAST, P.C.
801 Estelle Drive
Lancaster, PA 17601

David S. Corwin (VIA U.S. MAIL)
SHER CORWIN, LLC
190 Carondelet Plaza, Suite 1100
Clayton, MO 63105

Attorneys for Plaintiffs


s/ D. Jeffrey Ireland
D. Jeffrey Ireland

429862.1

29